IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CHRISTOPHER HOWARD and JEFFREY   Jacksonville, Florida
GREENSTONE,

                              Case No. 5:15-cv-200-Oc-39PRL

        Plaintiffs,

                              August 8, 2016

  vs.

                              9:21 a.m.

SECOND CHANCE JAI ALAI, LLC,

                              Courtroom No. 1A

        Defendant.
_____


BENCH TRIAL PROCEEDINGS
(VOLUME I OF II)
BEFORE THE HONORABLE PHILIP R. LAMMENS
UNITED STATES MAGISTRATE JUDGE


PLAINTIFF'S COUNSEL:

      **MICHAEL O. MASSEY, ESQ.**
      Massey & Duffy, PLLC
      855 East University Avenue
      Gainesville, Florida  32601

DEFENSE COUNSEL:

      **PATRICK G. GILLIGAN, ESQ.**
      Gilligan, Gooding & Franjola, PA
      1531 SE 36th Avenue
      Ocala, Florida  34471


COURT REPORTER:

      Shannon M. Bishop, RDR, CRR
      221 North Hogan Street, #150
      Jacksonville, Florida 32202
      Telephone:  (904)549-1307
      dsmabishop@yahoo.com

      (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE PLAINTIFFS:


**BRIAN MATTHEWS**
Direct Examination................................  39
Cross-Examination................................  49

**JASON BENJAMIN BENDURE**
Direct Examination................................  63
Cross-Examination................................  70
Redirect Examination.............................  88

**JEFFREY GREENSTONE**
Direct Examination................................  96
Cross-Examination................................  99
Redirect Examination............................. 126
Recross-Examination............................. 127

**CHRISTOPHER THOMAS HOWARD**
Direct Examination................................ 128
Cross-Examination................................ 133


WITNESSES FOR THE DEFENDANT:


**VICKI JEAN PERNEK**
Direct Examination................................ 168
Cross-Examination................................ 196

**BRIAN MATTHEWS**
Direct Examination................................ 199
Cross-Examination................................ 223
Redirect Examination............................. 228

E X H I B I T S   R E C E I V E D

<u>Page No.</u>

<u>Plaintiffs' Exhibits:</u>

1, 3, 4, 5, 7, 8, 10, 11, 14, 18, and 20.......... 38

<u>Defendant's Exhibits:</u>

3................................................ 195
4 and 5.......................................... 218
6................................................ 219
7................................................ 220
8................................................ 220
9................................................ 161
10............................................... 122
11, 12, 13, and 14...............................  82
21 and 22........................................  60

1                   P R O C E E D I N G S

2    August 8, 2016                              9:21 a.m.

3                        - - -

4        (Court called to order.)

5             THE COURT:  Please be seated, everyone.

6             All right.  Just give me a minute to get organized up

7    here.

8             All right.  Good morning, everyone.

9             MR. MASSEY:  Good morning.

10            MR. GILLIGAN:  Good morning, Your Honor.

11            THE COURT:  This is Case No. 5:15-cv-200, *Christopher*

12   *Howard and Jeffrey Greenstone, plaintiffs, versus Second Chance*

13   *Jai-Alai, doing business as Ocala Poker and Jai-Alai.*

14            This case is set for a bench trial.  And I'll begin

15   with appearances of counsel and then defendant.

16            MR. MASSEY:  Michael Massey on behalf of the

17   plaintiffs, Your Honor.

18            THE COURT:  And who's with you, Mr. Massey?

19            MR. MASSEY:  Sir, I have Christopher Howard here.

20            THE COURT:  Okay.

21            MR. MASSEY:  And Jeffrey Greenstone behind me.

22            THE COURT:  All right.  And for the defense?

23            MR. GILLIGAN:  Patrick Gilligan.  I have my partner

24   Chris Anderson with me.  I also have my paralegal Kristin

25   Peterson behind me, and Brian Matthews, who is the president of

1  the defendant Ocala Jai-Alai Poker.

2         And he just stepped out.  And it may be the

3  appropriate time to tell you Mr. Bendure, as promised -- I

4  reserved him.  He's here.

5         I'm assuming the rule is going to be exercised.  I

6  don't know when the court wants to do that, but he did just

7  step out.

8         THE COURT:  Okay.  We can do that now.  There are no

9  witnesses, I don't think, in the courtroom.

10        MR. MASSEY:  Yes, sir.  There's no witnesses for us.

11        THE COURT:  All right.

12        MR. GILLIGAN:  I don't know that Mr. Bendure knows

13 where to wait.  And I don't know what order plaintiff plans on

14 calling the witnesses.

15        But if he's maybe later this afternoon, maybe we

16 could let Mr. Bendure go.  And we've got his phone number.  We

17 can call him back and have him here back in an hour.

18        But if he's going to be the first witness, then he

19 probably should wait.  But that's just my -- I don't know what

20 the court's practice is with witnesses.

21        THE COURT:  What do you say?  Wouldn't you want to

22 coordinate with him as to what time you think you're going to

23 need him?

24        MR. MASSEY:  I think he can stay.  We're going to

25 call him fairly early.  Maybe second, I think.  Maybe call him

1    first, but I'm thinking second.

2              THE COURT:  Okay.  Do you want to -- do either one of

3    you want to let him know that?  I'm happy to wait a minute.

4              MR. GILLIGAN:  I'm fine.  I just -- I'd hate for him

5    to wait here until 4 o'clock in the afternoon if he calls a

6    witness.  And I --

7              THE COURT:  Right.

8              MR. GILLIGAN:  That's really my concern.  If he's

9    going to --

10             THE COURT:  Sounds like he'll be on before lunch.

11             MR. MASSEY:  Yes, sir.

12             THE COURT:  Okay.  Well, so y'all can begin with

13   opening statements if you want.  This case has been pretty

14   thoroughly briefed on motions -- on a motion for summary

15   judgment, a motion for reconsideration.  And I do have the

16   benefit of the defendant having submitted a trial brief.

17             But I'll defer to the parties whether you want to

18   make an opening statement or not.

19             MR. MASSEY:  Just very brief, Your Honor.

20             THE COURT:  All right.  Why don't you come to the

21   lectern, Mr. Massey.

22             Are we ready?

23             MR. MASSEY:  Yes, sir.  Thank you, Your Honor.

24             Yes.  Very briefly, two points that I want to

25   highlight about the case, is that the employer bears the burden

1   of proving that they're eligible for a tip credit, including

2   that sufficient notice was provided.

3          So maybe -- unlike in a typical case, where plaintiff

4   may bear those burdens, in this case the burdens rest on the

5   defendant.

6          And then second -- the second issue that I want to

7   just highlight is that that relates to both plaintiffs.  And

8   so, for example, if Mr. Howard was given sufficient oral notice

9   but Mr. Greenstone was not, Mr. Greenstone would prevail.

10          And so the defendant has the burden of proving these

11   elements, including compliance with the applicable regulations

12   as to both of my clients.  And one of my clients may win and

13   one may lose, but they do bear that burden as to each.

14          Thank you, Your Honor.

15          THE COURT:  All right.

16          Mr. Gilligan, you're free to make opening statement,

17   if you like.

18          MR. GILLIGAN:  Thank you, Your Honor.  Good morning.

19          I am going to take a little bit more time than that,

20   because I do think there's things I need to bring to the

21   court's attention.  I think it will be helpful as we develop

22   the evidence.

23          There's three main issues in this case.  And the

24   court is correct, they were addressed in the various motions

25   for summary judgment and the various -- and the motion for

1  reconsideration.

2           But just for organization's sake, I see them as was

3  there a valid notice of the tip credit under the Fair Labor

4  Standards Act; was the -- was there a valid tip pool

5  established, and then there's some subsets of that, in that

6  tippable employees -- typically tippable employees shared in

7  that tip share and they weren't managerial employees.  They

8  were customarily and regularly tipped as tippable employees,

9  not in management.

10          I think the first two issues about whether they were

11  tippable employees and it was a proper tip share -- I think the

12  more difficult issue -- and I'm going to wait and deal with

13  this last -- is the notice issue, or the FLSA.

14          I think the other issues are more fact-driven.

15  Certainly the law tells you what the facts are that have to be

16  driven, but I think they're more fact-driven in this case.

17          And I think the facts are going to clearly show that

18  my client had a valid tip pool, the people that participated in

19  the tip pool were tippable employees and not in management.

20          The valid tip pool at issue is -- here, what are --

21  my clients call -- it's cage department employees.  One of the

22  exhibits in the trial notebook shows the floor schematic of my

23  client's facility.

24          The cage employees are employees that perform various

25  job functions within that department.  And specifically they're

1  chip running, working as tellers, working at a podium, sort of

2  a hostess position.

3          And then some of the more senior cage employees also

4  work in what's called the vault.  But they -- but those

5  employees were the ones that share in the tip share.  And the

6  tip share is ten percent taken from the poker dealers.

7          Now, I think it's important for the court to know --

8  and you'll hear from Mr. Matthews, who's the president of --

9  and I'm going to refer to it, by the way, as Ocala Poker.  They

10 do business as Ocala Poker, but their corporate name, I think,

11 Ocala, Jai-Alai -- Second Chance Jai-Alai, LLC, but they do

12 business as Ocala Poker so I'm going to refer to them as Ocala

13 Poker.  I think everybody refers to them as Ocala Poker.

14         He will explain to you that that facility is a

15 pari-mutuel facility under Florida law.  And they actually

16 do more than poker.  They have a Jai-Alai -- they run Jai-Alai

17 for a certain portion of the year.  They have Inter-track

18 Wagering.

19         And then sort of as affiliated, but parts of that

20 business they have waitresses and delis and food service.  And

21 they have security and other things that go to it.

22         But in terms of actual gambling, they have Jai-Alai,

23 Inter-track Wagering, which is a simulcast over the television,

24 and they have poker.

25         The cage employees have nothing to do with any of

those other departments.  They're dedicated to poker and poker alone.

I think that's an important concept for -- for the court to understand.  And I think Mr. Matthews will make that very clear.  They don't work with ITW.  They don't work in food service.  They're dedicated to how the poker room runs.

The poker room itself is driven by the players. Poker is unlike -- is different than other gambling games, card games, in that you're not playing against the house.

The poker dealers -- the poker players play against other poker players.  The house gets paid differently.  They don't take -- they're not playing against them and winning and losing.  They actually charge a service fee, which they call a rake, for conducting the games between the poker players.

And in order for that job to be done efficiently, my -- my -- my client has a department called the cage department.

And in that department -- typically I think it's 12 to 14 employees -- they do all the ancillary stuff in the poker room to assist the poker players and the poker dealers.  They run chips.  And they're called chip runners.

They have a cart where they have the chips.  And they will sell chips to the actual customers at the tables or they will get the chips to the poker dealers if they run out of chips in their own little chip bank.

1          And they have a box on their little cart -- and

2    you'll see pictures of it -- where they get tipped themselves.

3    And you'll hear evidence that they're regularly and customarily

4    tipped directly more than $30 a month, which is a requirement

5    of the statute.

6          The other people are the podium people.  And they're

7    actually in the poker room also.  And so when a customer walks

8    in, they'll meet with the poker people and they'll put them on

9    a list and seat them, escort them to their seat, give them

10   what's called a card sometimes.  And that's -- that's -- and

11   they regularly get tipped also.  When they get tipped, they put

12   the tip in the chip box in the chip owner's cage.

13         Then there's the teller.  So when you first come in

14   to play poker, you have to go to a teller window, give the

15   teller some cash, they'll give you tips back, you go play

16   poker.

17         And at the end of the night hopefully you'll bring

18   your chips back to the teller window and they'll chip out the

19   cash for your winnings, or wherever you're at with the chips.

20         You can't play poker with cash.  You have to play

21   with chips that the house provides.  And so the customers have

22   to chip in -- or buy the chips to begin with and then tip out

23   at the end of the night with their winnings or whatever they've

24   got left.

25         There's a fourth category within this cage department

1    which is the people that work in the vault.  And we're going to

2    introduce the -- the floor plan that -- the narrative that we

3    have heard from the plaintiffs throughout the case is that the

4    people that work in the cage department that also work in the

5    vault are somehow managers or supervisors.

6              And the testimony is going to be -- conclusively show

7    that that's, in fact, not the case.  The cage department has a

8    manager.  Her name is Vicky Pernek.  She is going to testify

9    live here for the court.

10              Ms. Pernek is the manager of the cage department and

11   the 10 to 12 or 14 employees that regularly work in her

12   department.  She does not share in the tip share.  She gets

13   paid a salary.

14              She does not have an assistant manager or assistant

15   supervisor.  She is the manager of the cage department, and has

16   been so since 20- -- September of 2010, even actually before

17   that, and not shared in any tips.

18              The people that work in the vault -- and this is -- I

19   think this is going to be a big evidentiary issue, because I've

20   heard the plaintiffs say it.  The narrative of their case is

21   the vault person is somehow a managerial employee.

22              The people that -- the cage employees that work in

23   the vault also work as tellers.  They also work as the podium.

24   And they also work as chip runners.

25              In fact, during the time that the customers were

1   there, they work as both a teller and in the vault at the same

2   time.

3         And the floor schematic is actually going to show

4   that the vault is in the room they call the cage where the

5   tellers are.

6         Specifically, the -- they have a teller window

7   themselves, so that -- and they have what's called a bank,

8   meaning it's their own dish with their own money, so that when

9   a customer walks into the Ocala Poker, there's a -- typically a

10  teller sitting there that they can go to.

11        And there's also a teller window that somebody that

12  may be in the vault at the same time -- and it's literally me

13  to Mr. Massey.  And they can see it.

14        So if there's an overflow, they actually work out of

15  their own teller bank, interact with the customer, sell them

16  chips or chip them out.

17        These vault employees work typically -- out of a

18  typical eight-hour shift, maybe two hours doing specific vault

19  duties.  And those vault duties almost -- almost exclusively

20  are done either before the customers are there or after they've

21  left.

22        So Ms. Pernek, I think, is going to tell you -- and I

23  think Mr. Bendure will tell you, because he's one of the people

24  who work in the vault, that they typically may work two hours

25  in the vault, but that's when the customers are not there.

1    The -- the employees that also work the vault -- just

2    to show you how they're wearing two hats, at the end of the

3    evening, as the number of customers dwindles down -- at the end

4    of the evening, they actually are the only teller there at

5    Ocala Poker.

6    They are the exclusive one.  They don't have a second

7    one there.  They're the ones there working as the teller.  So

8    they never really take the two hats off.

9    These cage employees who also work in the vault are

10   the sort of designated pinch hitters.  They're the ones that

11   spell the chip runners, the podium people, the other teller

12   during the course of their shift for their breaks and then

13   their lunch break.

14   So if you've got four of them working in a given

15   night, they all get two, I think, 15-minute breaks.  They all

16   get a lunch break or an evening meal break.  He or she is the

17   person that's actually going out and doing that.

18   So in a typical vault -- a typical cage employee

19   working in the vault, probably six of a typical eight-hour

20   day -- they're doing the same thing all the other cage

21   employees do, and they regularly get tipped for it.

22   The narrative from the plaintiffs has always been

23   that they're somehow management or -- or in a supervisory role.

24   That's just not correct.

25   That's not the way my client organizes his

1  business -- its business.  It never has been.  And, in fact,

2  when they're working in the vault, there's nobody to supervise.

3  They're the person that's doing it.

4        They're simply cage employees that have more

5  experience and are more trusted because of the large amount of

6  money that's in there.

7        Now, the other issue I think's important is whether

8  or not any employees that share in the tip share had any sort

9  of managerial authority.

10        Specifically, the plaintiffs have alleged through

11  discovery that Mr. Bendure and a lady by the name of Kathleen

12  Danielson actually had some sort of managerial or supervisory

13  authority.

14        Mr. Bendure will be here to testify live.  And he

15  will tell you he's never been a supervisor, he's never been a

16  manager.  His manager is Vicky Pernek.  And she does not share

17  in the tip share.

18        He will tell you that he spends about two hours of

19  his typical day working in the vault.  The rest is doing all

20  these other cage -- typical cage employees duties.

21        He has never been an owner of Ocala -- any part of

22  Ocala Poker.  He has never been a manager.  He has no right to

23  hire and fire employees.  He has no right to discipline

24  employees.  He has no right to set the wages of any employee.

25        He will tell you he's never had the right or duty to

1  do that, and will tell you that the only people, to his

2  knowledge, that ever could do that were Ms. Pernek and

3  Mr. Matthews, the president.

4         As to Kathleen Danielson, we do not anticipate she'll

5  be a witness here, but we anticipate the plaintiff will try to

6  offer evidence that she had -- somehow had a managerial

7  function.  Ms. Pernek is going to dispute that.

8         The only thing that Ms. Danielson ever did during her

9  employment with Ocala Poker is -- for a short stretch of period

10 of time she proposed a proposed schedule for the cage

11 employees.  That proposed schedule was given to Ms. Pernek, who

12 then approved or disapproved or modified the schedule.

13        She's never been an owner.  She never had the right

14 to hire or fire.  She had no right to discipline employees.

15 She had absolutely no managerial authority.

16        And there's going to be zero evidence that either of

17 these employees that worked in the cage department, or any

18 other employee that worked in the cage department, had any of

19 those typical operational control ability.

20        You're going to also hear -- we have to show that the

21 employees of the cage department are themselves regularly and

22 customarily tipped.

23        And the statute -- there's some dispute in the case

24 law.  And I think the court has actually acknowledged that.

25 Some cases say that the statute says all you've got to show is

1   you made more than $30 a month typically, customarily and

2   regularly more than $30 a month.  Some cases engrafted the

3   further requirement, which is this managerial or supervisory

4   control function on it.

5          But just as to the $30 a month, we're going to call

6   Marsha Kelso.  And she's the business manager -- business

7   room -- business manager -- office manager, I'm sorry, for

8   Ocala Poker.

9          And she's the person that produced the business

10  records that the plaintiff is -- we had to produce them at a

11  discovery conference out at their facility.  And she's going --

12  and we have her records.

13         Mr. Massey has her records that are records from

14  their payroll programs.  They use a payroll program and then

15  they use an Excel spreadsheet to track all the -- all the poker

16  dealers and the cage employees' tips and how they're accounted

17  for.

18         She's going to testify that -- I asked her to go back

19  and look for -- I think since 2012, at just the cage

20  employees -- cage department employees, to see if they have

21  regularly and customarily gotten tipped more than $30 a month.

22         And she's going to tell you that an analysis of those

23  records -- and she'll show you the records -- shows that -- in

24  that -- since 2012, there have been four -- I may have it

25  wrong, four or five -- four or five instances where a cage

1　employee did not make $30 a month, just for that one month.

2　So we -- in that three-some-odd years' worth of review, there's

3　only three times that's happened -- four times that's happened.

4　　　　　And in the four -- maybe four, maybe five.  I'll have

5　to look at my notes.  But those four or five -- those four or

6　five times it's happened, on each and every occasion, that

7　employee did not work a full month.  They either -- that was

8　the end of -- they termed -- you know, two weeks into the

9　pay -- or that month, or they went on vacation or sick leave or

10　something like that.

11　　　　　So the four or five times it actually happened, in

12　all that period of time, they didn't even work the full month.

13　And so the law requires that they have to be customarily and

14　regularly tipped more than $30 a month.

15　　　　　And I think we clearly meet that when every single

16　cage employee for that three-year period of time actually get

17　it, unless they didn't work a full month.

18　　　　　She will also tell you about a -- I think it's a

19　three-month period of time that they let non-cage employees --

20　they experimented -- they let non-cage employees work in the

21　cage department to earn a little extra money.

22　　　　　A handful of them worked, like, less than an hour, so

23　it's almost impossible to tell what they would have worked.

24　But they didn't make more than 30 bucks a month, but they only

25　worked an hour, an hour or two.  And she'll tell you about

1  that.

2          And then there were two of them that did work more.

3  And one of them did make more than 30 bucks.  And the other one

4  did not.

5          So all cage employees that worked in the cage for

6  that period of time made more than 30 bucks an hour -- 30 bucks

7  a month in a -- in tips, except for four that didn't work the

8  full month.

9          And then the non-cage employees they let come over

10  and work there to get the extra hours and make some money.

11  There's one that did and one that didn't.  And there's a

12  handful that tried to do it and didn't like it, or for whatever

13  reason only worked an hour.  But the overwhelming evidence is

14  they all worked more than -- all made more than $30 a month.

15          By the way, the statute says month.  We can't really

16  compute it on a month.  We compute it on a 28-day basis,

17  because we do a two-week pay period.  So it ends up being 28

18  days per pay period.

19          The final issue, Judge, is this notice issue.  And I

20  have -- I have the actual posters hanging to your right, my

21  left.  And it's not all of them, because they put up a

22  different poster every year.  And we have it in evidence as a

23  photograph.

24          But it's these posters that employers buy throughout

25  the country to provide notice, not just of the FLSA, and in

1   Florida also you have to inform on the Florida minimum wage,

2   because it's actually different, but also workers' comp, OSHA.

3   There's all kinds of stuff in there.

4           I daresay that this federal courthouse probably has a

5   similar poster somewhere for its employees, where they check in

6   or clock in.

7           That poster -- and it's replaced every year by my

8   client -- is posted where the employees clock in and out,

9   including Mr. Greenstone and Mr. Howard.

10          And they will replace it every -- dutifully replace

11  it every year when there's an update in the law or whatever.

12  They buy the new poster.

13          Now, in our pretrial meeting with the court, you -- I

14  think the court indicated that when we conclude the trial that

15  you would consider allowing us to do a closing brief or a

16  closing argument or a combination of the two.

17          And I -- I think it's important that we be able to do

18  that, Judge, because I'm not going to do justice speaking to

19  you about this -- this subject of the notice issue.  And I

20  think it's crucially important.

21          I know we briefed it in our motion for summary

22  judgment.  Mr. Massey's responded.  And we briefed it in our

23  motion for reconsideration and his response.  And we've read

24  your orders.  We think there's been changes in the law since

25  then that the court is not aware of.

1          And I want to tell the court about it now, because

2   we're going to spend a lot of time on my client's reliance on

3   the poster and what they've told them.

4          And we think the reliance issue is huge.  And we

5   think that it's going to be different in light of what we think

6   the current state of the case law is, which I -- I believe,

7   Your Honor, is in a state of flux, or at least in a state of

8   ambiguity.

9          I want to start off with -- I'm going to cite these

10  shorthand.  I hope the court will bear with me, because -- I

11  can give you the cites if need be, but we can do it in a brief.

12          In 2008 or '09, in this district -- it was a case

13  called *Pellon*.  And you mentioned it in your order,

14  everybody -- we mentioned it in our briefs.

15          *Pellon* says, under the facts of the case, that

16  prominently displaying the poster and telling the employees

17  about the tip minimum wage is adequate notice.

18          *Pellon* doesn't say you conjunctively have to do that,

19  meaning you have to do the poster and tell them.  It goes on to

20  make clear, I believe, that the poster alone is adequate.

21          I believe we're -- we're *Pellon.*  We told them and we

22  did the poster.  But the poster is -- in and of itself is

23  adequate.  We're *Pellon*.  My client is, in essence, *Pellon.*

24  And we've argued *Pellon* as to the notice issue.

25          Plaintiff then argues that in 2011 -- and the court

1    recognized -- that the Department of Labor comes along and

2    passes a regulation 29 C.F.R., 531.59(b).

3            They argue in their brief that *Pellon* is old case

4    law, given what happened in the Department of -- Department of

5    Labor regulation in 2011.

6            And they also argue that the poster by itself is

7    inadequate now.  There's, engrafted by this new regulation in

8    2011, a fifth requirement of notice to the employees.

9            And I think the court, in its order, kind of left

10   that as an open question.  But that's certainly the argument of

11   the plaintiff, that the poster is inadequate.  *Pellon* as case

12   law has now been essentially overruled by the rulemaking

13   authority of the Department of Labor in that Code of Federal

14   Regulation.

15           In our brief we cited to the court some cases.  And I

16   don't think we did an adequate job in briefing those cases.

17   But one of the cases that we do want to bring to the court's

18   attention and adequately brief for the court's attention is

19   *Ide,* I-d-e, *versus Neighborhood Restaurant Partners*.

20           And *Ide* is important because it's out of the Northern

21   District of Georgia, so it's within our circuit.  And *Ide*

22   confronts the very argument made by the plaintiffs as to the

23   notice and the poster.

24           *Ide* -- and we are -- we are *Ide*.  We're *Pellon* and

25   we're *Ide*.  My client is *Pellon* and *Ide*.  That was the issue.

1          We actually went back and looked at the briefs

2    provided to the court in *Ide* to see what they were arguing.

3          We think Ide's opinion tells you clearly what they

4    were arguing.  But in *Ide*, when you look at the briefs, the

5    plaintiffs -- is arguing and relying on the *AppleIllinois* case,

6    which the court and Mr. Massey cite, that the poster in and of

7    itself is inadequate because it's been usurped by the

8    Department of Labor regulation in 2011.  So that was one of the

9    issues in *Ide*.

10         The district court -- the district court in Georgia

11   squarely addressed that issue and said they disagreed.  And I'm

12   going to quote now from *Ide*.

13         Also, the undersigned determines that the Wage and

14   Hour Poster properly informed defendants, tip credit employees,

15   of the tip credit exemption because a prominently displayed

16   poster using language approved by the Department of Labor to

17   explain 29 U.S.C., 2003(m) is sufficient notice, citing *Pellon*.

18         So they cite as their authority for that ruling

19   *Pellon*.  And, once again, the plaintiffs' arguing *Pellon* has

20   been usurped by that very -- by the very regulation.

21         So what happened?  And the court, by the way, in *Ide*

22   rules in favor of the defendants on that very issue, the issue

23   that was argued by the plaintiffs and the defendants, the same

24   issue I -- I submit to the court we're arguing here.  *Ide* gets

25   affirmed by the Eleventh Circuit on July 1st, 2016.

1        When we were briefing you, we were unaware of it.

2   And it may not have even happened yet.  I don't know my exact

3   days.

4        But it was affirmed on July 1st, 2016.  And it says

5   this case was not selected for publication in West Federal

6   Reporter.  But it is reported, Your Honor, at 2016 Westlaw

7   3564379.  And it was a per curiam affirmance.

8        THE COURT:  Will you say the number again?

9        MR. GILLIGAN:  2016 Westlaw 3564379.

10       Judge, I take medication that makes my mouth dry

11  sometimes.

12       THE COURT:  You're fine.

13       MR. GILLIGAN:  I'm not trying to be rude.  It just

14  happens.

15       THE COURT:  Don't think anything of it.

16       MR. GILLIGAN:  So we think -- we think we're *Pellon*.

17  We think *Pellon* has been confirmed by at least one other

18  district court in our circuit.

19       And we think *Pellon* has now been -- we know *Pellon*

20  has now been affirmed through the *Ide* case by the Eleventh

21  Circuit as of July 1st of this year.

22       THE COURT:  Can I ask you a question, Mr. Gilligan?

23       MR. GILLIGAN:  Yes, sir.

24       THE COURT:  You could work in a restaurant as a

25  waitress or a waiter and receive tips and not have to share

1  those tips with anyone, right?  You could also work --

2        MR. GILLIGAN:  It depends on the employer, the

3  employers -- how the employer decides to --

4        THE COURT:  But you could have different tip schemes,

5  right?  You could have a tip scheme where the individual

6  employee simply receives as part of their pay the tips they

7  receive, and so they're paid some lower wage because -- because

8  it's made up for in the tips they receive on a daily basis.

9        MR. GILLIGAN:  Yes.  Absolutely.

10        THE COURT:  And then you can also have the

11  circumstance where you have tip pooling, where a bunch of

12  people are involved.  They're all helping each other, but maybe

13  they're getting -- maybe the poker dealers are tipped more

14  than, say, the cage workers are.

15        MR. GILLIGAN:  You're going to hear evidence to that

16  effect.

17        THE COURT:  Okay.  So they pool the tips --

18        MR. GILLIGAN:  Yes, sir.

19        THE COURT:  -- and then share them amongst each

20  other?

21        MR. GILLIGAN:  Yes, sir.

22        THE COURT:  Those are different schemes?

23        MR. GILLIGAN:  You mean the tip pool and the tip --

24  yes, sir.  There's a different -- and you recognize in your

25  order -- and I may sometimes make the mistake -- even my client

1   may sometimes make the mistake, but there are clearly different

2   concepts of the tip credit and the tip pool.

3          THE COURT:  Okay.

4          MR. GILLIGAN:  You can have a tip credit where you

5   get the minimum wage, which is not the regular minimum wage and

6   not -- have no tip pooling scheme whatsoever.  And there's

7   certainly employers out there that do that.

8          THE COURT:  In the case you're talking about, the *Ide*

9   case, is that a tip pool?

10         MR. GILLIGAN:  I believe it -- it's a restaurant case

11  with the waitresses, so I don't know.  Let me -- don't let me

12  misrepresent anything to the court.

13         THE COURT:  All right.

14         MR. GILLIGAN:  We thoroughly -- we found out about

15  this actually yesterday.  We started reading these things a

16  little more thoroughly yesterday.

17         So -- and as the court recognized in your order, the

18  tip pool is a related but different animal.  An employer does

19  not have to have one, but if they have a tip pool, a portion of

20  the tips received -- in this case ten percent received by the

21  tippable employee; in this case the poker dealers -- goes and

22  is shared with that other group; in this case, the cage

23  employees.

24         The restaurant analogy is an excellent analogy, Your

25  Honor, because the restaurant analogy, I think -- I daresay

1  most the cases in this area are probably in the restaurant

2  industry area, not in the poker dealing room area.

3          And the analogy goes to who gets typically tipped the

4  most.  And it's the waitresses, not typically the hostess, not

5  typically the -- certainly not the busboys that come after the

6  customers usually leave.  And so that's when there's a --

7  typically a tip pool.

8          The evidence will show in this case, though, Your

9  Honor, we have a tip pool for the cage employees.  And even

10 though they are tipped themselves, which is required by law,

11 they are not tipped anywhere near what the poker dealers get

12 tipped.  And Mr. Matthews and his poker room manager, Mr. Faso,

13 will testify to you there's a reason for that, and that's

14 because a poker dealer is -- is sitting with the customers that

15 are actually playing, and they will deal on average 20 to 30

16 hands of poker per half hour.

17         And it's not unusual for almost every hand to be a

18 tippable opportunity, meaning that somebody won, you know,

19 somebody won the hand, and they'll throw a chip to the poker

20 dealer.

21         They get tipped way, way in excess to anything a cage

22 employee gets tipped.  And when it's almost said and done, they

23 get paid almost on a magnitude of, you know, 60 percent more

24 than a typical cage employee gets paid, even after the tip

25 share.

1        The next thing I wanted to -- did I answer your

2  question, Your Honor, about the tip pool and the --

3        THE COURT:   Yeah.

4        MR. GILLIGAN:   The next thing I want to address,

5  because I know we brought it up on our motion of

6  reconsideration.

7        And I want to address it because I don't want the

8  court to get frustrated with me -- with my presentation of the

9  evidence about issues that you may think are -- are somewhat

10 decided.

11       There's a lot -- a lot of cases I just told you

12 about, from *Pellon*, the *Ide*, and now the affirmance in the

13 Department -- that's one track where we think -- we think we're

14 right about this notice issue.  And I'm going to spend a lot of

15 time on it factually developing it for the court.

