IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

CHRISTOPHER HOWARD and JEFFREY    Jacksonville, Florida
GREENSTONE,

                               Case No. 5:15-cv-200-Oc-39PRL
          Plaintiffs,

                               August 9, 2016
  vs.

                               9:18 a.m.
SECOND CHANCE JAI ALAI, LLC,

                               Courtroom No. 1A
          Defendant.
_____


                  BENCH TRIAL PROCEEDINGS
                    (VOLUME II OF II)
           BEFORE THE HONORABLE PHILIP R. LAMMENS
               UNITED STATES MAGISTRATE JUDGE


 PLAINTIFFS' COUNSEL:

        **MICHAEL O. MASSEY, ESQ**.
        Massey & Duffy, PLLC
        855 East University Avenue
        Gainesville, Florida  32601

 DEFENSE COUNSEL:

        **PATRICK G. GILLIGAN, ESQ**.
        Gilligan, Gooding & Franjola, PA
        1531 SE 36th Avenue
        Ocala, Florida  34471


 COURT REPORTER:

        Shannon M. Bishop, RDR, CRR
        221 North Hogan Street, #150
        Jacksonville, Florida 32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com

        (Proceedings recorded by mechanical stenography;
 transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

Page No.

WITNESSES FOR THE DEFENDANT:


**PHILLIP RYAN FASO**
Direct Examination...............................   5
Cross-Examination...............................  38

**MARSHA SUE KELSO**
Direct Examination...............................  43
Cross-Examination...............................  63

## E X H I B I T S   R E C E I V E D

<u>Page No.</u>

Defendant's Exhibits:

```
15............................................  65
25............................................  37
```

1             P R O C E E D I N G S

2   August 9, 2016                                    9:18 a.m.

3                        - - -

4             COURT SECURITY OFFICER:  All rise.  This court is now

5   back in session.  Honorable Judge Philip Lammens presiding.

6             THE COURT:  Please be seated.

7             Good morning, everyone.

8             MR. GILLIGAN:  Good morning.

9             MR. MASSEY:  Good morning, Your Honor.

10            THE COURT:  This is Case No. 5:15-cv-200, *Mr. Howard*

11  *and Mr. Greenstone versus Second Chance Jai-Alai.*  This is day

12  two of our bench trial.  And it's now the defendant's case.

13            And, Mr. Gilligan, you're proceeding with your next

14  witness.

15            MR. GILLIGAN:  Thank you, Your Honor.  I'd call

16  Mr. Phil Faso.

17            COURTROOM DEPUTY:  Mr. Faso, if you would raise your

18  right hand.  Do you solemnly swear that the testimony you will

19  give before this court will be the truth, the whole truth, and

20  nothing but the truth, so help you God?

21            THE WITNESS:  I do.

22            COURTROOM DEPUTY:  Please have a seat and state your

23  full name for the record, spelling your last name.

24            THE WITNESS:  Phillip Ryan Faso, F-a-s-o.

25            MR. GILLIGAN:  I should have done this yesterday,

Case 5:15-cv-00200-PRL   Document 104   Filed 08/18/16   Page 5 of 72 PageID 2634

5

1   Your Honor.  But I'm putting the clerk's exhibit book in front

2   of the witness.  That way I don't have to keep going back and

3   forth.

4           THE COURT:  Okay.

5           **PHILLIP RYAN FASO, DEFENDANT'S WITNESS, SWORN**

6                       **DIRECT EXAMINATION**

7   BY MR. GILLIGAN:

8   Q.   Good morning, Mr. Faso.  Could you tell the court where

9   you work.

10  A.   Ocala Poker.

11  Q.   And what is your current position with Ocala Poker?

12  A.   Poker room manager.

13  Q.   When did you start working at Ocala Poker?

14  A.   In 2008, just after it opened.

15  Q.   What position were you initially hired for?

16  A.   I was hired as a dual rate.

17  Q.   Would you briefly explain to the court what a dual rate

18  is?

19  A.   A dual rate is a position in a poker room that -- where

20  someone deals, performs duties as a poker room dealer, as well

21  as floors.

22  Q.   And they get paid a different rate of pay depending on

23  where they're working as a poker dealer working the floor?

24  A.   Yes.

25  Q.   And how long did you work as a dual rate?

1   A.    Approximately three-and-a-half years, three years.

2   Q.    When did you get appointed to the position of the poker

3   room manager?

4   A.    Somewhere in September of 2011.

5   Q.    Who appointed you to that position?

6   A.    Ryan Matthews.

7   Q.    Who initially actually hired you at Ocala Poker?

8   A.    I think it was Chaz Allen.

9   Q.    And was he the fellow that initially opened Ocala Poker?

10  A.    Yeah.  He was the first poker room manager, I believe.

11  Q.    Have you previously worked at any other poker rooms?

12  A.    The Tropicana in Atlantic City.

13  Q.    How long did you work at the Tropicana?

14  A.    From '04 to '08, so four or five years.

15  Q.    And you worked -- what positions did you work at the

16  Tropicana?

17  A.    I began there as a dealer.  I was promoted to dual rate.

18  And then I was promoted to full-time floor.

19  Q.    And the -- when you say a "dealer," you're talking about a

20  poker dealer?

21  A.    Poker dealer, yes.  I'm sorry.

22  Q.    As opposed to a black jack or other things?

23  A.    No.  Not a table game dealer, just a poker dealer.

24  Q.    Who is your boss currently?

25  A.    Brian Matthews.

1   Q.    And what is his position with Ocala Poker?

2   A.    He is the president.

3   Q.    He is the person that promoted you to your current

4   position as poker room manager?

5   A.    Yes, sir.

6   Q.    Now, we're using the name Ocala Poker just as a -- as a

7   fictitious name for the business.  But that's pretty much what

8   everybody calls it, correct?

9   A.    Correct.

10  Q.    Does Ocala Poker do other forms of gaming other than just

11  poker?

12  A.    Yes, sir.

13  Q.    And could you tell the court briefly what those other

14  games are?

15  A.    It has simulcast.  It has simulcast of dogs, dog racing,

16  horse racing, Jai-Alai, and performs live Jai-Alai.

17  Q.    What do your -- and do those -- those other functions of

18  the Ocala Poker facility, do they have anything to do with the

19  runnings of the poker room?

20  A.    Not -- I mean, not day to day.  No.

21  Q.    They're in the same building, but they're not in the poker

22  room?

23  A.    Correct.  They're in a different location of the building.

24  Q.    What are your duties as the manager of the poker room?

25  A.    Protecting the integrity of the game, controlling -- or

1  organizing where the dealers go, organizing day-to-day

2  activities of the poker room, organizing jackpot funds, and

3  dealing with state officials.

4  Q.    Poker as a -- as a gaming activity is a little bit

5  different than what are called house-run games?

6  A.    Correct.

7  Q.    What's the difference?

8  A.    Well, in a house -- in a -- house table game?

9  Q.    Yes, sir.

10  A.    In a casino?

11  Q.    Yes, sir.

12  A.    It would be that the -- the players are playing against

13  the dealer and are winning either house money or the house is

14  taking their money; whereas, in poker we're providing more of a

15  service, where the dealer's there to deal the cards and run the

16  game and uphold the rules, more of a customer service kind of

17  thing.  And the dealer takes a rake out of the pot, which is a

18  service fee, basically, from the pot.

19  Q.    The players are playing against each other?

20  A.    Yes, the players play against each other.  They don't play

21  against the dealer.  The dealer doesn't have a hand.

22  Q.    You have a book of exhibits in front of you, Mr. Faso.  I

23  want to run some -- through some of the exhibits fairly

24  quickly.  If you would go to the exhibit marked as Defense

25  Exhibit 12 -- it's also -- has a tab there that says 12.

```
1              What is that?
2   A.    This is the poker room.
3   Q.    And there's a --
4   A.    A view from the entranceway.
5   Q.    Okay.  And it also shows -- is that the -- what we've --
6   what the court's heard as the podium?
7   A.    Yes, sir.
8   Q.    Who works in the actual poker room?
9   A.    Within the poker room you have poker dealers, you have
10  floor personnel, you have cage personnel, you have wait staff,
11  massage, maintenance, security.
12  Q.    Okay.
13  A.    I think that just about covers it.
14  Q.    What does a floor person or a floor manager do?
15  A.    The floor person is there to uphold the rules of the game
16  outside of the -- the dealer's responsibilities.  If a dealer
17  makes a mistake, the floor comes over and -- and makes a ruling
18  on the table as to how the mistake is going to be fixed.  They
19  aid in seating.  They run chips.  They do pretty much
20  everything that is required on the floor --
21  Q.    Okay.
22  A.    -- to make the customer have a good experience.
23  Q.    And those -- those floor managers report directly to you?
24  A.    Yes, sir.
25  Q.    And when the dual rates are working as floor managers,
```

1  they report directly to you?

2  A.    Yes, sir.

3  Q.    Do you have employees that work for you that are floor

4  managers that are not dual rates, meaning they're just always

5  floor managers?

6  A.    Yes, sir.

7  Q.    Do they -- we're going to get to it in more detail in a

8  little bit.  But do they participate in the tip pool?

9  A.    No, sir.

10  Q.    And the dual rates, when they're working as floor manager

11  and not as poker dealer, do they participate in the tip pool?

12  A.    No, sir.

13  Q.    Now, these floor managers, whether they're a floor manager

14  working in the capacity as a dual rate or just the full-time

15  regular floor managers, are they also sometimes called

16  supervisors?

17  A.    Yes, sir.

18  Q.    What -- are they also called sometimes just floor or

19  flooring?

20  A.    Yeah.  It's -- most likely we call -- referred to as a

21  floor person.

22  Q.    Regardless of what they're actually called, are they

23  actually really supervisors or managers?

24  A.    In what respect?

25  Q.    Well, do they have the authority to hire and fire

1  employees?

