UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Ocala Division

CHRISTOPHER HOWARD and
JEFFREY GREENSTONE, on behalf of
Themselves and other similarly situated,

        Plaintiffs,

vs.                               Case No:  5:15-cv-200-oc-39PRL

SECOND CHANCE JAI-ALAI, LLC, a Florida
for profit limited liability company, d/b/a Ocala
Poker & Jai-Alai, Fictiously

        Defendants.

_____/

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, Second Chance Jai-Alai, LLC, LLC, d/b/a Ocala Poker ("Ocala Poker") files these proposed findings of fact and conclusions of law and states:

## I. FINDINGS OF FACT

**A) Allegations of the Second Amended Complaint.**

1.   This is a Fair Labor Standards Act ("FLSA") claim brought by Plaintiffs, Christopher Howard and Jeffrey Greenstone against their former employer, Ocala Poker.  The Plaintiffs claim they were improperly compensated in violation of 29 U.S.C. § 206(a). Specifically, Plaintiffs claim that Defendant failed to pay them the statutorily required minimum wage of $7.25 for the hours the Plaintiffs worked as poker dealers. Plaintiffs claim that, although they were otherwise properly "tippable employees" as defined by statute, they were improperly disallowed from "retaining" their tips because the tip pool they participated in was invalid.

2.   Ocala Poker is a licensed pari-mutuel facility that operates a jai-alai fronton, inter-track wagering and a poker room.  Plaintiff, Christopher Howard, was employed by Ocala Poker as a poker "dual rate"[1] from May 20, 2008 to April 3, 2015. Plaintiff, Jeffrey Greenstone, was employed as a poker dealer from May 1, 2011 to April 8, 2015.

3.   Poker dealers working at Ocala Poker, including both Plaintiffs, were compensated at the Florida tipped minimum wage. *See* Trial Tr. vol. 1, 40:2-11, Aug. 8, 2016 (Brian Matthews, Ocala Poker's president, testified that both Plaintiffs were paid at the tipped minimum wage when working as dealers). Defendant concedes this is below the otherwise mandated federal minimum wage of $7.25, but contends that it validly claimed a tip credit for the hours Plaintiffs worked.

4.   Plaintiffs sued Defendant under the FLSA rather than the Florida Constitution.[2] Plaintiffs are claiming damages of $2.60 ($7.25 - $4.65) for the relevant hours worked from April 2012 to the end of that year;[3] $2.48 ($7.25 - $4.77) for the total hours worked during 2013; $2.34 ($7.25 - $4.91) for the total hours worked during 2014; and $2.22 ($7.25 - $5.03) for the total hours worked from the beginning of 2015 to the date of their respective departures in April 2015.

5.   At all times relevant to this action, Ocala Poker instituted a tip pool wherein every poker dealer was required to contribute 10% of his tips to a pool which would be distributed to certain other employees at Ocala Poker. *See* Trial Tr. vol. 1, 41:4-42:8, (Brian Matthews testified that

---

[1] A "dual rate" is an employee that is compensated at one rate for working as a poker dealer (which is the tipped minimum wage) and another rate while working as a floor manager (which is paid at hourly wage that exceeds the tipped minimum wage). *See* Trial Tr. vol. 1, 80:22-81:3 (Mr. Bendure testified that a dual rate is somebody that is a poker dealer but acting as a floor manager and gets paid differently for this time); 134:9-135:17 (Plaintiff Howard testified that he is usually a poker dealer and gets paid the minimum wage plus tips, but also works as a "floor manager" and receives $15 an hour for this work).

[2] The Florida Constitution would have provided $3.02 for all the hours worked based on the total value of the tip credit taken by Defendant.

[3] As reviewed later, Plaintiffs are claiming a three year statute of limitations based on 29 U.S.C. § 255 (b) due to an alleged "willful" violation of the FLSA.

10% of the tips were taken from the poker dealers and given to cage personnel). Plaintiffs

contend that this 10% was improperly taken from them because they were not fully notified

about the Defendant's tip pool, and because certain employees were improperly included.

6.   Defendant explained that it employs three general categories of employees for its poker

operations: poker dealers, floor managers, and cage department employees. It is the third

category of employees, the "cage department," that are the beneficiaries of the Defendant's tip

pool.  Those employees each receive a share of the 10% poker dealers' tip pool contribution. *See*

Trial Tr. vol. 1, 41:4-42:8.

7.   Plaintiffs do not contest Defendant's testimony regarding these categories. Rather,

Plaintiffs contend that the cage department employees are further divided into more specific and

discrete jobs based on the specific duties they perform. *See* Trial Tr. vol. 1, 118:6-23 (Plaintiff

Greenstone testified that "every person was different" and that "there was people that were –

they're primarily chip runners"). Defendant vigorously contested this characterization and

argued that all cage department employees essentially perform the same jobs, and that certain

more experienced cage employees had an additional duty of working in the "vault".

**B) The "tippable" status of cage department employees.**

**1) Cage department employees generally.**

8.   Plaintiffs' characterization of the cage department employees as discrete positions was

countered by witness testimony of multiple witnesses that demonstrated that all cage department

employees essentially perform the same three duties. *See* Trial Tr. vol. 1, 72:1-4 (Jason Bendure

testified that cage employees work at the podium, as chip runners, as tellers, and some more

experienced and trusted cage employees work in the vault); *and* 169:22-170:10 (Vicki Pernek

testified that cage department employees serve three basic job functions: chip runners, teller

position and podium position. Some cage department employees also work in the vault in addition to those three responsibilities). The evidence supported the contention that all cage employees perform these three job duties and that while performing these duties regularly interacts with customers. Trial Tr. vol. 1, 180:20-184:25 (Vicki Pernek testified that these employees regularly interact with customers and receive tips); Trial Tr. vol. 1, 196:7-20 (Vicki Pernek testified that everyone that worked in the vault also work as tellers, at the podium, and ran chips); Trial Tr. vol. 2, 27:1-14, (Phil Faso testified that cage department employees perform duties including chip running, teller, and podium duty, and vault workers do all three). It is also clear that everyone that performs these three basic job functions customarily and regularly receive tips performing these functions. *See* Trial Tr. vol. 1, 83:17-85:18 (Jason Bendure testified that chip runners receive tips and place them in tip boxes on their chip cart, that podium workers receive tips, and that tellers receive tips at a tip box next to the teller window), 88:2-11 (Jason Bendure testified that the cage employees customarily and regularly receive tips), 175:23-176:3 (Vicki Pernek testified tips are customarily given to chip runners, podium workers, and tellers) *and* 180:14-185:3 (Vicki Pernek testified chip runners, podium workers, and tellers are regularly tipped and regularly interact with customers).

9. In addition, Ocala Poker's office manager, Marsha Kelso, testified that all the cage department employees customarily and regularly received more than $30 a month in tips. *See* Trial Tr. vol. 2, 52:4-9. She further testified that these tips were separate from tips received from the tip pool. *Id.* In fact, she conducted a historical analysis of the cage employee tip history and found only six instances where cage department employees did not receive $30 a month in tips independent from the tip pool with the poker dealers, and in each of those instances the employee failed to work a full 28-day period. Trial Tr. vol. 2, 52:4-6, *and* 57:5-58:12.

4

**2) Cage department employees working in the vault.**

10. The testimony of multiple witnesses further demonstrated that certain cage department employees also worked in the vault. *See* Trial Tr. vol. 1, 72:1-4 (Jason Bendure testified that cage employees work at the podium, as chip runners, as tellers, and some employees work in the vault), *and* 169:22-170:10 (Vicki Pernek testified that cage department employees serve three basic job functions: chip runners, teller position and podium position. Some cage department employees also work in the vault in addition to those three responsibilities). Jason Bendure's testimony was especially compelling on this point as he is employed by Defendant in this position. *See* Trial Tr. vol. 1, 63:11-16. Although he sometimes characterized himself as a "vault person" rather than a "cage department employee," his testimony was clear that his job required that he perform all the various job functions related to different areas of the cage department. Notably, Bendure testified that when he is in the vault while customers are present, he is still expected to act as a teller and leaves the vault throughout the day to work as a teller.  In fact, the vault door is frequently left open so he can walk back and forth. *See* Trial Tr. vol. 1, 73:1-75:1, *and* 91:14-92:5.  Moreover, he testified that a "bank" is opened for him during his entire shift so he can act as a teller during his shift. *See* Trial Tr. vol. 1, 74:1-75:1. Many times during a shift he is the only person available to serve as both the vault and teller person. *See* Trial Tr. vol. 1, 75:2-21. He is essentially "wearing two hats" at this time, and is expected to be able to come out of the vault and interact with customers even when physically standing in the vault. *See id.* He is also responsible for going out on the poker floor and relieving other cage department employees that go on break. *See* Trial Tr. vol. 1, 76:7-19. The only time he is exclusively in the vault is when customers are gone, which accounts for roughly 30 to 45 minutes of his day. *See* Trial Tr. vol. 1, 72:11-21, *and* 75:22-76:2.

11. Plaintiffs offered no evidence to contest this testimony other than their own testimony. Essentially, the Plaintiffs asserted that the vault workers were not spending much time with customers. Specifically, Plaintiff Greenstone provided that he "didn't see [Mr. Bendure] that much" and that he was "[m]ainly in the vault[.]" *See* Trial Tr. vol. 1, 98:9-99:13. Plaintiff Howard had little to say about the level of customer interaction of cage department employees, and in fact conceded that vault people at the teller window would get tipped for their work. *See* Trial Tr. vol. 1, 163:1-164:8.