16       The other issue is the *Navarro* issue and this

17 reliance issue and how that affects the *Navarro* analysis.

18       My client is going to testify to you, Mr. Matthews --

19 is that he changed his tip pool in September of 2010.  And he

20 changed it because a poker room in South Florida -- I think

21 Palm Beach to be exact -- got sued.

22       And the issue there was there were managers sharing

23 in the tip pool that they established in this case down there.

24 He actually went down to that poker room in South Florida and

25 met with this manager and discussed with him, Hey, what's going

1    on here with you guys?

2              And he said, We're being sued.  And the allegation is

3    we're tipping -- we're allowing the tip pool that we take from

4    the poker dealers to be shared with people that are acting in a

5    managerial capacity.  They ultimately lost that case.

6              So in September of 2012, my client made the business

7    decision to change the way their tip pool worked.  And they

8    brought in all the poker dealers at that time.

9              And there's -- and the cage employees -- they all got

10   in the poker room.  And Mr. Matthews explained to them in about

11   an hour-long meeting, that Mr. Greenstone and Mr. Howard

12   attended, that they were going to change the way the tip pool

13   worked, that the tip share was going to go from eight percent

14   to ten percent, and that only the cage employees that -- and

15   the non-managerial cage employees were going to share in the

16   tip share.

17             They specifically told them that it was just the cage

18   employees, which meant the people that worked as chip runners,

19   podium, tellers involved, were the only people going to share

20   in it, and no managers henceforth, in any capacity, would be

21   sharing in the tip pool, not the poker room managers, not his

22   three floor managers, not what's called the dual rates.

23             And this, by the way, is a term you're going to hear.

24   Mr. Howard was a dual rate, meaning sometimes he worked as a

25   poker dealer and he got tips and the tip credit and sometimes

1    he worked as a poker room floor manager where he didn't get

2    that, he got paid a regular salary of about -- I think it was

3    18, 19, 20 bucks an hour -- equivalent of 18, 19, 20 bucks an

4    hour.  And he didn't -- he didn't contribute to the tip pools.

5            So the floor managers, the dual rates working as

6    floor managers, the actual manager, Ms. Pernek -- anybody who

7    was a manager or could be -- you know, could be said was a

8    manager was taken out of the pool in September of 2010.

9            Now, my client has since -- even before then, like

10   all employers -- I think millions of employers -- we have -- we

11   have this poster in my office.

12           Millions of employers post these posters.  They buy

13   them from a private enterprise, but they get them from the

14   governmental entities.  And there's posters within a poster,

15   including the Department of Labor.

16           They hang this poster in their workrooms, break

17   rooms, clock-in rooms, so the employees can see them.  My

18   client has done that since the day they opened.

19           That very poster is -- the same posters I believe

20   Mr. Howard and Mr. Greenstone are going to testify to you they

21   saw, not only at my client's place of business, but at their

22   prior places of business where they were poker dealers, and as

23   for Mr. Howard, where he's working as a poster -- as a poker

24   dealer now.

25           My client has never been informed by anybody that

1    those posters, concerning the FLSA tip credit notice, were

2    inadequate.  No other poker manager has ever told him that.

3            They've gotten no notice.  Up until the point I told

4    him what the plaintiffs' lawyer was saying in his summary

5    judgment brief -- was the first time he ever heard there was

6    any problem with the -- with the FLSA notice within these

7    posters.

8            So here's why I'm -- and here's the part where I'm

9    struggling, because Mr. -- the plaintiffs rely on a case called

10   *Dorsey*.  And the court cited *Dorsey* in its order on the motion

11   for reconsideration.

12           And *Dorsey* -- *Dorsey* -- when you read it -- and the

13   issue in *Dorsey* was -- is this exact rule -- this is a Code of

14   Federal Regulations, rule 531.59(b).

15           Is it retroactively enforceable?  And *Dorsey* says,

16   No, it's not.  And the reason they say it's not

17   retroactively -- retroactively enforceable is because it was a

18   change in law.  It wasn't a mere clarification of prior

19   practice.

20           And if you'd give me one second, I'm about to wrap

21   up.  But I do think it's important that I tell the court what

22   *Dorsey* actually says.

23           In *Dorsey*, in their discussion about the application

24   of the retroactivity, they say -- and I'm quoting now, Though a

25   regulation may apply retroactively if it merely clarifies

existing law, and it's citing that in quotations, a case called *Whiting* -- *Whiting* -- it then goes on and says, This does not appear to be the case with the new tip credit notification rule.

They go on to say, as to the DOL -- Department of Labor tip credit notification regulations, There is no language specifically stating that the notification provisions are meant to clarify ambiguity, at least with regard to the notification of the right to retain tips.

And the DOL's final rule appears to acknowledge that the new regulation represents a change in the law, at least as it has been applied by the courts.

And it goes on -- and is applied by the courts.  Of course, there's this constant -- the constant dispute between the different courts about whether or not the poster is adequate or not.

So *Dorsey* -- and *Dorsey* is saying it's a change in the law.  And what I'd like to submit to the court, and why -- and that's why I don't want you to -- I'm telling you about this now, because I want you to understand why I'm going to spend so much time on this reliance issue with my clients, is that that's what we're getting at.

My client relied on it, and -- as did, I believe, employers everywhere.  Because the Department of Labor FLSA poster has not changed, to our knowledge, since at least 1996

1     as to the tip credit information.

2          They actually changed the FLSA notice this year, just

3     a couple of weeks ago, as of August 1st, but they didn't change

4     it as to the tip credit.  They changed it as to nursing

5     mothers.  So they know how to change it.

6          So if you have a poster the Department of Labor is

7     requiring employers -- and, by the way, they're required by law

8     to post the notice about how their wages are being paid.

9          The Department of Labor requires them to do it.  They

10    have a poster that -- which is form 1088 -- I think it's

11    1088 --

12          MR. ANDERSON:  It's just a publication.

13          MR. GILLIGAN:  -- publication 1088.  They've had that

14    in effect without any significant changes to the tip credit

15    since 1996.

16          My client and all other poker dealers that we know of

17    seem to -- see that's what they're supposed to do.  They buy

18    it.  They post it.  And it hasn't changed.

19          The Department of Labor, to my knowledge, has never

20    ever sent out a memorandum or missive to anybody saying, Hey,

21    our poster is inadequate.

22          My clients received no information from anybody that

23    it's inadequate.  And we have the *Dorsey* case saying -- at

24    least in terms of its retroactivity, that it's not a

25    clarification.  It's a change in law.

1    So we believe that if it's a change in law, then

2  under -- then a *Navarro* analysis needed to be made.  And if it

3  needed to be made, you know our arguments as to that.

4    Now, finally, we also think that -- and we raise it

5  as an affirmative defense, that this is consistent with actual

6  federal law.

7    We raise it as an affirmative defense.  The

8  statute -- Federal Statute 29 U.S.C., 259(a), which I'm going

9  to describe as the good faith Olly, Olly, in come free to

10  employers.

11    But the specific language in that statute, Such a

12  defense, if established, shall bar the action -- bar to the

13  action or proceeding, notwithstanding that after such act or

14  omission, such administrative regulation, order, ruling,

15  approval, interpretation, practice, or enforcement policy is

16  modified or rescinded or is determined by judicial authority to

17  be invalid of no legal effect.  Congress is saying this is not

18  a spear.  This is not a spear to gig employers.

19    And our point is the Department of Labor has said

20  that's okay.  They're telling everybody it's okay because

21  they're not correcting it.  And then they do a regulation that

22  some courts say is fine, some courts say are not.  But we're

23  saying we relied on it.

24    And there's going to be no evidence that my client

25  did anything but rely on it.  We think the statute makes us

1   immune.

2           We don't think the -- we don't think the regulation

3   even as applied is factually correct, in terms of our clients.

4   We think they still gave them proper notice.

5           But if it comes out of *Denton*, we think the poster is

6   it -- or *Pellon*.  And *Pellon*, we think, has now been approved

7   by the Eleventh Circuit.

8           Thank you, Your Honor.  I know it was longwinded,

9   but -- and I do hope we'll get an opportunity to brief this in

10  a little bit more depth so I can do it justice.  It's probably

11  better done in -- justice in writing than orally.

12          THE COURT:  All right.

13          Do you want to respond at all, Mr. Massey?  Or do you

14  want to proceed with your first witness?

15          MR. MASSEY:  Proceed, Your Honor.  Thank you.

16          THE COURT:  All right.

17          MR. MASSEY:  All right.

18          THE COURT:  Why don't you call your first witness,

19  then.

20          MR. MASSEY:  Thank you, Your Honor.  I forget whether

21  we invoked the rule or not.  I'd like to do that.

22          THE COURT:  So invoked.

23          MR. MASSEY:  Thank you, Your Honor.

24          And initially I'd just like to go ahead and introduce

25  into evidence the exhibits that are -- that we'd like to

1    introduce, so they're not -- that have -- that are not opposed.

2          And those are -- if that's okay -- Exhibits -- 1,

3    which initially the defendant objected to, but I spoke to them

4    before trial and they have no objection to that anymore.

5          MR. GILLIGAN:  Judge, and I -- and we did -- we did

6    not -- Mr. Massey and I did have a conversation.  I don't -- I

7    can't -- it's spreadsheets from my client.  And I'm assuming

8    they're accurate, that we gave them to them accurately.

9          But there's no way -- there's hundreds of pages.

10   There's no -- and I'm not accusing or suggesting Mr. --

11   anything wrong.  It's just assuming they're exactly what we

12   gave them, then we got -- because they're Excel spreadsheets.

13         THE COURT:  Okay.

14         MR. GILLIGAN:  Because you -- you know, even by

15   accident sometimes they can get muddled.  And there's no way

16   for me to check.

17         THE COURT:  All right.

18         MR. MASSEY:  1, 3, 4, 5 --

19         MR. GILLIGAN:  And, Michael, can you -- let me go

20   along.

21         MR. MASSEY:  Of course.  You want me to start over?

22   It's 1.

23         MR. GILLIGAN:  Okay.  No objection -- no objection,

24   Your Honor.

25         MR. MASSEY:  3.

1          MR. GILLIGAN:  No objection.

2          MR. MASSEY:  4.

3          MR. GILLIGAN:  No objection.

4          MR. MASSEY:  5.

5          MR. GILLIGAN:  No objection.

6          MR. MASSEY:  7, which is another that we just

7   discussed.

8          MR. GILLIGAN:  No objection.  I did object.  I'm

9   withdrawing that objection.

10          MR. MASSEY:  8.

11          MR. GILLIGAN:  No objection.

12          MR. MASSEY:  10.

13          MR. GILLIGAN:  No objection, with the same caveat, I

14   haven't had a chance to side-by-side the Excel spreadsheets.

15   But I assume they're accurate.  No objection.

16          MR. MASSEY:  Those were the ones that were filed with

17   the court.

18          MR. GILLIGAN:  That we filed?

19          MR. MASSEY:  Yes.

20          MR. GILLIGAN:  Okay.  No objection.  I'm sorry.

21          MR. MASSEY:  10 and 11.

22          MR. GILLIGAN:  No objection.

23          MR. MASSEY:  14.

24          MR. GILLIGAN:  No objection.

25          MR. MASSEY:  18.

```
 1              MR. GILLIGAN:  No objection.

 2              MR. MASSEY:  And 20.

 3              MR. GILLIGAN:  No objection.

 4              THE COURT:  All right.  They'll be so admitted.

 5         (Plaintiffs' Exhibits 1, 3, 4, 5, 7, 8, 10, 11, 14, 18,

 6    and 20 received into evidence.)

 7              THE COURT:  Okay.

 8              MR. MASSEY:  And we'd like to call Mr. Matthews, Your

 9    Honor.

10              THE COURT:  Okay.

11              MR. MASSEY:  Brian Matthews.

12              Should I be here, Your Honor?

13              THE COURT:  Yeah.  If you can speak from the podium.

14              COURTROOM DEPUTY:  If you'll approach the witness

15    box, please, and raise your right hand.

16              Do you solemnly swear that the testimony you will

17    give before this court will be the truth, the whole truth, and

18    nothing but the truth, so help you God?

19              THE WITNESS:  I do.

20              COURTROOM DEPUTY:  Please have a seat.  And if you

21    would state your full name for the record, spelling your last

22    name.

23              THE WITNESS:  Brian Matthews, M-a-t-t-h-e-w-s.

24              COURTROOM DEPUTY:  Thank you.

25              THE COURT:  You can begin.
```

| | |
|---|---|
| 1 | MR. MASSEY:  Thank you, Your Honor. |
| 2 | **BRIAN MATTHEWS, PLAINTIFFS' WITNESS, SWORN** |
| 3 | **DIRECT EXAMINATION** |
| 4 | BY MR. MASSEY: |
| 5 | Q.   Could you just state your name for the record. |
| 6 | A.   Brian Matthews. |
| 7 | Q.   Thank you.  And where do you work? |
| 8 | A.   Ocala Poker and Jai-Alai. |
| 9 | Q.   And what's your position with Ocala Poker? |
| 10 | A.   President, slash, general manager. |
| 11 | Q.   And did Ocala Poker employ my client, Mr. Howard? |
| 12 | A.   Yes. |
| 13 | Q.   And when was that? |
| 14 | A.   What time did -- when did he start? |
| 15 | Q.   Yes, sir. |
| 16 | A.   I wasn't there when he was actually hired. |
| 17 | Q.   And then -- |
| 18 | A.   But sometime in 2007, 2008. |
| 19 | Q.   And what positions did he hold? |
| 20 | A.   He held the position of dealer and dual rate. |
| 21 | Q.   And did you also employ Mr. Greenstone? |
| 22 | A.   Yes. |
| 23 | Q.   And when about was that? |
| 24 | A.   Around the same time, I would guess. |
| 25 | Q.   And what positions did he hold? |

1   A.    He was a dealer.

2   Q.    Do you know Mr. Howard's regular rate, what his hourly

3   rate was?

4   A.    His hourly rate, I think, when he left was $5.03.

5   Q.    Was his hourly rate less than the federal minimum wage?

6   A.    Was it less than -- I know he was the minimum tip pool

7   rate, tip credit rate.

8   Q.    And so that would be less than $7.25 an hour?

9   A.    That's correct.

10  Q.    And is that the same truth for Mr. Greenstone?

11  A.    Yes.

12  Q.    Did Mr. Howard receive tips?

13  A.    As a -- as a dealer he received tips.  As a dual rate he

14  didn't.

15  Q.    And did Mr. Greenstone?

16  A.    As a dealer, yes.

17  Q.    And did the amount of tips received by Mr. Howard

18  fluctuate during his employment?

19  A.    I would presume yes.

20  Q.    Who would he receive tips from?

21  A.    He would receive tips from the players in the room.

22  Q.    And where was his actual location of employment?  Where

23  did he go when he came to work for you?

24  A.    Where did he go?  The poker room is where he did his work.

25  Q.    And so that's where people play cards, I suppose?

1    A.    That is correct.

2    Q.    And did the tips from Mr. Greenstone also fluctuate?

3    A.    Yes.

4    Q.    Were Mr. Howard and Mr. Greenstone parts of a mandatory

5    tip pool?

6    A.    Yes.

7    Q.    And how did that work?

8    A.    They both would get a minimum tip wage.  And then they

9    would get their tips minus a percentage that went to the cage

10   personnel.

11   Q.    And so when they contributed the tips, would they get

12   anything out of the pool, or were they just giving tips to

13   other people?

14   A.    Well, the way -- the way we collected it -- are you asking

15   me how we collected their tips or --

16   Q.    Well, you're saying -- well, let's start with

17   Mr. Greenstone.  What percentage of his tips were taken from

18   him by Ocala Poker?

19   A.    At -- when?  When he first came or when he left?

20   Q.    I guess both.

21   A.    When he first came in, they were eight percent.  And then

22   at the end it was ten percent.

23   Q.    And is that the same for Mr. Howard?

24   A.    Yes.

25   Q.    And so -- and would they -- and where -- so where would

1    those tips go that were taken from them?

2    A.   We would collect those tips every day and they'd be put

3    into a pool.

4    Q.   And then who would get money out of that pool?

5    A.   The cage personnel.

6    Q.   Would Mr. Howard or Mr. Greenstone get any of that money

7    from the pool?

8    A.   No, they would not.

9    Q.   Did Ocala Poker take a tip credit for the amount of tips

10   as to Mr. Howard?

11   A.   Yes.  There was a -- there is a tip minimum credit, yes.

12   Q.   And so how does that work?

13   A.   Basically, it's -- it's basically there's a -- a formula.

14   But basically what the tip minimum credit was -- was always

15   below what the minimum wage was.  It differed from the time

16   they started to the time that they end.

17   Q.   And where was that tip credit taken?  How would Ocala

18   Poker claim that tip credit?

19   A.   What do you mean how -- how we -- obviously -- are you

20   asking how we would take it or how we claimed it to the

21   government?

22   Q.   Claimed it to the government.

23   A.   Well, we have a system in place by which we do that.

24   Q.   And what's that?

25   A.   Well, the -- we apply -- we apply the -- we apply to the

1  government for the tip credit.  We take a certain percentage

2  out of their pay.  And, like I said, basically they get

3  their -- minus their eight percent, ten percent, it goes

4  into -- we have a system which takes place.  And it goes into,

5  like, a computer.  And that's how we handle it.

6  Q.   Okay.  And does Ocala Poker get a benefit from the

7  government by claiming that tip credit?

8  A.   Well, we don't pay the minimum wage.  We pay the tip --

9  the tip minimum wage instead.

10  Q.   And so is that the same for Mr. Greenstone?

11  A.   Yes.

12  Q.   Now, is the tip pooling arrangement at Ocala Poker

13  different than some of the other employers that may exist in

14  Florida?

15  A.   Are you talking other poker rooms, other --

16  Q.   Anything.

17  A.   I'm sure they differ.  I don't -- but do I know for a

18  fact?  No.

19  Q.   You designed the tip pooling -- Ocala Poker designed the

20  tip pooling arrangement at Ocala Poker?

21  A.   Well, the way it started was -- when the room opened,

22  we've kind of -- we kind of brought the -- it's kind of like an

23  industry standard, the -- the tip pool.  A lot of rooms have

24  the same process.  Now, that process has changed over time.

25  Q.   And how would you determine the percentages that would be

1  taken?

2  A.   When the room first opened eight percent was determined.

3  And then when we started to make our change and take management

4  out of the tip pool, we moved it up to ten percent.

5  Q.   And so Ocala Poker set those percentages?

6  A.   Well, I would take it in the beginning the eight percent

7  was pretty much -- because when we started, we brought people

8  over from Jacksonville.  And then we moved it up to ten

9  percent.

10 Q.   Ocala Poker made that determination?

11 A.   Yes.

12 Q.   And how was it determined who would be in the tip pool?

13         MR. GILLIGAN:  Object, because there's two tip pools

14 he's kind of testified to; one they started with and one now.

15 And so I -- I'd just ask him to clarify the question as to

16 which one he's referring to.

17         THE COURT:  All right.  And when you object,

18 Mr. Gilligan, if you could just come a little closer to the

19 microphone so we can hear you.

20         MR. GILLIGAN:  Do you require me to stand for

21 objections, Your Honor?  I'm not trying to be rude.

22         THE COURT:  Yeah.  If you could.  That way I can --

23         MR. GILLIGAN:  See me?

24         THE COURT:  -- see that you're doing it.

25         MR. GILLIGAN:  Yes, sir.

1    BY MR. MASSEY:

2    Q.    I can clarify that.

3          At the last part of Mr. Greenstone's and Mr. Howard's

4    employment, how would Ocala Poker determine who was in the tip

5    pool?

6    A.    We determined basically -- at the very end when we made

7    our change, we put only that the cage personnel would be able

8    to participate in the tip pool.

9    Q.    And who are the cage personnel?

10   A.    The cage personnel are our chip runners, our -- it's

11   basically the people that perform chip running.  They sit at

12   the podium, help sit customers, tellers, and some of them that

13   have been with us the longest work in the vault.

14   Q.    Okay.  And I heard during the opening statement by your

15   attorney that the first time that you heard -- well, let me --

16   let me ask you.  And I can hand you the regulation that I'd

17   like to talk to you about.

18          MR. MASSEY:  If that's okay, Your Honor.  Can I

19   approach the witness?

20          THE COURT:  You can.

21   BY MR. MASSEY:

22   Q.    Do you see that regulation 29 C.F.R., 531.59?

23   A.    Hold on.  Where exactly is that?

24   Q.    It's the whole thing.

25   A.    Oh, okay.  Very good.

1  Q.   When was the first time that you heard of these

2  obligations of this -- of this regulation?

3  A.   I'm reading it.  I just want to make sure.

4  Q.   Of course.

5  A.   Basically, what we do is -- every year we post a poster.

6  And these are some of the things that I saw on that poster when

7  we posted the poster every year.

8  Q.   Okay.  So did you -- did you learn about these obligations

9  from me when we filed our pleadings?  That's what I heard in

10  your counsel's opening --

11  A.   No.  I had a very basic --

12       MR. GILLIGAN:  Objection.  I said -- I believe what I

13  told the court was the first time he heard the argument that

14  the poster was inadequate was from the briefs that I discussed

15  with him.

16       I didn't -- I don't think I said that I showed him

17  this regulation or talked to him about the regulations.  The

18  first time I -- he heard the poster may be inadequate was in

19  the argument before.

20       THE COURT:  All right.  Well, the witness can clarify

21  when he first knew of or read the regulation.

22       THE WITNESS:  Well, it's like my lawyer said.  I

23  didn't know there was an issue with it until when the summary

24  judgment came about.  But I've seen this, yes.

25  BY MR. MASSEY:

1   Q.   And when was -- so when did you see that first?

2   A.   Well, most of the stuff in here -- once again, we have

3   to -- we're obligated to post these posters up every year.

4   This is -- you know, I've got a very layman's term of this.

5   But, basically, every year I know that we're required to post

6   something about the tip pool.

7   Q.   So when did you learn about the regulation first?

8   A.   The regula- -- are we talking about the regulation being

9   against the wall or this regulation --

10  Q.   Just --

11  A.   Well, when we first started.

12  Q.   When you first started Ocala Poker?

13  A.   Right.  And, once again, I didn't open -- open the room.

14  We had a manager that started this.  I've learned -- I, over

15  the years, have learned it.  Yes.

16  Q.   And then when did -- so when did Ocala Poker first open?

17  A.   We opened in May of 2008.

18  Q.   Okay.  And so in May of 2008 Ocala Poker first learned of

19  regulation 531.59; is that right?

20  A.   Well, so --

21          MR. GILLIGAN:  Objection, Your Honor.  Counsel knows,

22  in fact, that -- you know, it's an unfair question.

23          MR. MASSEY:  Speaking objection, Your Honor.

24          THE COURT:  You can shorten it up a little bit,

25  Mr. Gilligan.

```
 1              MR. GILLIGAN:  It's not relevant.

 2              THE COURT:  Okay.

 3              MR. GILLIGAN:  It didn't exist in 2008.

 4              THE COURT:  Well, go ahead with your questions,

 5     Mr. Massey.

 6              MR. MASSEY:  Thank you, Your Honor.

 7     BY MR. MASSEY:

 8     Q.   So is your testimony that Ocala Poker learned about 29

 9     C.F.R., 531.59 when it opened in 2008?

10     A.   When we opened in 2008?  No.  Once again, I wasn't the

11     one -- I wasn't there when the room opened up.  I can't testify

12     to, you know, the person that started this in 2008.

13     Q.   Well, when did you learn about it?

14     A.   I learned about this -- it took me a while to learn the

15     business.  I don't -- I didn't come from the gaming industry.

16     So it took me some time to learn.  I can't tell you exactly

17     when.

18     Q.   About when was it, about the time that you received the

19     summary judgment pleadings in this case?

20     A.   Honestly, I don't know.  I don't know.

21     Q.   Okay.  And I just heard from -- or, also, I heard from

22     your attorney regarding the possible difficulty in learning

23     about this regulation.

24              Have you ever Googled the words FLSA tip credit to

25     see what comes up?
```

```
1    A.    Have I Googled it?  No.

2    Q.    And so --

3              MR. MASSEY:  If I can approach the witness, Your

4    Honor, I've actually Googled those words and I'd like to show

5    him what comes up.

6              Defendant's opening statement relied pretty heavily

7    on the idea that they could not have learned about this easily.

8    I think it will show that it's pretty accessible.

9              MR. GILLIGAN:  Objection.  Argumentative.  Not

10   relevant.

11             THE COURT:  Sustained.

12             MR. MASSEY:  Thank you, Your Honor.

13             That's all I have.  Thank you.

14                      CROSS-EXAMINATION

15   BY MR. GILLIGAN:

16   Q.    Mr. Massey handed you a copy of the regulation 529 C.F.R.,

17   531.59.  Do you have it in front of you?

18   A.    Yes, I do.

19   Q.    Okay.  Have you ever actually read this regulation in your

20   life?

21   A.    No.

22   Q.    When the summary judgment motions and motions for

23   reconsideration were filed by my office and Mr. Massey's

24   office, did we provide you copies of those various motions and

25   pleadings?
```

1    A.    Well, we talked about it.  I don't remember seeing it.

2    Q.    Okay.  But you did talk about it with me?

3    A.    Yes.

4    Q.    Okay.  Prior to that, had you ever even heard of 29

5    C.F.R., 531.59?

6    A.    No.

7    Q.    Had any poker -- do you talk to the poker dealer -- poker

8    room managers around the state?

9    A.    Yes, I do.

10   Q.    Do you visit their facilities from time to time?

11   A.    Yes, I do.

12   Q.    And in opening you heard me talk about you actually going

13   to one in -- I think in Palm Beach County?

14   A.    That's correct.

15   Q.    Has any poker manager in any of the poker rooms you've

16   visited ever told you there was a regulation out there that

17   said you had to do something different than the posters you

18   posted?

19   A.    Never.

20   Q.    Have you received any information from the Department of

21   Labor -- the federal Department of Labor saying that there was

22   a regulation out there that required you to provide notice in a

23   way different than you did in the posters every year?

24   A.    No.

25   Q.    Okay.  Now, you don't provide notice to your employees

1    just -- about the tip credit just through the posters; is that

2    correct?

3    A.    No.

4    Q.    You also -- in terms of the actual poker dealers, you have

5    a poker dealer manual?

6    A.    That is correct.

7    Q.    And it explains the tip share in there?

8    A.    Yes.

9    Q.    Okay.  And then you also had a meeting -- and we're going

10   to go to this in our case in chief, but you also had a meeting

11   in September of 2010, when you changed the tip pool?

12   A.    That's correct.

13   Q.    And Mr. Greenstone and Mr. Howard were there?

14   A.    Yes, they were.

15   Q.    And you had about an hour-long meeting with them?

16   A.    That's correct.

17   Q.    And was that explained -- the tip share explained to them

18   at that time?

19   A.    Yes, it was.

20   Q.    Now, Mr. Massey, in his direct, asked you some questions

21   about how the tip was actually calculated.  But the poker

22   dealers have a tip box also, correct?

23   A.    That is correct.

24   Q.    And it's at their poker table?

25   A.    Yes.

1  Q.   Do they typically get tipped more than the cage employees?

2  A.   Yes.  Very definitely, yes.

3  Q.   Significantly more?

4  A.   Significantly, yes.

5  Q.   Does a poker dealer -- I guess they have a certain amount

6  of hands they do?

7  A.   Typically you get anywhere between 20 to 30 hands every

8  half hour.

9  Q.   Okay.  And is the conclusion of each hand a -- perhaps a

10  tippable moment in your industry?

11  A.   Yes, it is.

12  Q.   Meaning somebody won the hand, correct?

13  A.   That's correct.

14  Q.   And it's -- is it customary for customers that are -- have

15  the winning hand to tip the dealers?

16  A.   Yes.

17  Q.   The dealers, when they get tipped -- do they get tipped in

18  cash?

19  A.   Yes, they do.

20  Q.   And what do they have to do with the cash?

21  A.   Well, when cash -- chips, which is also -- that's how they

22  get tipped.

23  Q.   That's what I'm asking.  Do they get tipped in cash or

24  chips?

25  A.   Chips.

1   Q.   Okay.  And when -- and they have a tip box that's on their

2   table, correct?

3   A.   Yes.

4   Q.   And when they get tipped in chips, do they have to put it

5   in the tip box?

6   A.   Yes, they do.

7   Q.   In fact, do you have cameras in your facility to monitor

8   the dealers at all times?

9   A.   Yes, we do.

10  Q.   Like, you have cameras throughout the building monitoring

11  all facets of the operation?

12  A.   That is correct.

13  Q.   Is that customary and regular in the poker room business?

14  A.   Yes.

15  Q.   And at the end of their shift, the poker dealer takes

16  his -- his tip box to a tip-out room?

17  A.   That is correct.

18  Q.   Now, this tip box is -- when the tip -- the dealer comes

19  in that day, is that tip box one that he checks out?

20  A.   That is correct.

21  Q.   Is it numbered?

22  A.   Yes, it is.

23  Q.   Is there a room with tip boxes in it?

24  A.   Yes.

25  Q.   And in that room with tip boxes, they all look the same,

1    except they have a different number on it?

2    A.    That is correct.

3    Q.    So when the dealer comes in for the day, he will check

4    out, by way of example, tip box 28?

5    A.    That's correct.

6    Q.    And for the rest of his shift as a poker dealer, that's

7    his tip box and his tip box alone?

8    A.    Yes.

9    Q.    And his tips go into that tip box?

10   A.    That is correct.

11   Q.    And he's not -- and it's a locked box, correct?

12   A.    Yes, it is.

13   Q.    So once the tips go into the tip box -- I guess he can

14   turn and shake it out.  But, I mean, in theory, he's not

15   allowed to get in there, correct?

16   A.    That is correct.

17   Q.    So at the end of the shift, that poker dealer goes where?

18   A.    End of the shift he goes -- we have a tip-out room that

19   they go to.

20   Q.    And is that tip-out room also surveilled by cameras?

21   A.    Yes, it is.

22   Q.    And does the tip-out -- does the dealer go with anybody

23   into that room?

24   A.    There's another person in that room that counts the chips

25   with them.

1  Q.   And do they open the box at that time?

2  A.   That is correct.

3  Q.   And what do they do?

4  A.   What they do is they take the money -- they put it out and

5  they count the chips out.  Once the chips are agreed upon,

6  there is -- the person that's in the room will write down what

7  the ten percent is off, they both will agree upon it, and then

8  the dealer will sign the receipt and will record the tip money.

9  Q.   And that's called a tip slip?

10 A.   That is correct.

11 Q.   And so both the dealer and the person in the tip-out room

12 agree to the amount of tips -- agree as to the amount of the

13 tips that that particular poker dealer made for that night?

14 A.   That is correct.

15 Q.   And that -- and by way of example, if the poker dealer

16 earned 300 bucks on a particular night in chips, that tip slip

17 would say for that poker dealer $300, correct?

18 A.   Right.

19 Q.   And then because there's a ten percent tip share, the tip

20 form would say as a ten percent $30 to the tip share?

21 A.   That is correct.

22 Q.   And both the person and the dealer would agree on that on

23 the tip slip?

24 A.   That is correct.

25 Q.   And the dealer is then given a copy -- a carbon copy of

1  the tip slip?