2  A.   No, sir.

3  Q.   Do they have the authority to set any employees' wages?

4  A.   No, sir.

5  Q.   Do they have the authority to discipline any employees?

6  A.   They may do a write-up that's passed along to me that's

7  discussed with Brian Matthews as to what should be done with

8  the situation, but it's not anything that doesn't go through a

9  chain of command.

10  Q.   Okay.  So they make recommendations, but they can't take

11  action?

12  A.   Correct.

13  Q.   Who does -- who is the person that can take action?

14  A.   Brian Matthews lets me know what action is to be taken.

15  Q.   And have any of these floor managers ever had any

16  ownership interest in Ocala Poker?

17  A.   Not that I know of.

18  Q.   Any of the dual rates that have worked as floor managers

19  ever had any ownership interest in Ocala Poker?

20  A.   Not that I know of.

21  Q.   What do the cage employees do?

22  A.   The cage employees perform a lot of tasks.  They work

23  within the cage cashing players out, which is -- when the

24  players are done they bring the chips to the window and

25  exchange the chips for cash.

1    There's chip runners that -- that will exchange cash

2  for chips on the poker room floor.  The chip runners also bring

3  fills to the dealers.  They perform duties such as pulling

4  boxes, working in the count room, work the podium, where people

5  are sat, and comprise lists for games, and communicate with the

6  floors on when games should be opened.

7  Q.   Okay.  And who is the manager of the cage department?

8  A.   Vicki Pernek.

9  Q.   Do any of the cage employees, to your knowledge, have the

10 authority to hire and fire anybody?

11 A.   Other than Vicki Pernek?

12 Q.   Yes, sir.

13 A.   No.

14 Q.   Okay.  And with Vicki Pernek, she -- like you, she has to

15 make the recommendation to Mr. Matthews?

16 A.   Correct.

17 Q.   Any -- any cage employees have the right to set wages of

18 any employees?

19 A.   No, sir.

20 Q.   To your knowledge, any cage employees ever had an

21 ownership interest in Ocala Poker?

22 A.   No, sir.  Not to my knowledge.

23 Q.   Now, you're aware that there is a tip pool from which the

24 poker dealers contribute to the tips that they share with other

25 employees?

1    A.    Yes, sir.

2    Q.    And who are the other employees that the tip pool is

3    shared with?

4    A.    Just the cage personnel.

5          (Unidentified individual enters the courtroom.)

6          THE COURT:  Is this -- is this one of your witnesses,

7    Mr. Gilligan?

8          MR. GILLIGAN:  No, sir.

9          UNIDENTIFIED SPEAKER:  No.

10         THE COURT:  You're not going to be called as a

11   witness in the case?

12         UNIDENTIFIED SPEAKER:  No, sir.

13   BY MR. GILLIGAN:

14   Q.    So the tip share is not shared with anybody in security?

15   A.    No, sir.

16   Q.    With anybody that does surveillance for the cameras?

17   A.    No, sir.

18   Q.    The waitresses?

19   A.    No, sir.

20   Q.    The floor -- the floor managers or --

21   A.    No, sir.

22   Q.    -- or floor persons?

23         The maintenance people, they're usually not working

24   in there during -- while the customer is there, right?

25   A.    They're there to change the trash cans and stuff like

1   that, clean bathrooms, make sure everything is tiptop.

2   Q.   But they don't -- they don't share in the tip share,

3   correct?

4   A.   No, sir.

5   Q.   Why does -- and has Ocala Poker always had a tip share?

6   A.   Yes, sir.

7   Q.   And it started when it opened?

8   A.   From my knowledge, yes.  When I got there -- I started

9   just after it opened.  And there was a tip share when I got

10   there.

11   Q.   And was the tip share explained to every -- the new

12   employees when you got there?

13   A.   When I was there, it was explained to me where the tip

14   share would go, yes.

15   Q.   And who explained that back then?

16   A.   Chaz.

17   Q.   That's Mr. Allen?

18   A.   Yes, sir.  Chaz Allen.  I'm sorry.

19   Q.   Okay.  I think you described him as the original poker

20   room manager?

21   A.   Yes, sir.

22   Q.   And do you recall if Mr. Allen told the poker dealers back

23   then who the tip share would be shared with?

24   A.   Yes, sir.

25   Q.   And who is that?

1    A.    Well, at that point we were taking -- there was eight

2    percent taken out of our tips at the end of the night -- at the

3    end of each night.

4         Four percent was going to the dealers.  Four percent

5    was going to the floor and -- or not the dealers.  I apologize.

6    Four percent was going to the cage personnel.  And four percent

7    was going to the floor personnel.

8    Q.    Okay.  Fair enough.

9         And at some point in time did that change?

10   A.    Yes, sir.

11   Q.    And when did that change?

12   A.    I believe that was 2010.

13   Q.    Is there a -- a big -- in this 2008 time when Mr. Allen

14   was explaining that, was -- you were a -- you were, at that

15   time, a dual rate, correct?

16   A.    Yes, sir.

17   Q.    Were Mr. Greenstone and Mr. Howard there at that time?

18   A.    I know Mr. Howard was.  I think -- I think Mr. Greenstone

19   wasn't.

20   Q.    Was this a group meeting at -- where everybody was sort of

21   in the room at the same time?

22   A.    On -- in 2010?

23   Q.    In 2008.

24   A.    In 2008?  I wasn't there for the original meeting.  I was

25   just told on a personal level --

1  Q.    Okay.

2  A.    -- because I was hired after we opened.

3  Q.    Okay.  I got it.  Now, is there a disparity between the

4  amount the cage employees make versus the amount the poker

5  dealers make?

6  A.    Yes, sir.

7  Q.    Is it significant?

8  A.    Yes, sir.

9  Q.    Why is that?

10 A.    They get tips.  The cage personnel do receive tips from

11 customers.  But they don't have as -- as much of an opportunity

12 to receive the tips as the poker dealers do.  So the poker

13 dealers receive much more in tips than the cage personnel from

14 customers.

15 Q.    Okay.  Do you know how much the poker -- the poker dealers

16 are paid a minimum wage?

17 A.    It's the tipped income wage, I believe.

18 Q.    Do you know what that is currently?

19 A.    I believe it's $5, $5.03, something like that.

20 Q.    Okay.  Has that changed over the years?

21 A.    From when I was a poker dealer in Atlantic City, I made 4.

22 So, yeah, I mean, I'm guessing there's been some federal

23 raises.

24 Q.    Has the tip -- the amount of the tip credit minimum

25 wage -- is that something that's posted on the posters at Ocala

1    Poker?

2    A.    Yes, sir.

3    Q.    And was it posted on the posters when you worked at the

4    Tropicana in New Jersey?

5    A.    Yes.

6    Q.    Okay.  To your right is a -- posters that have been

7    hanging at Ocala Poker.  Have you seen those before?

8    A.    Yes, sir.

9    Q.    And if you would go to -- in your exhibit book, to Defense

10   Exhibit 3, which is also tab 3.  Is that essentially a

11   photograph of the posters that have been -- that were hanging

12   at Ocala Poker?

13   A.    Yes, sir.

14   Q.    Where are these hang- -- hung at exactly?

15   A.    They're hung directly right next to the clock-in and right

16   next to the tip-out room.

17   Q.    And the tip-out is the room where the poker dealers go to

18   count their tips out of the tip box at the end of the night?

19   A.    Yes, sir.  The poker dealers don't count them.  There's

20   cage personnel, or a floor person goes -- dual rate goes and

21   takes the box through a window and counts it out.

22   Q.    Okay.  Do you participate in the tip pool as the poker

23   room manager?

24   A.    No, sir.

25   Q.    Does the floor -- whether they're called floor

1    supervisors, managers, or just flooring, do they participate in

2    the tip pool?

3    A.    No, sir.

4    Q.    Do the employees working -- the cage department employees,

5    do they customarily and regularly interact with your customers?

6    A.    Of course.

7    Q.    And they do this on a regular basis?

8    A.    Every day.

9    Q.    Now, you know the plaintiffs in this case, Mr. Howard and

10   Mr. Greenstone?

11   A.    Yes, sir.

12   Q.    And you would have been their direct supervisor when they

13   left their employment with Ocala Poker?

14   A.    Yes, sir.

15   Q.    And at the time that you would have been, I guess, a dual

16   rate, you also would have been coworkers?

17   A.    Correct.

18   Q.    Now, was Mr. Howard also a dual rate?

19   A.    In the beginning, yes.

20   Q.    Okay.  And -- but Mr. Greenstone was always just a poker

21   dealer?

22   A.    Yes, sir.

23   Q.    When Mr. Howard was working as a poker dealer, would he

24   get that tip minimum wage of $5.03 you were talking about?

25   A.    Yes, sir.

1   Q.   Going back to the posters, did you notice that they

2   changed -- they got changed out from year to year?

3   A.   I know that they changed from year to year.  Yes.

4   Q.   And did you notice they got changed out from year to year

5   when you worked at the Tropicana?

6   A.   Yes, sir.

7   Q.   When a dual rate is not working as a poker dealer and

8   getting the tip credit minimum wage, how are they paid?

9   A.   They're paid hourly.

10  Q.   And, currently, what is that hourly rate?

11  A.   The hourly rate is $18 an hour.

12  Q.   What was it when Mr. -- at the end of Mr. Howard and

13  Mr. Greenstone's employment?

14  A.   I believe Mr. Howard was still making $18 an hour.  It

15  went from 15 to 18.

16  Q.   Okay.  And when they're working as dual rates as the floor

17  manager, they get -- they get that higher hourly rate, but they

18  don't get to participate in the tip share?

19  A.   Right.  They don't contribute or take from the tip share

20  while on the floor.

21  Q.   Now, where the posters are located are where the employees

22  clock in and out for work?

23  A.   Yes.

24  Q.   And that would include the poker dealers?

25  A.   Yes, sir.

1   Q.    And the dual rates?

2   A.    Yes, sir.

3   Q.    And Mr. Greenstone and Mr. Howard?

4   A.    Yes, sir.

5   Q.    Is there time working -- and this would be -- only apply

6   to Mr. Howard.  But Mr. Howard's time working as a dual rate,

7   is his time calculated, so how much time he worked as a poker

8   dealer versus how much time he worked as a dual rate?