12. The evidence presented by Plaintiffs was at best vague and self-serving and failed to raise any real dispute over the fact that every cage employee regularly interacted with customers and received tips. Importantly, Plaintiffs provided no testimony whatsoever to rebut the testimony of Marsha Kelso that conclusively showed that each employee that works in the cage regularly received tips in excess of $30 a month independent of the tips received from the poker dealers.

**C) The "employer" status of cage department employees working in the vault.**

13.  Plaintiffs contend that Bendure and certain other cage department employees were "employers" and were therefore improperly included in the tip pool. Specifically, Plaintiffs' contended that Jason Bendure and Kathleen Danielson, and certain other cage department employees with vault access were "supervisors," and therefore should not have been included in Ocala Poker's tip pool. *See* Trial Tr. vol. 1, 98:9-99:13, 126:21-23 (Plaintiff Greenstone testified that Bendure was a "supervisor of, like, all the chip runners" and "was mainly in the vault in the cage area") *and* 132:9-16 (Plaintiff Howard testified Bendure was a "vault supervisor" and that "if I ever had a problem with a trip [sic] runner when I was flooring, or there was a problem with – that he would take care of it for me").

14. The evidence is clear, however, that during all times relevant to this action none of these employees had any authority to hire, fire, discipline, or set pay rates of employees except for Brian Matthews. *See* Trial Tr. vol. 1, 204:15-205:2, 205:11-206:9 (Brian Matthews testified only he could hire and fire employees) 191:8-15 (Vicki Pernek testified that only Matthews could hire and fire employees and set their wages) *and* Trial Tr. vol. 2, 10:13-11:14 (Phil Faso testified floor managers could be called supervisors but could not hire and fire employees. Instead Matthews was the one that would "take action"). Specifically, neither Bendure nor Danielson ever had the ability to hire, terminate, or set rates of pay for any employees. Neither employee could do nothing more than make a recommendation to their superiors regarding same.  Finally, neither individual had any ownership interest in Ocala Poker, *See* Trial Tr. vol. 1, 77:1-78:12 (Jason Bendure testified he was once called a supervisor but did not have any ability to hire and fire employees or set their wages, which was also true of Ms. Danielson); 190:1-15 (Vicki Pernek testified that nobody working in the cage had any managerial authority); *and* 192:1-193:4 (at one time Ms. Danielson assisted Ms. Pernek in drafting work schedules for employees, but Ms. Danielson never had any authority to hire or fire employees, set their wages, or discipline them). This is something that Plaintiffs themselves do not appear to contest. *See* Trial Tr. vol. 1, 164:9-16 (where Plaintiff Howard testified Bendure could not hire, fire or set wages and Bendure never had an ownership interest in Ocala Poker).

15. Although there appears to be some evidence that people that work in the vault were called "supervisors" at one time, the evidence is clear that these people never in fact had any real supervisory or managerial authority. *See* Trial Tr. vol. 1, 77:1-17 (Jason Bendure testified he was "called a supervisor" but "I've never been formally given that title" by Matthews who is the only "person that appoints [employees] there"); *and* 189:18-190:11 (Vicki Pernek testified that vault

workers are not supervisors despite that word being used in the past). Moreover, even the department managers, Faso and Pernek were not "employers" in that did not have the authority to hire, terminate or set employee wages without first receiving approval from Matthews. *See* Trial Tr. vol. 1, 190:12-15, 191:8-15 (Vicki Pernek testified she did not have authority to hire and fire or set employees' wages, that was reserved for Brian Matthews) *and* Trial Tr. vol. 2, 10:13-11:14 (Phil Faso testified floor managers may have been called supervisors but could not hire and fire employees. Instead Brian Matthews was the one that would "take action."). Regardless none these department managers shared in the tip pool during the relevant time period. *See* Trial Tr. vol. 1, 191:20-25 (Vicki Pernek testified she was involved in the tip pool but that stopped in September, 2010) *and* vol. 2, 17:22-24, *and* 39:18-40:10 (Phil Faso testified that he did not ever receive anything from the tip pool, but used to contribute to it until 2013 when he was instructed to stop by Brian Matthews).

16. Plaintiffs only provided vague evidence that some cage department employees had some special authority, yet none of this evidence amounted to anything substantive. For example, Plaintiffs established that Danielson may have signed "tax documents" like "W-2Gs," but Plaintiffs failed to demonstrate what these documents were or how the forms would have demonstrated any kind of managerial authority over other employees. *See* Trial Tr. vol. 1, 68:13-69:3. Additionally, Plaintiffs offered evidence that Ms. Danielson may have signed "cage-short agreements," but again Plaintiffs failed to indicate how these agreements alone established that they had managerial or supervisory authority over other employees. Trial Tr. vol. 1, 69:4-25. There was evidence that Bendure and Danielson occasionally helped train new cage department employees to learn their job duties. *See* Trial Tr. vol. 1, 68:13-18, 78:13-16 (Jason Bendure testified that he and Danielson would occasionally help to train chip runners). However, it is

clear that this training was not due to any kind of supervisory or managerial position, but was instead because these employees were the most experienced and therefore most familiar with how to perform these specific job functions. *See* Trial Tr. vol. 1, 78:17-79:10 (Jason Bendure testified that it was not unusual for any cage employee that has been there for a while to help train new employees). Accordingly, it appears that whatever "training" Bendure and Danielson provided to new employees, it was typical on-the-job training that any more experienced employee would be expected provide to a new employee.

17. Finally there was evidence that Danielson may have occasionally helped Vicki Pernek draft work schedules for employees. *See* Trial Tr. vol. 1, 190:25-193:4. But it was also clear that whatever contributions Danielson made were limited and that Vicki Pernek ultimately had to approve the proposed final schedule. *See id.*

**D) Notice of § 203(m).**

**1) Notice of the Tip Credit.**

18. Plaintiffs and Defendant agree that Plaintiffs were fully informed of the provisions of the **tip credit**.[4] Specifically, Greenstone conceded that he was always aware of the hourly wage he would receive from the large print on the federal posters that were displayed near Ocala Poker's time clock. *See* Trial Tr. vol. 1, 97:11-15, 102:13-103:7. He also knew about his hourly pay from his pay stubs. *See* Trial Tr. vol. 1, 110:8-14. He understood, at all times he worked, that he received a lower minimum wage because Ocala Poker claimed a tip credit. *See* Trial Tr. vol. 1, 125, ll. 9-23. He also understood that he was able to "make up that difference" in tips. *See id.*

---

[4] As previously stated by this Court, there is a distinction between the "tip credit" and the "tip pool." "While the two terms are interrelated, they have separate and distinct meaning and requirements." *See* Doc. 81, p. 4 n. 1. The distinction between the two will be more fully discussed in the legal analysis below.

19. Similarly, Howard conceded that he was aware of his tipped hourly wage while he was working from his pay stubs. *See* Trial Tr. vol. 1, 150:15-151:7. In addition, Plaintiff Howard confirmed that at all times he worked with Ocala Poker he understood how the tip credit worked. *See* Trial Tr. vol. 1, 158:25-159:16 (Howard testified that he understood how the tip credit worked, but did not understand where his tip share contribution would go because "[t]en percent of my money was just gone.")

20. In regards to the employee rights posters, it is undisputed that Defendant prominently displayed federal and state employment posters as indicated by Defendant's Exhibits 3-8. *See* Trial Tr. vol. 1, 195:6-15, 203:14-23, *and* 216:10-220:25 (Brian Matthews testified as to the use of these posters). Matthews testified the Defendant would annually purchase these posters from a vendor to stay current. *See id.* and Trial Tr. vol. 1, 228:9-12. Exhibits 5-8 indicate the Florida regular and tipped minimum wage for 2013, 2014, 2015, and 2016. *See* Exhibits 5-8. Exhibit 4 indicates the federal regular and tipped minimum wage for all dates after 2009. *See* Exhibit 4. Plaintiffs did not contest that these posters were displayed and remained current during their employment. *See* Trial Tr. vol. 1, 101:8-17, 102:9-103:4 (Greenstone conceded he saw the employment posters and noticed the minimum wage rates), *and* 158:15-24 (Howard testified that he saw that posters changed "from time to time" and that is how he would know if there was any wage change for a year).

21. In regards to the explanation of the FLSA tip credit, Brian Matthews testified that Ocala Poker prominently displayed a poster containing a section entitled "Employees' Rights under the Fair Labor Standards Act." *See* Trial Tr. vol. 1, 216:10-18. This section contained a subsection which explained the FLSA "tip credit" as follows:

> Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage

> obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

*See* Exhibit 4. The section of the poster also notably indicates at the bottom right hand corner: "WHD Publication 1088 (Revised July 2009)." Mr. Matthews testified that he never noticed any change concerning the FLSA poster's summary of the tip credit. Trial Tr. vol. 1, 221:1-4.

**2) Notice of the Tip Share and Tip Pool.**

**a) Knowledge of the tip pool's existence and the retention of tips.**

22. In regards to understanding the tip share and tip pool program, there does not appear to be any dispute that Plaintiffs understood at least some aspects of Ocala Poker's tip share and tip pool.