2  A.   That is correct as well.

3          MR. GILLIGAN:  I know it's not my case in chief, Your

4  Honor, but I'd like to show Mr. Matthews our Exhibits 21 and

5  22.  They're actual tip slips for Mr. Howard and

6  Mr. Greenstone.

7          THE COURT:  Any objection?

8          MR. MASSEY:  No, Your Honor.  Thank you.

9          THE COURT:  All right.

10  BY MR. GILLIGAN:

11  Q.   Let me show you --

12          MR. GILLIGAN:  May I approach the witness, Your

13  Honor?

14          THE COURT:  You may.

15  BY MR. GILLIGAN:

16  Q.   -- two exhibits we've marked as Exhibit 21 and Exhibit --

17  Defense Exhibit 22.  Do you recognize those?

18  A.   Yes, I do.

19  Q.   And they are those tip slip documents we were talking

20  about?

21  A.   That is correct.

22  Q.   Are those the form of the tip slip documents that had been

23  used by Ocala Poker over the years?

24  A.   Yes, we do.

25  Q.   Are those a representative sample of the typical tip slip?

1   A.    That is correct.

2   Q.    Are those actual tip slips for a specific day for

3   Mr. Howard?

4   A.    Yes.

5   Q.    And what day was that?

6   A.    2/25/2015.

7   Q.    On that day, what was Mr. Howard's total tips?

8   A.    $150 received.

9   Q.    And does it reflect that on the tip slip?

10  A.    Yes, it does.

11  Q.    Does it reflect the -- his ten percent tip share?

12  A.    Yes, it does.

13  Q.    And how much was that?

14  A.    $15.

15  Q.    And it's dated and signed by, presumably, Mr. Howard?

16  A.    That is correct.

17  Q.    Okay.  And he gets a carbon copy of that?

18  A.    Yes, he does.

19  Q.    And then the original goes to Ms. Kelso, your

20  bookkeeping -- or --

21  A.    That is correct.

22  Q.    And she compiles all that information in some sort of

23  Excel spreadsheet?

24  A.    Yes, she does.

25  Q.    And then the -- is the dealer then subsequently paid at

1    the -- I guess the next paycheck, their tip -- minimum wage

2    plus their tips plus the tip share?

3    A.    That is correct.

4    Q.    Okay.  So there's a paper trail from that very night

5    through their -- to payroll with Ms. Kelso back to the dealer

6    in the form of their check?

7    A.    That is correct.

8    Q.    And all the years that Mr. Howard worked there, did he --

9    to your knowledge, did he ever complain about it being

10   inappropriately paid at Ocala Poker?

11   A.    No.

12   Q.    Did he ever complain about inappropriately being tipped or

13   not getting all his tips at Ocala Poker?

14   A.    No.

15   Q.    Did he ever complain about the tip share being incorrect?

16   A.    No.

17   Q.    Let's look at Mr. Greenstone.  Is that the same date?

18   A.    No.  It's 2/27, two days later.

19   Q.    Okay.  And what were his tips that day?

20   A.    $338.

21   Q.    And does it reflect that on the -- on that exhibit?

22   A.    Yes, it does.

23   Q.    And does it also show his contribution to the tip share?

24   A.    Yes, it does.  $33.80.

25   Q.    Did he also sign that tip slip?

1    A.   Yes, he did.

2    Q.   And the original, once again, would have been given to

3    Ms. Kelso?

4    A.   That's correct.

5    Q.   And a carbon copy given to Mr. Greenstone?

6    A.   Yes.

7    Q.   And for every tip slip not only these dealers ever filled

8    out, but any dealer ever filled out, they would always be given

9    a carbon copy of that?

10   A.   That is correct.

11   Q.   And the original would always go to Ms. Kelso to compute

12   their wages?

13   A.   Yes.

14   Q.   Now, you asked -- it was confusing to me, so I want to

15   make sure I understand your testimony.

16              THE COURT:  Mr. Gilligan --

17              MR. GILLIGAN:  Yes, sir.

18              THE COURT:  -- do you plan to move these exhibits

19   into evidence?

20              MR. GILLIGAN:  Oh, yeah.  Thank you, Your Honor.

21   Yes.  It's not my case in chief.  But if counsel doesn't mind,

22   I'd like to move them into evidence.

23              THE COURT:  Any objection?

24              MR. MASSEY:  No, sir.

25              THE COURT:  It's Exhibits 21 and 22.

1    MR. GILLIGAN:  Thank you, Your Honor.

2    (Defendant's Exhibits 21 and 22 received into evidence.)

3  BY MR. GILLIGAN:

4  Q.   So a poker dealer gets paid a tip minimum wage?

5  A.   That's correct.

6  Q.   And that tip minimum wage is different -- actually

7  different in Florida than it is federally, right?

8  A.   Sure.

9  Q.   And the federal -- the Florida rate is actually higher?

10 A.   Yes.  That's correct.

11 Q.   So no matter what, they get the tip minimum wage?

12 A.   Yes.

13 Q.   In addition to that -- and is that computed by Ms. Kelso?

14 A.   Yes, it is.

15 Q.   And that's part of the whole payroll function?

16 A.   That is correct.

17 Q.   Okay.  In addition to that, no matter what, they get the

18 tip minimum wage.  Do they also get all of their tips except

19 for their ten percent contribution to the tip share?

20 A.   Yes.

21 Q.   Okay.  And Ms. Kelso handles all that?

22 A.   Yes.

23 Q.   And that's reported on their pay stubs and whatnot that

24 they get?

25 A.   Yes.

```
 1            MR. GILLIGAN:  Thank you.  I do want to reserve -- I
 2    have extra questions, but I don't think they're really within
 3    the scope of Mr. -- and I reserve bringing him back in my case
 4    in chief.
 5            THE COURT:  All right.  Any redirect?
 6            MR. MASSEY:  No, sir.  Thank you.
 7            THE COURT:  All right.  You can step down,
 8    Mr. Matthews.
 9            THE WITNESS:  Thank you.
10       (Witness excused.)
11            MR. GILLIGAN:  I'd like to retrieve -- those are my
12    copies, Your Honor.
13            THE COURT:  You may.
14            MR. GILLIGAN:  Thank you, Your Honor.
15            THE COURT:  Does anybody want to take a five-minute
16    break?  We've been going a little over an hour.
17            MR. GILLIGAN:  I would very much.  Yes, sir.
18            THE COURT:  All right.  Let's do that.  We'll take a
19    five-minute break.
20            COURT SECURITY OFFICER:  All rise.
21            THE COURT:  You need ten?
22            Okay.  We'll take ten.
23            MR. GILLIGAN:  Thank you, Your Honor.
24            THE COURT:  Be at ease.  Go about your business.
25       (Recess, 10:36 a.m. to 10:49 a.m.)
```

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated.

3          COURT SECURITY OFFICER:  Court is back in session.

4          THE COURT:  All right.  Mr. Massey, your next

5    witness.

6          MR. MASSEY:  Thank you, Your Honor.  I'd like to call

7    Jason Bendure.

8          THE COURT:  Why don't you go out and get him.

9          MR. MASSEY:  Yes, sir.  I went out -- I didn't see

10   him.

11         MR. GILLIGAN:  He was out in --

12         MR. MATTHEWS:  Yeah.  He came back.

13      (Mr. Bendure enters the courtroom.)

14         COURTROOM DEPUTY:  Mr. Bendure, if you would please

15   come over to the witness box.

16         THE WITNESS:  Okay.

17         COURTROOM DEPUTY:  Raise your right hand.  Do you

18   solemnly swear that the testimony you will give before this

19   court will be the truth, the whole truth, and nothing but the

20   truth, so help you God?

21         THE WITNESS:  I do.

22         COURTROOM DEPUTY:  Please have a seat.  State your

23   full name for the record, spelling your last name.

24         THE WITNESS:  Jason Benjamin Bendure, B, as in boy,

25   e-n-d-u-r-e.

1    COURTROOM DEPUTY:  Thank you.

2    THE COURT:  You can begin, Mr. Massey.

3    MR. MASSEY:  Thank you, Your Honor.

4    **JASON BENJAMIN BENDURE, PLAINTIFFS' WITNESS, SWORN**

5    **DIRECT EXAMINATION**

6    BY MR. MASSEY:

7    Q.   Good morning.  I see you brought something with you.

8    A.   Yes.

9    Q.   What is that?

10   A.   A copy of the subpoena.

11   Q.   Okay.  Did you work -- or do you work for Ocala Poker?

12   A.   Yes, I do.

13   Q.   And you still work for them?

14   A.   Correct.

15   Q.   In what position?

16   A.   I'm a vault person.

17   Q.   And what does a vault person do?

18   A.   Basically handles money, oversees kind of independently

19   the cash operations for the evening for the night.

20   Q.   Did you -- did you move to vault during your employment?

21   A.   I'm sorry?

22   Q.   Did you move to be the vault person, into that position

23   during your employment?

24   A.   Shortly after I started working at Ocala Poker.  I was

25   trained initially to work out of a chip cart, to be a chip

1    runner and a teller, and for, you know, cash-handling

2    positions.  And then I was trained to work in the vault.

3    Q.    So who works in the vault now?

4    A.    There's a lady named Patricia and a lady named Melissa

5    that work during the day.  And myself and a gentleman named

6    Josh.  And my boss, Vicki.

7    Q.    And Dean Moore, is that a person --

8    A.    No.  He no longer works there.

9    Q.    Were these the same people that worked in the vault when

10   my clients were at Ocala Poker?

11   A.    Yes.

12   Q.    Are you full-time vault person at night?

13   A.    Yes.

14   Q.    Okay.  And so let me show you what we've previously

15   introduced as Plaintiffs' Exhibit 8.

16            MR. MASSEY:  May I approach the witness, Your Honor?

17            THE COURT:  You may.

18   BY MR. MASSEY:

19   Q.    There you go.  Do you recognize that?

20   A.    Yes.

21   Q.    What is it?

22   A.    It's -- it looks like a layout or a schematic of the

23   building, of the poker room.

24   Q.    Okay.  And do you see the vault designated there?

25   A.    I do.  Yes.

1    Q.    Is that where you work?

2    A.    Yes.  As well as, you know, other areas, the poker room

3    floor, tip-out room, cash cage.

4    Q.    And what's stored in the vault?

5    A.    I'm sorry?

6    Q.    What is stored in the vault?  What's in there?

7    A.    Cash and chips.  And we also keep the cards -- the playing

8    cards in a locked cabinet when they're not in use.

9    Q.    Is it a secured area?

10   A.    Yes.

11   Q.    Is the public allowed in and out?

12   A.    No.

13   Q.    There -- most of the time you're in the -- are you in the

14   vault most of the time?

15   A.    Not -- not these days, no.  I spend very little time in

16   the vault now when I'm at work.  Some nights I'm the only

17   person in my department, usually on Sundays.  So I also work in

18   the cage.  And I'm on the poker room floor most of the time.

19   Q.    Were you in the vault most of the time when my clients

20   worked there?

21   A.    More time than I am now.

22   Q.    And why was that time reduced?

23   A.    Labor.  We have a lot less people in our department that

24   work there now.

25   Q.    So did you work in the vault more than you did other

1    places when my clients worked there?

2    A.    I'm sorry?

3    Q.    Did you work in the vault more than you did other places

4    when my clients worked there?

5    A.    It was -- it was probably about an even amount of time.

6    Q.    Is the vault a position of trust?

7    A.    I would think so, yes.

8    Q.    What does that mean?

9    A.    Yeah.  I mean, it is a lot of responsibility, compared to

10   other positions, handling money.  The smaller banks don't

11   have -- you know, all the money -- the big bank is the vault.

12            And I don't think that everyone is necessarily

13   considered worthy of working in the vault, versus working out

14   of teller banks with less money.

15   Q.    Who are the tellers that worked there when my clients

16   worked there?  Can you recall?

17   A.    I honestly don't remember.

18   Q.    Is there a lady named Peggy?

19   A.    Yes.  There is a lady named Peggy.

20   Q.    And someone named Jennifer?

21   A.    Yes.

22   Q.    What about a guy named Josh?

23   A.    Yeah.  Josh -- Josh also works teller and chip runner.  I

24   don't think Jennifer worked there when your clients worked

25   there.  She's fairly new.

```
1   Q.   Do tellers go into the vault?

2   A.   No.

3   Q.   Why not?

4   A.   I don't know.  But I did notice there's a list on the door

5   in the cash cage.  It's an access list.  And it shows what

6   employees are allowed access to what areas.

7   Q.   Do you ever help the floor manager?

8   A.   I help them as far as making announcements on the podium

9   and running chips -- selling chips when I'm on the poker room

10  floor.

11  Q.   Do you ever fill in for the floor manager?

12  A.   No, no.

13  Q.   Who is Kathleen Danielson?

14  A.   She's a lady that used to work there, another person that

15  used to work there.

16  Q.   Did she work there when my clients were there?

17  A.   I'm sorry?

18  Q.   Did she work there when my clients worked there?

19  A.   Yes.  At least Mr. Howard.  I don't know about

20  Mr. Greenstone.  She might have been gone before he worked

21  there.

22  Q.   Are you a member of the tip pool?

23  A.   Yes.

24  Q.   Okay.  And what is the tip pool?

25  A.   It's a percentage -- my understanding of it is a
```

```
1   percentage of the dealers' tips are split based on the hours we
2   work between employees and the cage department, as well as we
3   have our own tip boxes.  But our -- our tips -- we share our
4   tips, too, but they're minimal.
5   Q.   Were you told anything else about the tip pool --
6   A.   No.
7   Q.   -- at Ocala Poker?
8   A.   No.
9   Q.   Is that typical -- is that the typical information given
10  to employees at Ocala Poker, what you just said about the tip
11  pool?
12  A.   As far as I know.
13  Q.   Did Ms. Danielson -- going back to Ms. Danielson, did she
14  help set employees' schedules?
15  A.   I don't believe so, but I wouldn't -- I don't know that.
16  Q.   Did she train chip runners?
17  A.   We all helped train each other and new employees, so, yes,
18  I'm sure.
19  Q.   Did she sign tax documents?
20  A.   Which --
21          MR. GILLIGAN:  Object.
22  BY MR. MASSEY:
23  Q.   Like W-2Gs.
24  A.   Yes.
25  Q.   And what's a W-2G?
```

1  A.  It's a carbon-copied form.  It's a report to the IRS

2  for -- if you receive a jackpot payout or a cash payout, over a

3  certain dollar amount.

4  Q.  Did Ms. Daniel ever -- did Ms. Danielson ever sign a

5  cage-short agreement that related to you?

6  A.  Yes.

7  Q.  And what is a cage-short agreement?

8  A.  If I had ever paid a player or had a cash shortage -- it

9  was just basically an agreement that I would pay it back.

10 Q.  And so was she binding Ocala Poker when she signed that,

11 the agreement?

12        MR. GILLIGAN:  Objection.

13 BY MR. MASSEY:

14 Q.  Why did she sign that?

15        MR. GILLIGAN:  Objection.

16        THE COURT:  It's sustained.  But I think he withdrew

17 it and asked a different question.

18 BY MR. MASSEY:

19 Q.  Why did she sign it?

20 A.  I don't know.  I guess that day she was in the vault and

21 she -- she was the one that signed it.  She was the one that

22 was there.

23 Q.  Would your coworkers normally sign court -- cage-short

24 agreements?

25 A.  I can't say it hadn't happened.

1    MR. MASSEY:  Okay.  Thank you, Your Honor.

2    Thank you, sir.

3    THE COURT:  Mr. Gilligan?

4    MR. GILLIGAN:  Thank you, Your Honor.

5                          **CROSS-EXAMINATION**

6    BY MR. GILLIGAN:

7  Q.   Good morning, Mr. Bendure.

8       Did you work last night?

9  A.   I'm sorry?

10 Q.   Did you work last night?

11 A.   No, no.

12 Q.   Because you normally get off pretty late, right?

13 A.   Yeah.

14 Q.   You work in a department called the cage department?

15 A.   Correct.

16 Q.   Does the cage department have a manager?

17 A.   Yes.

18 Q.   And that's Vicki Pernek?

19 A.   Yes.  Correct.

20 Q.   And she's been the manager for how long?

21 A.   For as long as I worked there.

22 Q.   And when did you start working there?

23 A.   It's been a little over seven years.

24 Q.   Okay.  And -- and you worked in the cage department the

25 entire time?

1    A.    Yes.   Correct.

2    Q.    My understanding is the cage department has typically

3    anywhere from maybe eight to 12 employees?

4    A.    We have a few less than that now.   I want to say about

5    seven now.

6    Q.    Another poker room has opened up in Marion County?

7    A.    Yes.

8    Q.    Has that kind of affected some of the business?

9    A.    I -- I don't know if that's why, but --

10   Q.    Okay.

11   A.    -- but could be.

12   Q.    Okay.   But you -- in the past you've had eight to 12 cage

13   employees, fellow cage employees?

14   A.    Correct.

15   Q.    And now it's down to what?

16   A.    Um --

17   Q.    I'm not asking for an exact number, but appraisement.

18   A.    I want to say seven including Ms. Pernek.

19   Q.    Okay.   And the only manager of that department the whole

20   time you've been there has been Ms. Pernek?

21   A.    Correct.

22   Q.    Does she have an assistant manager?

23   A.    No.

24   Q.    Has she ever had an assistant manager?

25   A.    Not that I'm aware of.

1   Q.   Now, the cage employees work the podium, work as chip

2   runners, work as tellers, and some, like you, also work in the

3   vault; is that correct?

4   A.   Correct.

5   Q.   Now, how long is your typical shift?

6   A.   Between seven and nine hours.

7   Q.   Okay.  And when you first get there to work, are you --

8   are you there before the customers get there or after?

9   A.   No.  I'm there -- there are customers in the building.  I

10  arrive later.

11  Q.   Okay.  You -- you deal with a portion of your work after

12  the customers leave for the night?

13  A.   Correct.

14  Q.   Okay.  And how long are you typically -- and you're

15  working in just the vault at that point in time?

16  A.   I would say 30 to 45 minutes.

17  Q.   Okay.  During the rest of your shift, when the customers

18  are there, do you also work the function as a teller?

19  A.   Work -- I'm sorry?

20  Q.   Work as -- the function as a teller.

21  A.   Yes.

22  Q.   Okay.  Let's go to Exhibit -- Plaintiffs' Exhibit 8, which

23  I think is in front of you, which is the schematic of the poker

24  room.

25  A.   Uh-huh (affirmative).

```
1   Q.   Mr. Massey asked you about the -- was the public allowed
2   in the vault.  And you said, No, they were not, correct?
3   A.   Correct.
4   Q.   And as part of that complex, there's a -- as you look at
5   the exhibit, there's a room that's called the cage right next
6   to the vault?
7   A.   Correct.
8   Q.   Is the public allowed in the cage?
9   A.   No.
10  Q.   Okay.  There's money there, too, right?
11  A.   Correct.
12  Q.   Okay.  And it looks like in the cage there's two squares.
13  Would those be the -- would those be teller windows?
14  A.   Correct.  Teller windows, teller banks.
15  Q.   Okay.  And there -- when you work in the vault -- you keep
16  the door open of the vault while you're working in there?
17  A.   Sometimes, yes.
18  Q.   Okay.  When the customers are there?
19  A.   I'm sorry?
20  Q.   When the customers are there?
21  A.   Yes, sometimes, when I'm in there for climate control.
22  Q.   Okay.  Now, the -- when you're working in the vault, is
23  there also a teller window set up for whoever is working in the
24  vault?
25  A.   Yes.
```

1  Q.   And does that teller window have what's called a bank?

2  A.   Yes.

3  Q.   What's a bank?

4  A.   It's basically just a big black metal box with cash and

5  chips in it.

6  Q.   Okay.  But that bank is counted out at the beginning of

7  every shift, specific to that person, correct?

8  A.   Correct.

9  Q.   That person has to correct -- has to account for the money

10  in that bank at the beginning of the shift, at the end of the

11  shift?

12  A.   Correct.

13  Q.   It's not anybody else's bank you'd be allowed to work out

14  of, correct?

15  A.   No.

16  Q.   Okay.  So the bank that's set up right next to the vault

17  window would be your bank for the night, correct --

18  A.   Correct.

19  Q.   -- when you're working as a teller?

20  A.   Uh-huh (affirmative).

21  Q.   Okay.  And the -- the square right next to it is another

22  teller bank, or teller window, correct?

23  A.   Correct.

24  Q.   So -- and that person has their very own bank for that

25  teller window?

1  A.   Yes.

2  Q.   Now, at the end of the -- you typically work nights,

3  correct?

4  A.   Correct.

5  Q.   And what time does Ocala Poker close for the customers?

6  A.   For the customers -- Wednesdays we close at 3 a.m.  And

7  Friday, Saturdays, we close at 4 a.m.  The rest of the week we

8  close at 1 a.m.

9  Q.   Okay.  And you're typically the night guy, correct?

10  A.   Correct.  Yes.

11  Q.   Now, is there a teller there the entire -- just a separate

12  teller that's doing nothing but teller duties at nighttime the

13  entire time?

14  A.   No.

15  Q.   Do they -- at some point in time does -- the only teller

16  there would be you?

17  A.   Correct.

18  Q.   And so at that point in time you're wearing -- you're

19  wearing two hats, you're both a teller and working in the

20  vault?

21  A.   Yes.

22  Q.   Most of your work in the vault, though, isn't done until

23  the customers are gone?

24  A.   I'm sorry?

25  Q.   Most of your work in the vault is not even done until the

1    customers are actually gone, correct?

2    A.    Correct.

3    Q.    And I think you said it was, like, maybe 45 minutes or

4    so --

5    A.    Yeah, about that.

6    Q.    -- of vault work?

7          Now, in addition to being the teller -- your own

8    teller, right next to the vault, do you also -- are you also

9    the person when there is another teller there that sits in for

10   them or lets them go on breaks?

11   A.    Yes.

12   Q.    And are you also the person typically that will go work

13   the floor, either work the podium or as a chip runner, when

14   those cage employees have to go on break or lunch or dinner?

15   A.    Yes.

16   Q.    Okay.  Not just for one, but for all of them?  They kind

17   of have to take their -- so you spend a fair amount of time on

18   the floor working the podium or doing chip running?

19   A.    Yes.

20   Q.    And you spend a fair -- some amount of time being the lone

21   teller there?

22   A.    Yes.

23   Q.    Either because you're the only teller there or because the

24   other teller may have gone on break?

25   A.    Yes.

1  Q.  Have you ever owned any ownership interest in Ocala Poker?

2  A.  No.

3  Q.  Have you ever been -- have you ever been told that you're

4  a manager?

5  A.  No.

6  Q.  Or supervisor?

7  A.  I've been called a supervisor, but I've never been

8  formally given that title.

9  Q.  Okay.  And you've never been told you were a supervisor by

10  Mr. Matthews, correct?

11  A.  Correct.

12  Q.  And he's the boss there, he's the president of Ocala

13  Poker?

14  A.  Yes.

15  Q.  And he's -- he's the person that appoints everybody there,

16  correct?

17  A.  Correct.

18  Q.  Do you have the authority to hire and fire employees?

19  A.  No.

20  Q.  Have you ever had the authority to hire and fire

21  employees?

22  A.  No.

23  Q.  Do you have the ability to set any employee's wages?

24  A.  No.

25  Q.  Have you ever had the authority to set any employee's

1  wages?

2  A.   I haven't, no.

3  Q.   Now, I think Mr. Massey asked you some questions about

4  Ms. Danielson.  To your knowledge, was she ever appointed as a

5  manager by Mr. Matthews?

6  A.   No.

7  Q.   By Ms. Pernek?

8  A.   No.

9  Q.   Did she basically do the same job you did, meaning that

10 she worked in the cage department, but she also worked in the

11 vault?

12 A.   Yes.

13 Q.   Mr. Massey asked you about Ms. Danielson training chip

14 runners.  Have you trained -- have you yourself trained chip

15 runners?

16 A.   Yes.

17 Q.   Have most of the senior employees there, when they get a

18 newbie -- do they train chip runners?

19 A.   Yes.

20 Q.   I don't want to -- I don't want to be -- I don't want to

21 denigrate what they do.  But it doesn't take a long time to

22 learn that job, does it?

23 A.   Not really.  You just have to be able to count well.

24 Q.   Okay.  And would that be -- have you also trained people

25 working in the podium?

1  A.   Correct.

2  Q.   Okay.  Once again, it's not -- it's be nice, seat -- learn

3  how to seat people, take phone reservations, things like that?

4  A.   Yeah.  You have to be able to use a microphone.  You can't

5  be afraid of interacting with people.

6  Q.   And would it be -- would it be unusual for any cage

7  employee that's been there for a while to train new cage

8  employees to do the various cage and -- cage employee jobs of

9  teller, chip runner, or podium?

10  A.   No.

11  Q.   Who is Ms. Pernek's boss?

12  A.   Ms. Pernek's boss?

13  Q.   Yes.

14  A.   Brian Matthews.

15  Q.   Did -- to your knowledge -- I know she's not there now.

16  But at the time Ms. Danielson was there, did Ms. Danielson ever

17  own any ownership interest in Ocala Poker?

18  A.   Not that I'm aware of.

19  Q.   Did she -- did she have any authority to hire and fire

20  employees?

21  A.   Not that I'm aware of.

22  Q.   Did she have the authority to discipline employees,

23  suspend them, or anything like that?

24  A.   She could recommend discipline, but I don't know that she

25  had enough authority to do that.

1   Q.   She could recommend it to Vicki?

2   A.   I'm sorry?

3   Q.   Recommend it to -- the manager, Vicki Pernek --

4   A.   Yes.

5   Q.   -- or Mr. Matthews?

6   A.   Yes.

7   Q.   Okay.  Did she have the authority to set anybody's wages?

8   A.   Not that I'm aware of.

9   Q.   Did you at one time -- were you Mr. Howard's roommate?

10  A.   Yes.

11  Q.   The plaintiff that's sitting here?

12  A.   Uh-huh (affirmative).  Yes.

13  Q.   When were you his roommate?

14  A.   I want to say between 2009, when I first came to Florida,

15  and around 2013.

16  Q.   Okay.  And you've always worked in the cage department,

17  correct?

18  A.   Correct.  Yes.

19  Q.   And he's always worked in the -- as either a poker dealer

20  or as a dual rate?

21  A.   Yes.

22  Q.   And you -- do you understand that a dual rate is somebody

23  that's not acting as a poker dealer, but more as a floor

24  manager?

25  A.   Yes.

1   Q.   And they get paid a different -- they get paid differently

2   when they're working as a floor manager?

3   A.   Yes.

4   Q.   Did Mr. Howard ever complain to you about the tip pool?

5   A.   Yes.

6   Q.   Did you make as much money as Mr. Howard?

7   A.   No.

8   Q.   Is that because of the tips they get from -- on the poker

9   floor?

10  A.   Yes.

11  Q.   Do the poker customers typically tip the poker dealers

12  more than they tip the other regular -- the cage employees?

13  A.   Yes.

14  Q.   Do the cage employees themselves, though, get tips?

15  A.   Yes.

16  Q.   Are there what are called tip boxes there for the cage

17  employees?

18  A.   Yes.

19       (Counsel confers with Ms. Peterson.)

20            MR. GILLIGAN:   I apologize, Your Honor.   Give me one

21  second.

22            Your Honor, I'd like to, if I could -- I know it's

23  out of order again, but I want to -- I don't want to call

24  Mr. Bendure back if I don't have to.   But I'd like to introduce

25  through him Exhibit 13.

1      COURTROOM DEPUTY:  Defendant's?

2      MR. GILLIGAN:  Defendant's.  I apologize.

3  Defendant's 13 and 14.  And also Defendant's 11 and 12.  11,

4  12, 13, and 14.

5      THE COURT:  Any objection to that?

6      MR. MASSEY:  No, sir.

7      THE COURT:  All right.

8      MR. GILLIGAN:  May I approach the witness and give

9  him a copy of those exhibits, Your Honor?

10      THE COURT:  You may.

11      MR. GILLIGAN:  Thank you.

12    (Defendant's Exhibits 11, 12, 13, and 14 received into

13  evidence.)

14  BY MR. GILLIGAN:

15  Q.   Okay.  Let me show you Defense Exhibits 13 through -- what

16  did I say -- let's start with Defense Exhibit 13.

17      Is that the first one in the stack, Mr. Bendure?

18      MS. PETERSON:  11.

19      MR. GILLIGAN:  I'm sorry.

20  BY MR. GILLIGAN:

21  Q.   Defense Exhibit 11.  I apologize.

22  A.   13?

23  Q.   Let's start with Defense Exhibit 11.

24  A.   11.  Okay.

25      MR. GILLIGAN:  Your Honor, if it's not a -- can I

1    just stand next to the witness and go through the exhibits?  Is

2    that permissible?  I don't have a copy of what he's looking at

3    and I'm trying to wing it here.

4              THE COURT:  You can only if the court reporter can

5    hear you okay.

6              MR. GILLIGAN:  Okay.

7              THE COURT:  And make sure you speak up.

8              MR. GILLIGAN:  Thank you, Your Honor.

9    BY MR. GILLIGAN:

10   Q.   Okay.  Let's look at Defense Exhibit 11.  Could you tell

11   the court what that shows.

12   A.   It shows a lady named Patricia running chips, it looks

13   like holding a chip rack.  She's on the poker room floor

14   standing next to a chip cart.

15   Q.   And, hence, the name chip runner, correct?

16   A.   Correct.  Yes.

17   Q.   There's a -- what looks like a box with, like -- it's a

18   poor picture, but a box with, like, a yellow tag on it.  What

19   is that box?

20   A.   It's a tip box.

21   Q.   And do the customers routinely give chip runners tips into

22   the tip box --

23   A.   Yes.

24   Q.   -- or directly, and they put them into the chip box?

25   A.   Yes.

1  Q.   And do all the chip runner carts have the chip boxes on

2  them?

3  A.   There's only one.  But if there's more than one chip cart

4  on the floor, we use the same one.

5  Q.   Okay.  The next exhibit is Exhibit -- Defense Exhibit 12.

6  Can you tell the judge what that is?

7  A.   That is -- when you walk into the poker room, that's the

8  podium.

9  Q.   Okay.  And there's nobody there right now, but -- in the

10  picture.  But that's where the podium person would work at?

11  A.   Correct.

12  Q.   And as I understand it, they take phone reservations, seat

13  new customers, things like that?

14  A.   Yes, and make announcements and...

15  Q.   And they do -- they get tipped themselves from time to

16  time?

17  A.   Yes.

18  Q.   And they put their tips in the chip runner's tip box when

19  that happens?

20  A.   Yes.

21  Q.   By the way, going back to Exhibit -- Defense Exhibit 11,

22  the lady there is apparently doing a chip running job.  But you

23  also do this job, correct?

24  A.   Correct.

25  Q.   You do it when they go on break or there's -- they need an

1   extra hand or whatever?

2   A.    Correct.

3   Q.    Okay.  And then Defense Exhibit 12, which is the podium --

4   you also work the podium as part of your cage employee job,

5   correct?

6   A.    Correct.

7   Q.    Let's go now to Defense Exhibit 13.  And will you tell the

8   court what that shows, please?

9   A.    That's the cash cage.  It's a lady named Peggy sitting in

10  the window in the cash cage.

11  Q.    And -- and she's got what's called the tip box in front of

12  her.  Is that a similar tip box to the one we saw on the chip

13  runner's cart?