9   A.    Yes, sir.

10  Q.    There's a procedure that's been set up by Ocala Poker to

11  accurately track that?

12  A.    Yes, sir.

13  Q.    And tell the court how that's done.

14  A.    If -- if they're flooring and dealing on the same shift,

15  what they would do is they would either go to the clock and

16  clock in -- or clock out from when they were a dealer, and

17  clock in for when they were floor, so that it can be separated;

18  it can be shown when they changed status.

19        There is also a sign-in sheet within the podium where

20  the floor person would then sign in, or the dual rate would

21  then sign in, when they took over as working on the floor.

22  Q.    And I guess as to Mr. Howard, this procedure would have

23  had to have been explained to him so he knew how to accurately

24  do that so that bookkeeping could accurately track his wages?

25  A.    Yes, sir.

1   Q.   And this information, the sign-in sheet or clocking in and
2   out -- that information is given to the management staff?
3   A.   Yes, sir.
4   Q.   And from that, their pay is calculated?
5   A.   Yes, sir.
6   Q.   And that's done by Ms. Kelso --
7   A.   Yes.
8   Q.   -- the lady that's going to testify next?
9   A.   Yes, sir.
10  Q.   Okay.  Now, at some point in time -- we briefly touched on
11  this -- managers did participate in the tip share; is that
12  correct?
13  A.   Yes, sir.
14  Q.   And that changed when?
15  A.   I believe in 2010.
16  Q.   And -- and at that point in time in 2010, the managers no
17  longer participated in the tip share?
18  A.   Yes, sir.
19  Q.   And that would have included you?
20  A.   I wasn't the manager at that point in time, but...
21  Q.   Okay.  But when you became a manager, you didn't
22  participate in the tip share?
23  A.   Correct.
24  Q.   But prior to that date in 2010, you did get a piece of the
25  tip share?

1   A.   There was a short period of time in 2008 where the dual

2   rates were included in the tip share; however, we all agreed to

3   step down from the tip share so that the floors and cage

4   personnel could receive more percentage.

5   Q.   Now, the -- when that happened in 2010, did Mr. Matthews

6   have a meeting?

7   A.   Yes.  It was with Chaz Allen.

8   Q.   No.  I'm talking about --

9   A.   Oh, 2010?  I'm sorry.

10  Q.   Yeah.

11  A.   In 2010, yes.  Mr. Matthews did.

12  Q.   Now, do you know why the -- Ocala Poker took the people --

13  the floor managers and the managers out of the tip pool?

14  A.   At that time I didn't know anything about it other than

15  there was a case in South Florida that was going on.

16  Q.   Okay.

17  A.   And I guess the case ended up with the floor managers not

18  being allowed.

19  Q.   Okay.  Now, at this meeting in 2010, were Mr. Greenstone

20  and Mr. Howard working at Ocala Poker?

21  A.   Yes, sir.

22  Q.   And do you recall if they were at that meeting?

23  A.   I believe so.

24  Q.   And how many people were at that meeting?

25  A.   Oh, probably 30 to 40.

1   Q.   And, specifically, what people were there?  Not -- not by

2   names.  But what kind of people were there?

3   A.   It was -- it was the poker room personnel, the dealers and

4   the -- and the floor people --

5   Q.   Okay.

6   A.   -- and Mr. Matthews.

7   Q.   Okay.  Were the cage employees there?

8   A.   Not to my knowledge.

9   Q.   Okay.  And did Mr. Matthews explain at that time the

10  change to the tip pool?

11  A.   Yes.

12  Q.   Okay.  Will you tell the court what he told everybody?

13  A.   He said that the -- the tip pool was then going to no one

14  but the cage personnel.  And the -- it would be 10 percent

15  going to the -- the cage personnel.

16  Q.   Okay.  Did he say why the cage personnel were going to

17  get -- share in the tip pool?

18  A.   Because they didn't make as much as the dealers did.

19  Q.   Okay.  Did he talk about them getting tips also?

20  A.   Excuse me?

21  Q.   Did he talk about them getting tips also?

22  A.   The cage personnel?

23  Q.   Yes, sir.

24  A.   Yes.

25  Q.   Okay.

1   A.     Nowhere near as much as the dealers.

2   Q.     Now, if you would go to Defense Exhibit 9 -- it's also

3   tabbed as Exhibit 9 in your -- in the exhibit book in front of

4   you.  Do you recognize this document called Ocala Poker Dealer

5   Handbook?

6   A.     Yes, sir.

7   Q.     Who prepared this handbook?

8   A.     I did.

9   Q.     When did you prepare it?

10  A.     I believe it was at the end of -- it was somewhere around

11  2012.

12  Q.     Okay.  And did you -- if you'd go to paragraph 19 of that

13  handbook.

14  A.     Page 19 or paragraph 19?

15  Q.     Paragraph 19.  I'm sorry.  On page four.

16  A.     Okay.

17  Q.     It says, All dealers will place tips in a locked and

18  numbered box, which will be emptied at the end of each shift by

19  either a cage or poker room supervisor.  A tip share of ten

20  percent will be deducted from all dealer tips to be distributed

21  to the cage personnel, not including full-time supervisors.

22  This does not mean the cage personnel work for you.  They are

23  to be treated with the same respect as any other coworker.

24          Did I read that correctly?

25  A.     Yes, sir.

1    Q.    And did you put that language in the Ocala Poker Dealer
2    Handbook?
3    A.    Yes, sir.
4    Q.    Was that language consistent with the practices that were
5    already going on when you --
6    A.    Yes, sir.
7    Q.    Okay.  So that had been already -- that had been -- what
8    this says in paragraph 19 -- was that the practice going back
9    to the September 2010 meeting?
10   A.    Yes, sir.
11   Q.    If you would go to -- quickly the next exhibit, Defense
12   Exhibit 10, there's a document that says, Please sign for your
13   copy of the dealer handbook and rule book.
14          Is the dealer handbook and rule book -- well, first
15   of all, do you know what Exhibit 10 is?
16   A.    Yes.
17   Q.    Okay.  Did you prepare that?
18   A.    Yes, sir.
19   Q.    And is the dealer handbook that you're referring to
20   Exhibit 9, that we just discussed?
21   A.    Yes, sir.
22   Q.    And was it -- and you handed out this rule book to, I
23   guess, everybody that signed for it?
24   A.    Yes, sir.
25   Q.    And Mr. -- Mr. Howard signed for it and Mr. Greenstone

1  signed for it?

2  A.    Yes, sir.

3  Q.    And this would have been sometime shortly after you

4  prepared this new handbook?

5  A.    Yes, sir.  At the end of 2012.

6  Q.    Has there ever been a time that you've worked at Ocala

7  Poker that you -- before you became the poker room manager,

8  that you did not know how you were going to be paid?

9  A.    No, sir.

10  Q.    Was there any time prior to you becoming a poker room

11  manager where you did not understand how the tip credit worked?

12  A.    No, sir.

13  Q.    Was there any time that you were -- prior to becoming a

14  manager, that you did not understand where the money in the tip

15  pool went?

16  A.    I understood all of it at all times.

17  Q.    Is there any time while you were employed as a dual rate

18  prior to becoming a manager why it was paid to the cage

19  employees?

20  A.    Say that -- excuse me?  I'm sorry.

21  Q.    Is there any time in your employment prior to becoming a

22  manager, when you were a dual rate, that you did not understand

23  why it was -- the tip share was being paid to the cage

24  employees?

25  A.    No, I understood it.

1  Q.   Now, the cage department employees, I think you already
2  told me, were supervised by Ms. Pernek?
3  A.   Yes, sir.
4  Q.   And those employees within the department actually have
5  various job duties; is that correct?
6  A.   Yes, sir.
7  Q.   And those job duties are chip running, teller, podium.
8  And then some of them actually also work in what's called the
9  vault?
10  A.   Yes, sir.
11  Q.   Do the vault employees -- the ones that actually work in
12  the vault, do they also do chip running, podium --
13  A.   Yes, sir.
14  Q.   -- and work as tellers?
15  A.   Yes, sir.
16  Q.   Okay.  If you would go to Defense Exhibit 11 in the
17  exhibit book.  And that's a picture of a chip runner?
18  A.   Yes, sir.
19  Q.   With a chip cart?
20  A.   Yes, sir.
21  Q.   Running chips?
22  A.   Yes, sir.
23  Q.   And the box with the yellow tag on it is a -- what?
24  A.   That's a tip box.
25  Q.   Have you seen the tip runners regularly and customarily

1  being tipped by customers?

2  A.   Yes, sir.

3  Q.   And we'll go back to Exhibit -- Defense Exhibit 12, which

4  shows the poker room and the podium.

5  A.   Yes, sir.

6  Q.   And the podium people do what again?

7  A.   They sit in that podium and they perform job duties, such

8  as running chips to the dealers -- to the players, as well as

9  keeping a list for call-ins, and for those who walk in without

10  calling in prior, to be seated at a poker game.

11  Q.   Do they, like, escort sometimes the customers to the

12  table?

13  A.   Yes, sir.

14  Q.   And there's different types of poker games?

15  A.   Yes, sir.

16  Q.   So certain customers request certain types of games?

17  A.   Yes, sir.

18  Q.   Would the podium person take them to the appropriate table

19  depending on the game they requested?

20  A.   Yes, sir.  Or hand them a seat card and direct them to the

21  table.

22  Q.   Okay.  You said something I wasn't familiar with.  What's

23  a seat card?

24  A.   A seat card means that -- there's nine seats at each poker

25  table.  There's a seat card for each seat, to denote whether

1    there's an opening at the table or not.

2            The dealer will call out, I have a seat card.  The

3    chip runner will come over and get the seat card and bring it

4    to the podium person, so the podium person knows there's a seat

5    open on a specific table, so then they can call a customer off

6    of the list to fill that seat from that table, hand the person

7    the seat card.  The person will then go to the chip runner and

8    get chips, or to the window and get chips, and then proceed to

9    the table.