23. Plaintiffs admit that they understood that a portion of their tips were withheld to compensate other employees. *See* Trial Tr. vol. 1, 97:2-7 (Greenstone testified that he was told that Ocala Poker was "taking out eight percent of our tips. And they didn't go into too much detail about it, **just that chip runners and people that helped us**, we [sic] get a share of it" (emphasis added)) *and see* 158:25-159:18 (Howard testified that he knew ten percent of his tips were taken out and he knew how much the tip share but that "[t]en percent of my money was just gone.")

24. It is also clear that Plaintiffs understood that they were able to retain all of their tips except those that were taken out as part of the tip share. Specifically, Brian Matthews testified that during every shift a poker dealer would work the dealer would have a tip box where he or she was required to place all the tips received. *See* Trial Tr. vol. 1, 53:1-12. At the end of the shift the poker dealer would take the tip box to the "tip out room" where their tip boxes were opened by another Ocala Poker employee and counted while being monitored by the dealer and a

video camera. *See* Trial Tr. vol. 1, 53:15-17, *and* 54:17-57:18. The total value of tips Plaintiffs

were able to retain would be recorded on a "tip slip" along with the value of the tip share that

would be contributed to the tip pool. *Id.* Both Plaintiffs concede this was always done at the end

of every shift they worked at Ocala Poker and through that process they always understood the

value of the tip share they would contribute to Ocala Poker's tip pool. *See* Trial Tr. vol. 1,

108:12-109:10 (Greenstone reviewed tip slip and understood how much he contributed to tip

pool on particular day), *and* 141:14-142:20 (Howard reviewed tip slip and understood how much

he contributed to tip pool on particular day). While the Plaintiffs apparently concede they

understood their tip share contribution, they contend they did not know where the money went

after the ten percent was deducted. Trial Tr. vol. 1, 97:2-7, *and* 158:25-159:18.

**b) Knowledge about the participants in the tip pool.**

25. Plaintiffs allege they were not sufficiently instructed about who the beneficiaries of the

tip pool were, and why these employees were allowed to receive a portion of Plaintiffs' tip share.

Specifically both Plaintiffs testified that they did not know who was in the tip pool. *See* Trial Tr.

vol. 1, 111:22-25 (Greenstone testified that "I mean honestly, I – I don't know where the ten

percent went. I knew chip runners get a portion of it. And the rest I didn't know. I mean, I was

just happy to make good money"); 157:24-158:10 (Howard testified that "I had ideas, but no one

ever told me" who was in the tip pool).

26. In regards to the identity of the participants of the tip pool, the Defendant provided

conclusive evidence that the Plaintiffs were informed of the employees involved in the tip pool

by providing them a copy of the Ocala Poker Dealer Handbook ("Handbook"). *See* Defendant's

Exhibit 9. The Handbook was prepared by Phil Faso, and distributed to Ocala Poker's employees

in February or March of 2013. *See* Trial Tr. vol. 2, 24:2-8, 41:23-42:8 (where Faso testified he

prepared the handbook and explained the dates he distributed it). Paragraph 19 of the Handbook

explains the tip pool and its participants as follows:

> All dealers will place tips in a locked numbered box, which will be emptied at the end of each shift by either a cage or poker room supervisor. A tip share of ten percent will be deducted from all dealer tips to be distributed to the cage personnel, not including full-time supervisors. This does not mean the cage personnel work for you. They are to be treated with the same respect as any other customer.

*See* Defense Exhibit 9, p. 4, ¶ 19.

27. Despite both Plaintiffs maintaining that they did not know who was in Ocala Poker's tip

pool, they both conceded that they received a copy of the Handbook. Trial Tr. vol. 1, 119:25-

121:17 (Greenstone admitted that "I did receive the handbook" and that his signature on a sign in

sheet indicates that he did), *and* 159:19-160:17 (Howard testified same). The Handbook clearly

describes Ocala Poker's tip pool and stated the cage department employees would receive the

poker dealers' contributions to the tip pool. *See* Defense Exhibit 9, p. 4, ¶ 19.

28. In addition even prior to the distribution of the Handbook, there is compelling testimony

that Plaintiffs were at least informed of the tip pool's participants at a meeting in 2010.

Specifically, the Plaintiffs and the Defendant's witnesses have testified that in 2010 Ocala Poker

management held a meeting where they explained that the tip share poker dealers would

contribute to the tip pool would increase from eight to ten percent. *See* Trial Tr. vol. 1, 51:9-19

(Brian Matthews testified that in 2010 he held a meeting with poker dealers where he explained

the tip share to the Plaintiffs), 117:18-19 (Greenstone testified that there was a meeting in 2010

where it was explained to him and the other poker dealers that his tip share would increase from

eight percent of his tips to ten percent), 131:12-132:2, 156:5-157:23 (Howard testified there was

a meeting held "[w]hen they were going from eight percent to ten percent taken out" but that no

one ever explained where the money would go), 193:5-18 (Vicki Pernek testified that she attended a meeting in 2010 where Ocala Poker was increasing the tip share from eight to ten percent and that they were told Ocala Poker was taking management out of the tip pool), 212:17-214-15 (Brian Matthews testified that he held an hour long meeting in 2010 where he explained that cage employees were receiving proceeds from the tip pool because, although they are regularly tipped, they do not receive the same amount of money as the poker dealers), 221:10-19 (Brian Matthews testified that because Ocala Poker was changing the tip pool he felt he had to notify the poker dealers of the changes), *and* Trial Tr. vol. 2 22:5-24:1 (Phil Faso testified that Ocala Poker had a meeting in 2010 where it was explained that they were increasing the tip share from eight to ten percent, that they were taking floor managers out of the tip pool, that the tip pool would be limited to cage department employees, and that they were receiving tips because although they were tipped they were not making as much money as the poker dealers).

29. The Plaintiffs and Defendant disagree, however, on what else was said during the meeting. Defendant's witnesses state that at the 2010 meeting the Plaintiffs received a comprehensive explanation of the tip pool and who would participate. *See* Trial Tr. vol. 1, 51:9-19, 193:5-18, 212:17-214-15, *and* Trial Tr. vol. 2, 22:5-24:1. Both Plaintiffs contend however that while they did attend the meeting, the poker dealers were not told about the participants of the tip pool and were only told the tip share would increase from eight to ten percent. *See* Trial Tr. vol. 1 (Howard testified that the 2010 meeting "was not about that" and argued that "[i]t was all about why are they going from eight percent to ten percent. And every dealer is saying, Why are we doing this?") *and* 117:13-118:5 (Greenstone testified that at the 2010 meeting "it wasn't explained to me" that managers would be removed from the tip pool).

30. Despite the Plaintiffs' testimony, however, it is difficult to conceive that the Ocala Poker management would remain silent when asked directly (as testified by Howard) "Why are we doing this?" and would not offer any justification whatsoever as to the cage department receiving the poker dealers' tips. Accordingly, Mr. Matthews's testimony that "I told them – I said, The cage personnel is on the floor, they're helping you guys to do your jobs.  And I said, Although they get regularly tipped, they don't receive the sizeable tips that the dealers make" seems far more likely than the Plaintiffs memory of that meeting. *See* Trial Tr. vol. 1, 212:1-214:15. Moreover, since one of the main reasons for the change of the tip pool which spurred the 2010 meeting was due to concerns regarding the involvement of management in the tip pool, it confounds reason that Ocala Poker would have totally neglected to talk about this aspect of the tip pool. *See* Trial Tr. vol. 1, 202:3-203:3, *and* 221:10-16 (Brian Matthews testified that Ocala Poker changed its tip pool because of a case in South Florida that held that managers could not be involved in tip pools). The fact that the Handbook which was distributed in 2013 made particular mention that managers were not included in the tip pool corroborates the fact that it would have also been mentioned at the 2010 meeting

31. Next Plaintiffs make a technical argument that the Defendant failed to adequately inform the Plaintiffs as to **why** the cage department employees were allowed to receive the poker dealers' tip share. Specifically, Plaintiffs testified that they were never instructed that Ocala Poker's tip pool "was supposed to be limited to employees who customarily and regularly received tips[.]" *See* Trial Tr. vol. 1, 126:4-13 (Greenstone testified no one ever told him "the tip pool was supposed to be limited to employees who customarily and regularly received tips") *and* 132:15-23 (Howard testified same). Accordingly, Plaintiffs apparently contend this failure alone

renders the tip credits Defendant claimed invalid and argues that Defendant is liable for damages because of it.

32. Even though Plaintiffs' argument legally fails because neither the statutes or regulations require such a highly technical notification requirement (as will be discussed in greater depth below), it is  clear that based on fair evaluation of the evidence Defendant has shown that Plaintiffs were adequately informed **why** cage department employees were able to receive the poker dealers' tip shares.

33. The testimony of Phil Faso is especially probative on this point. At the time of the 2010 meeting Phil Faso was employed by Ocala Poker as a poker dealer/dual rate similar to Howard. *See* Trial Tr. vol. 2, 41:2-22. Like both Plaintiffs, Faso (as a poker dealer) contributed ten percent of his tips as a tip share. Accordingly, he has the same motivation as both Plaintiffs in ensuring that he received the proper FLSA notice since, like Plaintiffs, he contributed his tips to the tip pool. However, Faso confirmed Matthews testimony that he spoke about Ocala Poker changing the tip pool program, explaining that the cage department would be receiving the tip share, and also explaining that cage department employees, although tipped employees, did not receive as much in tips as poker dealers. *See* Trial Tr. vol. 2, 22:8-24:1. Specifically, Faso testified:

> Q. Okay. And did Mr. Matthews explain at that time the change in the tip pool?
> A. Yes.
> Q. Okay. Will you tell the court what he told everybody?
> A. He said that the – **the tip pool was then going to no one but the cage personnel. And the – it would be 10 percent going to the – cage personnel.**
> Q. Okay. Did he say why the cage personnel were going to get – share in the tip pool?
> **A. Because they didn't make as much as the dealers did.**
> **Q. Okay. Did he talk about them getting tips also?**
> **A. Excuse me?**
> **Q. Did he talk about them getting tips also?**
> **A. The cage personnel?**

> **Q. Yes, sir.**
> **A. Yes.**
> Q. Okay.
> A. Nowhere near as much as the dealers.