14  A.    Yes.

15  Q.    And do the tellers, like Ms. Peggy there -- does she

16  routinely -- not just her, but any teller -- do they routinely

17  get tipped by the customers?

18  A.    Yes.

19  Q.    When a customer comes in to play poker, is this the first

20  place they visit in order to turn their cash into chips?

21  A.    Yes.

22  Q.    And the teller would take their money -- 100 bucks, let's

23  say.  They give them 100 bucks in tips and they'd walk into the

24  poker room, visit with the podium person, and get seated?

25  A.    Correct.

1  Q.   Now, if they needed to buy extra chips during the course

2  of their play, that would be the job of the chip runner?

3  A.   Correct.

4  Q.   Now, looking at Defense Exhibit 13...

5  A.   Is this 8?

6  Q.   Okay.  Exhibit 8.  You have Exhibit 8 in front of you?

7  A.   Correct.

8  Q.   And that, once again, is the floor plan for the poker

9  operations at Ocala Poker?

10  A.   Correct.

11        THE COURT:  That's Plaintiffs' Exhibit 8?

12        MR. MASSEY:  Yes.

13        MR. GILLIGAN:  Yes, sir.  I'm sorry.

14        Is it plaintiffs' or mine, Michael?

15        MS. PETERSON:  Plaintiffs'.

16        MR. GILLIGAN:  Plaintiffs' Exhibit 8, which is the

17  floor plan.

18  BY MR. GILLIGAN:

19  Q.   If you -- if -- looking at Plaintiffs' Exhibit 8 and

20  looking at Plaintiffs' Exhibit 13, which is the teller window

21  picture --

22  A.   Uh-huh (affirmative).

23  Q.   -- would you tell the judge this teller -- is she working

24  in the one right next to the vault or is she working next to

25  one next to what's called the mantrap?

1    A.    She's working in the one right next to the vault, between

2    the vault and the mantrap.

3    Q.    Okay.  And then there's one there that was right next to

4    the vault.  And that was where you would typically work when

5    you're working as a teller?

6    A.    The cage, yes.  Correct.

7    Q.    Now let me show you Defense Exhibit 14.  And can you tell

8    the court what that is, please.

9    A.    That is the view into the vault from the cash cage, with

10   the door open.

11   Q.    Okay.  And the lady peeking out of the door is actually

12   Ms. Pernek?

13   A.    Correct.

14   Q.    Your boss?

15   A.    Yes.

16   Q.    The cage room -- cage department manager.

17   A.    Uh-huh (affirmative).

18   Q.    Now, right next to that door there appears to be a black

19   seat.  Is that the teller window that somebody working the

20   vault when they're also working as a teller would work out of?

21   A.    Correct.

22   Q.    And when you were saying they had their own bank, that's

23   where their bank would be, correct?

24   A.    Correct.

25              MR. GILLIGAN:  Thank you.

1  BY MR. GILLIGAN:

2  Q.   Do the cage employees customarily and regularly get tipped

3  by the customers at Ocala Poker?

4  A.   Yes.

5  Q.   And do you customarily, as your position as a cage

6  employee, customarily and regularly get tipped?

7  A.   Yes.

8  Q.   Are you tipped customarily and regularly in excess of --

9  just your tips, forgetting the tip share, more than $30 a

10  month?

11  A.   Yes.

12       MR. GILLIGAN:   Thank you, Your Honor.   I have no

13  further questions.

14       THE COURT:   Mr. Massey?

15                    **REDIRECT EXAMINATION**

16  BY MR. MASSEY:

17  Q.   When did the new poker room open up in Ocala?

18  A.   I want to say last fall.

19  Q.   And was that after my clients left employment?

20  A.   Yes.

21  Q.   Okay.   And is that the time when you took on more duties

22  at Ocala Poker outside the vault room?

23  A.   I'd gradually taken on more duties before then.   But

24  lately, yes.

25  Q.   And why is that?

1   A.   I mean, just we don't have as many people in our

2   department and we're not as busy, so it really doesn't take as

3   many of us.

4   Q.   Now, who called you a supervisor?

5   A.   I don't remember where that started.  It was -- there was

6   a time that a lot of us that worked in the vault called each

7   other supervisors, the floor people called us supervisors.  We

8   just -- we called ourselves supervisor.

9   Q.   You identified yourself as a supervisor?

10  A.   At one point, yes.

11  Q.   And is that while my clients worked there?

12  A.   Yes.

13  Q.   And were you sharing the tip pool during that time?

14  A.   Yes.

15  Q.   Why would you call yourself a supervisor?

16  A.   I think it was just because we had more responsibility and

17  we were senior employees.

18  Q.   What were your extra responsibilities?

19  A.   I mean, we had to be able to do all the jobs, you know,

20  requiring money in our department.  And we had to be

21  responsible for the larger bank, which is the vault.

22  Q.   Now, when you fill in for a teller, they go on break or

23  whatnot, are you responsible for their bank?

24  A.   Not their bank, no.  I would have my own bank.

25  Q.   And I don't know if you still have the defendant's

1    exhibits before you.  Do you?

2    A.   Which page?

3    Q.   Well, I was looking particularly -- Defendant's Exhibit

4    14, do you have that?

5              MR. GILLIGAN:  I took them.

6              MR. MASSEY:  You took them?

7    BY MR. MASSEY:

8    Q.   Okay.  I can -- I can hand it to you if you'd like.

9    A.   Okay.  Yeah.  Is it the --

10   Q.   I think you have mine still.

11             MR. MASSEY:  May I approach the witness, Your Honor?

12             THE COURT:  You may.

13             MR. MASSEY:  Can I ask him questions here also?  I

14   only have one copy.  Or should I step back?

15             THE COURT:  It's just hard to hear.  And I'm

16   concerned that it won't be picked up on the recording, but

17   that's...

18   BY MR. MASSEY:

19   Q.   Okay.  Looking at Exhibit 14, this is the view from inside

20   the cage looking out, right?

21   A.   Correct.

22   Q.   And that's a bathroom we see there?

23   A.   I'm sorry?

24   Q.   Is that a bathroom we see back there?

25   A.   Yes.

1  Q.    Okay.  Do you see in any of the Exhibits 11, 12, 13, and

2  14 a picture of the -- a picture of the vault?

3  A.    No.  I don't see it in this.  I can see the edge of the

4  door in the picture of the cage.

5  Q.    Yeah.  I think -- okay.  And so is it the public walks up

6  to -- let's just look at No. 14, just -- Exhibit 14, just to be

7  clear.  The public walks up to this window; is that right?

8  A.    Correct.  Yes.

9  Q.    And then they speak to the people -- the tellers that are

10 on the other side of that window; is that right?

11 A.    Correct.

12 Q.    Do they have the -- does the customer -- can customers do

13 that for people that are in the vault?

14 A.    Well, I mean, we would come out of the vault if they walk

15 up to the cage if we're in there.

16 Q.    But if you're -- if someone was in the vault, can

17 customers come up to them and talk to them?

18 A.    They can come up to the window in the cash cage.  Usually

19 we see them or we hear them coming up to the window, so we come

20 out of the vault, if we're in there putting something away or

21 counting money.

22 Q.    All right.  So you have to leave the vault to talk to the

23 customers?

24 A.    If we're not doing anything in the vault, we're probably

25 just sitting in the cage.

1  Q.   Other times when you're in the vault?

2  A.   Other times when I'm in the vault?

3  Q.   Yes.

4  A.   I just step around the corner, if I see them or hear them

5  come up to the window, if I'm the only one in the cage.

6  Q.   No.  I'm just asking if there's times you're in the vault.

7  A.   Yeah.  I mean, I have to put money away and count money

8  and count chips and...

9  Q.   And sometimes that door is closed?

10  A.   When -- when I'm not in there, yeah.  I mean, if I'm not

11  in the cage -- if I'm the only person in the cage in the vault

12  area, I'll prop the door open sometimes.  But otherwise it's

13  closed.

14  Q.   Okay.  Are you ever in the vault with the door closed?

15  A.   No.

16  Q.   It's always open when you're in there?

17  A.   Yeah.

18  Q.   And then how will the -- how do people that walk up to the

19  window know you're in there?

20  A.   We have signs we put in the window.

21  Q.   That say what?

22  A.   They say next window, please.  And usually if there -- you

23  know, if I'm in there, there's no sign in the window.  If I'm

24  the only person working in my department, if I'm not on the

25  poker room floor, I'll put the signs up in both windows, so

1  that if they walk up to the cage they know there's no one in

2  there.

3  Q.   And then -- but how do they know you're in the vault?

4  A.   If the door is open.  Usually I'm in the cage if I'm in

5  the vault counting money.  If I see or hear anyone coming up to

6  the cage, I'll step into the cage, or I'm just sitting in the

7  cage.

8  Q.   Can the public see you in the vault?

9  A.   They can see movement, probably.  I mean, they can

10 probably tell there's someone in the cage, in the vault, if the

11 door is propped open.

12 Q.   Do they know what you're doing in there?

13 A.   I'm sorry?

14 Q.   Do they know what you're doing in there?

15 A.   I mean, I -- I don't know.

16       MR. GILLIGAN:  Object -- never mind.

17 BY MR. MASSEY:

18 Q.   Are there times when you have tellers working, in addition

19 to you being in the vault?

20 A.   Yes.

21 Q.   Okay.

22 A.   But I -- when I have a teller now -- if I have a teller,

23 it's only until a certain point in the evening.  And if I have

24 a teller in the cage, I'm usually on the poker room floor.

25 Q.   Well, let's talk about before the Ocala Poker opened up.

1  During that time, were there times when there were tellers in

2  your -- there were tellers working and you were in the vault?

3  A.    Yes.

4  Q.    Okay.  And if a customer came up and put money in the tip

5  box when they were talking with the teller --

6  A.    Uh-huh (affirmative).

7  Q.    -- would that customer be thinking that they were giving

8  it to someone -- that tip to someone in the vault?

9         MR. GILLIGAN:  Objection.  Specu- -- objection.

10 Calls for speculation.

11        THE COURT:  Sustained.

12        MR. MASSEY:  Thank you.  That's all I have, Your

13 Honor.

14        MR. GILLIGAN:  Thank you, Your Honor.  I have no

15 further questions.  May Mr. Bendure be released from his

16 subpoena?

17        MR. MASSEY:  Yes, sir.

18        THE COURT:  All right.  You can step down and you're

19 excused.

20        THE WITNESS:  For today or -- do I come back

21 tomorrow?

22        THE COURT:  I think the parties have agreed to excuse

23 you for the rest of the time the case goes on.

24        THE WITNESS:  Thank you.

25        MR. GILLIGAN:  That's correct.

1    THE COURT:  So you don't have to come back tomorrow
2  unless for some reason they say otherwise to you at some other
3  point.
4    THE WITNESS:  I'm sorry?
5    THE COURT:  You don't have to come back tomorrow
6  unless Mr. Gilligan or --
7    MR. GILLIGAN:  I'm releasing him from our subpoena.
8    THE COURT:  All right.  Then you're free to go and
9  you don't have to come back.
10    THE WITNESS:  Thank you.
11     (Witness excused.)
12    THE COURT:  The next witness?
13    MR. MASSEY:  Mr. Greenstone, Your Honor.
14    THE COURT:  All right.
15    MR. MASSEY:  May I retrieve my exhibits, Your Honor?
16  I think I left them up there.
17    THE COURT:  You can.  And if you can grab 14 for me.
18    And let the record reflect 11, 12, 13, and 14 of
19  defendant's exhibits were admitted without objection.
20    COURTROOM DEPUTY:  Okay.  If you would raise your
21  right hand.  Do you solemnly swear that the testimony you will
22  give before this court will be the truth, the whole truth, and
23  nothing but the truth, so help you God?
24    THE WITNESS:  I do.
25    COURTROOM DEPUTY:  Please have a seat and state your

1    full name for the record, spelling your last name.

2          THE WITNESS:  Jeffrey Greenstone,

3    G-r-e-e-n-s-t-o-n-e.

4          THE COURT:  You can proceed.

5          MR. MASSEY:  Thank you, Your Honor.

6          **JEFFREY GREENSTONE, PLAINTIFFS' WITNESS, SWORN**

7                    **DIRECT EXAMINATION**

8    BY MR. MASSEY:

9    Q.   Did you ever work for Ocala Poker?

10   A.   Yes.

11   Q.   And in what capacity?

12   A.   As a poker dealer.

13   Q.   And when about was that?

14   A.   I started in -- I believe it was May of 2008.

15   Q.   Let me show you Exhibit 20.

16          COURTROOM DEPUTY:  Plaintiffs'?

17          MR. MASSEY:  Plaintiffs' Exhibit 20, yes, ma'am.

18          May I approach the witness, Your Honor?

19          THE COURT:  You may.

20   BY MR. MASSEY:

21   Q.   Do you recognize that?

22   A.   Yeah.  It looks like a page from our handbook.

23   Q.   And when was the first time you saw that?

24   A.   I believe, like, a week before we opened we had, like, a

25   meeting with all the dealers and floors and they handed out

1   handbooks and stuff like that.

2   Q.    Okay.  And was there any discussion by Ocala Poker to you

3   about tip credits and tip pooling?

4   A.    All we were told was that they were taking out eight

5   percent of our tips.  And they didn't go into too much detail

6   about it, just that chip runners and people that helped us, we

7   get a share of it.  And that was all I was told about it.

8   Q.    Did you ever receive any other documents in addition to

9   the employee handbook?

10  A.    No.

11  Q.    You see to your right some posters the defendant's counsel

12  put up.  Did you ever see any of that?

13  A.    I saw posters up there by the time clock.  I mean, I don't

14  know if all those were up there.  I didn't really pay too much

15  attention to them.

16  Q.    Did you ever see -- did you ever notice anything about the

17  tip credit or tip pooling in any of that?

18  A.    No.

19  Q.    Now, what hourly wage did you make working at Ocala Poker?

20  A.    It fluctuated over the -- I worked there on and off for

21  about seven years.  In the beginning I don't -- I don't know

22  the exact number.  Maybe it was three-something.  I think at

23  the end it was, like, 5.03 or something.

24  Q.    Was it always less than the federal minimum wage?

25  A.    Yes.

1  Q.   Were you always required to participate in Ocala Poker's

2  tip pool?

3  A.   Yes.

4  Q.   Did you ever receive anything from the tip pool?  Or was

5  it just you giving your tips up?

6  A.   I was just giving.

7  Q.   Was that a required -- required part of your employment?

8  A.   Yes.

9  Q.   Who is Jason Bendure?

10 A.   From my understanding from when I worked there, he was

11 known as the supervisor of, like, all the chip runners.

12         MR. GILLIGAN:  Objection, Your Honor.  That's

13 nonresponsive.  He just asked him who he was and he just

14 testified -- now he's giving a description of what he

15 understood.  And I didn't have a chance to hear the question

16 and object, so...

17         THE COURT:  It's overruled.  You can continue.

18 BY MR. MASSEY:

19 Q.   And so what sort of duties did he do?

20 A.   He was -- I mean, I didn't see him that much.  He was

21 mainly in the vault in the cage area.  The only time I saw him

22 mainly was either -- if someone needed a break, he would come

23 out and, like -- if they needed a smoke break or something,

24 he'd watch the -- do the chip running for the other chip

25 runners.  And on occasion, at the end of the night, he'd cash

1   out our tips for us and stuff like that.

2   Q.   Was he mostly in the vault?

3   A.   Mainly in the vault, yes.

4   Q.   And so what is the vault?

5   A.   The vault -- that's where all the money is, like, kept and

6   stuff like that.  It's right -- there's a door that goes into,

7   like, the -- where the tellers and cashiers are.  And then the

8   vault is in there.

9   Q.   And is that -- is the vault area different than the -- the

10  area where the tellers sit?

11  A.   Correct.

12  Q.   Does the public normally walk up to the vault?

13  A.   Not to vault.  To the tellers, they walk up to.

14          MR. MASSEY:  Thank you, Your Honor.  That's all I

15  have.

16          THE COURT:  Any cross, Mr. Gilligan?

17          MR. GILLIGAN:  Thank you, Your Honor.

18                     **CROSS-EXAMINATION**

19  BY MR. GILLIGAN:

20  Q.   Are you currently employed?

21  A.   No.

22  Q.   Did you -- before you worked at Ocala Poker, had you

23  previously worked as a poker dealer?

24  A.   Yes, in Jacksonville.

25  Q.   And what was the name of that facility?

1  A.   It was called the St. Johns Poker Room.

2  Q.   Okay.  And did it have a formal corporate name?

3  A.   Best Bet, I think it's called.

4  Q.   And I understand Mr. Howard, the other plaintiff in this

5  case -- he didn't work in the same poker room, but he worked

6  for the same poker company --

7  A.   Correct.

8  Q.   -- which is Best Bet?

9        Did you know Mr. Howard when you were working -- a

10 different poker room, but owned by the same company up in

11 Jacksonville?

12 A.   No.  I met him at Ocala.

13 Q.   Okay.  And -- now, you were always a poker dealer for

14 Ocala Poker?

15 A.   Correct.

16 Q.   And that was off and on for, like, seven or eight years?

17 A.   For Ocala Poker, yeah.

18 Q.   Okay.  And have you worked -- other than Best Bet and

19 Ocala Poker, have you worked for any other poker operations?

20 A.   No.

21 Q.   You actually -- you're a college graduate?

22 A.   Correct.

23 Q.   I think you have a degree in computers?

24 A.   Computer engineering, yeah.

25 Q.   Computer engineering from the University of Central

1  Florida?

2  A.   Correct.

3  Q.   And you actually worked in the field of computer

4  engineering?

5  A.   Yes, for approximately 10 -- 12 years.

6  Q.   And you're an educated man?

7  A.   Right.

8  Q.   Okay.  Now, you said that you saw the examples -- we

9  haven't put them in evidence yet, but the posters that are

10 hanging to your right.  You recall seeing posters like that

11 where you clock in at Ocala Poker; is that correct?

12 A.   Correct.

13 Q.   But you didn't really read them?

14 A.   No.  I...

15 Q.   But certainly if you chose to have read them, you would

16 have been able to understand them?

17 A.   Yeah.  They were available for me to read.  I just...

18 Q.   Now, when you were employed by Ocala Poker -- you said you

19 got the handbook, I think, Mr. Massey showed to you?

20 A.   Correct.

21 Q.   Now, one of the things you said is that -- as I understood

22 your testimony, is that you -- you don't recall when Ocala

23 Poker first opened ever being told what your tip credit wage

24 was going to be.  Did I understand your testimony correctly?

25 A.   Yeah.  I mean, when I started what was given was the

1   handbook.  And they told us that eight percent was getting

2   taken out of our tips.

3   Q.   And I also think -- and correct me if I'm wrong.  But I

4   thought I heard you testify that Mr. -- in response to

5   Mr. Massey's questions that you got paid a tip credit minimum

6   wage, and it changed from time to time over the period of time

7   you were at Ocala Poker?

8   A.   Yes.

9   Q.   And you didn't really remember what it was in the previous

10  years.  But your testimony was that when you ended your

11  employment it was, like, $5.03 an hour; is that correct?

12  A.   Yeah.  I don't know the exact numbers, but...

13  Q.   Okay.  How did you know what the number was?

14  A.   From the sign.

15  Q.   That sign?

16  A.   Yeah.

17  Q.   Okay.  So you did read it to a certain degree?

18  A.   Only the -- the things I read on the sign were -- they

19  were in big print.  They had, like --

20  Q.   Okay.

21  A.   -- the minimum wage and then, like -- I also saw something

22  about child labor, something -- I never read, like, the

23  whole...

24  Q.   Okay.  But at least you took the time to read the sign to

25  know what the tip credit minimum wage was?

1  A.    Correct.

2  Q.    And that's fair.  I mean, that's important to you, right?

3  You want to know how much you're going to make, right?

4  A.    Right.

5  Q.    And you also received as part of your compensation with

6  Ocala Poker a -- the tips?

7  A.    Correct.

8  Q.    Now, I know we ran through the drill a little bit with

9  some of the other -- with Mr. Matthews, but -- but as I

10 understand it -- I want to make sure you have the same

11 understanding, is that you have a tip box on your table when

12 you're working as a dealer?

13 A.    Correct.

14 Q.    And that tip box is -- is unique to you for that day, in

15 that you go to a room that has all the tip boxes in it, they're

16 all numbered, and you check out, by way of example, tip box 28,

17 and that's your tip box for the day?

18 A.    Yeah.  When we get there for the beginning of our shift

19 with regard to the box, then we write it down with our name on

20 it.

21 Q.    Okay.  And when you check in for the day, you actually

22 have a -- a scanning-type ID card that identifies who you are?

23 A.    We have a -- our state license and then our badge.

24 Q.    Okay.  And it's a badge that's worn by a lanyard on your

25 neck?

1    A.    Yes.

2    Q.    And that -- you use that badge to clock in when you come

3    in that day?

4    A.    They did have those.  And I -- I saw a lot of people lost

5    theirs.  So they had a code you could just punch into the time

6    clock --

7    Q.    Okay.  So you --

8    A.    -- which is what I did.

9    Q.    So you could do it one of two ways?

10   A.    Yeah.

11   Q.    And you could scan your card and have, like, a -- like, a

12   scanner, like, in a grocery store, correct?

13   A.    Correct.

14   Q.    Or if you lost your card, you had a unique employee number

15   that you could punch in?

16   A.    Correct.

17   Q.    But either way you -- they would know you got to work at

18   such and such a time, either by scanning or punching in?

19   A.    Right.

20   Q.    And they would keep track of your hours that you worked

21   there that way?

22   A.    Correct.

23   Q.    And when you left work, the same process, only in reverse.

24   You scan your card out or you're punching your number out,

25   right?

```
1    A.    Yeah.  I mean, in theory that's what we're supposed to do.
2    I mean, there was occasions where I forgot to clock out and
3    stuff like that.
4    Q.    Okay.  And on those occasions, though, you'd just go to
5    management and tell them you kind of messed up, tell them when
6    you left, they'd confirm it to whoever did payroll --
7    A.    Right.
8    Q.    -- and you get paid right -- appropriately, right?
9    A.    Correct.
10   Q.    Okay.  And when you check out the tip box, the tip box is
11   actually -- do you notate that the tip box is to your employee
12   number?
13   A.    Not to my -- my --
14   Q.    When you get the -- when you get the tip box in -- when
15   you get to work, you get a tip box.  It will say No. 28 on the
16   tip box.  Do you actually register that box to your number
17   some -- to your employee number somehow?
18   A.    No.
19   Q.    Okay.  But you keep that box?  That's your box for the
20   day?
21   A.    Yeah.  How it works is there's a sheet by the time clock.
22   We put our name, the time we clocked in, and then our box
23   number.
24   Q.    Okay.  So there's a way for management to know whose tip
25   box that is for the day?
```

1    A.    Right.

2    Q.    Because they have to account for your tips?

3    A.    Correct.

4    Q.    And that -- and the tip box is locked?

5    A.    Yes.

6    Q.    And you're -- and the -- and you get tipped by the

7    customers --

8    A.    Correct.

9    Q.    -- sitting at the poker table?

10          And I heard -- and you can correct me if I'm wrong.

11   But typically a poker dealer may deal 20 to 30 hands a half

12   hour?

13   A.    20 is more realistic.

14   Q.    More realistic?  Okay.  And every hand there's a winner?

15   A.    Every hand there's a winner.

16   Q.    And do typically the winners, you hope -- do the winners

17   typically tip you?

18   A.    You hope.  It's not always the case, but...

19   Q.    Okay.  But it's certainly customary that they -- the

20   winners tip you in those hands, correct?

21   A.    Correct.

22   Q.    Okay.  Now, do they tip you in cash or tips -- or chips?

23   A.    Always chips.

24   Q.    And you actually -- there's a camera watching y'all.  So

25   you have to -- you have to put the chip in the chip box so the

1    camera can see you do it, right?

2    A.    Right.

3    Q.    You can't stick it in your pocket?  That's illegal, right?

4    A.    Correct.

5    Q.    And at the end of the day, you take this locked -- or the

6    end of your shift, you would take this locked chip box to a

7    tip-counting room --

8    A.    Correct.

9    Q.    -- where another employee and you would sit down by

10   your -- just you and this other employee and count through your

11   tip -- your chips that were -- your tips for the day?

12   A.    Just not another employee.  It would have to be a

13   supervisor count the money.

14   Q.    Okay.  And that -- and then that -- that would be -- you'd

15   fill out this tip slip we heard about?

16   A.    Correct.

17   Q.    And the tip slip would be -- you would -- you and this

18   person would both agree that on that particular day you earned

19   so much in tips, correct?

20   A.    Correct.

21   Q.    And y'all would sign off on the tip slip?

22   A.    Yes.

23   Q.    And you got a copy of it?

24   A.    Correct.

25   Q.    So if there was ever any problems, that you would be able

1    to, you know, deal with management about that?

2    A.    Yeah.   And there's been cases where there's been some

3    screw-ups and I'd bring my slips and they'd correct it.

4    Q.    I'm going to ask you about that in just a second.

5          MR. GILLIGAN:   May I approach the witness, Your

6    Honor, with Defense Exhibit 22?

7          THE COURT:   You may.

8          MR. GILLIGAN:   Madam Clerk, was Defense Exhibit 22

9    admitted already?

10         THE COURT:   They were.

11   BY MR. GILLIGAN:

12   Q.    Let me show you Defense Exhibit 22.   That's a tip slip for

13   what day?

14   A.    For February 27th, 2015.

15   Q.    And it's a tip slip actually for you, correct?

16   A.    Correct.

17   Q.    And on that particular day, how much did you earn in tips?

18   A.    $338.

19   Q.    And that's recorded on the tip slip?

20   A.    Correct.

21   Q.    And then the tip share, which is ten percent of that, is

22   that also recorded on the tip slip?

23   A.    Yeah.   It says $33.80.

24   Q.    Okay.   And then you and the other person in the tip- --

25   tip-out room both sign it?   You both agree and you both sign

1  it?

2  A.   Correct.

3  Q.   And then you get the carbon copy?

4  A.   Correct.

5  Q.   There's also a number on there.  That number is your

6  unique employee number?

7  A.   Yes.

8  Q.   Okay.  And then all that goes to the people that do

9  payroll?

10  A.   I assume.

11  Q.   Okay.  Now, in all your years there -- I think there were

12  a few minor hiccups about your pay?

13  A.   Correct.

14  Q.   And you brought that -- when you brought that to the

15  attention of management, did they always make the correction?

16  A.   Yes, they did.

17  Q.   In fact, the amount of the -- the amount of the

18  discrepancy was pretty nominal?  It was --

19  A.   Well, sometimes they just lost one of my slips for the

20  week or --

21  Q.   Okay.

22  A.   -- so I'd bring the slip and they'd add it in.

23  Q.   And they always corrected it --

24  A.   Correct.

25  Q.   -- to your satisfaction?

1   A.    Yes.

2   Q.    Now.  Later on -- what, I guess about two weeks later --

3   y'all get paid every two weeks?

4   A.    Correct.

5   Q.    And you would get your paycheck.  And it would show how

6   much you earned as a -- on your tip credit minimum wage, right?

7   A.    Yes.

8   Q.    I mean, it was -- let's say the last one you remember was

9   $5.03 an hour.  You would have a stub that said you got 5.03 an

10  hour times how many hours you worked?

11  A.    Right.

12  Q.    And it would also show how much you received for tips

13  during that period of time, plus the ten percent tip share?

14  A.    Correct.

15  Q.    Okay.  On this particular day you got $338 in tips?

16  A.    Correct.

17  Q.    Was that a good day, bad day, average day?

18  A.    That's probably an average for me.  I did pretty well

19  there myself.

20  Q.    Now, the ten percent tip share, you understand, goes to

21  the cage department employees?

22  A.    I mean, honestly, I -- I don't know where the ten percent

23  went.  I knew chip runners get a portion of it.  And the rest I

24  didn't know.  I mean, I was just happy to make good money

25  and --

1  Q.   I know you probably don't know exactly, but it's fair --

2  A.   Right.

3  Q.   Would it be fair for me to assume that you understand that

4  the poker dealers, because of the way y'all get tipped, make a

5  whole heck of a lot more money than the typical cage employee?

6  A.   Correct.

7  Q.   Okay.  And you don't -- but you don't really know who --

8  what cage employees are being tipped?

9  A.   Yeah.  I mean, I don't know --

10 Q.   Or sharing in the tip share?  I'm sorry.

11 A.   Yeah.  I don't know who's involved in the whole tip-share

12 thing.

13 Q.   Now, the chip runners that -- we saw a picture of the lady

14 that has a chip cart.  And she works in the -- goes around the

15 floor; is that correct?

16 A.   Yeah.

17 Q.   And she sells chips to customers on the floor that may

18 have run out of chips --

19 A.   Right.

20 Q.   -- from the chips they originally started their evening

21 with from the teller?

22 A.   Well, they sell them to players and they also sell them to

23 the dealers when we get short.

24 Q.   Okay.  So not only are they helping the customers when

25 they need to buy more chips, they're also filling up y'all's

1    chip bank --

2    A.    Right.

3    Q.    -- if y'all get low?

4    A.    Correct.

5    Q.    So they're doing a service to both the customers and you?

6    A.    Correct.

7    Q.    Okay.  And then the lady or the gentleman that works at

8    the front desk is called the podium?

9    A.    Right.

10    Q.    And those people make reservations for people to come play

11    poker in the poker room?

12    A.    Yeah.  Like, everybody that's in the poker room goes

13    through them first to see where they're going to sit or what

14    game they want to play.

15    Q.    And they -- oh, because you have different types of poker

16    games?

17    A.    Right.

18    Q.    And so if they want to play a particular type of poker,

19    they'll sit them at one table versus another table?

20    A.    Correct.

21    Q.    Okay.  And then the people they deal with initially to --

22    almost initially, is when they walk in the door -- if somebody

23    walks in the door, they want to -- they want to play poker,

24    they go to the teller window and give the teller some money,

25    and they give them back chips?

1  A.    Correct.

2  Q.    But you cannot gamble in a poker room with cash?  You have

3  to do it with chips; is that correct?

4  A.    Yeah.  I mean, they can give the cash to me, the dealer,

5  and I can get them chips.

6  Q.    Okay.  But the --

7  A.    But that's another alternative, is to go through the

8  teller.

9  Q.    Right.  Okay.  And that's a good point.  But the actual

10  betting has to be done with chips?  Somebody can't put --

11  A.    Right.

12  Q.    -- a $10 bill?  They have to take the $10 bill, buy a

13  chip, and use the chip to bet?

14  A.    Correct.

15        MR. GILLIGAN:  Hold on one second, Your Honor.

16      (Counsel confer.)

17        MR. GILLIGAN:  May I approach the witness, Your

18  Honor?

19        THE COURT:  You may.

20  BY MR. GILLIGAN:

21  Q.    Let me show you what's been admitted as Plaintiffs'

22  Exhibit 7 into evidence.  And let's -- I represent to you it's

23  an affidavit done by Brian Matthews.  It appears to have been

24  executed April 1, 2016.

25        Have you ever seen this affidavit before?

1    A.   No.

2    Q.   Okay.

3         THE COURT:  What exhibit?

4         MR. GILLIGAN:  It's Exhibit -- it's Plaintiffs'

5    Exhibit --

6         THE WITNESS:  7.

7         MR. GILLIGAN:  -- 7.  And I believe it's been

8    admitted into evidence.