10   Q.   Okay.  And -- and that's all part of their normal

11   interaction with the customers?

12   A.   Day to day.

13   Q.   The tellers -- and do the podium people get tipped also?

14   A.   Yes, sir.

15   Q.   And you -- that's regular -- you regularly and customarily

16   see them get tipped?

17   A.   Yes, sir.

18   Q.   Now, the tellers -- we'll go to Defense Exhibit 13, the

19   picture of a lady, I guess, behind a glass window.

20           Is that the teller station?

21   A.   Yes, sir.

22   Q.   And there's a -- appears to be, what, a tip box there?

23   A.   Yes, sir.

24   Q.   And is that tip box in the picture, is that -- reflect

25   what's normally there?  I mean, there's a tip box there.

1    A.    Yes, sir.  There's always a tip box.

2    Q.    Now, this top box is -- are these similar to the tip boxes

3    the poker dealers use themselves?

4    A.    They're identical to the ones that the dealers use.

5    Q.    So they're locked?

6    A.    They are locked.  They're numbered and labeled as tip box.

7    Q.    And have you seen the tellers routinely get -- customarily

8    tipped by the customers?

9    A.    Yes, sir.

10   Q.    When they deal with the customers, they're dealing with

11   the customers when they -- typically when they first walk into

12   the facility?

13   A.    They deal with the customers throughout the day.  I mean,

14   when the -- the first buy-in is at the cage.  So if a customer

15   comes in and gets a seat card to go to a table and they need

16   chips to play in the game, they will go to the window to the

17   teller and give them cash and receive chips of the value of the

18   cash.

19         And then at the end of their session or their playing

20   time, they will get up with the chips that they've accumulated

21   and go to the window and receive cash in exchange for the

22   chips.

23   Q.    And by -- and the poker players have to play with chips;

24   they can't play with cash?

25   A.    Cash does not play on the game, state regulation.

1   Q.   Or like in the movies, they can't throw a gold watch up

2   there or a deed to land or anything like that?

3   A.   No.

4   Q.   Okay.  Now, there are some employees that also -- cage

5   employees that also work in the vault?

6   A.   Yes, sir.

7   Q.   And if you would go to Defense Exhibit 14, take a look at

8   that.

9   A.   Yes, sir.

10   Q.   And what does that show?

11   A.   That shows the teller window from the view of the teller.

12   Q.   Okay.  And does it show the door into the vault?

13   A.   The door frame --

14   Q.   Okay.

15   A.   -- is all the way to the right.

16   Q.   Okay.  And there's a lady in the picture.  That's

17   Ms. Pernek, correct?

18   A.   Well, on 14 -- oh, I'm sorry.  I'm on 15.  I apologize.

19   Q.   Okay.  Sorry about that.

20   A.   Am I on 15?

21   Q.   14, please.

22   A.   14.

23   Q.   Hold up what you're looking at so we make sure we're all

24   looking --

25   A.   Okay.  That's the teller window.

1    Q.   Let me see what you're -- hold up, just so I can make sure

2    we're on the same sheet of music.  Yes, sir.  That's fine.

3    We're right.  Okay.

4    A.   Okay.

5    Q.   Okay.  So what is Defense Exhibit 14?

6    A.   That is the teller window --

7    Q.   Okay.

8    A.   -- from the view of the player.

9    Q.   Okay.  And then the door there that Ms. Pernek is in, is

10   that -- that's the entrance to the vault?

11   A.   Ms. Pernek is not in this picture.

12   Q.   Okay.  Well, then I'm looking at a different picture.

13          MR. GILLIGAN:  May I approach the witness --

14          THE COURT:  Yes, sir.

15          MR. GILLIGAN:  -- to figure out the snafu?

16          THE WITNESS:  This one is 14.  This one is 13.

17          MR. GILLIGAN:  13.  Okay.  One more.  14.  There you

18   go.  Okay.

19          THE WITNESS:  Okay.

20   BY MR. GILLIGAN:

21   Q.   Okay.  Now you've got Defense Exhibit 14.

22   A.   Okay.  Yeah.  That's the teller window from the view of

23   the teller.

24   Q.   Okay.  Inside the cage?

25   A.   Correct.

1  Q.   And -- and then it shows the entranceway to what's called

2  the vault?

3  A.   To the right, yes, sir.

4  Q.   Okay.  And Ms. Pernek is kind of peeking around the door

5  in that picture?  You'll probably have to remove the tag.

6  A.   I don't.  I don't have her in -- but I see the door to the

7  vault.  I don't have her in the picture.

8  Q.   Okay.

9         MR. GILLIGAN:  Approach the witness one more time.

10        THE COURT:  It looks like your photocopy may have cut

11 off part of the picture.

12        MR. GILLIGAN:  No, sir.  It's actually a different

13 picture.

14        What's important, Your Honor, is the Defense Exhibit

15 14 that I'm using -- I need to make sure it's the actual

16 Defense Exhibit 14 for the court.  He actually has a different

17 picture.

18        THE COURT:  Yeah.  I think I have the same one the

19 witness has.

20        MR. GILLIGAN:  Okay.  Well, that's important, Judge,

21 because that's not the Defense Exhibit 14 we've been talking

22 about -- I've been talking about throughout the case.

23        I know it is because the witnesses have said, yeah,

24 they see Ms. Pernek in the picture, so...

25        THE COURT:  I think your photocopy is -- the copies

1    of the exhibit binder that I have, and that perhaps the witness

2    has, just are cut off.  If you hand it up, I can look at it.

3              MR. GILLIGAN:  He actually has a different picture,

4    though, Judge.

5              THE WITNESS:  I think -- I think it's just enlarged.

6              THE COURT:  Oh, yeah.  It's an entirely different

7    picture.

8              THE WITNESS:  Is it just enlarged?

9              MR. GILLIGAN:  Yeah.  Take that one out, please.

10             THE COURT:  Well, it's either entirely different or

11   the copy you have in the binders is -- has part of it blown up.

12   Yeah.

13             MR. GILLIGAN:  I don't know if it's different or

14   what, but the one I need in evidence is the one that actually

15   shows the vault.  He doesn't have that picture.

16             As long as the court has the one I'm talking about

17   and that's the one that's going to be in the record -- that's

18   his.

19             THE COURT:  Well, what does the court have?

20             COURTROOM DEPUTY:  We're using mine with the witness.

21             MR. GILLIGAN:  Yeah.  We made a separate --

22             THE COURT:  Just go back -- go back to the mike so

23   that the court reporter gets what you're saying.

24             MR. GILLIGAN:  We made a separate exhibit notebook

25   with counsel, you, and the clerk, just so she could follow

1    along.

2            And I was using hers to go through with him.  And

3    when he got to my Defense Exhibit 14, I'm -- I'm looking at a

4    completely different picture.  It may be it just didn't copy

5    well, but it clearly shows this vault window and Ms. Pernek.

6            And I believe that's the picture that has been shown

7    to the other witnesses, because they said in their testimony

8    they saw Ms. Pernek in the picture.

9            He's telling me that he doesn't see Ms. Pernek in

10   this one.  And he doesn't.  So I just need to make sure the one

11   in the record is the one that shows Ms. Pernek in the picture.

12   And that's the one we've introduced.

13           THE COURT:  What do you say, Mr. Massey?

14           MR. MASSEY:  The picture that I have, that I've been

15   going through -- from this whole trial, is the one that he's

16   looking at and the one the court has.

17           And that's the one that I was given by counsel for

18   defendant -- no, this one.

19           I haven't seen this picture the whole trial.  The one

20   you're holding up, sir, I have not seen that picture this

21   entire trial.  I have seen the picture that you gave me in this

22   notebook and the picture that the witnesses have been talking

23   about this entire trial, and the picture that the court has

24   this entire trial.  So I have been going by this picture this

25   entire time.  I -- I have never seen this picture.

1    THE COURT:  All right.  I think that's fair enough.

2  Why don't we -- why don't we -- why don't you introduce the

3  picture you have in your hand now as the next exhibit you would

4  introduce.  And we'll call it Defendant's Exhibit 25.  And why

5  don't you use Mr. Faso to identify that exhibit.

6    I think Mr. Massey is right.  I know you've been

7  talking about --

8    MR. GILLIGAN:  I apologize, Judge.  I -- I didn't

9  realize they were --

10    THE COURT:  -- the image 14, which is similar, but

11  different insofar as -- 14 doesn't have a clear shot of that

12  open doorway that -- what will become Defendant's Exhibit 25

13  does.

14    But I think that can be corrected for the record

15  going forward.  And you probably can get what you need out of

16  Mr. Faso for that purpose.

17    MR. GILLIGAN:  What I've done for right now, Judge,

18  is put the green tag that says 25 on it.

19    THE COURT:  Okay.  Why don't you use that, then, and

20  see if you can get that introduced.

21    MR. GILLIGAN:  Thank you.

22  BY MR. GILLIGAN:

23  Q.   Okay.  So let me show you what we've now marked as Defense

24  Exhibit 25.  Does that show the entranceway to the vault?

25  A.   Yes, sir.

1    Q.    And in that picture, does that show Ms. Pernek sort of

2    peeking out around the corner?

3    A.    Yes, sir.

4    Q.    Okay.  That vault entrance is next to a teller window?

5    A.    Yes, sir.  And that's where that chair is located.

6    Q.    And does the -- do the people that work in the vault --

7    when they're working the vault, do they also work out of that

8    teller window?

9    A.    Yes, sir.  As you can see in the picture, there's a bank

10   number two, the white -- at the bottom left-hand corner there's

11   a little white thing right here.  That's a label on a bank.

12   What that is is a cart that has drawers for cash and for chips.

13              THE COURT:  Do you want to introduce that?

14              MR. GILLIGAN:  I'm sorry.  Yes, sir.  I'd like to

15   introduce Defense Exhibit 25.