*See* Trial Tr. vol. 2, 23:9-24:1 (emphasis added).

34. Notably Faso's testimony is similar to Vicki Pernek's recollection of this meeting. *See* Trial Tr. vol. 1, 193:14-18.

35. Moreover, this information also conforms to Faso's testimony that he was aware of Ocala Poker's tip pooling program throughout his employment. *See* Trial Tr. vol. 2, 14:5-15:7, 16:9-14 (Faso testified that "[t]he cage personnel do receive tips from customers, [b]ut they don't have as – as much of an opportunity to receive the tips as the poker dealers do"); *and* 18:4-8 ( Faso testified that the cage personnel interact with customers on a daily basis). Specifically, Faso testified that he always understood who was receiving a portion of his tips and why the cage employees were getting a portion. *See* Trial Tr. vol. 2, 26:6-25.

36.  It is particularly difficult to believe the Plaintiffs were ignorant about why cage department employees were involved in the Ocala Poker's tip pool in light of other facts unique to each. For example, Howard at one time lived with Bendure, whom he now contends worked exclusively in the vault. *See* Trial Tr. vol. 1, 134:4-8. Notably, Bendure testified that Howard would complain to him about the tip pool and having to contribute to it. *See* Trial Tr. vol. 1, 81:4-5. It is dubious that Howard would have lived with Bendure for that period of time and complained to him about Ocala Poker's tip pool, but stayed entirely oblivious as to the manner it was run, who was received the tip pool, and why. Howard's testimony is particularly difficult to reconcile with these facts.

37. In addition, Greenstone conceded that he previously dated someone that worked in Ocala Poker's cage department (although he did not use Defendant's term "cage department" but

instead described her as a "chip runner" and "poker dealer"). *See* Trial Tr. vol. 1, 127:12-18. Like Howard, it is difficult to reconcile that Greenstone dated someone that worked in the cage department, but did not understand that these employees benefitted from the tip pool. Moreover, it is difficult to reconcile that Greenstone would be ignorant that the person he was dating would not regularly receive tips and interact with customers while performing her job duties in the cage department. Accordingly, his testimony on this point is unpersuasive.

**3) The Defendant's reliance on previous policy of the Department of Labor.**

38. Defendant also provided compelling evidence to indicate that it relied heavily on prior Department of Labor policy to ensure that its employees were informed of relevant provisions of the FLSA. Specifically, Brian Matthews testified that since Ocala Poker has been open it has purchased employment posters in order to adequately inform its employees of their employment rights. *See* Trial Tr. vol. 1, 194:24-195:5, 203:17-204:3 *and* Defense Exhibits 4-8. Matthews testified that he never noticed any difference from year to year regarding the information in any in the posters relating to the FLSA tip credit. Trial Tr. vol. 1, 221:1-4.

39. Matthews also testified that it is common practice in the Defendant's industry to rely on these posters to ensure that employees are adequately informed of their employment rights. *See* Trial Tr. vol. 1 203:4-16, 204:1-11 (Matthews testified to visiting other poker facilities, seeing similar FLSA posters and not hearing about any potential issue with an inadequacy of notice). Even Plaintiffs conceded that these posters were displayed in other poker facilities that they worked in. *See* Trial Tr. vol. 1, 137:2-138:9 (Howard testified that a previous poker employer displayed posters similar to the ones displayed at Ocala Poker) 139:15-21, 165:13-18 (Plaintiff testified his current employer displays posters similar to the ones displayed at Ocala Poker) *and* Trial Tr. vol. 1, 115:25-116:6 (Greenstone testified a previous poker employer displayed similar

posters). It was not until this lawsuit that Mr. Matthews became aware of an assertion that Ocala Poker might have to supplement the annual poster with additional information in order to comply with the FLSA. Trial Tr. vol. 1, 204:8-11.

40. Matthews also testified that he never received any communication from the Department of Labor (*see* Trial Tr. vol. 1, 50:20-24, 221:5-9), or poster supply vendors (*see* Trial Tr. vol. 1, 228:13-229:4), or any other poker room (*see* 50:10-19, 204:8-11) that anything different was required of Ocala Poker.  Ocala Poker simply had no notice of an intervening change of law that would render Defendant's employment posters inadequate.

## II. CONCLUSIONS OF LAW

**A) § 203(m) and the Tip Credit.**

41. For all times relevant to this action, federal law required that (unless otherwise provided) every employer pay its employees "wages" at $7.25 an hour. *See* 29 U.S.C. § 206(a). 29 U.S.C. § 203(m) defines "wage" as:

> "Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees: Provided, That the cost of board, lodging, or other facilities shall not be included as a part of the wage paid to any employee to the extent it is excluded therefrom under the terms of a bona fide collective-bargaining agreement applicable to the particular employee: Provided further, That the Secretary is authorized to determine the fair value of such board, lodging, or other facilities for defined classes of employees and in defined areas, based on average cost to the employer or to groups of employers similarly situated, or average value to groups of employees, or other appropriate measures of fair value. Such evaluations, where applicable and pertinent, shall be used in lieu of actual measure of cost in determining the wage paid to any employee. In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

42. Although 29 U.S.C. § 206(a) requires the hourly wage described above, § 203(m) provides an exception. Specifically, when an employee is a "tipped employee," the employer may count a portion of the tips received by the employee as satisfying a portion of the employer's obligation to pay the "wages" of $7.25 required by 29 U.S.C. § 206(a). This is known as the employer claiming a "tip credit."

43. The process of claiming a tip credit is described by § 203(m) beginning with the last sentence of the first paragraph. It provides that, if an employee is a tipped employee, an employer may use the tips retained by the employee to satisfy the employer's wage obligations as long as the employer still pays a direct hourly wage to the employee as "required to be paid such an employee on August 20, 1996[.]"[5] If the amount of tips made by the employee does not make up the difference between $7.25 and $2.13, the employer must provide further direct

_____

[5] As of August 20, 1996, this was defined as $2.13 an hour and has remained the same ever since.

compensation to ensure that regardless of the amount of tips collected by a tipped employee, the employee makes at least $7.25 an hour.

44. There are further conditions and exceptions to the tip credit. Specifically, the last paragraph of § 203(m) states that, beyond the requirement that the employer ensure that its tippable employee make the statutorily required wage, the employer must comply with two additional conditions. First, the employee must be allowed to "retain" his tips.

45. The "right to retain tips" is limited by an additional qualification: that an employer may split tips with other tippable employees through a "valid tip pool." Therefore, proceeds received as a result of a valid "tip pool" are not deemed "retained" by the employee initially receiving the tip, but instead by the employee that ultimately receives the tip.

46. Second, in order to claim the "tip credit" the employee must be "informed by the employer of the provisions of this subsection."

47.  During this case, Defendant has referred to the additional conditions and exceptions of § 203(m) as the "hanging paragraph." This characterization is appropriate since, looking only at the statute's language, it is unclear exactly how the paragraph is intended to relate to the remaining provisions of § 203(m). *See Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 681 (D. Md. 2012) (noting that § 203(m) is awkwardly worded); *see also*, *In re. Graupner*, 537 F.3d 1295, 1302 (11th Cir. 2008) (which characterized a similar paragraph as a "hanging paragraph").

**B) The "tippable" status of the cage department employees.**

**1) All the cage department employees are regularly and customarily tipped employees.**

48. The FLSA defines a customarily and regularly tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips."

29 U.S.C. 203(t). Although whether an employee is a customarily tipped employee may depend in some instances on whether the employee "performs important customer service functions [and] the employee have more than *de minimis* service interaction with customers" (*see Wacjman v. Investment Corp. of Palm Beach,* No. 07-80912-CIV, 2008 WL 783741, at *3 (S.D. Fla. March 20, 2008)) if an employee receives $30 a month in tips **directly** from the customer, they are a tipped employees under the FLSA. *See Manning v. St. Petersburg Kennel Club, Inc.*, No. 8:13-cv-3060-T-36MAP, 2015 WL 477364, at *2 (S.D. Fla. Feb. 5, 2015)("Critically, the undisputed evidence reveals that the cashiers employed at Derby Lane customarily and regularly receive more than $30 a month in tips **directly** from the customer, thus qualifying as "tipped employees under the FLSA"(emphasis added)).

49. In *Wacjman* the court evaluated whether the tipped employee reached the $30 a month threshold without any evidence of directly receiving tips from customers. *Wacjman*, 2008 WL 783741, at *2 ("For purposes of making the $30/month statutory threshold calculation, it is not necessary that the employee receive the tips directly from the customer … [in such cases] the focus is properly drawn to the question of whether the employee performs important customer service functions"). The *Wacjman* court noted that "there [was] no evidence tending to show that the floor supervisors were engaged in services on the floor that were likely subject of tipping" and concluded that without requiring some level of customer interaction an employer could make an otherwise un-tippable position (with no customer interaction) tippable simply by forcing other tippable employees to hand over their tips to the un-tippable position. *See id.* at *3-4 ("Stretched to its illogical extreme, this view would permit any employee with something more than *de minimis* customer contact to qualify as a 'tipped employee' under § 203(t). This result would

render meaningless the statutory requirement that a 'tipped employee' be engaged in an 'occupation' that 'customarily and regularly' receives tips.")