9         THE COURT:  Okay.

10   BY MR. GILLIGAN:

11   Q.   I know you haven't seen Exhibit 7 before, but it's been

12   admitted into evidence.  If you would go to paragraph 31 of

13   Mr. Matthews' affidavit -- if you would read -- would you read

14   paragraph 31?  And when you're done, if you could let me know

15   when you're done reading it.

16   A.   I'm done.

17   Q.   I'm sorry?

18   A.   Yeah.  I'm done.

19   Q.   Okay.  Thank you.

20        So Mr. Matthews is representing in paragraph 31 of

21   his affidavit that, at least according to his calculations from

22   May 1, 2011, to April 8, 2015, that you were -- that you earned

23   $173,544.20.

24        I know you probably can't agree or disagree to that

25   off the top of your head, but does that number sound roughly

1   correct?

2   A.   What is it, over a three-year period?

3   Q.   Yes, sir.

4   A.   Yeah.  Probably around there.  Yeah.  I average around 58-

5   to 60,000 a year, so...

6   Q.   Okay.

7   A.   Sounds about right.

8   Q.   And in that span of time he calculated -- and I'm not

9   asking you to confirm it, because that would be unfair.  But

10  does the amount of hours he says you worked of 4864.49 hours --

11  would that kind of jibe with your memory and experience?

12  A.   I mean, I'd just have to take his word on it.  I mean,

13  I --

14  Q.   Okay.  It doesn't sound out of whack to you, right?

15  A.   Yeah.  I mean, I average probably 30, 35 hours a week.  I

16  mean, I took some vacation, but it's probably accurate.

17  Q.   Okay.  And then he did some simple math and he calculated

18  your effective hourly rate over that period of time was about

19  $35.68.

20       Does that sound about right?

21  A.   It sounds about right.

22  Q.   Okay.  And in terms of just raw income for the year, you

23  typically will earn about 55- to $60,000 a year?

24  A.   Correct.

25  Q.   Now, where you worked at -- I'm sorry.  Was it Poker --

1   A.    Best Bet in Jacksonville.

2   Q.    Best Bet in Jacksonville.  You -- they had posters there

3   similar to these posters here, where you would clock in and out

4   also, correct?

5   A.    From what I remember.  I mean, that was, like, 10 or 11

6   years ago, so...

7   Q.    Okay.  Now, when you first began working at Ocala Poker,

8   did they explain to you that you weren't going to be getting

9   the regular minimum wage because you're going to get a tip

10  minimum wage and then get a tip credit of -- from the tips?

11  A.    I don't recall any discussions about that.  I mean, I

12  just -- I was -- I've been in the business from Jacksonville.

13  And I just kind of knew.  I mean...

14  Q.    Well, did you understand that from being in the business

15  in Jacksonville?

16  A.    I just understood from the business that whatever we

17  make -- every room has different -- some people are five

18  percent, some people are eight percent, some people are ten

19  percent that they take out of our tips.

20  Q.    Okay.  I'm -- and I'm not trying to be rude to you.  I'm

21  not talking about the tip share, and everybody is making --

22  A.    Okay.

23  Q.    Mr. Matthews kind of said it once, this --

24  A.    Yeah.

25  Q.    -- about the tip share and tip credit.  The judge asked a

1  question about it.  I've done it.  So I'm not trying to be rude
2  to you.
3          I'm not asking about the tip share that went to the
4  cage employees.  I'm talking about the tip credit minimum wage.
5  Do you recall being told at your former employee what the tip
6  credit minimum wage was?
7  A.   No.
8  Q.   How did you know what it was, then?
9  A.   I honestly don't know what it is.
10 Q.   But at some point in time you knew at Ocala Poker it was
11 $5.03?
12 A.   Yeah.  I remember looking at the signs.
13 Q.   Now, did you -- do you recall a meeting in 2010 in the
14 poker room where all the poker dealers were there and the cage
15 employees and Mr. Matthews and some other employees where they
16 were explaining a change and how the tip share -- not the tip
17 credit, the tip share was going to work?
18 A.   I remember we had a meeting about how it was going from
19 eight percent to ten percent.
20 Q.   Okay.  And was it explained to you, the folks there,
21 including you at that time, that the managers were going to be
22 taken out of the tip pool?
23 A.   It wasn't explained to me that way, no.
24 Q.   Did you hear that?
25 A.   No.  I didn't even know the managers were included in the

1   first go-round.

2   Q.    Okay.  So it's fair to say even after that meeting you

3   don't know who was in the tip pool and who wasn't, in terms

4   of --

5   A.    To this day I still don't know who's in.

6   Q.    Okay.  Do you know how much time a typical cage employee

7   spends working as a teller, working as a chip runner, or

8   working in the podium?

9   A.    I mean, every person was different.  I mean, there was

10  people that were -- they're primarily chip runners.  And then

11  there was -- the lady I -- the lady Peggy that we had a

12  reference to, she was just the teller.  She never went on --

13  she never did podium.  She never did chip running.

14  Q.    Okay.  You never saw her do it?

15  A.    I never saw her as a chip runner or podium.

16  Q.    Okay.  And would somebody -- would those people sometimes

17  do different jobs depending on how busy it was?

18  A.    Certain people.  Like, she was just a teller.

19  Q.    Okay.

20  A.    Jason would be vault.  He would break people -- if they

21  needed cigarette breaks, stuff like that.  So there were people

22  that were primarily chip runners.  There were people that were

23  primarily tellers and then primarily vault people.

24  Q.    You allege in your complaint that people that work in

25  surveillance were sharing in the tip pool.  Do you recall doing

1  that?

2  A.   I don't recall that.

3  Q.   Okay.   And you have no information whatsoever of anybody

4  working in surveillance has ever shared in the tip pool, do

5  you?

6  A.   You mean, like, security or something like that, or...

7  Q.   Yeah.   Or people watching on the cameras.

8  A.   I don't believe.

9  Q.   Okay.   The Ocala Poker handbook --

10      (Counsel confer.)

11      MR. GILLIGAN:   Your Honor, is Exhibit 20 --

12  Plaintiffs' Exhibit 20 is in evidence?

13      THE COURT:   It is.

14      MR. GILLIGAN:   Thank you, Your Honor.

15      May I approach the witness?

16  BY MR. GILLIGAN:

17  Q.   Let me show you Plaintiffs' Exhibit 20.   Is this the -- is

18  this the poker dealer handbook that you, I think, testified

19  about with Mr. Massey?

20  A.   It looks like it, yes.

21  Q.   Okay.   And would you go to paragraph 19.   And let me know

22  when you have a chance to read that.

23  A.   Yeah.   I read it.

24  Q.   Okay.   And this is an explanation about how you work with

25  the tip box and how the tip share will be deducted and given to

1    the cage employees, or distributed to the cage employees?

2    A.    Yes.  I mean, I just don't know -- this is the same copy I

3    got when I started the place.

4    Q.    You just don't know when you got it?

5    A.    No.  I know -- like, I know I was given one when I started

6    working there.  And then down the road -- I don't know the

7    time, maybe 2010, like you said, that we got a new handbook.

8              But I don't know if this is the exact wording that

9    was in the handbook I was given.  I've got to take your word on

10   it.

11   Q.    Well, I'm not -- I'm not suggesting one way or the other.

12   You just don't know -- you just don't know if this was the

13   original one you were given or one that was given to you later

14   on?

15   A.    Or if at all.  I mean...

16   Q.    Okay.  Well, what's the name of the -- what's the name of

17   that document, if you go to the front page?

18   A.    It says Ocala Poker Dealer Handbook.

19   Q.    Okay.

20         MR. GILLIGAN:  May I approach the witness, Your

21   Honor?

22         THE COURT:  You may.

23   BY MR. GILLIGAN:

24   Q.    Let me show you what's been marked as Defense Exhibit 10.

25   And it says, Please sign for your copy of dealer handbook and

1    rule book.

2            Do you see that?

3    A.   Yeah.  No.  I agree I received -- I remember receiving a

4    handbook.  Like I said, I got one when I started and one later

5    on when they changed from eight to ten percent.

6    Q.   Okay.

7    A.   I just don't -- I can't say yes or no that I recall

8    reading all this -- going through every single excerpt and --

9    Q.   Okay.  And I'm not -- and that's fine.  But I just -- for

10   completion sake, it says Jeff Greenstone, and appears to have a

11   signature?

12   A.   Yes.

13   Q.   And that's your signature?

14   A.   Correct.

15   Q.   Is it fair for me to assume, then, that you would have

16   gotten -- received the dealer handbook by signing for it?

17   A.   I did receive the handbook, yes, so...

18           MR. GILLIGAN:  Your Honor, could I move Defense

19   Exhibit 10 into evidence at this time?

20           THE COURT:  Any objection?

21           MR. MASSEY:  I think that -- that may be a duplicate

22   of the one I already did.  What's 10?  Is that --

23           MR. GILLIGAN:  It's the sign-in sheet.

24           MR. MASSEY:  I think I already did that.  I think

25   that may be -- I mean, I have no objection.

1    THE COURT:  All right.  Defendant's Exhibit 10 is so

2  admitted.

3    (Defendant's Exhibit 10 received into evidence.)

4    THE COURT:  Mr. Gilligan, can I ask you -- it's about

5  noon.

6    MR. GILLIGAN:  About five minutes.

7    THE COURT:  Five minutes?  Okay.

8    MR. GILLIGAN:  Or I'll stop.

9    THE COURT:  Well, I don't want to cut you off if you

10  only have a few more minutes.  Otherwise, if you're going to be

11  a while, we'll take a break.  I've got a hearing.

12    MR. GILLIGAN:  I don't want to -- it may be another

13  10 or 15, so we should probably take a break.

14    THE COURT:  All right.  Well, if you're going to be

15  10 or 15, that seems like a good stopping point.  It's noon

16  right now.  Why don't we resume at 1:15.

17    MR. GILLIGAN:  Okay.  Thank you.

18    THE COURT:  Does that work for everyone?

19    MR. GILLIGAN:  Yes, sir.

20    MR. MASSEY:  Yes, sir.

21    THE COURT:  All right.  We'll be in recess, then.

22    COURT SECURITY OFFICER:  All rise.

23    (Recess, 12:01 p.m. to 1:19 p.m.)

24    COURT SECURITY OFFICER:  All rise.

25    THE COURT:  Please take your seats.

1       COURT SECURITY OFFICER:  Court is back in session.

2       THE COURT:  All right.  Mr. Gilligan, shall we

3  resume?

4       MR. GILLIGAN:  Yes, sir.  Thank you.

5       THE COURT:  Mr. Greenstone, you're still under oath.

6  BY MR. GILLIGAN:

7  Q.   Did -- when you left Ocala Poker, did you quit or were you

8  fired?

9  A.   Fired.

10  Q.   And were you fired for selling drugs?

11  A.   There was no reason given to me.

12  Q.   Okay.

13  A.   They called me into the office and -- Ryan and Phil, and

14  cussed me out and told me to leave the premises.

15  Q.   Okay.  Well, did you, in fact, sell drugs to an employee

16  by the name of Zac Howard?

17       MR. MASSEY:  Objection, Your Honor.  It's irrelevant.

18       MR. GILLIGAN:  I'll make a proffer, Your Honor.  Zac

19  Howard is, I think, a cousin of the other plaintiff,

20  Mr. Howard.  That's why I'm -- one of the reasons I'm asking.

21       MR. MASSEY:  Also, would advise my client to assert

22  his right to --

23       THE COURT:  Well, you can do that.  But I don't think

24  it's necessary.  I don't think the line of questioning is

25  necessarily relevant to the ultimate issues in the case.

1          MR. GILLIGAN:  Okay.  Thank you, Your Honor.

2          But just so the court knows, I -- I did -- didn't do

3    this haphazardly.  I believed I had the right to ask the

4    question under rule 404.

5          I'm not disputing your ruling, Your Honor, but I'm

6    just telling you that I did -- my intention was to offer it

7    under 404(b)(2) and under rule 607(b).

8          THE COURT:  If you could just speak up a little bit

9    so the --

10         MR. GILLIGAN:  I'm sorry.  Thank you, Your Honor.

11         THE COURT:  Well -- all right.  Hold on a second.

12   Let me pull out the rule.  You said 404(b)(2)?

13         MR. GILLIGAN:  Yes, sir.  And also 608(b).

14         THE COURT:  This -- this case is about whether or not

15   he received notice as to a tip pool for a certain period of

16   time and received tips under the Fair Labor Standard Act.

17         I don't see in what way -- whether he was termi- --

18   that he was terminated or what reason he was terminated for

19   would be relevant, particularly under 404(b)(2).

20         And, frankly, 608(b), either he was given notice and

21   the tip pool was valid or he wasn't.  That's all the case is

22   about.

23         MR. GILLIGAN:  Okay.  Thank you, Your Honor.

24         THE COURT:  So I'll sustain the objection.

25   BY MR. GILLIGAN:

1  Q.    You're not alleging, Mr. Greenstone, that Ocala Poker ever

2  inappropriately or wrongly calculated the total number of hours

3  you worked, are you?

4  A.    Total number of hours?  No.

5  Q.    And in all your years working at Ocala Poker, you always

6  made more than the tip minimum wage working there when your

7  tips were put in, correct?

8  A.    Correct.

9  Q.    You're not contending that you did not understand how the

10  tip credit worked, are you -- worked, are you?

11  A.    The tip credit?

12  Q.    Yes, sir.

13  A.    I believe I know how it works.

14  Q.    And, specifically, you know there was a tip credit -- a

15  tip minimum wage required by Florida law --

16  A.    Right.

17  Q.    -- and that that -- you would get that tip minimum wage,

18  plus your tips, plus your ten percent contribution to the tip

19  share?

20  A.    Correct.

21  Q.    There was no doubt in your mind that you understood that

22  in all the years you worked at Ocala Poker?

23  A.    Right.

24        MR. GILLIGAN:  That's it, Your Honor.  Thank you.

25        THE COURT:  Any redirect?

```
 1              MR. MASSEY:  Yes.  Thank you, Your Honor.
 2                      REDIRECT EXAMINATION
 3   BY MR. MASSEY:
 4   Q.   Did Ocala Poker ever tell you that the tip pool was
 5   supposed to be limited to employees who customarily and
 6   regularly received tips?
 7   A.   No.
 8   Q.   Was that in any of the posters that you saw there, to your
 9   knowledge?
10   A.   To my knowledge, no.
11   Q.   Was that in the handbook -- or any of the handbooks that
12   they gave you?
13   A.   No.
14   Q.   When you worked there, did you know Jason Bendure was in
15   the tip pool?
16   A.   I did not know that.
17   Q.   When did you find that out?
18   A.   Just during the litigation, like, during --
19   Q.   After you filed the lawsuit?
20   A.   Correct.
21   Q.   What did you think Jason Bendure was?
22   A.   I thought he was a vault personnel and the supervisor of
23   the chip runners, but his main purpose was to be in the vault.
24              MR. MASSEY:  Thank you, Your Honor.
25              THE COURT:  You can step down, sir.
```

1        Mr. Greenstone, you can step down.

2        THE WITNESS:  Oh.

3        MR. GILLIGAN:  I'm sorry, Your Honor.  I do have one

4   question.

5        THE COURT:  All right.  Sorry about that.  I spoke

6   too soon.  You can...

7                    **RECROSS-EXAMINATION**

8   BY MR. GILLIGAN:

9   Q.   Did you date a lady for some point in time that worked in

10  the cage department?

11  A.   Excuse me?

12  Q.   Did you date a lady that worked in the cage department?

13  A.   No.

14  Q.   You never dated anybody that worked in the cage

15  department?

16  A.   Not in the cage -- I dated a chip runner, slash, dealer.

17  Q.   Okay.  And what was her name?

18  A.   Jesaka Downs.

19  Q.   Okay.  Thank you.

20        THE COURT:  You can step down.  I assume you don't

21  have any follow-up to that?

22        MR. MASSEY:  Correct.  Yes, sir.

23        THE COURT:  You can take your seat, Mr. Greenstone.

24  Sorry.

25     (Witness excused.)

1          THE COURT:  You can call your next witness.

2          MR. MASSEY:  I call Christopher Howard.

3          COURTROOM DEPUTY:  Raise your right hand.  Do you

4   solemnly swear that the testimony you will give before this

5   court will be the truth, the whole truth, and nothing but the

6   truth, so help you God?

7          THE WITNESS:  Yes.

8          COURTROOM DEPUTY:  Please have a seat and state your

9   full name for the record, spelling your last name.

10          THE WITNESS:  Christopher Thomas Howard, H-o-w-a-r-d.

11          THE COURT:  You can begin.

12          MR. MASSEY:  Thank you, Your Honor.

13      **CHRISTOPHER THOMAS HOWARD, PLAINTIFFS' WITNESS, SWORN**

14                      **DIRECT EXAMINATION**

15   BY MR. MASSEY:

16   Q.   Did you used to work for Ocala Poker?

17   A.   Yes.

18   Q.   As what?

19   A.   As a poker dealer, slash, manager.

20   Q.   And when about did you work for Ocala Poker?

21   A.   From May of '08 until April 13th, 2015.

22   Q.   And were you the same -- were you there at the same time

23   as Mr. Greenstone was there?

24   A.   Yes.

25   Q.   Would you get tips from customers?

1   A.   Yes.

2   Q.   And what would happen with those tips?

3   A.   Either -- when they won a hand, customarily they would

4   toss me a tip.  And sometimes the guy sitting to my left would

5   just drop it into my box.

6   Q.   And were you forced to be in a mandatory tip pool?

7   A.   Yes.

8   Q.   And what happened with your tips after they were taken

9   from -- oh, can you explain the tip pool?

10  A.   No.

11  Q.   Were tips taken -- I mean, let me -- were some of your

12  tips taken?

13  A.   Ten percent of my tips were taken.

14  Q.   Okay.  And where did those tips go?

15  A.   They went -- they withdrew it and then they did something

16  with -- they'd divvy it out into a tip pool.

17  Q.   Okay.  And did you get any -- did you get anything out of

18  that tip pool, or you were only given?

19  A.   Only taken.

20  Q.   So you only had money taken out and put in the tip pool?

21  A.   Yes.

22  Q.   Now, did some managers have a tip box?

23  A.   I'm sorry?

24  Q.   Did some managers have a tip box?

25  A.   Yeah.  Phil Faso did.

1    Q.    Okay.  Who was he?

2    A.    He was my manager.

3    Q.    Okay.  And was that while you worked there?

4    A.    Is he the reason why I worked?

5    Q.    I'm sorry.  When about was that?  When did he have a

6    tip pool?

7    A.    He had -- at least for a year, from 2014 to 2015.

8    Q.    Okay.  And where would he keep the tip box?

9    A.    In his office.

10   Q.    And so what would he do with it?

11   A.    He -- what he would do with it is, like, when he would tap

12   us dealers out when we would be short dealers.  And he would

13   have to open a game, stuff like that -- he would have his own

14   tip box that he'd get tips from -- the customers from.

15   Q.    And you say he was a manager?

16   A.    Yes.

17   Q.    And why would you say that?

18   A.    Because he told me what to do.

19   Q.    Did anyone else refer to him as management?

20   A.    Everyone did.

21   Q.    Did he tell other people what to do?

22   A.    Yes.

23   Q.    Did you have any conversations with Ocala Poker regarding

24   how the tip credit and tip pools worked?

25   A.    No.

1    MR. GILLIGAN:  Objection.  He said anybody with Ocala

2  Poker.  I need a specific name.  It could be anybody working

3  there.  Improper foundation.

4    MR. MASSEY:  I can be more...

5    I can rephrase that, Your Honor.

6    THE COURT:  Okay.

7  BY MR. MASSEY:

8  Q.   Did you discuss the -- with any of the own- -- did any of

9  the owners of Ocala Poker tell you how the tip pool was to

10  work?

11  A.   No.

12  Q.   Was there a meeting about the tip credit and tip pool?

13  A.   It was about ten percent.

14    MR. GILLIGAN:  Objection.  Objection.  It's a

15  compound question.  As the court identified, there's a

16  difference between a tip credit and a tip pool.  Compound

17  question.

18    THE COURT:  All right.  Well, since they are

19  different, maybe you can break it apart.

20  BY MR. MASSEY:

21  Q.   Was there a meeting about tip credit?

22  A.   Yes.

23  Q.   And was there a meeting about the tip pool?

24  A.   No.

25  Q.   Okay.  What was the meeting about -- the tip credit about?

1  A.    When they were going from eight percent to ten percent

2  taken out.

3  Q.    And who is Jason Bendure?

4  A.    He was a vault supervisor, to my knowledge.

5  Q.    Would he write people up?

6  A.    He -- if I ever had a problem with a trip runner when I

7  was flooring, or there was a problem with -- that he would take

8  care of it for me.  I would address it to him and he would

9  address it to them.

10 Q.    And when about was this; do you recall?

11 A.    From -- from the day I -- from the day he became a vault

12 supervisor until I left.

13 Q.    Do you remember when he came -- became a vault supervisor?

14 A.    Sometime around '09.

15 Q.    Did Ocala Poker ever tell you that the tip pool was

16 supposed to be limited to employees who customarily and

17 regularly received tips?

18 A.    No.

19 Q.    Was that -- was that information in any of the posters, to

20 your knowledge?

21 A.    No.

22 Q.    Was it in any of the handbooks you were provided?

23 A.    No.

24        MR. MASSEY:  That's all I have.  Thank you, Your

25 Honor.

1    MR. GILLIGAN:  Thank you, Your Honor.

2    THE COURT:  Mr. Gilligan.

3    MR. GILLIGAN:  Thank you, Your Honor.

4                    **CROSS-EXAMINATION**

5    BY MR. GILLIGAN:

6    Q.   Mr. Howard, Mr. Massey asked you if any of the owners ever

7    told you about the tip pool.  Do you even know who the owners

8    of Second Chance Jai-Alai are?

9    A.   Joe Coffey.

10   Q.   Okay.  And --

11   A.   Other than that, some guy that rides around in a

12   wheelchair.

13   Q.   Okay.  And they're typically -- especially Mr. Coffey.

14   He's -- you've only met him once or twice, correct?

15   A.   Seen him once, only have -- I've only spoke to him once on

16   a video chat.

17   Q.   Okay.  And so the people that you -- the person you deal

18   with primarily when you were there on a day-to-day basis -- the

19   ultimate manager there was Mr. Brian Matthews, correct?

20   A.   He was never -- he was always in his office.  Phil Faso

21   was the person I dealt with.

22   Q.   Okay.  He's the poker room manager?

23   A.   Correct.

24   Q.   Okay.  And his boss was Mr. Matthews, correct?

25   A.   Correct.

1  Q.    Okay.  And you know that Ms. Vicki Pernek is the cage
2  department manager?
3  A.    Correct.
4  Q.    Now, Mr. Bendure was actually your roommate for a number
5  of years, correct?
6  A.    Yes, a few years.
7  Q.    And you knew he worked in the cage department?
8  A.    Yes.
9  Q.    Now, when you worked at Ocala Poker, you actually worked
10  as what's called a dual rate?
11  A.    Correct.
12  Q.    And as a dual rate -- I want to make sure the court
13  understands it, so if you'll help me -- walk through an
14  explanation of it, is -- sometimes you're dealing -- you're
15  working just as a poker dealer, correct?
16  A.    The majority of the time I am a poker dealer.
17  Q.    I'm sorry?
18  A.    The majority of the time I am just a poker dealer.
19  Q.    Okay.  And when you're working as a poker dealer, you get
20  paid the tip minimum wage plus your tips, correct?
21  A.    Correct.
22  Q.    Less the ten percent tip share?
23  A.    Yes.
24  Q.    The other reason you're called a dual rate is because when
25  you're not working as just a poker dealer, you're working as a

1  floor manager?

2  A.    Correct.

3  Q.    When you're working as a floor manager, you're sort of --

4  is it the equivalent of a pit boss at a casino?

5  A.    Yes.

6  Q.    Okay.  When you're working as a floor manager, you're --

7  if there's disputes with customers or things like that, you're

8  the person that would initially handle it?

9  A.    Correct.

10  Q.    And when you were working as a floor manager, you don't

11  get paid the tip credit rate and the tips, you get paid a -- a

12  salary that was equivalent of about, what, 18, $19 an --

13  A.    $15 an hour.

14  Q.    When you were there, it was $15 an hour?

15  A.    Uh-huh (affirmative).

16  Q.    I'm sorry?

17  A.    Yes.

18  Q.    Okay.  But you don't regularly get tipped for that?

19  A.    No.  You don't get tipped at all.

20  Q.    Occasionally -- but occasionally would a customer hand you

21  a tip when you were working as a floor manager?

22  A.    Occasionally some customers would hand me a tip, but

23  usually I would drop it into either a chip runner's box or I

24  would drop it into another dealer's box --

25  Q.    Okay.

1    A.    -- because I was not allowed to keep tips.

2    Q.    Okay.  But occasionally people -- well, they didn't

3    understand.  But they would walk up to you and --

4    A.    I never want to insult customers.

5    Q.    I got it.  So -- and so -- and then Ocala Poker actually

6    made sure that they differentiated your time when you were

7    working as a poker dealer versus working as a floor manager as

8    a so-called dual rate, correct?

9    A.    For me, yes.

10   Q.    Okay.  And I'm only interested in you right now.  Mr. --

11   Mr. Greenstone did not work as a dual rate?

12   A.    No.

13   Q.    You were -- you were a dual rate, correct?

14   A.    Correct.

15   Q.    And the reason you were a dual rate -- one of the reasons

16   you're probably a dual rate is that you actually worked as a

17   dual rate in other poker rooms before you came to Ocala Poker?

18   A.    No, sir.

19   Q.    Okay.  Well, let me go back to your work history just a

20   little bit.  I know right out of high school you worked for a

21   plumbing or an electrician company; is that --

22   A.    Johnston Supply.

23   Q.    I'm sorry?

24   A.    Johnston Supply.

25   Q.    Okay.  And you worked as -- was it a plumber or an

1    electrician?

2    A.    It was a wholesale warehouse.  I sold everyone that did

3    all that -- AC work, plumbing, all that.

4    Q.    It's been a while since I read your deposition.  But

5    shortly after that, after a year or two, you went to work in

6    the poker industry; is that fair?

7    A.    Correct.  I worked at Ameristar Casino.

8    Q.    And Ameristar Casino was in Missouri?

9    A.    Yes.

10   Q.    Kansas?

11   A.    Kansas City, Missouri.

12   Q.    Kansas City, Missouri.  Okay.

13         And you worked for Ameristar as a poker dealer for

14   how long?

15   A.    Five years.

16   Q.    And as I recall -- I think you told me that Ameristar had

17   posters that told you about the tip credit rate and stuff like

18   that, similar to the posters that are here?

19   A.    Correct.

20   Q.    The entire time you were there?

21   A.    Yes.

22   Q.    And would you read those posters from time to time?

23   A.    I was just making sure my base pay was correct.

24   Q.    Okay.  And that was -- and that would be one of the ways

25   you would find out what the tip credit rate was for that

1  particular year --

2  A.   Correct.

3  Q.   -- or the tip minimum wage rate?

4  A.   Yeah.  I never actually -- we actually got raises there.

5  So I was above any tip credit.

6  Q.   Okay.  With the way they did it there, they had the

7  posters, but they also took -- claimed the tip credit, meaning

8  you got paid a certain wage and you got tips on top of that?

9  A.   Correct.  I had an hourly wage.

10  Q.   Okay.  And after the five-some years at Ameristar, you

11  then went to an outfit in Las Vegas?

12  A.   I went to go work for the World Series of Poker.

13  Q.   Are those the people we see on TV sometimes?

14  A.   Yes.

15  Q.   So you were a poker dealer for the World Series of Poker

16  for how long?

17  A.   Three years.

18  Q.   I understand that you did part of that in Las Vegas and

19  part of it traveling?

20  A.   Correct.  They have circuit events all around the country.

21  Q.   Okay.  And did they have a tip credit similar to what was

22  at Ameristar and what your -- what Ocala Poker had?

23  A.   No.  It's totally different from -- anywhere from here.

24  Q.   Okay.  And how long did you work there?

25  A.   I worked three years.

1   Q.   I'm sorry.  Okay.  And then from Ameristar -- World Series

2   of Poker, you then went to the poker rooms in Jacksonville?

3   A.   No.  I went straight to Ocala.

4   Q.   You went straight to Ocala?

5   A.   Uh-huh (affirmative).

6   Q.   Didn't you work at the poker rooms in Jacksonville?

7   A.   I work there now.

8   Q.   Okay.  My mistake.  So -- and how long have you worked

9   there?

10  A.   April of last year.

11  Q.   And your position there?

12  A.   Poker dealer.

13  Q.   You're not a dual rate?

14  A.   No.

15  Q.   And where you work now, I understand they have posters

16  similar to the posters there, where they inform you what the

17  tip credit is and workers' comp and all kinds of stuff?

18  A.   Yes.

19  Q.   And do you look at those from time to time?

20  A.   Didn't look at those.  I know where they are.  They're

21  posted.

22  Q.   Okay.  And you quit work at Ocala Poker April 3, 2015?

23  A.   Correct.

24  Q.   I think you already had a job lined up with the

25  Jacksonville outfit at that time?

1   A.    Yes.

2   Q.    Now, I want to make clear that no part of your lawsuit

3   that we're here for today and tomorrow had anything to do with

4   you believing you were improperly compensated as a dual rate,

5   sometimes being the floor manager versus sometimes being a

6   poker dealer; is that correct?

7   A.    Correct.

8   Q.    And no part of your claim is that all the times you worked

9   at Ocala Poker that they did not pay you appropriately your

10  tips?

11  A.    Correct.

12  Q.    Now, meaning that -- that there may have been

13  discrepancies from time to time on the tip slips and your

14  pay -- and your pay stubs.  But when that happened, you went

15  and talked to management and they fixed it?

16  A.    Correct.

17  Q.    And even the times there was discrepancies -- were few and

18  far between, correct?

19  A.    Correct.

20  Q.    Like, once or twice?  And the amount wasn't even that much

21  money?

22  A.    Well, it depends on what you call that much money.

23  Q.    Well, less than $100?

24  A.    No.

25  Q.    Okay.

```
1   A.    There was -- it was probably hundreds of dollars --
2   Q.    Okay.
3   A.    -- between -- like, my tip slips could range from 100 to
4   300.
5   Q.    Okay.  But when they -- when you brought it to the
6   attention of management, they corrected it?
7   A.    Correct.
8   Q.    Now, I'm going to try to do this real quick.  But let me
9   show you...
10             MR. GILLIGAN:  May I approach the witness?
11             THE COURT:  Yes.
12             MR. GILLIGAN:  Defense Exhibit 21.
13  BY MR. GILLIGAN:
14  Q.    Defense Exhibit 21 is one of these tip slips that I talked
15  to Mr. Greenstone about?
16  A.    Uh-huh (affirmative).  Yes.
17  Q.    And is that actually a tip slip for you for one of the
18  days you worked at Ocala Poker?
19  A.    Yes.
20  Q.    And you would have done the same drill?  You would have
21  gone to the tip-out room with another employee, emptied your
22  tip box, and counted all the tips?
23  A.    It was either a supervisor or it was a manager that went
24  to that back room.
25  Q.    Okay.  And you and whoever that person was would count the
```

1    tips and assure, both yourself and that other person, that the

2    tip count was correct?