16              THE COURT:  Any objection?

17              MR. MASSEY:  No, sir.

18              THE COURT:  All right.  So admitted.

19         (Defendant's Exhibit 25 received into evidence.)

20              MR. GILLIGAN:  Thank you, Your Honor.  I apologize

21   for the confusion.

22   BY MR. GILLIGAN:

23   Q.    Now, when the -- these cage employees that also work in

24   the vault, do they also work out on the floor?

25   A.    Yes.  They'll run breaks for the chip runner or the podium

1  person that's out there, or if it becomes busy and they have

2  their vault duties taken care of, they'll come out on the floor

3  and help run chips or help run the podium.

4  Q.   Would their interaction when they're doing those jobs be

5  the same as the chip runners and the teller -- or the podium

6  people?

7  A.   Yes, sir.

8  Q.   And would their interaction -- and when they're doing the

9  teller function, be the same as the other tellers?

10 A.   Yes, sir.

11       MR. GILLIGAN:  If you would give me one second, Your

12 Honor.

13       Thank you, Your Honor.  I have no further questions.

14       THE COURT:  Mr. Massey?

15                    **CROSS-EXAMINATION**

16 BY MR. MASSSEY:

17 Q.   Would you sometimes fill in for the poker dealers?

18 A.   Yes, sir.

19 Q.   And what years were that -- was that?

20 A.   I'd say on a daily basis I could start the push or

21 anything like that.

22 Q.   Okay.  And is that throughout the course of your

23 employment?

24 A.   Yes, sir.

25 Q.   Including years 2014?

1  A.   Yes, sir.

2  Q.   2015?

3  A.   Yes, sir.

4  Q.   2013?

5  A.   Yes, sir.

6  Q.   And when you're filling in for a poker dealer, what would

7  you do about the tip box?

8  A.   What tip box?

9  Q.   Was there a tip box in front of you?

10  A.   For a period of time in the beginning I had a tip box in

11  2011 and 2012.  That was where I would put the tips I received

12  while filling -- while acting as a poker dealer.

13  Q.   And then what would you do with those tips?

14  A.   I left them in the box until they accumulated.  And I

15  cashed it out by contributing ten percent to the tip pool.

16  Q.   So that would go into the tip pool?

17  A.   Yes, sir.

18  Q.   And so the records would show that you participated in a

19  tip pool in 2012?

20  A.   I didn't participate in the tip pool.  I contributed to

21  it.

22  Q.   Okay.

23  A.   I never received anything from it.

24  Q.   And then what would happen in 2013?

25  A.   2013, I was -- after I cashed it out, I was told not to do

1    that any longer.

2    Q.   Okay.  And then -- and so how did you deal with tips then?

3    A.   I handed them to the poker dealers.  I gave them to the

4    poker dealers from there on out.

5    Q.   Okay.  And when in 2013 was that?

6    A.   I can't remember exactly.

7    Q.   Early or late?

8    A.   I really can't remember.

9    Q.   Okay.  And who told you to stop?

10   A.   Brian Matthews.

11   Q.   Was there -- was there ever a time when Mr. Greenstone

12   would have to buy food for players, VIP players?

13   A.   Well, I asked him if he could pick something up, yes.

14   Q.   And then would he pay for that with his own money?

15   A.   Because he was picking it up, yes.

16   Q.   And then how would he be compensated for that?

17   A.   The players would reimburse him.

18   Q.   Would you ever give him a chip?

19   A.   They would -- they would sometimes give him chips, yes.

20   Q.   And those chips would go into his chip box?

21   A.   Yes, sir.

22   Q.   And that chip box would then go in the tip pool?

23   A.   Yes, sir.

24          MR. MASSEY:   That's all I have.  Thank you, Your

25   Honor.

1     MR. GILLIGAN:  I have no questions, Your Honor.

2     THE COURT:  When the meeting changing the tip pool

3  percentage from eight to ten percent occurred, were you a

4  manager at that time?

5     THE WITNESS:  No, I was not, sir.

6     THE COURT:  You attended the meeting, though?

7     THE WITNESS:  Yes, sir.

8     THE COURT:  Do you remember if Mr. Howard was at the

9  meeting?

10     THE WITNESS:  It was a mandatory meeting for all

11  dealers.  So I would suspect that he was there.

12     THE COURT:  So the meeting was mandatory for all

13  dealers.  And Mr. Howard was a dealer?

14     THE WITNESS:  Yes, sir.

15     THE COURT:  And Mr. Greenstone -- Greenstone was a

16  dealer?

17     THE WITNESS:  Yes, sir.

18     THE COURT:  Do you remember specifically if they were

19  there or not?

20     THE WITNESS:  Specifically, no.  I mean, I'm -- like

21  I said, it was mandatory for the dealers to be there.  So I'm

22  guessing that they were both there.

23     THE COURT:  The employee handbook we talked about

24  earlier, you said that you distributed that in 2012?

25     THE WITNESS:  I distributed it in 2013.  I worked on

1    it in 2012.

2         THE COURT:  Do you remember when in 2013 you

3    distributed it?

4         THE WITNESS:  First few months of 2013.

5         THE COURT:  What would that be?

6         THE WITNESS:  Sir?  I'm sorry?

7         THE COURT:  What is your best estimate?

8         THE WITNESS:  Probably February or March.

9         THE COURT:  Do either counsel have additional

10   questions?

11        MR. GILLIGAN:  No, sir.

12        MR. MASSEY:  No, sir.

13        THE COURT:  All right.  You can step down.  Thank

14   you.

15        THE WITNESS:  Do I leave this here?

16        THE COURT:  Yes, sir.

17        MR. GILLIGAN:  I have one more witness -- I have one

18   more witness, Your Honor.  Is it possible to take a five-minute

19   comfort break?

20        THE COURT:  Yes.

21      (Witness excused.)

22        MR. GILLIGAN:  And then, also -- I know it's not an

23   official exhibit, it's the clerk's exhibit, but can I have the

24   clerk and my paralegal get together and reorganize that

25   appropriately, including putting the Exhibit 25 in?

1    THE COURT:  Sure.  We'll take a ten-minute break,

2  then.

3    COURT SECURITY OFFICER:  All rise.

4    (Recess, 10:08 a.m. to 10:19 a.m.)

5    COURT SECURITY OFFICER:  All rise.

6    THE COURT:  Please be seated.

7    COURT SECURITY OFFICER:  Court is now back in

8  session.

9    THE COURT:  All right.  Mr. Gilligan, your next

10  witness.

11    MR. GILLIGAN:  Thank you.  The defense calls

12  Ms. Marsha Kelso.

13    COURTROOM DEPUTY:  Ms. Kelso, if you'd please come

14  around to the witness box.  Raise your right hand.  Do you

15  solemnly swear that the testimony you will give before this

16  court will be the truth, the whole truth, and nothing but the

17  truth, so help you God?

18    THE WITNESS:  I do.

19    COURTROOM DEPUTY:  Please have a seat.  And state

20  your full name for the record, spelling your last name.

21    THE WITNESS:  Marsha Sue Kelso.  Kelso, K-e-l-s-o.

22    **MARSHA SUE KELSO, DEFENDANT'S WITNESS, SWORN**

23    **DIRECT EXAMINATION**

24  BY MR. GILLIGAN:

25  Q.   All right.  Good morning, Ms. Kelso.  Can you tell the

1  court who you work for?

2  A.   Second Chance Jai-Alai.

3  Q.   And it does business as Ocala Poker?

4  A.   Yes.  Sometimes Ocala Poker, sometimes Ocala Jai-Alai.

5  Q.   Okay.  I'm going to refer to it as Ocala Poker.

6  A.   Okay.  That works.

7  Q.   What's your present position with Ocala Poker?

8  A.   I'm the office manager.

9  Q.   How long have you held that position?

10 A.   About four-and-a-half years.

11 Q.   Do you know when you -- do you remember when you started

12 with Ocala Poker?

13 A.   January 30th, 2012.

14 Q.   And that's -- that's the position you've held since that

15 time?

16 A.   Yeah.  That's the only position I've had there.

17 Q.   What are your job duties for that position?

18 A.   I do all aspects of accounting and process the information

19 for payroll and miscellaneous office duties.

20 Q.   And you're responsible for the payroll data processing?

21 A.   Yes.

22 Q.   Do you actually do the payroll?

23 A.   No.  We outsource it to Payroll Office of America, POA.

24 And they actually cut the checks and do the direct deposits and

25 pay the workman's comp and the quarterly taxes.

1    Q.    But you're the person that accumulates all the data?

2    A.    I tell them who to pay and what to -- how much.

3    Q.    Okay.  Do your job duties include accounting for the tips

4    to the poker dealers?

5    A.    Oh, yes.

6    Q.    Do your jobs include accounting for the tips to the cage

7    employees?

8    A.    Yes.

9    Q.    Let's discuss how that's done.  First of all, are you

10   familiar with how the poker dealers are tipped?

11   A.    Well, I -- you know, I see evidence of them getting

12   tipped.  I'm not there to witness them getting tips, because I

13   don't work anywhere near the poker room.  But they are given --

14   they collect their tips in a locked box.

15             This is how I understand it, because I'm an

16   accounting person, not a poker person.  But they accumulate

17   their tips in a locked box.  And that is counted under camera

18   with them and someone that witnesses that and watches the

19   count.  And that -- that information is recorded on what's

20   called a tip slip.  And that's what I receive in order to

21   process the payroll.

22   Q.    Okay.  And these tip slips are individual to each poker

23   dealer?

24   A.    Yes.  And they're -- they have the -- the dealer's name,

25   their number, their signature, the date, whoever witnessed the

1  counting of the chips, and their employee number.

2      And the gross amount of the chips and the -- what

3  they call the tip-out amount, which is -- goes to the tip pool,

4  and then the net amount of their tips.  And they keep a copy

5  and I get the original.

6  Q.   Okay.  So let's -- you have a -- an exhibit book in front

7  of you.