50. This is distinguishable from circumstances where the employee receives tips of $30 a month **directly** from customers; in such instances an analysis of the quality of interaction is not needed because to do so would stray from the language of the statute. *See Palacios v. Hartman and Tyner, Inc.*, No. 13-CIV-61541, 2014 WL 7152745, at *6 (S.D. Fla. Dec. 25, 2014) ("*Wacjman* did not purport to make [customer interaction] a requirement in every case. [To do so] would essentially require[] the Court to modify the language of the statute, adding a customer service requirement" (emphasis added)) *and Manning*, 2015 WL 477364, at *3 ("[B]ecause [the defendant's] cashiers are 'tipped employees' under the FLSA, [the Plaintiff's] characterization of their job duties is irrelevant").

51. Here, the testimony of Marsha Kelso (Defendant's office manager responsible for evaluating the Defendant's pay records) conclusively shows that all the employees that work in cage department, including those that work in the vault, received over $30 a month in tips directly from customers independent from the value of tips received from poker dealers. *See ¶ 9* above. The Plaintiffs provided no evidence disputing this finding, and accordingly all the participants of Ocala Poker's tip pool were tipped employees.

52. Even if the evidence did not conclusively show they received $30 a month directly from customers (and not from the tip shares of poker dealers), the evidence also clearly demonstrated that every employee in the cage department, including those that also worked in the vault, have far more than a *de minimis* interaction with customers. *See ¶¶ 8 and* 10 above. Plaintiffs' conclusory proclamations that they did not regularly see some employees on the poker floor is not enough to contradict the unrefuted evidence that everyone in the cage department regularly

interacted with customers and regularly received more than $30 a month in tips. *See ¶¶* 8-10

above. Accordingly, judgment on this issue is for the Defendant.

### 2) None of the cage department employees are "employers" under the FLSA.

53. The forced sharing of tips with "employers" is an illegal practice that would invalidate the

tip pool regardless of whether the members of management are engaged in services that could be

the subject of tipping. *See Wacjman,* 2008 WL 783741, at *3 & n.1. An employee who exercises

"operational control" over the day to day operations is an "employer" under the FLSA.[6] *See*

*Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008). To

qualify as an "employer," courts analyze whether the alleged employer controls the hiring and

firing of employees, the manner work is performed, and fixing employees' wages. *See Dole v.*

*Continental Cuisine, Inc.,* 751 F. Supp. 799, 802-03 (E.D. Ark. Sept. 28, 1990); *see also*

*Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 176 (D.D.C. 2011).

54. The evidence presented by all of Defendant's witnesses and Jason Bendure, called by the

Plaintiffs, overwhelmingly demonstrates that none of the tipped cage employees was an

"employer" under the FLSA. *See ¶* 14 above. Specifically, the evidence demonstrated only

Defendant's president, Brian Matthews, had the ability to hire or fire employees or set the rate of

compensation for employees. *See id*. Plaintiffs presented no evidence disputing this, but instead

presented evidence of clerical work on business or tax documents or mundane business practices

to support the speculation that certain cage department employees may have been "supervisors"

to other employees at Ocala Poker. *See ¶* 16 above.

55. Nothing Plaintiffs submitted in evidence convincingly demonstrates that any cage

department employee that participated in Ocala Poker's tip pools could be characterized as an

---

[6] Section 203(d) defines an "employer," as "any person acting directly or indirectly in the interest of an employer in relations to an employee. . . ." 29 U.S.C §203(d).

employer because of a title of "supervisor" or "manager". *See ¶¶* 14-17 above. The evidence

offered by Plaintiffs did not demonstrate the "operational control" required to be an "employer"

because none of the beneficiaries of Ocala Poker's tip pool had the authority to hire, fire, suspend,

discipline, or set the rate of pay of employees. *See ¶* 14 above. Moreover, none of these

employees retained any ownership interest in Defendant. *See id*.[7]

**C) Ocala Poker's duty to inform.**

**1) The Plaintiffs' contention.**

56. The Plaintiffs' next claim that the Defendant failed to adequately inform them of the

"provisions" of § 203(m) because it did not sufficiently communicate certain specific phrases

required by a 2011 regulation promulgated by the Department of Labor. *See, e.g.*, Trial Tr. vol.

1, 225:20-228:3 (Plaintiffs' counsel asked Brian Matthews how could the Defendant have

complied with the regulation's requirement that employees involved in Ocala Poker's tip pool

were limited to "regularly and customarily tipped employees" if the regulation had not yet been

promulgated); 126:4-13 (Greenstone testified no one ever told him "the tip pool was supposed to

be limited to employees who customarily and regularly received tips") *and* 132:15-23 (Howard

testified to the same). According to Plaintiffs, the Defendant's ignorance as to the existence of

this regulation is fatal, and the Defendant is liable for damages because of it. *See id.*, Trial Tr.

vol. 1, 45:22-50:6 (where Plaintiffs' counsel questions Matthews about when he discovered the

existence of the regulation).

**2) The statutory language of § 203(m)'s duty to inform.**

---

[7] Although it is not at issue here, it is also noteworthy that Plaintiffs have failed to prove that even certain department mangers (for e.g., Ms. Pernek and Mr. Faso) had enough responsibilities to have adequate "operational control" in order to qualify as an "employer" under the FLSA. As noted above, none of the department managers could hire, fire, discipline, or set the rate of pay of employees. *See ¶* 14 above.

57. The duty to inform is contained in § 203(m)'s hanging paragraph, and provides that a tip credit is not valid unless an employee is "informed by the employer of the provisions of this subsection." *See* 29 U.S.C. § 203(m). This is nonsensical. Because of the way the statute is structured, it is doubtful that the hanging paragraph itself can be characterized as the "provisions of this subsection."[8] Notably, the conditions contained in § 203(m)'s hanging paragraph do not define the tip credit, but instead provide limitations and conditions **related** to it. In this way, the hanging paragraph is more accurately described as "conditions" to the tip credit, rather than the "provisions" of it. *See Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 580-81 (9th Cir. 2010).[9] Specifically, in reviewing the hanging paragraph of § 203(m), the *Cumbie* court noted:

> Cumbie argues that under section 203(m), an employee must be allowed to retain all of her tips-except in the case of a "valid" tip pool involving only customarily tipped employees-regardless of whether her employer claims a tip credit….**However, we cannot reconcile this interpretation with the plain text of the third sentence, which imposes conditions on taking a tip credit and does not state freestanding requirements pertaining to all tipped**

---

[8] It is also worth noting that "provisions of this subsection" would obviously have to be more specific than **all** the provisions of § 203(m) since the initial paragraph deals such matters as the inclusion of costs related to boarding and lodging. No one appears to contend these provisions are included in the "provisions of this subsection" contemplated by the duty to inform.

[9] The Ninth Circuit's holding in *Woody Woo* has been substantially modified by *Oregon Restaurants And Lodging Ass'n v. Perez*, 816 F.3d 1080 (9th Cir. 2016). However, the only court in this circuit to review *Oregon Restaurants* has found it unpersuasive. *See Malivuk v. Ameripark, LLC*, No. 1:15-cv-2570-WSD, 2016 WL 3999878, at *4 (N.D. Ga. July 26, 2016); *see also Brueningsen v. Resort Express Inc.*, No. 2:12-CV-843-DN, 2016 WL 1181683 (D. Utah Mar. 24, 2016). Specifically, the court in *Malivuk* held:

> Even if the Court considered Plaintiff's argument regarding the DOL Regulation, the Ninth Circuit's decision is not binding on this Court, and **the Court also does not find [*Oregon Restaurants*] decision persuasive. The weight of authority holds the DOL Regulation is invalid under *Chevron*.** The Court agrees with the district court's opinion in *Brueningsen v. Resort Express Inc.* that [Oregon Restaurants'] reading and application of *Cumbie* **"is not persuasive, as it ignores the plain language of [S]ection 203(m) and of [*Cumbie*]."** …The *Cumbie* court found that Section 203(m) **only imposed a condition** on employers who take a tip credit, **rather than a blanket requirement on all employers regardless of whether they take a tip credit.**

*Id.* (emphasis added) (citations omitted).

> **employees.** A statute that provides that a person must do X in order to achieve Y does not mandate that a person must do X, period.
>
> If Congress wanted to articulate a general principle that tips are the property of the employee absent a "valid" tip pool, it could have done so without reference to the tip credit. **"It is our duty to give effect, if possible, to every clause and word of a statute."** …. Therefore, we decline to read the third sentence in such a way as to render its reference to the tip credit, **as well as its conditional language and structure, superfluous**.

58. The analysis above conforms to the Court's previous recognition that the **tip credit** and the **tip pool** are in fact separate and distinct concepts. *See* Doc. 81, p. 4 ("While the two are interrelated, they have **separate and distinct meaning and requirements**"). In regards to the requirements of the tip pool, it is valid if it is limited to other employees that regularly and customarily receive tips.

59. This distinction is bolstered by the Senate Report that accompanied the 1974 Amendments that explained:

> The amendment modifies Section 3(m) of the FLSA by requiring employer explanation to employees of the **tip credit provisions, and by requiring that all tips received be paid out to tipped employees**….The **tip credit provision** [] is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer **must explain the provision of the Act to the employee and that all tips received by such employee must be retained by the employee**.