3    A.    Correct.

4    Q.    And then you would enter that information on the tip slip?

5    A.    Yes.

6    Q.    And take out -- and they would note the ten percent tip

7    share that would come out?

8    A.    Yes.

9    Q.    And then you would sign it?

10   A.    Yes.

11   Q.    And the other person would sign it?

12   A.    Yes.

13   Q.    And you would get a carbon copy?

14   A.    Correct.

15   Q.    And as far as you know, the original goes to the

16   managerial staff there that takes care of your paycheck?

17   A.    Yes.

18   Q.    And so if you got paid what would be typically two weeks

19   later -- you're on a two-week pay cycle, correct?

20   A.    Biweekly, yes.

21   Q.    Okay.  So then you'd get your paycheck.  You'd have all

22   those tip slips.  You'd get your paycheck and you would be able

23   to look at your paycheck, look at the pay stub, and see if you

24   got paid correctly all your tips?

25   A.    Our paychecks were really confusing about that, because we

1    had tournament downs, too, as well.  So it was very hard for us

2    to calculate our tournament downs from our cash.

3    Q.    Okay.  Well, I'm just talking about the tips right now.

4    A.    And I'm talking about tips, as well.

5    Q.    Okay.  Well, if you -- if you agree with the person in

6    the -- in the tip-out room that those are your tips and you're

7    signing for it, how would anybody know differently than at the

8    point that you've agreed that's your tips?

9    A.    The -- my cash slips are right, but they would lump this

10   cash sum into another pool with my tournament downs.  And they

11   would put it all together.  So we would have to break it down.

12   Q.    Okay.

13   A.    So it was never clear.

14   Q.    Okay.  Well, you haven't alleged that in your lawsuit,

15   correct?

16   A.    No.  But you're asking and I'm telling you.

17   Q.    Okay.  Now, the way Ocala Poker would track your actual

18   hours working was through this time clock, where you would scan

19   your identification card?

20   A.    Correct.

21   Q.    And if you lost it, you could also, like, keypunch in your

22   employee number?

23   A.    Mine just stopped working, so I just started punching.

24   Q.    But one way or the other, when you walked in there,

25   there's a time machine that you can either scan or, in your

1    case, just punch in your employee number?

2    A.    Correct.

3    Q.    And Ocala Poker would know that that's when you began

4    working?

5    A.    Correct.

6    Q.    And then the reverse process of that would be when you're

7    leaving you would check out the same way?

8    A.    Correct.

9    Q.    And where this clock is is where the posters are posted?

10   A.    Correct.

11   Q.    And the -- Ocala Poker would track the amount of time that

12   you worked as a dual rate either as a poker dealer -- which was

13   most of your time, right?

14   A.    Uh-huh (affirmative).  Yes.

15   Q.    -- or as a dual rate, where you're working as a floor

16   manager, where you're not -- you're not in the tip pool or any

17   of that?

18   A.    Correct.

19   Q.    Okay.  So -- and so they would do that by means of a

20   sign-in sheet?

21   A.    We had a sign-in sheet at the podium that -- where I would

22   put down the time.  And then I would clock in and out, again,

23   to, one, clock out as a dealer and then re-clock in as a floor

24   supervisor.

25   Q.    And you're not alleging in your complaint that Ocala Poker

1    ever inappropriately calculated your time as either a -- as

2    just a regular poker dealer or as a dual rate manager, are you?

3    A.    No.

4    Q.    You don't believe that Ocala Poker ever inappropriately

5    calculated the total number of hours you worked while there, do

6    you?

7    A.    No.

8    Q.    Have you ever worked in the cage department?

9    A.    No.

10   Q.    And I probably didn't ask him, but did Mr. Greenstone ever

11   work in the cage department, to your knowledge?

12   A.    No.  Not that I know of.

13   Q.    And the manager of the cage department is Ms. Pernek?

14   A.    She's the head of everyone, yes.

15   Q.    In the cage department?

16   A.    Correct.

17   Q.    Have you ever seen an organizational chart for -- of how

18   the employees are working in different departments there?

19   A.    No.

20   Q.    But you do know there are different departments?

21   A.    All over, yes.

22   Q.    Okay.  And by way of example, there's the -- we've talked

23   about the cage department.  There's the poker room department,

24   I guess, where Mr. Faso is the manager?

25   A.    Yes.

1  Q.   And then I guess there's a security or surveillance

2  department?

3  A.   Yes.

4  Q.   And then just people that work in the bar and deli?

5  A.   Yes.

6  Q.   And the IT -- Inter-track Wagering and the Jai-Alai people

7  that do all that?

8  A.   Yes.

9  Q.   Okay.  And their operation, by the way -- the Inter-track

10 Wagering people and the Jai-Alai people -- their operations are

11 completely separate from the poker dealer room, correct?

12 A.   Right.

13 Q.   I mean, people that want to play poker can certainly walk

14 over there and bet if they want, but they're not intermingled;

15 they're separate parts of the building?

16 A.   Well, there's machines in the poker room to -- for ITW.

17 Q.   Okay.  But the people that run ITW are separate from the

18 poker room manager?

19 A.   Correct.

20 Q.   Okay.  And none of those people share in the tip share,

21 correct?

22 A.   No.

23 Q.   Now, there are these tip boxes that we heard everybody

24 talk about.  You pick them up at the beginning of your shift if

25 you're working as a poker dealer, correct?

1  A.   Correct.

2  Q.   And you get a numbered poker -- a tip box for yourself for

3  your work shift?

4  A.   Yes.

5  Q.   And it's locked.  And that's when you go through the

6  counting process with the other employee in the tip-out room?

7  A.   Yes.

8  Q.   The cage employees also use tip boxes, correct?

9  A.   Yes.

10 Q.   And they're the same type of tip boxes that you use on a

11 poker table.  They may have a different number, but they're the

12 same type of box?

13 A.   When I left, yes.

14 Q.   Okay.  And they're numbered and they're black boxes with a

15 yellow sticker on it or whatever, correct?

16 A.   Yes.

17 Q.   Okay.  And those tip boxes -- we've seen pictures of other

18 exhibits.  And I'll show them to you if need be.  But those tip

19 boxes -- a tip box would be on a chip runner's rolling cart?

20 A.   Yes.

21 Q.   And a chip box also would be in front of the teller

22 window?

23 A.   Correct.

24 Q.   And you've seen customers actually put tips in their tip

25 box or give them a tip and they put it in the tip box?

```
 1  A.    Yes.
 2  Q.    Both the tellers and the chip runners?
 3  A.    Yes.
 4  Q.    And even the podium people?
 5  A.    I never saw the podium precisely, but I knew they got it.
 6  Q.    Okay.  Now, these people -- the tellers, the podium
 7  people, the chip runners -- they all assist the poker dealers
 8  and the poker managers, everybody running the poker room?
 9  A.    The podium and chip runners, yes.
10  Q.    Okay.  And the tellers do also?
11  A.    No.
12  Q.    If they don't have -- in order to play poker in Ocala
13  Poker's poker room, you have to play with chips; do you not?
14  A.    So does the cashier have bank -- get tips?
15  Q.    Well, in order -- my question is -- and maybe you didn't
16  understand it.  My question is -- is that in order to sit down
17  at your poker table, when you were a dealer there, you have to
18  bet with chips, correct?
19  A.    Correct.
20  Q.    Okay.  And those chips are initially purchased from the
21  tellers, correct?
22  A.    Sometimes.  And sometimes from the chip runners, yes.
23  Q.    When a customer first comes in the door, on their left is
24  a teller window, where they can give them the money and get the
25  chips?
```

1   A.   Correct.

2   Q.   And then walk right into the door to their right, where

3   the podium is in the poker room?

4   A.   Yes.

5   Q.   And tell the podium lady, I want to play poker, and what

6   type of poker.  And she or he will sit them at the appropriate

7   table?

8   A.   Correct.

9   Q.   And if there's a waiting line, they'll do a waiting list?

10  A.   Yes.

11  Q.   Now, all these tips that you get while you're on the poker

12  floor, that's videotaped?

13  A.   Correct.

14  Q.   And when you're in the tip-out room, that's videotaped?

15  A.   Correct.

16  Q.   Okay.  So everybody is -- realizes there's an eye in the

17  sky making sure everybody is doing everything on the up-and-up?

18  A.   Yes.

19  Q.   That's standard practice pretty much in the gaming

20  industry; is it not?

21  A.   Correct.

22  Q.   Now, on that tip slip there that we showed you, which was

23  Exhibit --

24  A.   21.

25  Q.   21.  Thank you, Mr. Howard.

1              I think your tips that day were $150?

2    A.    Correct.

3    Q.    Was that a good day or a bad day, average day?

4    A.    A low day.

5    Q.    I think Mr. Greenstone had 300-plus day on his.  Would

6    your typical day be around 300, whatever his --

7    A.    From anywhere from 250 to 400.

8    Q.    And the poker dealers get tipped a whole heck of a lot

9    more than the cage employees, correct?

10   A.    Yes.

11   Q.    Did you ever dispute, other than those few minor

12   occasions, any of the tip slips that you've ever been given a

13   carbon copy of?

14   A.    No.

15   Q.    The entire time you were there, you made more than the

16   regular minimum wage when you added in your tips, correct?

17   A.    Yes.

18   Q.    And when you left, what was the tip credit minimum wage?

19   A.    I think 5.03.

20   Q.    And you knew that by looking at the posters?

21   A.    No.  My paycheck.

22   Q.    Your paycheck?  So your paycheck said you got a tip -- tip

23   minimum wage of 5.03 an hour?

24   A.    Correct.

25   Q.    And it would also tell you, based on your signing in --

1  your logging in and out on the time machine how many hours you

2  worked in a pay period?

3  A.   Correct.

4  Q.   And you could actually do the math of 5.03 times how many

5  hours worked and you would see what you made just in tip

6  minimum wage?

7  A.   In my hourly wage, yes.

8  Q.   Okay.  And then your paycheck would also show you how much

9  you made in tips less the tip share?

10 A.   And my tournament downs were put into that, too.

11 Q.   Okay.  Mr. -- I already showed Mr. Greenstone

12 Mr. Matthews' affidavit, where he calculated approximately how

13 much he made.  And I think he said he made about 50- to $60,000

14 a year in total income.

15       Would that be about the same for you?

16 A.   No.  It was less.

17 Q.   What would it be for you?

18 A.   Somewhere around 40-.

19 Q.   In Mr. Matthews' affidavit he ultimately calculated that

20 after wages and hours worked for a period from March 9, 2012,

21 to April 17, 2015, that your effective hourly rate was $30.51.

22       Does that sound about accurate to you?

23 A.   That's right.

24 Q.   Okay.  Now, you never actually saw Mr. Faso taking tips

25 when you --

1    A.    Yes, I did.

2    Q.    Okay.  Okay.  Mr. Greenstone -- I'm sorry, Mr. Howard.  I

3    apologize.

4           Do you recall me taking your deposition on

5    September 26th, 2015, at my office?

6    A.    Yes.

7    Q.    And do you recall at that deposition me asking you the

8    question -- this is page 32, line 4.

9           Did you ever see -- and I will show it to you in a

10   second, if need be.

11          Did you ever see Mr. Faso taking tips when he was

12   doing the function of a manager?

13          Your answer:  Not personally, no.

14          Do you recall telling me that?

15   A.    No.  Actually, I don't.  I guess I said it because I had

16   to, it's in my deposition.  But he had a tip box when he would

17   go tap out dealers.

18          MR. GILLIGAN:  May I approach the witness, Your

19   Honor?

20          THE COURT:  You may.

21   BY MR. GILLIGAN:

22   Q.    I'll show you a copy of your deposition.  Okay.  If you go

23   to -- if you go to page 32, line 4, do you see where I asked

24   the question?

25          Did you ever see Mr. Faso taking tips when he was

1   doing the function of a manager?

2           And your answer:  Not personally, no.

3   A.    Correct.

4   Q.    Okay.  Do you believe your answer was truthful back then

5   when I asked you at my office?

6   A.    Honestly, I didn't have time to think about it.

7   Q.    Okay.  Fair enough.

8           You didn't like working as a dual rate?  Is my

9   understanding correct?

10  A.    I didn't mind it.  I mean, there were some things I didn't

11  care for, but there's other things I did enjoy.

12  Q.    Okay.  Did you not like working as a dual rate because

13  you -- when it is all said and done, you didn't make as much

14  money working as a manager?

15  A.    That was one of the bad parts of it.

16  Q.    Okay.  And you'd make a lot more money working just as a

17  poker dealer, even though you get a low minimum wage with the

18  tips?  You actually make a lot more money than you would make

19  as a manager, correct --

20  A.    Correct.

21  Q.    -- where you don't get tips?

22  A.    Correct.

23           MR. GILLIGAN:  Defense Exhibit 9?  I keep asking if

24  that's in.

25           COURTROOM DEPUTY:  Defense Exhibit 9?  No, I don't

1    have that one.

2              MR. GILLIGAN:  Okay.

3    BY MR. GILLIGAN:

4    Q.   Let me show you Defense Exhibit --

5              MR. GILLIGAN:  I apologize, Your Honor.  I didn't ask

6    for permission.  Is it okay if I approach the witness?

7              THE COURT:  You can approach him, yeah.

8              MR. GILLIGAN:  Thank you.

9    BY MR. GILLIGAN:

10   Q.   Let me show you Defense Exhibit 9 and 10.  Have you seen

11   Defense Exhibit 9 before?

12   A.   Yes.

13   Q.   And that's the poker dealer handbook?

14   A.   It looks like it.

15   Q.   Okay.  And paragraph 19 of that has an explanation about

16   how the tip share would work?

17   A.   Yes.

18   Q.   And Defense Exhibit 10 is a sign-in sheet acknowledging

19   receipt of the poker dealer handbook?

20   A.   Correct.

21   Q.   And your signature is --

22             MR. GILLIGAN:  If you'll find it, please.

23   BY MR. GILLIGAN:

24   Q.   -- is somewhere in there, correct?

25   A.   Yes.

1  Q.   Do you remember when you got your poker dealer handbook?

2  A.   When I first got hired, yes.

3  Q.   That's why I had a question about it.  If you'd go to

4  paragraph 19, how much does it say that the tip share is?

5  A.   It says ten percent.

6  Q.   Okay.  And that's why I'm confused.  Because my

7  understanding is when you first worked there -- first started

8  working there, the tip share was originally eight percent,

9  correct?

10  A.   Correct.

11  Q.   So now that you say -- see that it says it's ten percent,

12  do you think it's possible you got that dealer handbook at a

13  later time, when they changed it from eight percent to ten

14  percent?

15  A.   I guess so.  I -- I guess they gave it out to me when

16  they -- no.  They changed it from eight percent to ten percent.

17  Q.   I understand that.  And you agree they changed it from

18  eight percent to ten percent?

19  A.   Yes.

20  Q.   Okay.  And you would agree it wouldn't make sense for them

21  to give you that Ocala dealer book way back when you started in

22  2008 or '09, when it was eight percent, but it says ten?

23  A.   Correct.

24  Q.   Okay.  Fair to assume, then, that that one you got

25  sometime later on in your employment with Ocala Poker?

1    A.    Yes.

2    Q.    It's fair to assume that you got that one about the time

3    they switched from the eight percent to the ten percent?

4    A.    Correct.

5    Q.    And do you recall having a meeting with all the poker

6    dealers and the cage employee dealers and Mr. Matthews in the

7    poker room where he made an announcement about changes to the

8    tip share?

9    A.    From eight to ten, yes.

10   Q.    Okay.  And you were at that meeting?

11   A.    Correct.

12   Q.    Okay.  And he explained to you that the tip share was

13   going to go from eight percent to ten percent?

14   A.    Yes.

15   Q.    And the tip share was going to go to the cage department

16   employees?

17   A.    He didn't go into details about that.  Because when he did

18   that, all of a sudden we started arguing.

19   Q.    Okay.  You weren't happy about it?

20   A.    No one was.

21   Q.    And there was approximately, what, 50 people there?

22   A.    Give or take.

23   Q.    And the majority of them were poker dealers?

24   A.    Correct.

25   Q.    Is it fair to assume none of them were happy about the tip

1   share going from eight percent to ten percent?

2   A.   Correct.

3   Q.   And is it fair to assume that everybody there was

4   questioning Mr. Matthews about why you're doing that?

5   A.   Correct.

6   Q.   And fair to assume that they would have been questioning

7   him about why you're tipping the cage employees?

8   A.   It wasn't about that.  It was all about why are they going

9   from eight percent to ten percent.  And every dealer is saying,

10  Why are we doing this?

11  Q.   And nobody questioned during that roughly hour-long

12  meeting?

13  A.   There was a lot of other things probably in there, but I'm

14  just saying -- I don't know how long it was.  You probably

15  would have my time-in and time-out.

16  Q.   Okay.  And nobody -- did you ask any questions?

17  A.   Everybody else was doing the questions for me.

18  Q.   So no?

19  A.   No.

20  Q.   Did anybody -- and you don't recall anybody asking any

21  questions about why we're doing a tip share to the cage

22  department employees?

23  A.   No.  It was all about the eight to ten.

24  Q.   Is it your testimony that you didn't even know who the tip

25  share was going to go to?

1    A.    I had ideas, but no one ever told me.

2    Q.    Okay.  Well, you knew -- did you think it was going to the

3    surveillance people?

4    A.    Like I say, I had no clue.  I thought different things.

5    No one ever told me and broke it down.

6    Q.    And you actually lived with Mr. Bendure for, what, two to

7    three years?

8    A.    Correct.

9    Q.    And he was a cage employee?

10   A.    That's the only reason why I knew he got a tip share.

11   Q.    Okay.  Did you ever tell Mr. Bendure while you were living

12   with him that you would -- had the intentions at some point in

13   time to sue Ocala Poker over these issues?

14   A.    No.

15   Q.    Now, the posters that are actually used -- that were

16   actually at Ocala Poker, you had actually looked at those

17   posters?  They would get replaced on a yearly basis, correct?

18   A.    They looked like they changed from time to time.

19   Q.    And you would actually look at them to see what -- if

20   there was a change in the tip credit minimum wage?

21   A.    Correct.

22   Q.    And that was one of the ways you knew how it got changed

23   from year to year?

24   A.    Correct.

25   Q.    Are you claiming to this court that you did not know how

1    the tip credit minimum wage worked?

2    A.    Tip credit or tip pool?

3    Q.    Tip credit.

4    A.    Tip credit, I figured all it was was ten percent.  That's

5    what they did with the 5.03.  So I knew that.

6    Q.    Okay.  That's the tip share.  I'm talking about the tip

7    credit, where you get the tip credit minimum wage plus your

8    tips.  Do you claim to this court --

9    A.    No.  I knew how that worked.

10   Q.    So your complaint is that you didn't understand how the

11   tip share worked --

12   A.    Correct.

13   Q.    -- meaning ten percent of your tips were taken and

14   distributed, as -- as we contend, to the cage employees; you

15   just didn't know how that worked?

16   A.    Ten percent of my money was just gone.

17   Q.    But you knew how much the tip share was?

18   A.    Correct.

19   Q.    Now, if you go back to the Ocala dealer's poker handbook,

20   paragraph 19, did you read it at the time?

21   A.    No.

22   Q.    You did not read it at the time?

23   A.    Not until you -- our depositions.

24   Q.    Okay.  But you see where paragraph 19 says, A tip share of

25   ten percent will be deducted from all dealer tips to be

1  distributed to cage personnel, not including full-time

2  supervisors?

3  A.   It says cage or poker room supervisor.  It doesn't say

4  just cage employee.

5  Q.   Okay.  Well, I'm -- the part I'm reading is -- and correct

6  me if I'm reading it incorrectly.  Let's start on the second

7  sentence.

8        A tip share of ten percent will be deducted from all

9  dealer tips to be distributed to the cage personnel, not

10 including full-time supervisors.

11       Did I read that incorrectly?

12 A.   No, that's correct.

13 Q.   So even though you might not have read it, apparently

14 somebody at least told you in the poker dealer's handbook that

15 the ten percent would go to the cage personnel, not including

16 supervisors?

17 A.   That's written down here, so, yes.

18       THE COURT:  Mr. Gilligan, what were you reading from?

19 What exhibit?

20       MR. GILLIGAN:  I apologize, Your Honor.

21       MS. PETERSON:  It's our Exhibit 10.

22       MR. GILLIGAN:  And it's paragraph 19 of Exhibit 10.

23       MS. PETERSON:  It's our Exhibit 9, rather.  It's

24 Plaintiffs' Exhibit 20.

25       MR. GILLIGAN:  It's in twice, Your Honor, but it's

1   the same exhibit, Plaintiffs' Exhibit 20, our Exhibit 9.

2           MS. PETERSON:  Uh-huh (affirmative).

3           MR. GILLIGAN:  Either one --

4           THE COURT:  Was Defense Exhibit 9 admitted?

5           MS. PETERSON:  No.

6           THE COURT:  Did you say no?

7           MS. PETERSON:  I thought we just did that.

8           MR. GILLIGAN:  If you can give me a second, I'll try

9   to correct the confusion.

10          Can I approach the witness, Your Honor?

11          THE COURT:  Yes, you can.

12          MR. GILLIGAN:  I may not have admitted it.

13          It is my Defense Exhibit 9.  It's not already in -- I

14  know it's already in the -- it's the same document through the

15  plaintiff.  But for completeness sake, may I move Exhibit 9

16  into evidence?

17          THE COURT:  Any objection?

18          MR. MASSEY:  No, sir.

19          THE COURT:  All right.  That will be so admitted.

20      (Defendant's Exhibit 9 received into evidence.)

21          THE COURT:  And what about 10?

22          MS. PETERSON:  10 is the --

23          MR. GILLIGAN:  Yeah.  I'm sorry.  10 is the sign-in

24  sheet.  And the same -- we would move it into evidence, Your

25  Honor.

1        THE COURT:  Any objection to that?

2        MR. MASSEY:  No, sir.

3        THE COURT:  All right.  So admitted.

4        MR. GILLIGAN:  Sorry for the confusion.

5    BY MR. GILLIGAN:

6    Q.   Okay.  So Defense Exhibit 9 is the -- our exhibit of the

7    Ocala Poker's handbook, correct?

8    A.   Correct.

9    Q.   And paragraph 19 is the paragraph I just read to you about

10   the cage employees getting ten percent of the tip share?

11   A.   Yes.

12   Q.   Now, as I understand it, you really don't have a problem

13   with the tip share going to the cage employees that do the

14   function of chip running?

15   A.   No.

16   Q.   And, as I understand it, you really don't have a problem

17   with the cage employees doing the function of working the

18   podium?

19   A.   No.

20   Q.   And do you have a problem with the cage employees that are

21   working as tellers?

22   A.   Yes.

23   Q.   And you have a problem with the cage employees that work

24   in the vault?

25   A.   Yes.

1  Q.   You've actually seen cage employees working in the vault

2  being tipped by customers; have you not?

3  A.   Cage employees?

4  Q.   That work in the vault, being tipped by customers.

5  A.   I always see money in there, so I'm not for sure.

6  Q.   Okay.

7  A.   I've never seen -- oh, yes, I have seen people get tipped

8  out.

9  Q.   Okay.  And I'm not trying to trick you here.  But one of

10 the reasons is -- as Mr. Bendure explained it, there's a teller

11 window right next to the vault door, correct?

12 A.   But there's a door with a window on it.

13 Q.   Okay.  That wasn't my question.  There is a teller window

14 right next to the vault door.  Is that not -- is that not

15 correct?

16 A.   Correct.

17 Q.   Okay.  And Mr. Bendure explained that when somebody comes

18 up he'll go sit at that window and he has his own bank.  Do you

19 dispute that?

20 A.   No.

21 Q.   Okay.  And so it wouldn't be unusual for -- if a -- if a

22 customer came up to that window to buy chips and he was the

23 only teller there, or to cash out later on and he was the only

24 teller there, to tip him?

25 A.   Well, the thing is, though -- I've noticed before when he

1    was in the vault people had to yell through the window to get

2    him to come out.

3    Q.    Okay.  That wasn't my question again.

4          Okay.  My question was:  It wouldn't be unusual to

5    see him tipped if he's doing the teller function, correct?

6    A.    Correct.

7    Q.    And you've seen that happen?

8    A.    Yes.  Not him personally, though, no.

9    Q.    Okay.  Mr. Bendure never had the authority to hire or fire

10   anybody?

11   A.    No.  He could recommend it, though.

12   Q.    And -- and you know that -- for a fact he never owned any

13   part of Ocala Poker?

14   A.    No.

15   Q.    And he didn't have any authority to set anybody's wages?

16   A.    No.

17   Q.    Did you -- when you worked there, did you work the

18   nightshifts?

19   A.    I worked all over, night, day, over the years.

20   Q.    And I don't remember the exact days and the exact times.

21   Mr. Bendure was testifying that some nights they close at four

22   in the morning, some nights three, and some nights maybe one in

23   the morning.  Is that generally correct?

24   A.    Correct.

25   Q.    And you would have worked all those shifts over your years

1    there?

2    A.    Yes.

3    Q.    You would have seen, like Mr. Bendure described, that he

4    would have been the only teller there at those late hours?

5    A.    Correct.   Near the end he was.

6    Q.    I mean, as the night goes on, there's fewer and fewer

7    customers?

8    A.    Yes.

9    Q.    And -- and if there's fewer and fewer customers, there's

10   less need for multiple tellers out there, because there's just

11   not that many people there anymore?

12   A.    Well, yes.   Business slowed down.

13   Q.    Where do you work now?

14   A.    Best Bet Jacksonville.

15   Q.    Are they still using those posters?

16   A.    Yes.

17   Q.    The posters that are on the easel next to you?

18   A.    Yes.

19   Q.    Do you have a Facebook page?

20   A.    Yes.

21          MR. GILLIGAN:   Thank you, Your Honor.   I have no

22   further questions.

23          MR. MASSEY:   No.

24          THE COURT:   Any redirect?

25          MR. MASSEY:   No.   No, sir.

1          THE COURT:  Mr. Howard, you can step down.

2      (Witness excused.)

3          MR. GILLIGAN:  I didn't move the tip-share --

4  tip-slip document into evidence.  I'd like to do so at this

5  time.

6          Mr. Howard, let me retrieve it and get the number.

7          MS. PETERSON:  It's No. 21.

8          THE WITNESS:  Haven't seen it in a while.

9          MR. GILLIGAN:  That was Greenstone.

10          MS. PETERSON:  Defendant's Exhibit No. 21 is for

11  Howard.

12          COURTROOM DEPUTY:  That's already been admitted.

13          MR. ANDERSON:  I think we entered it in when we did

14  Matthews.

15          THE COURT:  Your next witness, Mr. Massey.

16          MR. MASSEY:  We have nothing else, Your Honor.  We

17  close.

18          THE COURT:  All right.  The plaintiff rests.

19          Mr. Gilligan.

20          MR. GILLIGAN:  We have the burden of proof --

21          THE COURT:  Why don't you -- if you're going to talk,

22  why don't you come to the lectern.

23      (Counsel confer.)

24          MR. GILLIGAN:  As Mr. Massey pointed out in his

25  opening, we have the burden of proof as to the tip credit

1    issue.  And so with that burden of proof I think a motion for

2    directed verdict on that would be inappropriate.

3              But I don't know that we have the burden of proof on

4    the tip-share issue.  I don't want to represent to the court

5    that we do or don't, because, quite frankly, I don't know if we

6    do or don't.

7              But if we don't have the burden of proof, it seems to

8    me that we're entitled to a directed verdict on the tip-share

9    issues in this case.

10             THE COURT:  Well, I'm inclined either way to withhold

11   any judgment at this time and let the case proceed to hear

12   evidence from the defense and then rule at the close of all the

13   evidence.

14             MR. GILLIGAN:  I told my first witness to be here at

15   2:30.

16             THE COURT:  All right.  Well, let's take a break

17   until 2:30.  It's a good time for an afternoon break anyway.

18   And we'll simply resume at that time.

19             MR. GILLIGAN:  Thank you, Your Honor.

20             COURT SECURITY OFFICER:  All rise.

21             THE COURT:  All right.

22        (Recess, 2:18 p.m. to 2:36 p.m.)

23             COURT SECURITY OFFICER:  All rise.

24             THE COURT:  Be seated, please.

25             COURT SECURITY OFFICER:  Court is now back in

 1 | session.
 2 |    THE COURT:  All right.  Mr. Gilligan, it's the
 3 | defense case now.
 4 |    MR. GILLIGAN:  Thank you, Your Honor.  We'd call as
 5 | our first witness Vicki Pernek.
 6 |    COURTROOM DEPUTY:  Ms. Pernek, if you will raise your
 7 | right hand.  Do you solemnly swear that the testimony you'll
 8 | give before this court will be the truth, the whole truth, and
 9 | nothing but the truth, so help you God?
10 |    THE WITNESS:  Yes.
11 |    COURTROOM DEPUTY:  Please have a seat and state your
12 | full name for the record, spelling your last name.
13 |    THE WITNESS:  Vicki Jean Pernek, P-e-r-n-e-k.
14 |    **VICKI JEAN PERNEK, DEFENDANT'S WITNESS, SWORN**
15 |        **DIRECT EXAMINATION**
16 | BY MR. GILLIGAN:
17 | Q.   Good afternoon, Ms. Pernek.  Can you tell the court who
18 | you work for?
19 | A.   I work for Second Chance Jai-Alai, Ocala Poker.
20 | Q.   What's your current position with Ocala Poker?
21 | A.   I'm the cage department manager.
22 |    THE COURT:  Would you just slide forward so you can
23 | talk in --
24 |    THE WITNESS:  Sure.
25 |    THE COURT:  -- or pull the microphone closer to you,

1   if it moves.  There you go.

2   BY MR. GILLIGAN:

3   Q.   When did you start working at Ocala Poker?

4   A.   May of 2008.

5   Q.   Who hired you?

6   A.   Chaz Allen.

7   Q.   What were you brought in to do at that time?

8   A.   I was brought in as a dealer.

9   Q.   A poker dealer?

10  A.   Yes.

11  Q.   What other positions have you held at Ocala Poker other

12  than poker dealer and poker --

13  A.   The cage department manager that I do now.

14  Q.   When did Ocala Poker open for business?

15  A.   May of 2008.

16  Q.   Is it just a poker room?

17  A.   No.

18  Q.   What else does it do?

19  A.   It's a facility that has a Jai-Alai fronton, Inter-track

20  Wagering.  We have a deli and a bar.  And also security.

21  Q.   Okay.  What are your job duties as the cage manager?

22  A.   I oversee everybody that works in the cage department to

23  make sure they do their job and have what they need to do their

24  job to the best of their ability.

25  Q.   Now, there's -- are there different job functions within

1  the --

2  A.   There are.  We have chip runners.  We have tellers.

3  Positions -- the podium is a position.  And the vault is a

4  person who does all three plus what goes on in the vault.

5  Q.   Okay.  And are all those employees trained to do the

6  podium, chip running, and teller?

7  A.   Yes.

8  Q.   And then a few select employees are also trained to work

9  in the vault?

10 A.   Yes.

11 Q.   Who is your boss?

12 A.   Brian Matthews.

13 Q.   What is his position?

14 A.   President of the company.

15 Q.   And Mr. Matthews is the gentleman sitting back here?

16 A.   Yes.

17 Q.   Have you always reported directly to Mr. Matthews as the

18 cage department manager?