8  A.   Oh.

9  Q.   If you could take a look at that.  And go to Defense

10 Exhibit 21.

11      THE COURT:  You can take it and sit down with it.

12      THE WITNESS:  Oh, thank you.

13      Oh, that's a tip slip.

14 BY MR. GILLIGAN:

15 Q.   Okay.  That was going to be my question.

16 A.   That's a tip slip.

17 Q.   Okay.  Okay.  That's a -- and, specifically, that's a tip

18 slip for Mr. Howard for February 25th, 2015?

19 A.   Yes.

20 Q.   And these tip slips would be similar for him throughout

21 his employment there at Ocala Poker?

22 A.   Yes.

23 Q.   And you get the original of all these?

24 A.   Yes.

25 Q.   And then -- and then on the next exhibit, which is Defense

1  Exhibit 22, that's a tip slip for Mr. Greenstone for

2  February 27, 2015?

3  A.    Yes.

4  Q.    Same type of form?

5  A.    Yes.

6  Q.    And same thing, he would have done one of these every day

7  he tipped out; you would have gotten the original?

8  A.    Correct.

9  Q.    Now, were these tip slips then -- do you take that

10 information and enter it into some sort of program?

11 A.    Yes.  I have an Excel workbook that has a tab for the

12 dealers and a tab for the cage, a tab for the tournaments, and

13 then a final summary page that all of it populates to, so I

14 know who and how much to pay.

15 Q.    Now, those tip slips -- tip slips for the dealers reflect

16 their gross tips and it reflects the ten percent that's taken

17 out for the tip share?

18 A.    Correct.

19 Q.    And do you -- and do you then take that information, both

20 their total tips and the ten percent tip share, and enter that

21 data into this Excel spreadsheet?

22 A.    Correct.  Actually, it does it for me.  The ten percent --

23 it calculates the ten percent.

24 Q.    Okay.  And then that, with other -- and then there's also

25 information that you get from a time clock?

1  A.    Yes.

2  Q.    And you -- and that calculates the employee's actual hours

3  working at Ocala Poker?

4  A.    Yes.

5  Q.    And do you take that information and also put it into a

6  software program?

7  A.    Actually, it -- it carries over.  It actually downloads

8  into the payroll system.  And where it matters the most is for

9  the cage people, where their -- their tip depends on how many

10 hours they work.

11 Q.    Okay.

12 A.    Whereas, the dealers it doesn't.

13 Q.    But all that information ultimately gets into a

14 computerized payroll system?

15 A.    Correct.

16 Q.    And with a clock, that -- I think what you're telling me

17 is that's automatically downloaded into the payroll system

18 maintained by POA?

19 A.    Correct.

20 Q.    Okay.  And what pay cycle is Ocala Poker on?

21 A.    Biweekly, every two weeks.

22 Q.    And does that equate -- how many pay -- how many days in a

23 pay period would that be?

24 A.    Seven.  So a pay period is 14 days.

25 Q.    Okay.  So a month's worth of pay periods would be 28 days?

1  A.    Yes.  It -- yeah.

2  Q.    Okay.  What employees -- and, now, the tip -- the tip

3  share that the -- the poker dealers are making are reflected on

4  these tip slips and -- and then ultimately in the software.  To

5  whom do those tip shares go?  What employees get the --

6  A.    They're called cage employees.

7  Q.    And do you know what the cage employees do?

8  A.    Yes.  There's different duties.  There's a teller, chip

9  runners, a vault person, a podium person.  Some of them do more

10 than one of those jobs.  They -- you know, wherever they're

11 needed, mostly.

12 Q.    Okay.  And do your job duties include accounting for the

13 cage employees' tips?

14 A.    Yes.

15 Q.    And do they also have these tip boxes like the poker

16 dealers have?

17 A.    Yes, they do.

18 Q.    Now, you told me you're the office manager.  Are you also

19 the custodian of the records that you generate?

20 A.    Absolutely.  Yes, sir.

21 Q.    And when Mr. Massey, the attorney for the plaintiffs, and

22 I visited the facility to -- in order for him to get records

23 that he had requested, were you the person that provided those

24 records to him?

25 A.    Yes, it was.

1  Q.    Do you know Mr. Howard and Mr. Greenstone?

2  A.    Mostly as names on a spreadsheet, but, yes.

3  Q.    Okay.  And it would have been your duties as office

4  manager to also pay the payroll information for Mr. Greenstone

5  and Mr. Howard?

6  A.    Yes, sir.

7  Q.    And that would include their contribution to the tip

8  share?

9  A.    Yes.

10  Q.    Who is your boss?

11  A.    Brian Matthews.

12  Q.    And what is his position?

13  A.    President.

14  Q.    Are there other departments at Ocala Poker?

15  A.    Yes.

16  Q.    There's maintenance?

17  A.    Deli, security, waitresses.  We have an ITW, which is

18  off-track wagering -- Inter-track Wagering.

19  Q.    Okay.  And are there managers for these departments also?

20  A.    Yes.  Yes, there are.

21  Q.    Are they separate and apart, though, from the poker --

22  A.    Oh, absolutely.

23  Q.    And none of the employees or managers in any of these

24  other departments -- do they share -- do they share in the

25  poker dealer tip pool?

1   A.   Oh, no.  Huh-uh (negative).

2   Q.   Is there a -- and you see all the records.  Is there a

3   disparity between how much the Ocala Poker poker dealers make

4   versus the employees that work in the cage department?

5   A.   Oh, yes.  Yes.  About three times.

6   Q.   Is that primarily because of the tips received?

7   A.   Yes.  Yeah.  They all make the same hourly wage pretty

8   much.

9   Q.   Okay.  By way of example, have I asked you to look at some

10  records -- just random look at recent records to calculate the

11  amount of disparity between the tips that a poker player -- a

12  poker dealer would make versus the cage employee?

13  A.   Yeah.  I did.  And I -- I got kind of a rough average.

14  The -- an average dealer that worked pretty much full-time made

15  about $2100 in the two-week pay period.  And the -- in tips,

16  just -- I was just looking at the tips, because they both make

17  about the same hourly wage.

18         And then the dealer -- the cage employee made about

19  700, so about three times -- the dealer is making about three

20  times as much as the cage people, in tips.

21  Q.   Okay.  And since you'd see the tip slips on a daily basis,

22  would that be typical?

23  A.   Yes.  And that includes their share of the tip pool.

24  Q.   Now, the cage employees, they actually get tipped

25  themselves directly from the customers?

1   A.   Yes.

2   Q.   And you keep track of those tips also?

3   A.   Correct.  Separately.

4   Q.   Did the tip -- did the cage employees typically get paid

5   more than $30 a month in tips?

6   A.   Yes.

7   Q.   And these are not -- these are tips paid directly to cage

8   employees, not part of the tip pool?

9   A.   Correct.  You asked me to actually analyze that.

10  Q.   Okay.  We're going to get to that.

11  A.   Oh, sorry.

12  Q.   I know.  I gave you a homework assignment, so I'm going to

13  get to it.  And how do you actually do that?

14  A.   The spreadsheet -- the spreadsheet separates them.  The --

15  the -- what I would call their direct tips.  The one that go

16  into the cage tip boxes are kept completely separate from the

17  ten percent that comes from the dealers for the tip share pool.

18          And so the spreadsheet separates those distinctly.

19  And it's -- the cage employees are tipped on the hours that

20  they worked per week.  So it separates them by week, as well.

21  Q.   Okay.  Now, their tips are -- are counted under a

22  surveillance camera just like the poker dealers; is that

23  correct?

24  A.   Absolutely, yes.

25  Q.   And the records -- do you have records that are generated

1    as a result of keeping track of the cage employees' tips and

2    pay?

3    A.    Yes.

4    Q.    Okay.  If you would turn to the exhibit book in front of

5    you and go to Defendant's Exhibit 15, it's a fairly large --

6    A.    Yes.

7    Q.    -- document with numerous pages.  But could you tell the

8    court what Defense Exhibit 15 is.

9    A.    Okay.  This is the cage tip sheet.  In my workbook, as I

10   said, I have different worksheets.  This is the cage tip

11   worksheet.

12            And it shows the ten percent coming from the

13   dealer tip -- the dealer tip pool, the direct cage tips, and

14   then it shows all of the cage employees and the hours they

15   worked in both weeks, and the calculation, therefore.

16   Q.    Okay.  Now, this is part of an Excel program?

17   A.    Yes.

18   Q.    Okay.  And is this the same Excel program that you input

19   the data for the poker dealers and their wages and tips and

20   whatnot?

21   A.    Yes.

22   Q.    Okay.  So this is not the full Excel spreadsheet?  It's a

23   section of the --

24   A.    Yeah, a worksheet of this --

25   Q.    A worksheet of the --

1  A.    Of the workbook.

2  Q.    Of the workbook.  That just deals with the cage employees?

3  A.    Correct.

4  Q.    And it appears that it started in January -- the records

5  that we've got here that I've asked you to analyze start

6  in -- January 3 of 2012?

7  A.    That's the week ending.  So it really starts 12 --

8  12/28/2011.

9  Q.    Okay.  And then we have a year's worth of records for

10  2013.  And then it appears, like, 2014; is that correct?

11  A.    Yes.

12  Q.    And I think it goes up --

13  A.    It goes through 4/28/15.

14  Q.    Okay.  And I believe that's the time that Mr. Greenstone

15  and Mr. Howard left the employment with Ocala Poker?

16  A.    They both left in April of 2015, correct.

17  Q.    So looking at these records, did I ask you to do an

18  analysis of just how the cage employees got tipped to see if

19  they regularly and customarily got tipped more than $30 a

20  month?

21  A.    Yes.

22  Q.    Now, I'm saying $30 -- $30 a month because the statute

23  says $30 a month.  But are you really on a -- a 30- or

24  31-day-month schedule?

25  A.    No.  In order to be close to what you asked me to do, I

1   examined two -- two pay periods at a time, which would be four

2   weeks, or 28 days.

3   Q.   Okay.  Now, in the periods that are reflected in

4   Exhibit 15, was there ever an instance where a cage employee

5   earned less than $30 in this 28-day pay period?