*See* Doc. 81, p. 6 (emphasis added) (quoting *Updating Regulations Issued Under the Fair Labor Standards Act*, 76 Fed. Reg. at 18843). The fact that the Senate Report provided that an employer explain the **tip credit provisions** to an employee reinforces that it was not intended to include the separate **conditions**, *inter alia* the provisions relating to the **tip share** and the **tip pool**. It

would confound reason that a hanging paragraph that contains additional and separate concepts

to the tip credit could fairly be characterized as "provisions" of the "distinct" concept.

### 3) The Department's prior interpretation of § 203(m)'s duty to inform.

60.   Soon after the 1974 Amendments, the Department of Labor promulgated 29 C.F.R. §

516.4 which requires that: "[e]very employer employing any employees subject to the Act's

minimum wage provisions shall post and keep posted a notice explaining the Act, as prescribed

by the Wage and Hour Division[.]" At least as of 1996, the Wage and Hour Division of the

Department has provided Publication 1088 to ostensibly satisfy this requirement. Until

recently,[10] Publication 1088's description of the tip credit has remained unchanged and states:

> Employers of "tipped employees" must pay a cash wage of at least
> $2.13 per hour if they claim a tip credit against their minimum wage
> obligation. If an employee's tips combined with the employer's cash
> wage of at least $2.13 per hour do not equal the minimum hourly
> wage, the employer must make up the difference. Certain other
> **conditions** must also be met.

(Emphasis added).

61. In Publication 1088 the Department notably limited their summary of "provisions of the

subsection" to the **tip credit** provisions of the numbered paragraphs in § 203(m) and not the

**conditions** to it. Soon afterwards, the Department stated:

> This is in response to your letter of October 21, 1996, requesting a
> formal opinion as to the adequacy of the information your client
> gives its tipped employees regarding Section 3(m) of the Fair Labor
> Standards Act, 29 U.S.C. 203(m). [§ 203(m)] provides in pertinent
> part that the **tip credit provision** "shall not apply with respect to

---

[10] In August of 2016 the Department of Labor revised Publication 1088 to modify the language as follows:
> Employers of "tipped employees" who meet certain conditions may claim a partial
> wage credit based on tips received by their employees. Employers must pay tipped
> employees a cash age of at least $2.13 per hour if they claim a tip credit against
> their minimum wage obligation. If an employee's tips combined with the
> employer's cash wage of at least $2.13 per hour do not equal the minimum hourly
> wage, the employer must make up the difference.

For purposes of this case, this description of the tip credit remains practically the same. The most noteworthy
addition to Publication 1088 appears to be the inclusion of notice related to nursing mothers.

> any tipped employee . . . unless (1) such employee has been informed by the employer of the provisions of this section. . . ."
>
> You state that your client displays the FLSA poster furnished by the Wage and Hour Division, explains its tip pooling arrangement to employees when first hired, and includes the explanation in the employee handbook which is provided to each employee and posted on the employee bulletin board. In addition, the employees' paycheck stubs explain the amount of the tip credit taken by the employer.
>
> The FLSA poster alone is not sufficient notice to employees of the provisions of Section 3(m). Even if the poster were prominently displayed, an employee might not take notice of the tip credit provision unless specifically directed to it by the employer. **However, the combination of verbal notification, written notification in the employment handbook, and notification by paycheck stub would be sufficient to meet the notice requirement in [§ 203(m)]**.

Dep't of Labor Wage & Hour Div., FLSA Op. Letter, 1997 WL 958300 (Jan. 21 1997)("Opinion Letter")(emphasis added).

62. Notably, although the Opinion Letter indicated that an employer may have to direct an employee to Publication 1088, and may have to provide an explanation of the tip pooling arrangement, it reaffirmed that the **content** of the information in Publication 1088 was sufficient to summarize the **tip credit provisions**. *Id.* Specifically, no mention was made that employees would have to inform employees of the additional conditions of the hanging paragraph, specifically the provisions and requirements relating to the **tip pool**.

**4) Ocala Poker prominently displayed the Department's poster which is sufficient to inform its employees of the provisions of § 203(m).**

**a) Prior Eleventh Circuit precedent provides that a poster that contains Publication 1088's description of the tip credit is sufficient to inform employees of the provisions of § 203(m).**

63. Based on the language of § 203(m) and the Department's subsequent Publication 1088, it is unsurprising that courts would determine that a prominently displayed poster with the information in Publication 1088 would satisfy § 203(m)'s duty to inform. Specifically, in *Pellon*

*v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1308 (S.D. Fla. 2007) *aff'd*, 291 Fed.

Appx. 310 (11th Cir. 2008) the plaintiffs (like Plaintiffs in this case) argued that the defendants

failed to properly "inform" them of the provisions of § 203(m). The defendants argued, however,

that the plaintiffs were properly informed of the provisions of § 203(m) because the defendants

prominently displayed the Department's FLSA poster. *See id.* at 1310-11.

64. The *Pellon* court ruled that a Department's poster alone should be sufficient stating:

> Department of Labor regulations explicitly require employers to
> post "a notice explaining the [FLSA minimum wage provisions]."
> 29 C.F.R. § 516.4. **Because it would defy logic to require the
> display of inadequate information regarding the minimum wage
> and employer tip credit, a prominently displayed poster using
> language approved by the Department of Labor to explain 29
> U.S.C. § 203(m) is sufficient notice**.

*Id.* (emphasis added).

**b) Plaintiffs' argument for ignoring *Pellon*: Regulation 29 C.F.R. § 531.59(b).**

65. Plaintiffs argue that *Pellon* should be ignored because of an intervening regulation which

purportedly imposes other specific notice requirements. Specifically the regulation, codified as

29 C.F.R. 531.59(b) provides:

> Pursuant to [§203(m)], an employer is not eligible to take the tip
> credit unless it has informed its tipped employees in advance of
> the employer's use of the tip credit of the provisions of section 3(m)
> of the Act, i.e.: [1] The amount of the cash wage that is to be paid to
> the tipped employee by the employer; [2] the additional amount by
> which the wages of the tipped employee are increased on account
> of the tip credit claimed by the employer, [3] which amount may not
> exceed the value of the tips actually received by the employee; [4]
> that all tips received by the tipped employee must be retained by the
> employee except for a valid tip pooling arrangement limited to
> employees who customarily and regularly receive tips; [5] and that
> the tip credit shall not apply to any employee who has not been
> informed of these requirements in this section.

66. The regulations first three discrete requirements mirror the language of the numbered

paragraphs in § 203(m) and is similar in substance to the Publication 1088's description of the tip

credit. The two additional requirements, however, incorporate the additional conditions contained in § 203(m)'s hanging paragraph into the "provisions of the subsection" that employees must be informed of. Of particular note is the fourth requirement mentioned above that "all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips." It is this discrete requirement which purportedly serves as the basis for Plaintiffs' action.

### c) Other district courts within this Circuit have continued to apply *Pellon* after 29 C.F.R. § 531.59(b).

67. Despite this regulation, courts within the Eleventh Circuit have continued to rely on *Pellon* to decide that the language in posters containing a reproduction of Publication 1088 is sufficient to communicate the "provisions of the subsection" as required by § 203(m). *See Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1292-93 (N.D. Ga. 2014) *aff'd per curiam* No. 15-11820, 2016 WL 3564379, at *1 (11th Cir. July 1, 2016); *and Garcia v. Koning Rests. Int'l*, No. 12-CV-23629-HUCK, 2013 WL 8150984 (S.D. Fla. May 10, 2013). Specifically, in *Ide* the district court ruled:

> During the relevant time period, [the defendants] provided associate handbooks to their employees that articulate the tip credit requirements of 29 U.S.C. § 203(m) …. Further, Defendants maintained in the Applebee's restaurants a poster issued by the Wage and Hour Division of the U.S. Department of Labor (the "Wage and Hour Poster") that informs their employees of tip credit pay …. Defendants argue that their associate handbooks and the Wage and Hour Poster, *inter alia*, provided its tip credit employees with adequate notice of 29 U.S.C. § 203(m). In its reply brief, Plaintiff appears to concede that Defendants' tip credit employees had access to these associate handbooks and the Wage and Hour Poster …. **However, Plaintiff maintains that the language of these associate handbooks and the Wage and Hour Poster do not provide adequate notice of the requirements of 29 U.S.C. § 203(m)** ….

As an initial matter, the undersigned acknowledges that, to properly provide notice to its employees of the tip credit provision of 29 U.S.C. § 203(m), an employer needs to merely "inform its employees that it intends to treat tips as satisfying part of the employer's minimum wage obligations." ***Pellon v. Bus. Representation \*1293 Int'l, Inc.***, 528 F.Supp.2d 1306, 1310 **(S.D.Fla.2007)**. Therefore, "[e]mployers do not have to 'explain' the tip credit to employees, however; it is enough to 'inform' them of it." … Here, Defendants' respective associate handbooks contain the following language:

**Employers of tipped employees must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an associate's tips combined with the cash wage of at least $2.13 per hour do not equal the minimum wage, the employer must make up the difference.**

**…The undersigned is convinced that this language appropriately informed Defendants' tip credit employees of the requirements of 29 U.S.C. § 203(m). Also, the undersigned determines that the Wage and Hour Poster properly informed Defendants' tip credit employees of the tip credit exemption because "a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m) is sufficient notice." Pellon, 528 F.Supp.2d at 1310. In summary, Plaintiff's argument that Defendants' associate handbooks and the Wage and Hour Poster provided insufficient notice of the tip credit requirement of 29 U.S.C. § 203(m) is without merit.**

*Id.* (emphasis added). Although this specific issue was not raised on appeal, *Ide* has since been affirmed by the Eleventh Circuit.