19 A.   Yes.

20 Q.   There's no intermediate boss between you and Mr. Matthews?

21 A.   No.

22 Q.   Is there a separate room just for poker?

23 A.   Yes.

24 Q.   And who works in the poker room?

25 A.   Poker manager, the poker room floor personnel.  Everybody

1    that works in the cage at one point or another works in the

2    poker room.  The waitresses work in the poker room.  Security

3    works in the poker room.  And the dealers.  I don't know if I

4    said that.

5    Q.    Does the poker room have a manager?

6    A.    Yes.

7    Q.    And who is that?

8    A.    Phil Faso.

9    Q.    And what does he do?

10   A.    He runs the poker room.  He oversees the dealers and their

11   position, and the floor people.

12   Q.    Now, do the cage employees generally do the different jobs

13   of -- of teller or podium chip running?

14   A.    Yes.  Depending on the business of the day, they did.

15   Q.    How many employees do you typically have in the cage

16   department that you manage?

17   A.    Anywhere from seven to twelve.

18   Q.    And of those how many actually work in the cage

19   department -- or, I'm sorry, actually also work in the vault?

20   A.    Four.

21   Q.    Are they -- are they employees that are more senior?  Or

22   how do they end up also having vault duty?

23   A.    More senior, more experience, trustworthy.

24   Q.    Now, the cage employees that do these various job

25   functions, do they have a set time that they're a chip runner

1    and in the podium or work with the teller or anything like

2    that?

3    A.    Oh, they may do more than one job in their shift.  It

4    depends on the business of the day.

5    Q.    You're aware there's an issue concerning the poker dealer

6    tip pool in this case, correct?

7    A.    Yes.

8    Q.    Okay.  Who -- who -- how much is the tip share?  Do you

9    know?

10   A.    We take ten percent of every dealer.

11   Q.    These are the poker dealers?

12   A.    Yes.

13   Q.    And that ten --

14   A.    On a daily basis.

15   Q.    And that ten percent share goes to what employees?

16   A.    Everybody that works in the cage department, except for

17   myself.

18   Q.    Okay.  And you're -- and that's because you're a manager?

19   A.    Yes.

20   Q.    And you get -- you don't -- you get paid a salary?

21   A.    Yes.

22   Q.    Do you mind telling the court what that is?

23   A.    60,000 -- or 55,000.  Excuse me.

24   Q.    A year?

25   A.    A year, yes.

1    Q.    Do you have an assistant cage department manager?

2    A.    No.

3    Q.    Assistant cage department supervisor?

4    A.    No.

5    Q.    Have you ever had an assistant cage manager?

6    A.    No.

7    Q.    Or supervisor?

8    A.    No.

9    Q.    Do the waitresses that work there participate in the chip

10   share?

11   A.    No.

12   Q.    The security personnel?

13   A.    No.

14   Q.    The people that work in ITW?

15   A.    No.

16   Q.    Or Jai-Alai?

17   A.    No.

18   Q.    Just the cage employees?

19   A.    Correct.

20   Q.    Less you?

21   A.    Correct.

22   Q.    Is there a significant disparity in pay between the cage

23   employees and the poker dealers?

24   A.    Yes.

25   Q.    Why is that?

1    A.    Well, the dealers have more opportunity to be tipped than

2    a cage department does.

3    Q.    And why is that?

4    A.    Well, the dealers can get tipped per hand.  And they can

5    deal anywhere from 15 to 27 hands per half hour, where the cage

6    department personnel only get tipped when someone cashes out or

7    someone colors up.

8    Q.    And this is even after their participation in the tip

9    share?  They make significantly less?

10   A.    Yes.

11   Q.    Now, the employees that you supervise in the cage

12   department, how many currently work there now?

13   A.    In the cage itself?

14   Q.    In the cage department.  Yes, ma'am.

15   A.    There's seven.

16   Q.    And is that a combination of full- and part-time

17   employees?

18   A.    Yes.

19   Q.    Approximately how many poker dealers are there?

20   A.    Right now there, I believe, is 18.

21   Q.    And are they full- and part-time?

22   A.    Yes.

23   Q.    Now, Mr. Faso -- I think you identified as the poker room

24   manager?

25   A.    Yes.

1  Q.   Does he share in the tip pool?

2  A.   No, he does not.

3  Q.   Do the cage employees get tipped themselves?

4  A.   Yes.

5  Q.   And these are tips separate from the tip share they get

6  from the poker dealers?

7  A.   Yes.

8  Q.   How is that done?

9  A.   They have tip boxes.  There's a tip box in front of the

10 teller window and there's also a tip box in the poker room.

11 And anytime they are tipped by a player, they have to drop the

12 tip in the box.

13 Q.   Okay.  When you say the word "player," you're talking

14 about a customer, right?

15 A.   Yes.

16 Q.   Okay.  And we've -- you don't know this, but the court has

17 heard it at some length, that these tip -- these tips are

18 placed in a tip box.  Is that correct?

19 A.   Yes.

20 Q.   And the tip boxes are the same tip boxes, other than maybe

21 a number on it, that the poker dealers use?

22 A.   Yes.

23 Q.   And those tips are regularly and customarily given to the

24 employees that work as chip runners?

25 A.   Yes.

1    Q.    And they're regularly and customarily given to the cage

2    employees that work on the podium?

3    A.    Yes.

4    Q.    And they're regularly and customarily given to the

5    employees that work as tellers?

6    A.    Yes.

7    Q.    Let's talk about the people that work in the vault.  Is

8    that a singular job or is it a dual-hat job?

9    A.    It's a dual-hat job.

10   Q.    Would you explain that to the court.

11   A.    They have to -- they do their part of the job, which is to

12   balance the vault.  However, they also are a teller.  They run

13   chips.  And they also do work on the podium.  They do breaks

14   for the employees that are there.  And there are days when we

15   only schedule a vault person who is the teller.

16   Q.    Okay.  The -- let's see.

17         (Counsel confers with Ms. Peterson.)

18             MR. GILLIGAN:  May I approach the witness, Your

19   Honor?

20             THE COURT:  You may.

21   BY MR. GILLIGAN:

22   Q.    Let me first show you Defense Exhibit 12.

23   A.    Can I -- can I take it?

24   Q.    Yes, ma'am.

25   A.    Okay.

```
1   Q.    Defense Exhibit 12, would you tell the court what that is?
2   A.    That's the podium inside the poker room.
3   Q.    Okay.  And it also shows a portion of the poker room,
4   correct?
5   A.    Yes.
6   Q.    And if you'd also look at Defense Exhibit 13, could you
7   tell the court what that is, please?
8   A.    That's the cage window --
9   Q.    And it --
10  A.    -- with the teller in it with a tip box.
11  Q.    Okay.  And then Defense Exhibit -- if you'll read the
12  number for me?
13  A.    I have 14.
14  Q.    Okay.  Defense Exhibit 14, could you tell the court what
15  that is?
16  A.    Yes.  It's a picture of the inside of the cage with a door
17  entrance to the vault and the teller window to the left.
18  Q.    And there's somebody actually in the picture that is you?
19  A.    That would be me.
20  Q.    Okay.  And so you're actually inside the vault looking out
21  the vault door --
22  A.    Yes.
23  Q.    -- into the cage area --
24  A.    Yes.
25  Q.    -- what's called the cage area?
```

1    A.    Yes.

2    Q.    Now, right next to that door, about the distance from

3    what -- me to Mr. Massey, there is a teller window; is that

4    correct?

5    A.    Yes.

6    Q.    And whose teller window is -- who occupies that teller

7    window?

8    A.    The person who works in the vault.

9    Q.    And do they have what's called a bank?

10   A.    Yes, they do.

11   Q.    Could you explain to the court what a bank is?

12   A.    The bank is the money -- it's a container that money,

13   cash, and chips are put into to be able to be sold to the

14   player.

15   Q.    Now, is that teller bank a teller bank that just

16   anybody -- any teller can use?

17   A.    No.   It's just for the vault.

18   Q.    So for purposes of accounting, that bank is made up just

19   for the vault person?

20   A.    Yes.

21   Q.    There is a teller window right next to that window,

22   correct?

23   A.    Correct, to the left.

24   Q.    And that's for if you have another teller there?

25   A.    Yes.

1  Q.   Does that teller employee -- that cage employee working as

2  a teller, do they have their own bank?

3  A.   Yes, they do.

4  Q.   And so if -- by way of example, Mr. Bendure is a cage

5  employee that works in the vault, correct?

6  A.   Yes.

7  Q.   But he also works as a teller?

8  A.   Yes.

9  Q.   And he also works at the podium?

10 A.   Yes.

11 Q.   And he also works in the -- as a chip runner?

12 A.   Yes.

13 Q.   Okay.  When he's working out of his bank in the -- in his

14 teller window, is he allowed to work out of the other teller's

15 bank?

16 A.   No, he is not.

17 Q.   And is that for accounting and security purposes?

18 A.   Yes.  In case somebody has a shortage or an overage, we'll

19 know it was the person who was in charge of the bank at the

20 day -- at that time.

21 Q.   Do the cage employees themselves regularly receive more

22 than $30 a month in tips?

23 A.   Yes.

24 Q.   Okay.  And you know that how?

25 A.   We track it.  The tips are counted every evening at the

1  end of the shift.  And the numbers are given to the bookkeeper.

2  And it's tracked on a spreadsheet.

3  Q.    And that's -- the bookkeeper is Ms. Kelso --

4  A.    Yes.

5  Q.    -- that we'll hear from tomorrow?

6  A.    Yes.

7  Q.    And those $30 in tips a month, that's separate and apart

8  from whatever they get from the tip share from the poker

9  dealers?

10  A.    Yes.

11  Q.    Do the tip -- the cage employees make anywhere near what

12  the poker dealers do?

13  A.    No.

14  Q.    What do the chip runners do?

15  A.    The chip runners, they are on the poker room floor.  They

16  sell chips to players.  They replenish the banks that the

17  dealers have in their tables, so that they are brought back up

18  to par so that if they have to sell chips to the players they

19  can, or make change.

20  Q.    Can they also sell chips to the customers on the floor?

21  A.    Yes.

22  Q.    Do they have -- do they receive tips customarily and

23  regularly for this function?

24  A.    Yes.

25  Q.    They have a tip box on their --

1  A.   Yes, they do.

2  Q.   -- cart for that?

3        And it's the same type of tip box the dealers have,

4  correct?

5  A.   Yes.

6  Q.   Do they customarily interact in -- with -- and regularly

7  interact with the poker room customers?

8  A.   Yes, they do.

9  Q.   Part of the -- the business is gaming and gambling?

10  A.   Yes.

11  Q.   But do you instruct the people working the cage employees

12  what they're to be doing to make the customers' experience

13  better?

14  A.   Absolutely.

15  Q.   What do you tell them?

16  A.   We tell them if somebody calls for a chip that they are

17  supposed to be as prompt as they possibly can be.  They are

18  courteous, polite.  They help in any way.  They may help seat a

19  player, if they don't know where the seat is, or the table is,

20  to show them where they need to go.

21  Q.   Are the cage employees part of the overall poker room

22  team?

23  A.   Yes, they are.

24  Q.   And the podium people, could you tell the judge

25  specifically what they do?

1    A.    Yes.   They answer phones.   They keep track of a list that

2    the players get their names put on, so that we know how many

3    people we have, so that we may either open a game or seat a

4    player.   They seat players.   They collect seat cards.   Then

5    they sell chips, depending on the day.   Sometimes they have

6    their own bank, also.

7    Q.    Okay.   And do the needs of the poker room, as far as your

8    supervision of the cage employees -- does it change day to day

9    from what day it is, how many customers are there --

10   A.    It does.

11   Q.    -- whether there are tournaments?

12   A.    Depending on the business of the day, yes.

13   Q.    Okay.   So one day somebody may spend a lot of time being a

14   chip runner and the next day a lot of times being a podium

15   person?

16   A.    Correct.

17   Q.    There's no set real time for that?

18   A.    No.

19   Q.    You do have a lady by the name -- I don't know her last

20   name, but her name is Peggy?

21   A.    Yes.

22   Q.    She's an older lady?

23   A.    Yes, she is.

24   Q.    She's trained to do all these functions?

25   A.    She is.

1   Q.   And she's done all these functions?

2   A.   She has.

3   Q.   I mean, she doesn't work in the vault, though?

4   A.   No.

5   Q.   Okay.  But she -- she has worked as a chip runner; she has

6   worked on the podium?

7   A.   Yes.

8   Q.   Does she primarily, though, work as a teller?

9   A.   Yes.

10  Q.   Why?

11  A.   It's just a better position for her.

12  Q.   Because of her age?

13  A.   Yes.

14  Q.   Do the podium people regularly and customarily get tipped?

15  A.   Yes, they do.

16  Q.   Do they regularly and customarily interact with the poker

17  room customers?

18  A.   Yes.  They are the first person that a player will see

19  when they come in the room.

20  Q.   Okay.  Now, the tellers, they -- what do they do?

21  A.   They exchange cash for chips.  They either sell the chips

22  to the player or they cash the chips out for the player when

23  they go.  They sell tournament seats.  They answer phones.

24  Q.   Okay.  And so they do some of the functions the podium

25  people do?

1  A.    Yes.

2  Q.    But they're -- when they walk in the front door of Ocala

3  Poker, are they the first people they see, in terms of buying

4  chips?

5  A.    As far as buying chips, yes.

6  Q.    Okay.  Now, are poker players allowed to play poker with

7  cash?  Or do they have to have chips?

8  A.    They have to have chips.

9  Q.    Okay.  So when you walk in the door of Ocala Poker,

10  there's a teller window there to the left, correct?

11  A.    Yes, there is.

12  Q.    And it's pretty much across the -- right across the way

13  from the entrance to the poker room?

14  A.    Yes.

15  Q.    And when the poker players are done playing, they go back

16  to the teller --

17  A.    To the window, yes.

18  Q.    -- and they cash out their chips?

19  A.    Yes, they do.

20  Q.    Do the tellers customarily and regularly interact with the

21  customers?

22  A.    Yes, they do.

23  Q.    And are they regularly tipped?

24  A.    Yes, they are.

25  Q.    And customarily tipped?

1    A.    Yes.

2    Q.    More than $30 a month?

3    A.    Yes.

4    Q.    Now, I want to talk finally about the special -- the

5    special duties of the cage employees that work in the vault.

6    How many cage employees do you typically have that also work in

7    the vault?

8    A.    There are four.

9    Q.    And that's currently?

10   A.    Yes.

11   Q.    And Mr. Bendure is one of those employees?

12   A.    Yes, he is.

13   Q.    And their duties -- would you explain them to the judge,

14   please?

15   A.    Yes.  They -- if it's a day person, they come in and they

16   verify everything that happened from the night before.  We have

17   a count team.  They are part of the count team that counts the

18   amount of money that -- that -- their chips that were brought

19   in from the night before.

20          When they are finished with that, they make deposits.

21   And they balance to make sure that everything is good before

22   the money goes to the bank.

23          At night they have to close the vault.  They have to

24   make sure that it balances before they leave.

25   Q.    Okay.

1    A.    And any other time that they're not doing that, which is

2    basically when they come in or right before they leave, they

3    are -- either a chip runner or podium, they have to be wherever

4    someone isn't, or where someone needs help.

5    Q.    And let's talk about the times they're working in the

6    vault.  Are they actually -- when they're doing this initial

7    count in the morning --

8    A.    Uh-huh (affirmative).

9    Q.    -- what time do they typically come in to do that?

10   A.    They come in at 10:15.

11   Q.    And the doors open for the customers at what time?

12   A.    11:30.

13   Q.    So most of their work is done before the customers get

14   there?

15   A.    Yes.

16   Q.    And then when they're doing sort of the same thing at

17   closing, whoever the person may be, are they doing that work

18   after the customers have left?

19   A.    Yes.

20   Q.    Approximately in a -- is a typical shift for a cage

21   employee that also works in the vault -- what, eight hours?

22   A.    Six to eight hours.

23   Q.    Okay.  How much time would they spend working just in the

24   vault when the customers aren't there, on average?

25   A.    About an hour-and-a-half.

1   Q.    Okay.  And you --

2   A.    Maybe two hours -- maybe two hours, depending -- if

3   there's a mistake or an issue.

4   Q.    Okay.  But no mistakes, no issues, about an

5   hour-and-a-half?

6   A.    Yes.

7   Q.    And the rest of their workday would be spent with -- with

8   the actual customers there?

9   A.    Yes.

10  Q.    And doing the other job functions of either working the

11  podium --

12  A.    Yes.

13  Q.    -- chip running, or telling?

14  A.    And they may also -- they would have to go back and forth

15  into the vault, because they would have to replenish the chips

16  or the cash as needed by either the chip runner, somebody on

17  the podium if they have them, or the teller.  They have to make

18  sure that they always have enough cash and enough chips to be

19  able to sell to the players.

20  Q.    Now, does the vault person -- these cage employees who

21  also work in the vault, do they customarily and regularly

22  interact with the customers?

23  A.    Yes, they do.

24  Q.    Except for that time --

25  A.    Except for that time span when we're not open, yes.

1  Q.    Okay.  Or the short amount of time the customers may be

2  there that they have to go in the vault?

3  A.    Correct.

4  Q.    That period of time when the customers are actually there,

5  they may go in the vault, when would that typically be in a --

6  A.    Oh, anywhere from five, maybe, to 15 minutes, if they have

7  to balance something after they've given the cash or the chips

8  out.

9  Q.    Okay.  Now, at the time these cage employees who work --

10  also work in the vault, are there while the customers are

11  there, do they -- are they always also a teller if they're in

12  the vault?

13  A.    Yes.

14  Q.    That's why they have their own bank?

15  A.    Yes.

16  Q.    Their own seat right next to the door?

17  A.    Yes.

18  Q.    And are they sort of the designated relief pitcher to go

19  in for the podium people and the chip runners?

20  A.    Yes.

21  Q.    And those people work six- to eight-hour shifts?

22  A.    Some work ten.

23  Q.    And they're entitled to, I guess, a meal break?

24  A.    Uh-huh (affirmative).

25  Q.    Yes?

1    A.    Yes.  And on occasion we give them -- we would give them

2    more breaks, only because of the type of job.

3    Q.    And they're also entitled to regular breaks?

4    A.    Yes.

5    Q.    Okay.  So when they go on a meal break in their six-,

6    eight-, ten-hour shift -- they go on a meal break or just a

7    regular break, typically it would be Mr. Bendure or somebody

8    like him that would then go take their place?

9    A.    Yes.

10   Q.    Would it be unusual for this person to sub in for a podium

11   person for 15 to 20 minutes?

12   A.    Yes.

13   Q.    And then right after they finished up subbing for them,

14   then do a break for a chip runner?

15   A.    Yes.

16   Q.    In fact, is that typical?

17   A.    Yes.

18   Q.    Okay.  Are they -- are the vault people supervisors?

19   A.    No, they are not.

20   Q.    Have you ever designated a vault person as some sort of

21   supervisor?

22   A.    I have used that word.

23   Q.    But they don't -- do they supervise anybody?

24   A.    No.  They're there to make sure that everybody gets what

25   they need, but they're not typically a supervisor.

1    Q.    Are they a manager?

2    A.    No.

3    Q.    Have you ever made them a manager?

4    A.    No.

5    Q.    Do any of the cage employees that work for you now have

6    any managerial authority?

7    A.    No, they do not.

8    Q.    Have any of the cage employees that have ever worked for

9    you while you were the cage department manager ever had any

10   managerial authority?

11   A.    No.

12   Q.    Did any employee that ever worked for you as a cage

13   department manager ever have the authority to hire and fire any

14   employee?

15   A.    No.

16   Q.    Did any cage department employee that ever worked for you

17   ever have the authority to set an employee's wages?

18   A.    No.

19   Q.    Did any cage employee that ever worked for you ever have

20   the right to discipline an employee?

21   A.    No.

22   Q.    Could -- do the cage employees have the right to set

23   schedules?

24   A.    No.

25   Q.    Who sets the schedules?

1    A.    I do.

2    Q.    Have you ever had a cage employee suggest to you a

3    schedule?

4    A.    Yes.

5    Q.    And -- but who has the ultimate authority on setting the

6    schedule?

7    A.    I do.

8    Q.    Do you even have the authority to set wages?

9    A.    I do not.

10   Q.    Who has that authority?

11   A.    Brian Matthews.

12   Q.    Do you have the authority to hire and fire employees?

13   A.    No, I don't.

14   Q.    Who does?

15   A.    Brian does.

16   Q.    And -- and you -- but you do do the scheduling?

17   A.    I do.

18   Q.    And you do recommend discipline to Mr. Matthews?

19   A.    I do.

20   Q.    And you do not share in the tip pool?

21   A.    I do not.

22   Q.    And did you ever share in the tip pool?

23   A.    Yes.

24   Q.    And when did that -- when did that stop?

25   A.    That stopped in September of 2010.

```
1   Q.   We -- the court has heard about an employee by the name of
2   Kathleen Danielson.  Do you know Ms. Danielson?
3   A.   I do.
4   Q.   She worked -- she was a cage department employee?
5   A.   Yes.
6   Q.   Was she one of the cage department employees that also
7   worked in the vault?
8   A.   Yes.
9   Q.   Did you ever appoint her as a manager?
10  A.   I did not.
11  Q.   Did Mr. Matthews ever appoint her as a manager?
12  A.   No.
13  Q.   Did you ever appoint her to some sort of supervisor?
14  A.   No.
15  Q.   But she did work in the vault?
16  A.   She did.
17  Q.   Did she ever do any scheduling for you?
18  A.   She helped me with the schedule when -- there was a time
19  when I had to be called to do something else that took me
20  outside of the cage.  And she helped me.  But I always
21  authorized the schedule before it was put up.
22  Q.   Okay.  So she would suggest it and you --
23  A.   Yes.
24  Q.   Did she ever have any authority to hire or fire anybody?
25  A.   No.
```

1  Q.    Set anyone's wages?

2  A.    No.

3  Q.    Discipline any employee?

4  A.    No.

5  Q.    Do you recall a meeting in -- around September of 2010

6  where the -- with all the poker dealers in the cage?

7  A.    Yes.

8  Q.    Where was that held?

9  A.    In the poker room at Ocala Poker.

10  Q.    Who called that meeting?

11  A.    Brian Matthews.

12  Q.    And did he announce changes in the tip-share program?

13  A.    Yes.

14  Q.    What do you recall him telling everybody about that?

15  A.    That they were taking management out of the tip pool and

16  that the cage would get -- not only the eight percent, but they

17  were changing the eight percent to ten percent and the cage

18  would be getting all of that.

19  Q.    And did Mr. Greenstone and Mr. Howard work there at that

20  time?

21  A.    I believe so.

22  Q.    Do you recall seeing them at the meeting?

23  A.    I -- you know, it was a long time ago.

24  Q.    Okay.  Fair enough.  Did -- did the poker dealers that

25  were there -- do you recall them being upset about the change

1    from the --

2    A.   Yes.

3    Q.   Okay.  Did they question why that happened?

4    A.   I can assume that they did.  I don't remember the exact

5    conversations that went on.

6    Q.   Okay.  Now...

7         (Counsel confers with Ms. Peterson.)

8    BY MR. GILLIGAN:

9    Q.   All right.

10            MR. GILLIGAN:  May I approach the witness, Your

11   Honor?

12            THE COURT:  You may.

13   BY MR. GILLIGAN:

14   Q.   I want to show you Defense Exhibit 3.  And, first of all,

15   does the -- Ocala Poker have a place where everybody clocks in?

16   A.   Yes.

17   Q.   And they have a -- and they can either use their ID card

18   to sort of scan it and it will automatically say when they came

19   to work or left work?

20   A.   Yes.

21   Q.   I understand from Mr. Howard and Mr. Greenstone they can

22   also punch in their number on the keypad?

23   A.   Yes, they can.

24   Q.   Okay.  And at the clock where everybody clocks in and out

25   every day, are posters hung that explain all employee different

1    rights?

2    A.    Yes.

3    Q.    I've got them here.  Does that look like them on the easel

4    to your right?

5    A.    Yes.

6    Q.    Okay.  Exhibit 3 is a -- of course, we have a photograph

7    of some of all of those posters.  Are you looking at Exhibit 3

8    in front of you, the picture?

9    A.    Yes.

10   Q.    Okay.  Does that look like a photograph of how it was

11   actually hung at Ocala poster [sic] while you've been employed

12   there?

13   A.    Yes.

14   Q.    Did the posters change from year to year?

15   A.    They do.

16         MR. GILLIGAN:  At this time if I could move Exhibit 3

17   into evidence, Your Honor.

18         THE COURT:  Any objection?

19         MR. MASSEY:  No, sir.

20         THE COURT:  So admitted.

21       (Defendant's Exhibit 3 received into evidence.)

22         MR. GILLIGAN:  Could I get one quick second to talk

23   to my partner?

24         THE COURT:  You can.

25       (Counsel confer.)

```
 1              MR. GILLIGAN:  Thank you, Your Honor.  I have no
 2     further questions.
 3              THE COURT:  Mr. Massey, your witness.
 4              MR. MASSEY:  Thank you, Your Honor.
 5                        CROSS-EXAMINATION
 6     BY MR. MASSEY:
 7     Q.   Who participated in the tip pool when my clients worked at
 8     Ocala Poker?
 9     A.   Just the cage department.  I mean, prior to -- if they
10     were there before 2010, the management did.  But after 2010, it
11     was just the cage.
12     Q.   So only -- so who is that?  Can you --
13     A.   All of the people that work in the cage department, they
14     worked as tellers, podium, chip runners, and the people that
15     work in the vault, because they do all the other positions as
16     well.
17     Q.   Did that include Kathleen Danielson?
18     A.   Yes.
19     Q.   And Jason Bendure?
20     A.   Yes.
21     Q.   Now, do chip runners go into the vault?
22     A.   No.
23     Q.   Why?
24     A.   Because they're not authorized to go in the vault.
25     Q.   But why?
```

1    A.    Because they're not trained to work in the vault.   The

2    vault is where everything gets balanced.   And they're just not

3    trained in that position.

4    Q.    But I thought everybody did all positions?

5    A.    No.   There are four people that do all four positions,

6    which is the vault, the podium, the chip runner, and teller.

7    Everybody else does -- they all do everything, except for the

8    vault position, which is -- we use the more trusted and -- I

9    mean, we don't need everybody to do that position, simply

10   because, excuse me, there are not enough hours in the day.

11   Q.    Not enough hours in the day to...

12   A.    Well, in a week -- in a workweek we wouldn't need

13   everybody to know everything, because we always have somebody

14   scheduled there.

15   Q.    In the vault?

16   A.    Yes.

17   Q.    Okay.   So there's someone always scheduled to be in the

18   vault?

19   A.    Yes.   Because someone always has to have access to the

20   chips and the cash.

21   Q.    And that would be the vault person?

22   A.    Yes.

23   Q.    For example, Jason Bendure, would that be his role?

24   A.    Yes.   Yes.

25   Q.    And who else played that role at Ocala Poker while my

 1 | clients worked there?

 2 | A.    Kathleen Danielson, Patricia Sharon, Dean Moore, Karen

 3 | Drake.

 4 | Q.    And did those people share in the tip pool?

 5 | A.    Yes, they did.

 6 |           MR. MASSEY:  That's all I have, Your Honor.  Thank

 7 | you.

 8 |           MR. GILLIGAN:  I have no further questions, Your

 9 | Honor.

10 |           THE COURT:  You can step down, ma'am.

11 |           MR. GILLIGAN:  Thank you.

12 |           THE WITNESS:  Thank you.

13 |           MR. GILLIGAN:  May I retrieve my exhibits, Your

14 | Honor?

15 |           THE COURT:  You may.

16 |           MR. GILLIGAN:  Can I release Ms. Pernek?

17 |           THE COURT:  Any objection to that?

18 |           MR. MASSEY:  No, sir.

19 |      (Witness excused.)

20 |           MR. GILLIGAN:  I'm going to call my witnesses out of

21 | order just to make use of our time, Your Honor.  But for

22 | planning purposes, I have -- I'll call Mr. Matthews to finish

23 | up his testimony that I didn't do during the plaintiffs' case

24 | in chief.

25 |           I have two other witnesses, Ms. Kelso and Mr. Faso,

1　that I plan on calling.  I expect that -- it's 3:10.  I expect

2　Mr. Matthews would probably get us past the 4 o'clock hour.  Do

3　you want me to call one of those witnesses to fill in the rest

4　of the day --

5　　　　　　　THE COURT:  Did you just tell Kelso and Faso that

6　they'd be called tomorrow?

7　　　　　　　MR. GILLIGAN:  Sir?

8　　　　　　　THE COURT:  Did you just tell Kelso and Faso they'd

9　be called tomorrow?

10　　　　　　MR. GILLIGAN:  I have not told them.  I can call them

11　to have them here.  I anticipate -- like I said, if I -- with

12　Mr. Matthews, I think we'll get done 4:10, 4:30.  I don't know

13　how long his cross-examination will be.

14　　　　　　THE COURT:  Well, that's fine.  Why don't we just

15　finish with Mr. Matthews today.

16　　　　　　MR. GILLIGAN:  Okay.  Thank you, Your Honor.  I'd

17　call Mr. Matthews.

18　　　　　　THE COURT:  You're still under oath, Mr. Matthews.

19　　　　**BRIAN MATTHEWS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

20　　　　　　　　　　　　**DIRECT EXAMINATION**

21　BY MR. GILLIGAN:

22　Q.　Do you have any ownership interest in Ocala Poker?

23　A.　No, I do not.

24　Q.　Have you ever?

25　A.　No.

1  Q.   And who is your poker room manager?

2  A.   Phil Faso.

3  Q.   And who does he report to?

4  A.   He reports to me.

5  Q.   And we just heard from Ms. Pernek.  And she reports to

6  you, too?

7  A.   That is correct.

8  Q.   Who appointed them to their -- Mr. Faso to his position as

9  poker room manager?

10  A.   I did.

11  Q.   And who appointed Ms. Pernek to her position as the cage

12  department?

13  A.   I did.

14  Q.   Do you have other departments in the -- Ocala Poker other

15  than just poker room and the cage department?  Could you tell

16  the court what those are?

17  A.   We have security.  We have the ITW department.  We have

18  the bar and deli.

19  Q.   Okay.  And when the season is on, you also have Jai-Alai?

20  A.   That is correct.

21  Q.   Okay.  And do -- are those departments separate from the

22  poker room operations?

23  A.   Yes, they are.

24  Q.   I mean, nobody that works in any of those departments,

25  other than maybe delivering cocktails, has anything to do with

1    the poker room?

2    A.    They do not.  Well, security is in the room.

3    Q.    Okay.

4    A.    You know, they play a part.

5    Q.    No.  Do any of those people that are in the room, maybe

6    the cocktail waitresses and security -- did they participate in

7    the poker dealer tip pool at all?

8    A.    Never.

9    Q.    Never have done that?

10   A.    Never.

11   Q.    Now, in a complaint it was alleged against Ocala Poker --

12   the plaintiffs said that some position known as surveillance

13   also shared in the tip pool.

14         Do you have a department or employees known as

15   surveillance?

16   A.    Security.

17   Q.    And those are the people that watch the cameras?

18   A.    That is correct.

19   Q.    But they're in the same department where the people --

20   they'll walk around just making sure nothing bad happens?