6   A.   Yes.

7   Q.   Okay.  And how many specific instances of that were there?

8   A.   Five pay periods, six people, if I'm remembering.

9   Q.   And did I ask you to analyze why it was -- in those

10  limited exceptions why it was those cage employees did not make

11  at least $30 on those particular pay periods?

12  A.   Yes.

13  Q.   Okay.  And I know you did some calculations as to the

14  exact amount they got paid.

15  A.   Yes.

16  Q.   And could you redo those calculations just looking at the

17  records that we have here?

18  A.   Oh -- oh, no.  I wrote it down.

19  Q.   Okay.

20  A.   I have to --

21  Q.   Okay.  We're going to get to that.

22  A.   Okay.  Good.

23  Q.   I have to lay a predicate for the judge --

24  A.   Okay.  I understand.

25  Q.   -- so he knows what we're doing.

1  A.   No, I couldn't do it off the top of my head.  But I know

2  that in every case they didn't work a full four weeks.

3  Q.   Okay.  And I just want to go through that in somewhat --

4  in somewhat detail, but you actually sat down and

5  mathematically went through these and made some computations?

6  A.   Absolutely.

7  Q.   And in order -- and in doing those computations, you made

8  a -- you made an aid for yourself so you could -- or notes to

9  keep track of those mathematical computations?

10  A.   Yes.

11  Q.   And those computations are based on the analysis of the

12  records, which are Defense Exhibit 15?

13  A.   Exactly, yes.

14  Q.   And sitting here today, could you remember those

15  calculations without looking at your notes?

16  A.   No, sir.

17  Q.   Would the notes be an aid to you in refreshing your memory

18  about what you calculated?

19  A.   Yes.

20  Q.   Okay.

21       MR. GILLIGAN:  Your Honor, I'd like to show her her

22  notes so she can refresh her memory and we don't have to have

23  her do the math right in front of us.

24       THE COURT:  All right.

25  BY MR. GILLIGAN:

1  Q.    Okay.  Are those your notes concerning --

2  A.    Yes, sir.

3  Q.    -- the person I asked you to analyze?

4  A.    Yes, sir.

5  Q.    Now, let's look at the first instance of an exception.

6  Could you tell the court what that was?

7  A.    In the four-week pay period 5/30 to 6/26 in 2012, Joel

8  Brahim worked only two weeks.  And during those two weeks his

9  direct cage tips were $22.61.

10 Q.    So he didn't even work the entire 28-day period?

11 A.    No, sir.

12 Q.    Let's look at the second instance.

13 A.    In the pay period 9/19 -- pay periods 9/19 through

14 10/16/2012 -- because I was always looking at two pay periods,

15 four weeks -- Jay Flannery only worked one week in the pay

16 period, as it was his last week of employment with us.  And he

17 made $22.63 in that one week.

18 Q.    And this is in tips directly to him?

19 A.    The direct cage tips.

20 Q.    Okay.  And then let's look at the third instance.

21 A.    Pay periods 9/19 to 10/16/2012, Peggy Lee only worked

22 three weeks of the four.  And she was paid $21.55 for those --

23 during those three weeks in tips.

24 Q.    And -- and the fourth instance?

25 A.    11/14 to 12/11/2012, Peggy Lee only worked three of the

1   four weeks.  And she made $20.

2   Q.    And the fifth instance?

3   A.    Pay periods 6/26 to 7/23/13, V. Newby only worked two of

4   the four weeks.  And during that two weeks she made $11.70 in

5   tips.

6   Q.    And the final, sixth instance.

7   A.    Mr. Rodriguez worked one of four weeks in the pay period

8   his last week of employment there.  And he made 19.75 in tips.

9   Q.    So of the six instances you noted any cage department

10  employee making less than $30 in a 28-day period -- not a 30 or

11  31 -- all those instances where they did not work that full

12  period of time?

13  A.    That's correct.

14  Q.    Now, was there a time that Ocala Poker also was

15  experimenting with having non-cage employees work in the cage

16  department part-time so they could earn extra money?

17  A.    Yes, about --

18  Q.    Approximately how long did that --

19  A.    About four months.

20  Q.    And did -- now, these weren't regular cage employees.

21  These were other employees that worked in -- at Ocala Jai-Alai?

22  A.    They were specifically dealers.

23  Q.    Okay.  And they wanted to get extra time to make extra

24  money?

25  A.    There was a twofold reason.  One was -- in the case of two

1  specific dealers, it was to give them extra hours, and,

2  therefore, an extra opportunity to earn tips and an hourly

3  wage.

4        And in some cases for a brief time -- very, very

5  brief, we were putting dealers on the podium for very, very

6  short periods, like not even half an hour, just to cover the

7  podium during a time when we were short-staffed.

8  Q.   And did I ask you to do an analysis of that also?

9  A.   Yes, you did.

10 Q.   And did you also make notes as to when that occurred and

11 how it occurred?

12 A.   Yes, sir, I did.

13 Q.   And would you be able to tell the court what your notes

14 reflected from your analysis without the aid of your notes to

15 refresh your recollection?

16 A.   I would not.

17        MR. GILLIGAN:  May I approach the witness?

18        THE COURT:  You may.

19 BY MR. GILLIGAN:

20 Q.   Are those the notes that you made concerning that part of

21 the analysis?

22 A.   Yes, sir.

23 Q.   And would it refresh your recollection as to the analysis

24 you made at the time of those records?

25 A.   Yes.

1  Q.   Okay.  Now, generally speaking, what did that -- the

2  analysis of those records show?

3  A.   Well, for about four months the dealers were given this

4  chance to work on the podium and -- and as chip runners.  And

5  in four -- in four pay periods, which each of -- consisting of

6  four weeks, the dealers were not making -- always making the

7  $30 in those direct tips, but they were also making their

8  dealer tips.

9  Q.   Okay.  And in the first pay period, I think, is -- that

10 you analyzed, where you found this discrepancy, was 1/7/15

11 through 2/13/15?

12 A.   Yes.

13 Q.   And what did you find there?

14 A.   Both Downs and Tu, which both are the last names of

15 dealers -- they worked two of the four weeks.  Downs made 26.39

16 and Tu made 19.29 in direct cage tips.

17 Q.   Okay.  Now, they also would have had their tips working as

18 poker dealers?

19 A.   Yes.

20 Q.   Okay.  But, nevertheless, that's what you found.  And then

21 the second time that you found an anomaly was in 2/4/15 through

22 3/3/15?

23 A.   Correct.

24 Q.   And can you tell --

25 A.   And Downs and Tu both worked four weeks.  Downs made 43.37

1   and Tu made 27.99.  Also during the week of 2/18 to 2/24,

2   that's when eight of our other dealers worked either as chip

3   runners or on the podium.

4          Seven of those dealers worked between .28 and .49

5   tenths of an hour, and one worked 5.36 hours, making 7.29 for

6   those hours.

7   Q.   Okay.  So it looks like seven of the eight really --

8   A.   They're just fill-in.

9   Q.   I got you.  But your records track it?

10  A.   Yes, sir.

11  Q.   Okay.  And then the third pay period that you just called

12  an anomaly --

13  A.   Yeah.  3/4 to 3/31/2015, Downs and Tu, again -- now, those

14  were back to being the only two dealers that were helping out.

15  And they both worked the four weeks.  Downs made 44.48 and Tu

16  made 27.63.

17  Q.   And, finally, the fourth time?

18  A.   4/1 to 4/28 Downs and Tu both worked four weeks.  Downs

19  made 33.83 and Tu made 25.30.

20  Q.   Okay.  And -- now, they -- while they were doing this,

21  they're not even working full-time there in those positions?

22  A.   Oh, very few hours.  I can look it up.  You know --

23  Q.   Okay.  They're not working a 40-hour week, also working in

24  the cage -- as a cage employee, correct?

25  A.   No.  They were never even considered cage employees.  They

1    were just helping that department.

2    Q.    Okay.  So it looks like, if I'm analyzing correctly, the

3    only person that did not make $30 in a 30 -- at least $30 in a

4    month would have been Mr. Tu on two occasions, where even he --

5    but he wasn't even working full-time?

6    A.    No.

7    Q.    Okay.  Do any of the cage employees have any managerial

8    authority to hire or fire?

9    A.    No.

10   Q.    Who is the cage department manager?

11   A.    That's Vicki Pernek.

12   Q.    Did any of the cage employees have the authority to set

13   wages for any employees?

14   A.    No.

15   Q.    Ultimately, whose function is that?

16   A.    Brian Matthews.

17   Q.    Your direct boss?

18   A.    Yes, or in the case of someone that's being paid a tip

19   minimum wage that's governed by the state.

20   Q.    Okay.  Thank you, Ms. Kelso.

21          MR. GILLIGAN:  I have no further questions.

22          THE COURT:  Mr. Massey.

23          MR. MASSEY:  May I approach the witness, Your Honor?

24          THE COURT:  You may.

25          MR. MASSEY:  Defense Exhibit 13.

1    THE WITNESS:  Oh.

2    MR. MASSEY:  It may be in your book there.

3    THE WITNESS:  Oh.

4    MR. MASSEY:  Do you see a 13?

5    THE WITNESS:  I see a 13.  Oh, yeah.  Yeah.  Great.

6    MR. MASSEY:  Okay.

7    THE WITNESS:  Awe, Peggy.

8                        **CROSS-EXAMINATION**

9    BY MR. MASSSEY:

10   Q.   What does that picture show, Defendant's Exhibit 13?

11   A.   That's a picture of the cage -- what we call the cage

12   window.  There's a teller sitting in the window.  And you can

13   see their tip box right there.

14   Q.   Okay.  And is that -- is that the tip box for the cage

15   people?

16   A.   Yes.

17   Q.   Is that the only tip box for the cage people?

18   A.   No.  They have them on the chip runners' carts.

19   Q.   Okay.  So chip -- so there's some for the chip runners'

20   carts.  And then there's this one that sits in front of where

21   the tellers sit?