68. Moreover, while this Court has previously stated that *Ide* and *Garcia* "are distinguishable and do not analyze – or even discuss – the amended rule" (*see* Doc. 93, p. 6), further review of the trial records in those cases clearly indicates that both courts specifically addressed and rejected the argument now made by Plaintiffs here. *See Ide v. Neighborhood Rest. Partners, LLC*, No. 1:13-cv-00509-SCJ, Doc. 58, pp. 19-22 (filed Feb. 24, 2014) and *Garcia v. Koning Rests. Intern., L.C.*, No. 12-CV-23629-HUCK, Doc. 46, pp. 15-16 (filed Apr. 5, 2013). In both

cases arguments identical to Plaintiffs' was rejected, and in *Garcia* the court specifically referenced plaintiff's argument concerning the new regulation in a footnote and stated:

> Plaintiff relies on *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 55 (D.D.C. 2012) in arguing that C.F.R. § 531.59(b) imposes five specific notice requirements on an employer. As the district court concluded in *Solis*, however, section 531.59(b) "does not require employers to do anything other than what they were already obligated to do under section 3(m), which is to 'inform employees of the provisions of this subsection.'"

*See Garcia*, 2013 WL 8150984, at *4 n. 3.

69. This Court has also stated that *Pellon*, *Garcia*, and *Ide* are factually distinguishable because the instant case deals with tip pooling. *See* Doc. 93, p. 6. By this logic, *Pellon*, *Garcia*, and *Ide* may have correctly held that the language in Publication 1088 is sufficient to satisfy § 203(m) when an employer is not using a tip pool, but insufficient when an employer is. However, at least one other federal court (albeit before the applicable 2011 regulation) has favorably cited to *Pellon* when discussing adequate notice of § 203(m) when an employer has implemented a tip pool. *See Garcia v. Palomino, Inc.*, 738 F. Supp. 2d 1171, 1178 n. 37 (D. Kan. 2010). Additionally, another division of this Court, while reviewing a claim about invalid notice of § 203(m) relating to a tip pool, has recently cited to *Ide* and explained that it spoke to the "sufficiency of the notice." *See Campbell v. Pinchers Beach Bar Grill Inc.*, No. 2:15-cv-695-FtM-99MRM, 2016 WL 3626219, at *4 (M.D. Fla. July 7, 2016). Notably, the *Campbell* court does not mention a distinction as to the *Ide* being inappropriate in the tip pool context. *See id.*

70. Moreover, the regulatory scheme established by the Department does not justify that 29 C.F.R. § 531.59(b) mandates stricter notice requirements when implementing a tip pool. Specifically, 29 C.F.R. § 531.54[11] (which is entitled "tip pooling") already provides specific

---

[11]As mentioned in footnote 9 above, 29 C.F.R. § 531.54 (which this Court has previously implied lends support to the viability of 29 C.F.R. § 531.59(b) because it was promulgated by same 2011 final rule (*see* Doc. 93, p. 8)) has

notice requirements an employer must provide when implementing tip pool, stating: "an employer must notify its employees of any required tip pool contribution amount."[12] There is no discernable reason to read 29 C.F.R. § 531.59 (which is entitled "tip wage credit") as imposing even more notice requirements for an employer that uses a tip pool, and therefore no reason to distinguish cases like *Pellon*, *Ide*, and *Garcia* on that basis. If the Department of Labor intended to create additional notice requirements relating only to employers with tip pools, the Department would have put these additional requirements in 29 C.F.R. § 531.54 and not 29 C.F.R. § 531.59(b).

71. Despite the continued viability of *Pellon* within this circuit, this Court has previously looked to *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793 (N.D. Ill. 2013) for its evaluation of § 203(m) after the subject regulation. *See* Doc. 81, p. 8. Notably, in *AppleIllinois* the court argued that "[t]he text of [Publication 1088] alone cannot comply with the requirement to inform employees of the provisions of § 203(m)" and found further that "(Publication 1088) provides only a limited description of the tip credit rules and recognizes that 'other conditions must also be met'…." *AppleIllinois*, 917 F. Supp. 2d at 802-03 (citing 76 Fed. Reg. 18832, 18843, 2011 WL 1231289 (Apr. 5, 2011)). The court opined that "[o]ne of such conditions not described is the requirement of § 203(m) that the employee **retain tips except for tip pooling**." *Id.* at 803 (emphasis added).

72. *AppleIllinois* is not persuasive for several reasons. First, *AppleIllinois* interpreted § 203(m) without any notable precedent in within that circuit.  In the instant case this Court has

---

[12] Ocala Poker's tip slips are unquestionably sufficient to inform its employees of "any required pool contribution amount." *See* ¶ 24 above.

already come under judicial scrutiny in this circuit. *See Malivuk*, 2016 WL 3999878, at *4. Moreover, as recently noted by a dissenting justice in the Ninth Circuit, the Ninth Circuit's decision in *Oregon Restaurants* contradicts practically every other court that has evaluated the issue. *See Oregon Restaurants and Lodging Assoc. v. Perez*, No. 13-35765, No. 14-15243, 2016 WL 4608148, at *9 (9th Cir. Sept. 6, 2016) (O'Scannlain, J. dissenting).

Eleventh Circuit essentially reaffirming the viability of *Pellon* through *Ide*. Second, *AppleIllinois* did not defer to the agency interpretation of 29 C.F.R. § 531.59[13] but instead formulated its own interpretation of § 203(m), ostensibly because it found certain observations by the Department persuasive. It is therefore dubious that *AppleIllinois* stands for the proposition that the regulation invalidates prior precedent when that court explicitly refrained from evaluating whether 29 C.F.R. § 531.59(b) was entitled to "any consideration" whatsoever. *AppleIllinois*, F. Supp. 2d at 802.

73. More importantly, *AppleIllinois* assumes that the hanging paragraph is a "provision of the subsection" without providing further analysis of the structure of § 203(m). Accordingly, *AppleIllinois* fails to recognize that the tip credit and tip pool are actually **distinct concepts**, and provisions relating to the requirements of a tip pool and are not "tip credit" provisions.

### d) *Pellon* precedent remains viable after 29 C.F.R. § 531.59(b).

74. Any additional notice requirements supposedly implemented by 29 C.F.R. § 531.59(b) would not be entitled to *Chevron* deference. When evaluating whether deference should be given an agency interpretation of a statute, *Chevron* states:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or

---

[13] Specifically, the court in *AppleIllinois* provided that:
> For purposes of this opinion it is not necessary to decide whether 29 C.F.R. § 531.59(b) applies "retroactively," is a "clarification of existing law" … **or deserves no consideration here** because AppleIllinois has not demonstrated that it has met the minimal requirements under § 203(m).

*AppleIllinois*, 917, F. Supp. 2d at 802.

> ambiguous with respect to the specific issue, the question for the
> court is whether the agency's answer is based on a permissible
> construction of the statute.

*Chevron*, 467 U.S. at 842-43. As noted above, the accompanying Senate Report to the 1974

Amendments suggests § 203(m)'s duty to inform is limited to the provisions that describe the tip

credit. Accordingly, an interpretation by the Department that deviates from the clear intent of

Congress fails the first step of *Chevron*.[14]

75. However, even if Congress did not speak directly to what it meant by the "provisions of

this subsection," the rule implementing 29 C.F.R. § 531.59(b) is still procedurally defective

because the Department did not properly take into account related reliance interests, and the

regulation is therefore not entitled to *Chevron* deference on that basis. Specifically, in *Encino*

*Motorcars, LLC v. Navarro*, No. 15-415, 2016 WL 3369424, at *9 (June 20, 2016) the Court

explained that even though an agency may otherwise be free to depart from prior interpretations

of statutes,[15] a more thorough justification is required when significant reliance is placed on a

previous position adopted by the agency. *See Navarro*, 2016 WL 3369424, at *9 ("In light of **the**

**serious reliance interests at stake**, the Department's conclusory statements do not suffice to

explain its decision" (emphasis added)); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S.

502, 515-16 (2009) ("[T]he agency need not always provide a more detailed justification than

---

[14] To the extent that *Natl. Rest. Assn. v. Solis*, 870 F.Supp.2d 42 (D.D.C.2012) may suggest a different result, *Solis* did not analyze, or even recognize, the distinction between the provisions of the tip credit and the conditions of it. Instead the Court decided that "the agency's conclusion is consistent with – and probably compelled by the statute." *Id.* at 57. However, the court in *Dorsey* specifically acknowledged that "[g]iven the awkward wording of the statute and the weight of prior authority, this court is not prepared to conclude … **that the regulation is 'probably compelled by' the statute"**. *Dorsey*, 888 F. Supp. 2d at 685 n. 12. Notably, the court in *Dorsey* acknowledged that the "right to retain tips" included in the § 203(m)'s hanging paragraph was a change of law rather than a clarification because it was inconsistent with prior interpretations of § 203(m). *Id.* at 684-85.