21   A.    Right.

22   Q.    Okay.  And have they ever participated in the tip pool?

23   A.    Never.

24   Q.    Does Ms. Pernek participate in the tip pool?

25   A.    I don't know about --

1    Q.    Before 2010.

2    A.    Yes.  Before 2010 she did.

3    Q.    Okay.  And something happened in 2010 to get you to change

4    the tip-pooling policies?

5    A.    Yes.

6    Q.    And tell the court what happened.

7    A.    There was a case down in South Florida where management

8    was partaking in the tip pool.  And the crux of the case was,

9    you know, the dealers were saying managers shouldn't partake in

10   the tip pool.  They're saying they should be because they had

11   regular interactions with the customers.

12            We saw where the case was going.  And we knew that --

13   although we thought we were doing it right, that there was

14   probably going to be a change.

15   Q.    Okay.  And as a result of that case, did you make a

16   change?

17   A.    Yes, we did.

18   Q.    Now, did you actually go down to this poker room in South

19   Florida?

20   A.    Yes, we did.

21   Q.    And you met with the poker manager?

22   A.    Yes.

23   Q.    I'm sorry?  What was that?

24   A.    Yes, we did.  I'm sorry.

25   Q.    Okay.  Do you remember the fellow's name?

```
1   A.    Noah Carbone.

2   Q.    Okay.  And you talked to him about the case?

3   A.    Yes, we did.

4   Q.    Do you also, from time to time, talk to other poker

5   managers -- room managers --

6   A.    Yes, I do.

7   Q.    -- in your industry?

8   A.    Yes.

9   Q.    And do you visit their poker rooms?

10  A.    Yes, I do.

11  Q.    When you've been there and visited, have you seen the

12  notice posters, similar to the posters we have on your right?

13  A.    Yes.

14  Q.    And similar to the exhibit that I showed Ms. Pernek, which

15  is a picture of all of those posters?

16  A.    Yes.

17  Q.    And you posted those posters yourself, correct?

18  A.    Yes, I did.

19  Q.    And have those posters been posted since Ocala Poker

20  opened its doors?

21  A.    Yes.

22  Q.    Do you change the poster every year?

23  A.    Every year we do, yes.

24  Q.    And do y'all purchase them from some source?

25  A.    There's a private company that we go to when we get them.
```

```
 1   Q.   And those posters don't talk just about the Fair Labor
 2   Standards Act; they talk about all kinds of employee notice
 3   issues?
 4   A.   Right.  That's correct.
 5   Q.   Have you seen those posters in use at other poker
 6   facilities?
 7   A.   Yes, I have.
 8   Q.   Okay.  In your discussions with other poker dealer -- or
 9   poker managers, have they ever told you there was a problem
10   with the posters?
11   A.   Never.
12   Q.   Up until this lawsuit, had you ever heard there was a
13   problem?
14   A.   No.
15   Q.   Even though Mr. Faso is a poker -- has a management
16   position, does he have the right to hire and fire employees?
17   A.   He recommends them to me.
18   Q.   But ultimately that decision is whose?
19   A.   That's mine.
20   Q.   Does he have -- does he have the right to set wages?
21   A.   No, he does not.
22   Q.   Who has that right?
23   A.   That's me.
24   Q.   And what about disciplining employees?
25   A.   He recommends to me.  And together we do it.
```

1   Q.   And that's -- but ultimately it's whose decision?

2   A.   It's my decision.

3   Q.   Does Mr. Faso -- let me break the question down.  Has

4   Mr. Faso ever participated in the tip pool?

5   A.   He was a dealer.

6   Q.   Okay.  Oh, he was a dealer back in 2010?

7   A.   Before 2010.

8   Q.   Okay.  Has he ever been -- has he ever participated in the

9   tip pool as a poker room manager?

10  A.   As a poker room manager, no.

11  Q.   Now, you have a -- cage department employees -- cage

12  employees.  And Ms. Pernek runs that?

13  A.   That is correct.

14  Q.   And does she participate in the tip pool?

15  A.   Pernek?  No, she does not.

16  Q.   Can she hire and fire employees?

17  A.   She can recommend them to me, but I'm the ultimate

18  decisionmaker.

19  Q.   She can't set wages?

20  A.   No.

21  Q.   Can't discipline without your say-so?

22  A.   That's correct.

23  Q.   Have you ever appointed anybody that worked -- to work in

24  the cage department as, like, an assistant manager for

25  Ms. Pernek?

1   A.   No.

2   Q.   Since the beginning?

3   A.   Never.

4   Q.   Have you ever appointed anybody to work as a supervisor?

5   A.   Never.

6   Q.   Have you ever compensated anybody to work in the cage

7   department as a -- some sort of assistant supervisor or

8   manager?

9   A.   No.

10   Q.   You understand that some of the cage employees --

11   Mr. Bendure being a good example -- in addition to being chip

12   runners, working the podium, and working as tellers, also work

13   in the vault?

14   A.   That is correct.

15   Q.   Have any of those employees ever had an ownership interest

16   in Ocala Poker?

17   A.   No.

18   Q.   Have any of those employees ever had the right to hire and

19   fire an employee?

20   A.   No.

21   Q.   To discipline an employee?

22   A.   No.

23   Q.   To set that employee's wages?

24   A.   No.

25   Q.   Now, you have poker dealers that are also called dual

1  rates?

2  A.   That is correct.

3  Q.   And, in fact, Mr. Howard was a dual rate?

4  A.   Yes.

5  Q.   And a dual rate is -- tell the court what a dual rate is.

6  A.   It's like a floor supervisor.

7  Q.   Okay.  When the -- now, do they have two different job

8  functions?

9  A.   The dual rate?

10  Q.   Yes, sir.

11  A.   Well, a dual rate is a dual rate manager.  And when he's

12  not that, he's a poker dealer.

13  Q.   Okay.  So they get compensated differently when they're a

14  poker dealer than when they're working as a floor manager?

15  A.   That is correct.

16  Q.   When they get compensated as a poker dealer, how are

17  they -- are they compensated the way the regular poker dealers

18  are compensated?

19  A.   Yes.

20  Q.   Do they get a tip minimum wage?

21  A.   They get a tip minimum wage plus their tips, minus the

22  percentage to the cage personnel.

23  Q.   When they work as a floor manager, do they participate in

24  the tip share?

25  A.   No, they do not.

1   Q.    And do they get paid differently?

2   A.    Yes.  They get an hourly wage.

3   Q.    Okay.  And what is that?

4   A.    It's anywhere between -- you know, right now it's, like,

5   19.

6   Q.    An hour?

7   A.    Yeah, give or take.

8   Q.    Do any of the dual rates have the right to hire and fire

9   employees?

10  A.    No.

11  Q.    Discipline employees?

12  A.    No.

13  Q.    Set any employees' wages?

14  A.    No.

15  Q.    Okay.  You actually have working under Mr. Faso also

16  people that aren't dual rates; they're just regular floor

17  managers?

18  A.    That is correct.

19  Q.    And do these floor managers have the right to hire and

20  fire employees?

21  A.    No, they do not.

22  Q.    Set wages?

23  A.    No, they do not.

24  Q.    Discipline employees?

25  A.    They have some leeway there, but they have to come to me.

1   Q.    And you make the ultimate decision?

2   A.    Yes.  Like, there's instances where something happens in

3   the evening and I'm not there.  And they'll send a dealer home.

4   They'll leave a note on my desk for me.  But they have that

5   right to make that.

6   Q.    And then you have to -- you have to take final action the

7   next day?

8   A.    That is correct.

9   Q.    Now, do the floor managers participate in the tip pool?

10  A.    No, they do not.

11  Q.    They get paid a regular hourly salary?

12  A.    That is correct.

13  Q.    Why do -- why do you even have a tip pool at all?

14  A.    We have a tip pool because the -- we have a tip pool

15  basically because we have two people working -- two types of --

16  we have cage personnel working in the poker room and we have

17  dealers working in the room.

18        Now, although the cage personnel are making --

19  they're getting tips, the difference is so substantial that for

20  us it's just a matter of being -- you know, it's fair to give

21  the -- the cage personnel that ten percent.

22  Q.    Okay.  In the actual lawsuit it was alleged that you had

23  employees known as, quote, cashier, slash, audit working at

24  Ocala Poker that shared in the tip pool.

25        Do you recall that?

1    A.    Do I recall seeing that?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Do you actually have a position called cashiers?

5    A.    No, we do not.

6    Q.    Getting back to these dual rates, why do y'all even have

7    the dual rates?

8    A.    It's kind of like an industry standard.  They help out

9    when we have, like, little absences where we need somebody.

10   Also, we're a smaller room.  We try to optimize our personnel,

11   obviously.

12   Q.    Okay.  Did Ocala Poker set up a methodology by which the

13   dual rates were -- their pay was accounted for, whereby they

14   were -- when they were working as a poker dealer versus working

15   as a floor manager?

16   A.    Yes.  They would come in to punch a clock.  And if they

17   were dual rating, they would also fill out a form.

18   Q.    Okay.  And that would be turned over to Ms. Kelso?

19   A.    That is correct.

20   Q.    And she would account for that in part of the payroll

21   system?

22   A.    Yes, she would.

23   Q.    And when the dual rate -- like, Mr. Howard would get his

24   paycheck, would the paycheck stub reflect those hours worked as

25   a dual rate, where he was getting, you know, 15-some-odd

1    dollars an hour and the hours he worked as a poker dealer?

2    A.    Yes.

3    Q.    Would it reflect any -- and the hours worked as a poker

4    dealer reflect the tip credit wage at that point in time?

5    A.    Yes.

6    Q.    Now, does this -- Ms. Kelso also keep track of the -- the

7    tips that the poker dealers get?

8    A.    Yes, she does.

9    Q.    Does she also keep track of the tips that the cage

10   employees get?

11   A.    Yes.

12   Q.    And does she keep track of the -- of the tips that are in

13   the tip share that go from the poker dealers to the cage

14   employees?

15   A.    Yes, she does.

16   Q.    Has Mr. Howard ever come to you and complained while he

17   was working there at Ocala Poker that his wages were calculated

18   incorrectly because of the tip credit?

19   A.    No.

20   Q.    Did he ever come and complain to you that he had any

21   complaints about his wages being miscalculated because of his

22   hours being taken down wrong?

23   A.    No.

24   Q.    Did he ever complain to you about his wages being

25   inappropriate because of the tip share?

1    A.    No.

2    Q.    As to Mr. Greenstone, did you ever get complaints like

3    that from him?

4    A.    No.

5    Q.    Not as to the tip credit?

6    A.    No.

7    Q.    The tip share?

8    A.    No.

9    Q.    Or the calculation of his hourly rates?

10   A.    No.

11   Q.    Had you got the complaints, would you have investigated

12   it?

13   A.    Yes.

14   Q.    And if their complaints were correct, would you have

15   corrected it?

16   A.    Yes.  Yes, I would.

17   Q.    Now, after you became aware of the poker room in South

18   Florida that had been sued because managers were participating

19   in the tip share, you decided to make a policy change?

20   A.    That is correct.

21   Q.    And you took all of the managers out of the tip share?

22   A.    Yes, I did.

23   Q.    And you had a meeting to tell all the employees about --

24   or the poker room employees about that?

25   A.    Yes, we did.

1    Q.    And where was that meeting held?

2    A.    The poker room.

3    Q.    And approximately how many people were there?

4    A.    About 50.

5    Q.    And the poker dealers were there?

6    A.    The poker dealers were there, yes.

7    Q.    Was Mr. Greenstone and Mr. Howard there?

8    A.    I would say yes.

9    Q.    Were the cage department employees there?

10   A.    Yes, they were.

11   Q.    And do you recall how long the meeting lasted?

12   A.    About an hour.

13   Q.    Do you recall what you told them?

14   A.    Yes.

15   Q.    Can you tell the court what you told them.

16   A.    Basically, we had the meeting because -- for two reasons.

17   One, we were taking the management out of the tip pool

18   because -- what was going down in Palm Beach.

19        The second part was -- we told them that we were

20   increasing the tips that we're giving the cage personnel from

21   eight percent to ten percent.

22   Q.    Did -- were there complaints about that?

23   A.    Yes, a lot of complaints.

24   Q.    Did people have questions?

25   A.    Yes, a lot of questions.

1  Q.   Were there questions about why they had to share their

2  tips with the cage employees?

3  A.   Yes, there was.  They were very angry.

4  Q.   Did you explain to them why the tips were being shared

5  with the cage employees?

6  A.   Yes, I did.

7  Q.   What did you recall telling the collective group there?

8  A.   I told them -- I said, The cage personnel is on the floor,

9  they're helping you guys to do your jobs.  And I said, Although

10  they get regularly tipped, they don't receive the sizable tips

11  that the dealers make.

12        And I said, For us this was the fairest thing to -- I

13  said, We are a team.  All right.  And we had to go forward as a

14  team.  And we had to be fair to the cage personnel.  And that's

15  why we were going to do it.  And they were not happy.

16  Q.   Did you also provide a -- at some point in time a poker

17  dealer policy handbook?

18  A.   Yes, we did.

19        MR. GILLIGAN:  May I approach the witness, Your

20  Honor?

21        THE COURT:  You may.

22  BY MR. GILLIGAN:

23  Q.   Let me show you what we've been -- admitted into evidence

24  as Defense Exhibit 9.  And if you'll tell the court what that

25  is.

1    A.    This is from our handbook -- dealer handbook.

2    Q.    Okay.  And that was given to the poker dealers?

3    A.    That is correct.

4    Q.    Including Mr. Greenstone and Mr. Howard?

5    A.    That is correct.

6    Q.    And paragraph 19, does it explain the tip share and who

7    it's going to be paid to?

8    A.    Am I -- you want me to read paragraph 19?

9    Q.    No, but -- you can read it.

10   A.    Yes.

11   Q.    Okay.  And that was given to all the poker dealers?

12   A.    Yes, it was.

13   Q.    Let me show you --

14         MR. GILLIGAN:  Approach the witness, Your Honor?

15   BY MR. GILLIGAN:

16   Q.    Let me show you Defense Exhibit 3.  Can you tell the court

17   what that is, please?

18   A.    These are the forms that were required by law to put up

19   for the dealers to look at.  Anybody, actually.  Not just the

20   dealers.

21   Q.    Okay.  And is that a picture of the one that's actually in

22   Ocala Poker?

23   A.    That is correct.

24   Q.    And where is it posted at?

25   A.    It's posted by the time clock.

```
1   Q.    Are these some of the posters that were previously posted
2   on the easel at your right?  Is that a picture of some of the
3   posters that were posted --
4   A.    Yes.
5   Q.    -- at the Ocala Poker?
6   A.    Yes.
7              MR. GILLIGAN:  Approach the witness, Your Honor?
8              THE COURT:  You may.
9   BY MR. GILLIGAN:
10  Q.    Let me show you Exhibit 4.  Let me ask you what Exhibit 4
11  is.
12             Exhibit 4 is what -- is Exhibit 4 the Fair Labor
13  Standards Act noted from the poster?
14  A.    Yes.
15  Q.    And I think we might have cut it off in the picture.  But
16  is it entitled Employees' Rights under the Fair Labor Standards
17  Act?
18  A.    Yes.
19  Q.    Okay.  Now, the tip -- the tip credit minimum wage under
20  federal law is different than the one under Florida law,
21  correct?
22  A.    That is correct.
23  Q.    Okay.  And did you also have posters that showed the
24  employees what the tip credit minimum wage was under Florida
25  law?
```

1  A.   Yes, we did.

2  Q.   Would you look at the next exhibit, please, and identify

3  it by number.

4  A.   I see it.

5  Q.   Okay.  Is that a Florida minimum wage tip credit notice?

6  A.   Yes, it is.

7  Q.   And what exhibit number is that, please?

8  A.   It says No. 6 --

9  Q.   And what --

10  A.   Actually, Exhibit No. 5.  I'm sorry.

11  Q.   Okay.  And Exhibit 5, does that show what year it was?

12  A.   2013.

13  Q.   And what was the tip credit -- Florida minimum wage at

14  that time?

15  A.   The Florida minimum wage was 7.79.

16  Q.   I'm sorry?

17  A.   The Florida minimum wage was 7.79.

18  Q.   And what was the tip credit minimum wage?

19  A.   4.77.

20  Q.   Okay.  And --

21          MR. GILLIGAN:  And, Your Honor, I'd move that

22  Exhibit --

23          MS. PETERSON:  5.

24          THE WITNESS:  5.

25          MR. GILLIGAN:  -- 5 into evidence, please.

1       THE COURT:  What about 4?

2       MR. GILLIGAN:  4 is already in evidence.

3       THE COURT:  Is 4 already in evidence, Donna?

4       COURTROOM DEPUTY:  Defendant's 4?

5       THE COURT:  Yes.

6       COURTROOM DEPUTY:  No.

7       MR. GILLIGAN:  Okay.  I move Defense Exhibit 4 into

8  evidence.

9       THE COURT:  Any objection?

10       MR. MASSEY:  No, sir.

11       THE COURT:  So admitted.

12     (Defendant's Exhibits 4 and 5 received into evidence.)

13  BY MR. GILLIGAN:

14  Q.   Okay.  Let's go to Defense Exhibit 6, which is -- is that

15  another Florida minimum wage poster?

16  A.   Yes, it is.

17  Q.   And for what year?

18  A.   2014.

19  Q.   And what was the tip credit minimum wage then?

20  A.   Tip minimum wage was 4.9- -- it's 4.91.

21  Q.   And were these posters posted with the other posters,

22  where -- at the time clock --

23  A.   Yes, they were.

24  Q.   -- every year?

25  A.   Every year.

1    MR. GILLIGAN:  And, Your Honor, I'd move Defense

2  Exhibit 7 into evidence, please.

3    (Counsel confers with Ms. Peterson.)

4  BY MR. GILLIGAN:

5  Q.   Which one were you looking at, Brian?  6?

6  A.   The last one I just looked at was 6.  Yes.

7  Q.   Okay.

8    MR. GILLIGAN:  I'm sorry.  Move Defense Exhibit 6

9  into evidence.

10    THE COURT:  Any objection?

11    MR. MASSEY:  No.

12    THE COURT:  So admitted.

13    (Defendant's Exhibit 6 received into evidence.)

14  BY MR. GILLIGAN:

15  Q.   And now let's go to Defense Exhibit 7.  Is that another

16  Florida minimum wage poster?

17  A.   Yes, it is.

18  Q.   For what year?

19  A.   2015.

20  Q.   What was the tip credit for that year?

21  A.   5.03.

22  Q.   And was it posted on your -- in your check-in?

23  A.   Yes, it was.

24  Q.   And then --

25    MR. GILLIGAN:  And move that exhibit into evidence,

```
 1   7.
 2              THE COURT:  Any objection?
 3              MR. MASSEY:  No, sir.
 4              THE COURT:  So admitted.
 5         (Defendant's Exhibit 7 received into evidence.)
 6   BY MR. GILLIGAN:
 7   Q.   You have another one there?
 8   A.   Yes.
 9   Q.   Defense Exhibit 8.  And would you tell the court what that
10   is.
11   A.   It's 2016.
12   Q.   And that's the tip minimum wage for 2016?
13   A.   That is correct.
14   Q.   And what does it show?
15   A.   503.
16              MR. GILLIGAN:  And move Defense Exhibit 8 into
17   evidence.
18              THE COURT:  Any objection?
19              MR. GILLIGAN:  No, sir.
20              THE COURT:  That will be admitted also.
21         (Defendant's Exhibit 8 received into evidence.)
22   BY MR. GILLIGAN:
23   Q.   And, once again, that was '16.  But that would have been
24   routinely put up also, correct?
25   A.   Of course.
```

1  Q.    Now, as to the Fair Labor Standards Act poster, have you

2  ever noticed any change in that concerning the -- what had to

3  be reported concerning the tip credit?

4  A.    No.

5  Q.    Did you ever receive any kind of correspondence or e-mail

6  from anybody -- anybody representing the Department of Labor

7  telling you that their poster concerning the tip credit was

8  inadequate?

9  A.    No.

10  Q.    Going back to this 2010 meeting, why did you -- did you

11  feel that you had to explain the changes in 2010?

12  A.    Yeah.   You know, every year we're required to post these

13  posters notifying the dealers of what's going on.   So I felt,

14  you know -- in this meeting if we were going to make any

15  changes, we had to notify the dealers, because it was just the

16  right thing to do.

17  Q.    Okay.   And because you had planned to make changes to the

18  tip share?

19  A.    Right.   That too.

20  Q.    Let's talk specifically about Kathleen Danielson.   Do you

21  know who Ms. Danielson is?

22  A.    Yes, I do.

23  Q.    She's no longer employed at Ocala Poker?

24  A.    No, she's not.

25  Q.    Did she at one time work at Ocala Poker?

1  A.    Yes, she did.

2  Q.    What department did she work in?

3  A.    The cage department.

4  Q.    While she worked in the cage department, did you ever

5  appoint her to a position of management?

6  A.    No.

7  Q.    Or a position of supervisory authority?

8  A.    No.

9  Q.    Did she ever have any authority to hire or fire?

10  A.    No.

11  Q.    Set wages?

12  A.    No.

13  Q.    Mr. Bendure, who testified today, works in the cage

14  department?

15  A.    That's correct.

16  Q.    And he's one of the more trusted employees that also works

17  in the vault?

18  A.    Yes, he is.

19  Q.    Have you ever given him any -- any managerial authority?

20  A.    No.

21  Q.    Appointed him as supervisor or manager?

22  A.    No.

23  Q.    Does he have the authority to hire or fire?

24  A.    No.

25  Q.    Terminate?

```
 1   A.    No.

 2   Q.    Set wages?

 3   A.    No.

 4         MR. GILLIGAN:  Thank you, Your Honor.  I have no

 5   further questions.

 6         THE COURT:  Mr. Massey, do you have questions?

 7         MR. MASSEY:  I just have a couple.  Not much.

 8         THE COURT:  All right.  Maybe we'll just take a

 9   five-minute break to stretch our legs and then we'll finish up

10   with Mr. Matthews.

11         MR. MASSEY:  Thank you, Your Honor.

12         COURT SECURITY OFFICER:  All rise.

13      (Recess, 3:37 p.m. to 3:47 p.m.)

14         COURT SECURITY OFFICER:  All rise.

15         THE COURT:  Take your seats.

16         COURT SECURITY OFFICER:  Court is now back in

17   session.

18         THE COURT:  All right.  Mr. Massey.

19         Mr. Matthews.

20         Whenever you're ready, Mr. Massey.

21         MR. MASSEY:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. MASSEY:

24   Q.    Now, in your testimony you said that -- something about a

25   new case made you take Ms. Pernek out of the tip pool; is that
```

1    right?

2    A.    That is correct.

3    Q.    What were -- what were her job duties that you thought

4    conflicted with that case?

5    A.    She was called the manager, so it was just -- that was it.

6    She was a manager.  So we had to take her out of the tip pool.

7    Although in the case they talked about how managers -- in that

8    other case they thought the managers should partake in the tip

9    pool.  It was the same way with us.

10         We felt that although, okay, they're managers, they

11   regularly partook -- sat customers down, did everything they

12   needed to do.

13         But the law that was coming down was -- it stated

14   that they didn't care; you're management, you can't be -- you

15   can't partake in the tip pool.  So what I did was -- I just

16   took all the managers out of the tip pool.

17   Q.    And how did you determine who was a manager and who was

18   not?

19   A.    The managers of each department were taken out.

20   Q.    Just by title?

21   A.    By their job duties.

22   Q.    And what are the job duties --

23   A.    Vicki managed -- Vicki managed the cage department.

24   Phil -- well, Phil -- I don't know if Phil was the manager --

25   he was the manager at the time.  But the managers of the poker

1  room were also taken out of the -- the tip pool.

2  Q.  Did Vicki fill in for people, like tellers?

3  A.  No.  She was -- she was -- she was the manager on the

4  floor for the cage department.

5  Q.  She was a floor manager?

6  A.  She's a manager -- she's a manager of the cage department.

7  Q.  And so what does that mean, like --

8  A.  She manages all the personnel in the cage department.  She

9  schedules.  She -- if there's a problem with someone that needs

10  to be either fired -- she comes to me.

11       If she needs somebody else in the department, she's

12  the one that comes to me and says -- recommends that somebody

13  needs to be hired.

14  Q.  But she's recommending those, not actually doing the

15  firing?

16  A.  That is correct.  I'm the only one that hires and fires.

17  Q.  So by making that recommendation, does that make her

18  management?

19  A.  You know, according to the lawsuit down south it did, yes.

20  Q.  Okay.  Now, this meeting that you discussed -- that you

21  talked about regarding the tip credit, that was in 2010?

22  A.  That is correct.

23  Q.  Now, you may recall earlier today I showed you a

24  regulation with some requirements in it.  Did you explain to

25  the poker dealers the requirements of that regulation at that

1  meeting?

2  A.   I explained to them exactly what I said.  I told them that

3  the cage personnel are on the floor helping them and that

4  they -- although they regularly got tipped, they didn't get

5  tipped as much as the dealers, and it was just the fair thing

6  for us to give them -- from eight percent to ten percent.

7  Q.   But you didn't talk about the regulation?

8  A.   No, I did not.

9  Q.   Now, are you aware of the requirement that the tip pool

10  should be limited to employees that customarily and regularly

11  receive tips?

12  A.   Yes.

13  Q.   Now, where is that information conveyed in the posters

14  that have been either introduced into -- introduced into

15  evidence or beside you?

16  A.   Where are they?  I don't know.  I just -- you know, all of

17  my readings, I knew that was -- customarily was a prerequisite

18  for it.

19  Q.   Okay.  And where is that information in the employee

20  handbook?

21  A.   It's not.

22  Q.   Okay.  And so how are my clients supposed to know this

23  requirement?

24  A.   How are they supposed to know what?

25  Q.   How did they -- how were they supposed to have been

1   informed about what -- that the tip pool should have been

2   limited to employees that customarily and regularly received

3   tips?

4   A.   When they first started, Chaz Allen was the poker room

5   dealer.  He's the one at the very beginning that spoke to them

6   and told them about the -- the tipping issues and the other

7   items.  But when I spoke in 2010, I specifically told you what

8   I told them.

9   Q.   And so my question is:  How would -- so you're saying Chaz

10   Allen informed my clients of the regulations requirement?

11   A.   What I'm saying is I wasn't there at the time.  So when

12   Chaz Allen came in, Chaz Allen was the manager who hired these

13   employees.

14   Q.   But you don't know what Chaz Allen may have told them or

15   may not have?

16   A.   No, I did not.

17   Q.   And you could not have told -- you did not tell them of

18   that requirement in 2010, because the regulation hadn't even

19   come out?

20   A.   No, I did not.

21   Q.   Okay.  And so I heard a lot of testimony from you about

22   whether my clients complained or not.  How could they complain

23   that the tip pool was illegal if you did not inform them that

24   it should be limited to employees that customarily and

25   regularly receive tips?

1   A.   I don't know.

2        MR. MASSEY:  Thank you, Your Honor.  That's all I

3   have.

4        THE COURT:  Mr. Gilligan?

5        MR. GILLIGAN:  Thank you, Your Honor.  Just a few

6   more questions.

7                   **REDIRECT EXAMINATION**

8   BY MR. GILLIGAN:

9   Q.   I think you testified that these -- the posters that you

10  do at the clock-in area for your employees -- you purchase them

11  from a vendor every year?

12  A.   That is correct.

13  Q.   Did any of these vendors either -- inform you that there

14  was any problem with the Fair Labor Standards Act notice?

15  A.   No.

16       MR. MASSEY:  Objection, Your Honor.  It's hearsay.

17       MR. GILLIGAN:  Well, it goes to the -- it's an issue

18  as to -- do you want a proffer, Your Honor?

19       THE COURT:  I'm just looking back at what was said.

20  I have realtime.

21       MR. MASSEY:  Your Honor, to make things simple, I'll

22  just waive that objection.

23       THE COURT:  All right.

24       MR. GILLIGAN:  Okay.

25  BY MR. GILLIGAN:

```
 1   Q.    Did any of the vendors that sold you the poster ever tell
 2   you there was a problem with the Fair Labor Standards Act
 3   notice that's in their poster?
 4   A.    No.
 5              MR. GILLIGAN:  I have no further questions, Your
 6   Honor.
 7              THE COURT:  Any additional cross on that?
 8              MR. MASSEY:  No, sir.
 9              THE COURT:  You can step down.
10              THE WITNESS:  Thank you.
11              THE COURT:  Oh, sorry.  Before you do,
12   Mr. Matthews -- if you could take a seat.
13              Is the record clear, Mr. Gilligan, when the handbook
14   was given to the plaintiffs -- when the handbook was given out?
15   If not, I'd like to ask --
16              MR. GILLIGAN:  I don't -- I don't know.  And I don't
17   think so.  So it's probably a good question to ask -- a good
18   question to ask, Your Honor.
19              THE COURT:  All right.  Mr. Matthews, do you know
20   when the handbook that references -- that -- the handbook --
21              MR. GILLIGAN:  I think it's No. 9, Your Honor.
22              MS. PETERSON:  Defendant's 9.
23              THE COURT:  Defendant's Exhibit 9 --
24              MR. GILLIGAN:  Do you have defendant's up there?
25              THE COURT:   -- do you know when that was given to the
```

```
 1  plaintiffs?
 2          THE WITNESS:  Exhibit 9?
 3          THE COURT:  Yeah.  Exhibit -- Defendant's Exhibit 9
 4  is the poker dealer handbook.  Do you know when that was given
 5  to the plaintiffs in this case?
 6          THE WITNESS:  I don't know the exact date that it was
 7  given out, no.
 8          THE COURT:  Do you know if it was given before or
 9  after that meeting?
10          THE WITNESS:  Uh --
11          THE COURT:  The meeting was, I think you said, in
12  September.
13          THE WITNESS:  2010.  To be fair, I don't know.
14          THE COURT:  All right.  Thank you.  You can step
15  down.
16          THE WITNESS:  Do you want these back?
17          MR. GILLIGAN:  I'll get it in a second.
18      (Witness excused.)
19          THE COURT:  Any other witnesses today?
20          MR. GILLIGAN:  No, sir.  I do have two in the
21  morning.  And I anticipate we should be done with those
22  probably by -- if we start at nine, by eleven, or whatever time
23  the court wants us to start.
24          THE COURT:  All right.  We'll start -- let's say if
25  y'all can be here ready to start by 9:15.
```

1          MR. GILLIGAN:  Yes, sir.

2          THE COURT:  That will give me a little time to look

3     at e-mails in the morning.

4          MR. GILLIGAN:  Yes, sir.  Are we allowed overnight to

5     leave our stuff here, or do we have to --

6          THE COURT:  I think we lock the courtroom.

7          Right, Donna?

8          COURTROOM DEPUTY:  Yes.  Yes.  And it won't be a

9     problem to lock it up.

10          THE COURT:  Yeah.  You can leave your items.  That's

11     okay.

12          All right.  We'll be in recess, then, for the

13     remainder of the day.  See y'all in the morning.

14          COURT SECURITY OFFICER:  All rise.

15        (The proceedings adjourned at 3:57 p.m.)

16                              - - -

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a

true and correct computer-aided transcription of my stenotype

notes taken at the time and place indicated herein.


        DATED this 16th day of August, 2016.




            s/Shannon M. Bishop
            Shannon M. Bishop, RDR, CRR