22   A.   Correct.

23   Q.   Okay.  And so how do you know how many tips the people --

24   how many tips are meant for the people -- for the vault

25   persons?

1   A.   The vault -- the vault people are part of the -- the cage

2   crew.   They're part of the cage group.

3   Q.   So how do you know when people put a tip into that box

4   that it's meant for the vault persons and not for the tellers?

5   A.   I don't.

6   Q.   And so -- I heard you say some people in the cage

7   department, as you call it, do more than one job.   Are there

8   people -- are there some people that don't do more than one

9   job?

10  A.   Actually, I don't really know.   I -- I sit in an office.

11  I do see people that work in the cage doing all sorts of jobs.

12  I don't know specifically which ones do what.   But I've seen

13  them out on the floor.   I've seen them in the vault.   I've seen

14  them in the cage.

15  Q.   Are there some people that just do teller work?

16  A.   I don't know.

17  Q.   Okay.   How is Phil Faso paid?

18  A.   He is the poker room manager.   And he is paid a salary.

19  Q.   Okay.   Did he ever make tips?

20  A.   There was a time quite a while ago when he was needed as a

21  dealer and he had a tip box, just like a dealer would.   And

22  when he was sitting as a dealer, he was paid as a dealer -- in

23  tips as a dealer.

24  Q.   Does he still work as a dealer?

25  A.   I've never seen him sit as a dealer, for a couple of years

1    now.

2              MR. MASSEY:  Thank you, ma'am.  That's all I have.

3              THE COURT:  Mr. Gilligan?

4              MR. GILLIGAN:  Thank you, Your Honor.  I have no

5    further questions of Ms. Kelso.

6              THE COURT:  Ms. Kelso, you can step down.

7              THE WITNESS:  Thank you.

8              MR. GILLIGAN:  We're about to rest.  I just want to

9    make sure that all the exhibits I intended to put in evidence

10   have been put into evidence.

11             Did I move the -- if I didn't move Exhibit 15 into

12   evidence, I need to do that, Your Honor, which is the cage tip

13   document.

14             THE COURT:  Any objection to that?

15             MR. MASSEY:  No, sir.

16             THE COURT:  All right.  Defendant's Exhibit 15 is

17   admitted.

18        (Defendant's Exhibit 15 received into evidence.)

19             MR. GILLIGAN:  Did you leave your notes?

20             THE WITNESS:  I did.

21             MR. GILLIGAN:  You can grab those.

22             If I could go through them with the clerk real quick

23   and just make sure I've got what I think I've got in, if that

24   would be acceptable to the court.  And then I'll rest.

25             THE COURT:  Sure.  We can -- do you want to take a

1    five-minute break to look at your exhibits?

2              MR. GILLIGAN:  I was just going to walk through them

3    and take -- but I'm ready to rest.  I just want to make sure

4    that I have not moved something I -- I think I have, but I

5    just -- you see me fumbling with numbers, Judge, so I --

6              THE COURT:  Go ahead.

7              MR. GILLIGAN:  -- I had people smarter than me take

8    care of it, but -- okay.

9              Defense Exhibit 1, is that in evidence?

10             COURTROOM DEPUTY:  Defense Exhibit 1?

11             MR. GILLIGAN:  Yes, ma'am.

12             COURTROOM DEPUTY:  No.  I don't have that.

13             MR. GILLIGAN:  Okay.  Can -- we didn't offer it

14   either.  Okay.  That's fine.

15             Defense Exhibit 2?

16             COURTROOM DEPUTY:  No.

17             MR. GILLIGAN:  I think that was --

18             MR. MASSEY:  It's one of my exhibits.

19             MR. GILLIGAN:  It's the plaintiffs' floor plan.  It's

20   Defense Exhibit -- it was a plaintiffs' exhibit.  So we didn't

21   introduce it.

22             COURTROOM DEPUTY:  Okay.

23             MR. GILLIGAN:  Defense Exhibit 3?

24             COURTROOM DEPUTY:  Yes, I have that admitted.

25             MR. GILLIGAN:  Defense Exhibit 4?

1        COURTROOM DEPUTY:  Yes.

2        MR. GILLIGAN:  Defense Exhibit 5?

3        COURTROOM DEPUTY:  Yes.

4        MR. GILLIGAN:  6?

5        COURTROOM DEPUTY:  Yes.

6        MR. GILLIGAN:  7?

7        COURTROOM DEPUTY:  Yes.

8        MR. GILLIGAN:  8?

9        COURTROOM DEPUTY:  Yes.

10       MR. GILLIGAN:  9?

11       COURTROOM DEPUTY:  Yes.

12       MR. GILLIGAN:  10?

13       COURTROOM DEPUTY:  Yes.

14       MR. GILLIGAN:  11?

15       COURTROOM DEPUTY:  Yes.

16       MR. GILLIGAN:  12?

17       COURTROOM DEPUTY:  Yes.

18       MR. GILLIGAN:  13?

19       COURTROOM DEPUTY:  Yes.

20       MR. GILLIGAN:  14 and 25, those are the two different

21  versions.

22       COURTROOM DEPUTY:  Yes.  The two photos of the vault.

23  Yes.

24       MR. GILLIGAN:  15?

25       COURTROOM DEPUTY:  Yes.

1   MR. GILLIGAN:  16?

2   COURTROOM DEPUTY:  No.

3   MR. GILLIGAN:  17?

4   COURTROOM DEPUTY:  No.

5   MR. GILLIGAN:  18?

6   COURTROOM DEPUTY:  No.

7   MR. GILLIGAN:  19?

8   COURTROOM DEPUTY:  No.

9   MR. GILLIGAN:  20?

10   COURTROOM DEPUTY:  No.

11   MR. GILLIGAN:  21?

12   COURTROOM DEPUTY:  Yes.

13   MR. GILLIGAN:  22?

14   COURTROOM DEPUTY:  Yes.

15   MR. GILLIGAN:  23?

16   COURTROOM DEPUTY:  No.

17   MR. GILLIGAN:  24?

18   COURTROOM DEPUTY:  No.

19   MR. GILLIGAN:  That's a defense exhibit?

20   MS. PETERSON:  That's plaintiffs' 7.

21   MR. GILLIGAN:  Okay.  Thank you, Your Honor.

22   That's -- that's all the exhibits I wanted.

23   THE COURT:  You rest?

24   MR. GILLIGAN:  Yes, sir.

25   THE COURT:  Any rebuttal?

1    MR. MASSEY:  No, sir.

2    THE COURT:  All right.  We've come to a conclusion,

3  then.  What I'm inclined to do is simply allow the parties an

4  opportunity to prepare, as they see it, the findings of fact

5  and conclusions of law, and to submit in that form any further

6  arguments they think appropriate based on what's been presented

7  as evidence in this two-day bench trial.

8    If either of the parties think it's necessary to make

9  closing argument, you can, or you can simply rest on those

10  briefs.

11    How much time do you think you would need to prepare

12  a brief?

13    Mr. Gilligan, I'm thinking somewhere between at least

14  21 days, if not 30 days.

15    MR. GILLIGAN:  Either is fine.  Could I inquire from

16  the court how long the court reporter would take to get a

17  transcript of the hearing?  That's the driver for us.

18    THE COURT:  Yeah.  I think -- I think it will

19  probably be about two weeks.  I'll order it.

20    MR. GILLIGAN:  Okay.

21    THE COURT:  30 days?

22    MR. GILLIGAN:  I would prefer 30 days, if it's going

23  to take two weeks to get the transcript.

24    THE COURT:  All right.

25    MR. MASSEY:  Yes, sir.  30 days.

1          THE COURT:  That's fine?  Okay.

2          In light of the additional briefing, do either

3     parties want to make any closing statement?

4          MR. MASSEY:  No, sir.

5          MR. GILLIGAN:  Are you -- are you talking about now

6     or after we submit the proposed findings of fact and the

7     written --

8          THE COURT:  No.  I was talking about now.

9          MR. GILLIGAN:  Okay.

10         THE COURT:  I don't anticipate having any additional

11    oral argument.  I'm not saying it's not possible, but I

12    anticipate simply writing the memorandum decision based on the

13    trial and argument that you might make in your briefs.

14         MR. GILLIGAN:  I'm hesitating because I've read some

15    of his work, and it took me -- it took me -- not that his

16    work's fabulous, but I had to read through it a few times to

17    kind of follow it because it was somewhat dense.

18         And I'm trying to figure out the best way -- I think

19    it's better to explain a lot of this in terms of the law

20    through a brief.

21         But part of -- part of our explanation -- I don't

22    know if writing about -- because we're talking about the law

23    itself, 203(m).  And if I can just -- let me just give you this

24    statement.

25         We refer to 203(m), the actual statute in effect.

 1  There's what we're calling the hanging paragraph.  And I want

 2  to -- I want the court to know when you see in our brief what

 3  we're talking about is the hanging --

 4          THE COURT:  Well, you did make that argument in your

 5  trial brief.

 6          MR. GILLIGAN:  Okay.  So that's my concern.  If you

 7  know what we're talking about in terms of the hanging

 8  paragraph, then I think we're good.

 9          THE COURT:  Yeah.  I think what you would do is write

10  how you see the -- the findings of facts and then applying

11  those facts that came out through the bench trial to what you

12  think the law is, and arguing those facts within what you think

13  the law is.  With that said, then...

14          MR. GILLIGAN:  Yes, sir.

15          THE COURT:  Shall we be in recess?

16          MR. MASSEY:  Yes, sir.

17          THE COURT:  All right.  Thank you.

18          MR. MASSEY:  Thank you, Your Honor.

19          COURT SECURITY OFFICER:  All rise.

20      (The proceedings concluded at 10:58 a.m.)

21                          - - -

22

23

24

25

**<u>CERTIFICATE</u>**

UNITED STATES DISTRICT COURT   )
                               )
MIDDLE DISTRICT OF FLORIDA     )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


       DATED this 16th day of August, 2016.




               <u>s/Shannon M. Bishop</u>
               Shannon M. Bishop, RDR, CRR