[15] *See Navarro*, 2016 WL 3369424 at *9 ("Although an agency may justify its policy choice by explaining why that policy 'consistent with statutory language' than alternative policies … the Department did not analyze or explain why the statute should be interpreted to exempt dealership employees who sell vehicles but not dealership employees who sell services[.]")

what would suffice for a new policy created on a blank slate… [but must when] its prior policy has **engendered serious reliance interests that must be taken into account**[;]…[i]t would be arbitrary or capricious to **ignore such matters**" (emphasis added); *Nat. Cable & Telecomm. Ass'n Brand X*, 545 U.S. 967, 981 ("Agency inconsistency [alone] is not a basis for declining to analyze the agency's interpretation under *Chevron* framework ... [but] **unexplained inconsistency** [can be] a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act" (emphasis added)); *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("Sudden and unexplained change … or **change that does not take account of legitimate reliance on prior interpretation** … **may be 'arbitrary, capricious or an abuse of discretion**[;] … **but if these pitfalls are avoided**, change is not invalidating" (citing 5 U.S.C. § 706(2)(A)) (emphasis added).

76. The evidence provided by Defendant proves that significant reliance within at least the gaming industry was placed on the Department's prior position in Publication 1088, specifically that the relevant "provisions of the subsection" were limited to the provisions of the **tip credit**. *See* ¶¶ 38-40 above. Specifically, Brian Matthews testified that he followed a common business practice of purchasing employment posters from a vendor responsible for ensuring compliance with federal and state laws. *See* ¶ 38 above. He indicated that these posters were common in the industry, and no one had ever indicated that there might be a problem with inadequate notice despite displaying the poster. *See* ¶¶ 39-40.

77. Despite the significant reliance of the industry, the Department failed to acknowledge, or even address the confusion which may result in requiring a poster to be displayed that does not adequately inform employees of their rights under the FLSA. Instead, the Department merely stated that Publication 1088 "provides only a limited description of the tip credit rules" but failed

to explain why. Even though employers are clearly relying on Publication 1088 to adequately inform employees of their rights under the FLSA, the Department did not justify its departure from its prior interpretation of § 203(m). *See Updating Regulations Issued Under the Fair Labor Standards Act*, 76 Fed. Reg. at 18843. This is especially concerning in light of the fact that a commenter specifically suggested that Publication 1088 should conform to whatever regulation the Department was to promulgate in order to reduce the likelihood of confusion. *See* Comment to *Updating Regulations Issued Under the Fair Labor Standards Act*, 73 Fed. Reg. 43654 from Mark J. Beutler, esq., Epstein, Becker & Green, P.C., p. 5 (Aug. 13, 2008) (available at www.regulations.gov/document?D=WHD-2008-0003-0003).

78. This Court previously has distinguished *Navarro* on the basis that 29 C.F.R. § 531.59(b) represents a "clarification" rather than a "change of law." *See* Doc. 93, pp. 7-8. However, further consideration compels the finding that, if anything, the regulation is a change of law in regards to the inclusion of the additional conditions of the hanging paragraph into the duty to inform. Specifically, in *Dorsey* the district court **explicitly found** that "at least with regard to the notification of the right to retain tips" 29 C.F.R. § 521.59(b) **constituted a change of law rather than merely a clarification**. *See Dorsey*, 888 F. Supp. 2d at 684-85. Specifically, the court concluded:

> "In determining whether a revision of a rule changes or merely clarifies existing law, the Court 'looks to statements of intent made by [the enacting body].'" …
>
> The new DOL tip credit notification regulations … **contain no language suggesting that the Department intended them to be retroactive. There is no language specifically stating that the notification provisions are meant to clarify ambiguity, at least with regard to the notification of the right to retain tips**. Plaintiffs have not argued that there is any noticeable conflict in the courts as to this issue.[] **And the DOL's final rule appears to acknowledge that the new regulation represents a change in the**

> **law, at least at it has been applied by the courts.** *See* 76 FR 18844 ("To the extent that ... courts have reached different results, the Department notes that those courts generally failed to consider the important legislative developments underlying the FLSA's tip credit provisions and we choose to not be guided by those decisions in this revision of the regulations.").[] This court therefore cannot hold that the language of the rulemaking "requires the result" of retroactive effect....

*Id.* (emphasis added).

79. Accordingly, this Court is obligated to follow the Supreme Court's decision in *Navarro*. Because there are significant reliance interests involved with the Defendant's use and reliance on Publication 1088, the Court is compelled to find that any regulation by the Department that would establish liability beyond the Department's prior inconsistent interpretation of § 203(m) contained in Publication 1088 is invalid on account of a *Navarro* analysis.

**4) The evidence presented by Defendant satisfied even the heightened conditions of the hanging paragraph.**

80. Regardless, Defendant has provided sufficient evidence to indicate, that regardless of the standard imposed, Plaintiffs received a comprehensive and practical explanation of the conditions contained in §203(m)'s hanging paragraph.

81. While the court in *AppleIllinois* discussed the purported additional notice requirement of 29 C.F.R. 531.59(b) related to informing employees of their "right to retain tips," (*see AppleIllinois*, 917 F. Supp. 2d at 803 "[o]ne of such conditions not described is the requirement of § 203(m) that the employee **retain tips except for tip pooling**." (emphasis added)) the record before this Court is clear that the Defendant regularly informed its Plaintiffs of their right to retain the tips except for their contribution to Ocala Poker's tip pool. Specifically, after every shift Plaintiffs would have their tips counted in their presence and of the presence of another Ocala Poker employee who would fill out a tip slip which would indicate the Plaintiffs' tip share contribution to Ocala Poker's tip pool. *See* ¶ 24 above. It is difficult to conceive that Plaintiffs

could have a better understanding that they were able to keep the tips not taken towards the tip pool than having Ocala Poker employees actually count out the Plaintiffs' contribution to the tip pool on a daily basis.

82. Therefore it is not surprising that at trial Plaintiffs strayed away the duty to inform of the employee's "right to retain tips" that was at issue in *AppleIllinois*; but instead, fixated on another requirement specifically related to the tip pool, and contested that they were not informed that the recipients of their tip share were "regularly and customarily tipped." *See* ¶ 31 above.

83. As discussed above, there is no statutory basis for concluding that an employer's duty to inform its employees of the "provisions of" § 203(m) was meant to include an explanation of the requirements of the **tip pool**. Moreover, this interpretation appears to be inconsistent with the Department's regulatory scheme, which addresses the notice requirements related to a tip pool in 29 C.F.R. § 531.54.

84. Regardless, the Defendant has provided sufficient evidence to prove that the Plaintiffs **actually were informed** about the fact that Ocala Poker's tip pool was restricted to employees that "regularly and customarily tipped employees." Specifically, it is undisputed that in 2010 Ocala Poker held a meeting which was prompted primarily about a concern that the involvement of floor personnel in Ocala Poker's tip pool might violate federal law. *See* ¶ 30 above. As discussed above, it is clear that at this meeting Plaintiffs were informed that the tip pool would consist of cage department employees. *See* ¶¶ 28, 30, *and* 33-37. Moreover, it is also clear that during the explanation Brian Matthews explained that the reason cage department employees were receiving the poker dealers' tip share was because, although the cage department employees did receive tips, they were not receiving nearly as much as the poker dealers. *See* ¶¶

28 *and* 30. Of note, this version of what was said at this meeting was substantiated by Phil Faso in his testimony.

**D) Ocala Poker's good faith defense.**

85. As a defense, Ocala Poker provided evidence of the significant reliance it placed on the use of Department approved FLSA poster. In that regard  U.S.C. § 259(a) provides:

> In any action or proceeding based on [the FLSA] … no employer shall be subject to any liability or punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation … if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the [Department of Labor], or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged.

86. In this case, the record credibly indicates that Ocala Poker reasonably relied on the Department's Publication 1088 and believed that its use adequately informed Ocala Poker's employees of the tip credit. *See* ¶¶ 38-40. The fact that courts within this circuit have consistently (even after the promulgation of the related regulation) stated that a poster that contains Publication 1088 is adequate notice of the tip credit provisions further proves that Ocala Poker has shown a good faith basis in believing that its actions would comply with the FLSA. Accordingly, even if the Plaintiffs' argument was otherwise convincing that the regulation validly required that employers must now inform their employers that "tip pools" were limited to employees that "regularly and customarily receive tips," and that Ocala Poker never adequately did so; Ocala Poker's good faith reliance on Publication 1088's interpretation of § 203(m)'s tip credit provision (and the Department's prior and current policy requiring employers to post Publication 1088) forecloses the Plaintiffs' ability to impose liability in this case. Accordingly, Defendants are entitled to judgment on this issue.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using CM/ECF system which will send a notice of electronic filing to the following: Michael O. Massey, Esquire, massey@352law.com, this 8th day of September, 2016.

GILLIGAN, GOODING & FRANJOLA, P.A.


BY: ***s/Patrick G. Gilligan***
     Patrick G. Gilligan
     Florida Bar No. 375454
     1531 S.E. 36th Avenue
     Ocala, Florida 34471
     (352) 867-7707 Phone
     (352) 867-0237 Facsimile
     Attorney for Defendants
     Second Chance Jai Alai, LLC, d/b/a
     Ocala Poker & Jai Alai, and Joseph
     Coffey, individually
Primary:   pgilligan@ocalalaw.com
Secondary: canderson@ocalalaw.com
            kpeterson@ocalalaw.com


E:\01. PGG\SECOND CHANCE- HOWARD\Motions orders\Defendant's Proposed Findings of Fact and Conclusions of Law 09.08.16.docx