**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**CHRISTOPHER HOWARD and**
**JEFFREY GREENSTONE, on behalf of**
**themselves and all others similarly**
**situated**

      **Plaintiffs,**

**v.**                                                                    **Case No: 5:15-cv-200-Oc-PRL**

**SECOND CHANCE JAI ALAI LLC**

      **Defendant.**

---

## MEMORANDUM DECISION AND ORDER

Plaintiffs, Christopher Howard and Jeffrey Greenstone, seek wages from their former employer, Defendant Second Chance Jai Alai, LLC, under the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").[1]  Beginning on August 8, 2016, I held a two day bench trial in this case.  For the reasons explained below, I find that the preponderance of the evidence establishes that Defendant did not violate the minimum wage provisions of the FLSA and that judgment should be entered in favor of Defendant under Federal Rule of Civil Procedure 52.  In accordance with Rule 52, the following constitutes the Court's findings of fact and conclusions of law.

---

[1] The parties previously consented to jurisdiction by magistrate on July 29, 2016.  (Docs. 21, 22, 23, 24).

## I.   BACKGROUND AND FACTUAL RECORD

Plaintiffs were previously employed as poker dealers in Defendant's poker room.   As set forth in their Second Amended Complaint (Doc. 29), they allege that Defendant violated the minimum wage provisions of the FLSA.[2]

The dispute arises from Defendant's claiming of a tip credit on its poker dealers, which permitted Defendant to pay the dealers—including Plaintiffs—less than the statutorily required minimum wage.   Plaintiffs allege that Defendant's failure to comply with the FLSA tip credit requirements results in Defendant's inability to claim a tip credit for the dealers.   They also allege that by requiring its poker dealers to share their tips with non-tipped employees and managerial employees, Defendant was not permitted to claim the tip credit and was therefore obligated to pay its dealers the full minimum wage.   In a single count against Defendant, Plaintiffs seek unpaid minimum wages owed to them for the period in which they were paid pursuant to the tip credit, along with liquidated damages and attorney's fees and costs.

The following facts were established at trial by a preponderance of the testimony and documentary evidence offered and admitted into evidence.[3]   Defendant operates a multi-faceted gaming operation in North Central Florida.   The operation involves inter-track wagering, a Jai-Alai court, a bar and deli, and a poker room—all of which are separated into different departments. (Tr. 169, 200; Tr. II. 7, 50).   At dispute here is the poker room department and how the poker

---

[2] This Court has subject matter jurisdiction over this case pursuant to federal question jurisdiction (28 U.S.C. § 1331).

[3] Plaintiffs presented their own testimony, along with the testimony of Brian Matthews and Jason Bendure.   Defendants presented the testimony of Vicki Pernek, Matthews, Phil Faso, and Marsha Keslo. Official transcripts of the trial testimony, which are contained in two volumes, have been filed with the Court.   (Docs. 103, 104).   The Court will refer to the transcripts contained in volume one (Doc. 103) as "Tr." followed by the appropriate page or pages and will refer to the transcripts contained in volume two (Doc. 104) as "Tr. II." followed by the appropriate page or pages.   The Court will refer to Plaintiffs' and Defendant's exhibits as "PX" and "DX" followed by the appropriate exhibit number.

room's employees are compensated, tipped, and required to share those tips through a mandatory tip pool.

### A.  Overview of Defendant's poker room

An overview of Defendant's poker operation is useful to understanding this case.   When a prospective customer first enters the poker room, he or she will first be greeted by an employee at a podium near the room's entrance.   (Tr. 183; DX. 12).   The employee working the podium, like a restaurant host or hostess, will direct the customer to a seat at a poker table.   (Tr. 181–82; Tr. II. 28–29).

Prior to being seated, however, the customer will walk over to a teller window to exchange his or her cash for gambling chips.   (Tr. 183–84; Tr. II. 29–30).   Indeed, customers are only allowed to play with gambling chips in the poker room.   (Tr. 113, 148; Tr. II. 30–31).   To this end, employees working as tellers are located in a separate area behind two teller windows and exchange cash for chips.   (Tr. 91; DX. 13, 14).

At this time, the customer may (if he or she wishes) tip the teller by placing chips in a tip box that is located outside of the teller windows.   After the customer receives chips from the teller, the podium employee will then seat the customer at a poker table and the customer may tip the podium employee with chips.   The customer is now ready to play poker.

In the poker room, though, customers do not play against the house.   (Tr. II. 7–8).   That is, customers do not gamble against Defendant; customers play against—and only against—other customers.   (Tr. II. 8).   So, at each gambling table in the poker room sit a dealer, who is Defendant's employee and deals cards to facilitate the poker games, but the dealer does not play as a player in the card games.

A dealer will deal customers around thirty hands per hour, or perhaps up to twice this amount.   (Tr. 52, 106, 174).   When a customer wins a hand, the customer (usually) tips the dealer with chips.   (Tr. 52, 106–07, 128).   To accommodate such tips, each dealer has a tip box into which customers may place chips.   (Tr. 53).

To be sure, each customer will not win every hand.   And in the event that a customer needs additional chips, the customer can remain seated as the dealer can exchange chips for cash right at the poker table.   Each dealer (though they do not gamble in the games) is equipped with a "bank" of chips and cash in case a customer needs more chips during play.

Nonetheless, sometimes a dealer's bank runs low.   Then, employees who work as "chip-runners" uses a cart to deliver more chips to the dealer, and the chip-runners may also deliver chips directly to customers.   (Tr. 86).   The chip-runner's cart has, of course, its own bank of chips and also has a tip box in case a customer wishes to tip the chip-runner.   (Tr. 84).

After a customer is finished playing, if he or she still has chips, the customer returns to the teller.   (Tr. 184).   The customer then exchanges his or her chips for cash with the teller.   At this time the customer is free, once again, to tip the teller by placing a tip in the teller tip box.   (Tr. 184–85).   If all goes well the customer walks out with more cash than he or she walked into the poker room with.

But before a customer leaves, he or she may notice a door-way into a room adjacent to the teller windows.   (Tr. II. 36–37; PX. 8; DX. 25).   This room is filled with cash and chips and is the biggest "bank" of chips and cash in the poker room—this room is known as "the vault."   (Tr. 65, 89, 178).   In other words, when a dealer, teller, or chip-runner's bank gets low, that exhausted bank is replenished with chips and cash from the vault.   Obviously, customers do not have access

to the vault: the vault serves the sensitive and important function of the master bank for all the other banks.   (Tr. 65).   Of course, only the most trusted employees enter the vault.

In sum, although customers experience many aspects of the poker room operation, there are undoubtedly other aspects that customers do not encounter.   The next sections will examine some of these aspects that are not within public view.

### B.  The poker room's managerial and employee structure

An understanding of Defendant's employee structure, including which employees are managerial, is also important here.   Notably, none of the employees mentioned in this opinion have any ownership interest in Defendant.   (Tr. 77, 79, 199, 206).

#### 1. Non-management

The poker room's non-management employees are broken down into two different occupations.   Defendant, quite naturally, designates poker room dealers as "dealers."   Perhaps less intuitively, Defendant calls the other poker room employees—the employees who work as tellers, chip-runners, at the podium, and in the vault—"cage employees."[4]   Simply put, dealers deal cards and cage employees perform all the other poker room duties that serve that end but do not directly involve card dealing.   I will address the dealers first.

##### i.    Dealers

Dealers sit at the poker tables and deal cards to the customers.   As noted above, dealers do not act as players in the poker games; dealers merely facilitate the poker games by dealing the

---

[4] The cage apparently refers to the room that includes the teller work area and the vault.   (Tr. 177–78); PX. 8; DX. 25).

cards.   Both Plaintiffs, Christopher Howard and Jeffrey Greenstone, dealt cards as dealers at the poker room.[5]

Beyond dealing cards, dealers do not perform any other duties.   Employees who are dealers sometimes, however, do work in other capacities.   For instance, Plaintiff Howard dealt cards and when not dealing cards worked in a salaried position.[6]   (Tr. 134–36).   And there is evidence that other dealers worked as cage employees on a very limited basis.   (Tr. II. 58–62).  But beyond these limited exceptions, poker dealers only deal cards.

ii.   Cage employees

In contrast to the limited duties dealers perform, cage employees perform numerous, varied duties.   (Tr. II. 27–31, 37–38).   Jason Bendure, a current cage employee, provided testimony as to his typical work day in which he usually works the evening shift.   (Tr. 64).   He stated that once he arrives to work, he works as a teller during his seven to nine hour shift; and he also works, contemporaneously with his teller duties, in the vault, but only when needed.[7]   (Tr. 72–76).

As to the vault duties that Bendure performs while customers are present at the poker room, those duties are relatively limited.     For example, Bendure only enters the vault during this time when necessary to collect cash or chips to refill a teller, chip-runner, or dealer bank (or to balance

---

[5] Howard and Greenstone started around 2007 or 2008 and both stopped working for Defendant in 2015.   (Tr. 39, 96, 128).

[6] When an employee works in both salaried and non-salaried positions, like Howard did, that employee is known as a "dual-rate."   (Tr. 80–81; Tr. II. 5, 20–21).   When a dual-rate employee works in a salaried capacity, that employee does not receive tips or participate in the tip pool during those hours.  (Tr. 207–08; Tr. II. 10, 19–21)).   For a discussion of the tip pool see *infra* sub-section I.C.

[7] As an important aside, not all cage employees are allowed to enter the vault—a very sensitive area of Defendant's poker room operation.   (Tr. 182–83).   Undeniably, employees like Bendure are among Defendant's most trusted and reliable cage employees, as *only* these cage employees are eligible to enter the vault.   (Tr. 196–97).   Out of the seven current cage employees, only four are eligible to enter the vault; and there must be a cage employee who is eligible to enter the vault at all times when the poker room is open to customers.   (Tr. 196–97).

the vault to ensure that no amounts are missing).   *See* (Tr. 187–88).   Bendure never closes the vault door when he is physically in the vault; instead, he actively listens for any customers who may need his services as a teller, and he is sometimes the *only* teller in the poker room.   (Tr. 75, 91–93, 176); *see also* (Tr. 165) (Plaintiff Howard admits that Bendure was sometimes the sole teller when Howard worked for Defendant).

As to Bendure's teller duties, he exchanges cash for chips and vice versa.   To ensure that accounting and security goals are met, Bendure is given a separate "bank" of chips and cash in which to serve his teller duties—no other cage employee is allowed to use Bendure's bank.   (Tr. 74, 87, 89, 178–79).   In other words, even when another teller is present there is a separate teller bank that Bendure, and only Bendure, uses.

But the vault and teller duties are not the only duties that Bendure performs.   He also works at the podium and as a chip-runner whenever the other cage employees need a break.   (Tr. 76, 179, 188–89).   Naturally, cage employees are entitled to breaks each shift and it is the cage employees, like Bendure, who are eligible to enter the vault that are designated to step in when these breaks occur.   For example, it is not uncommon for a cage employee like Bendure to spend around twenty minutes at the podium (thus giving the cage employee is who is currently working the podium a break) and then work as a chip-runner (thus giving a chip-runner a break), before returning to work as a teller.   (Tr. 189).

Moreover, Bendure testified that sometimes he is the only cage employee in the poker room.   (Tr. 65).   In essence, Bendure wears numerous hats: he exchanges cash for chips (and vice versa) as a teller and he works the vault, along with also working at the podium and as a chip-runner.

Importantly, during the seven years that Bendure has worked as a cage employee, the amount of time in which he has spent in the vault has varied.   (Tr. 65–66, 70).   When Plaintiffs worked for Defendant, Bendure would spend about half his time in the vault, and about half his time elsewhere working in the other positions.   (Tr. 66).   But the allocation has changed overtime with a trend that Bendure spends less and less time in the vault.   (Tr. 65, 75; 187–88).   In any event, even when Bendure is in the vault he leaves the vault door open and keeps a look out for customers who may need his assistance as a teller.   (Tr. 92–93).

To be sure, Bendure is a trusted employee tasked with handling the sensitive area that is the vault; that is, Bendure balances the vault to ensure that other employees do not, through mistake or malfeasance, abscond with Defendant's cash or chips.   Vault duties extend beyond the time in which customers gamble at the poker room.   Bendure testified that *after* the customers have left the poker room for the evening, he spends about thirty to forty-five minutes balancing and accounting for the chips and cash in the vault.   (Tr. 72, 76).   And on a related note, each day, *before* customers ever arrive at the poker room, the cash and chips in the vault must be balanced to ensure, once again, that no amount of either cash or chips is missing—this duty takes around one hour to complete.   (Tr. 185–89).

To briefly summarize the duties that the cage employees perform, they ensure (1) that customers, through the tellers, have chips to start gambling with; (2) that customers find their way to the gambling tables, though the podium position; (3) then, once a customer needs more chips, the cage employees, this time in the capacity of the chip-runner, ensure that the customers need not get up from their seats at the table—the chip-runners deliver more chips right to the gambling tables; (4) and, importantly, the cage employees who are eligible to enter the vault ensure that everyone—customers, dealers, teller, and chip-runners—have a sufficient amount of chips.

Notably, while Bendure is one of Defendant's most trusted and reliable cage employees (*only* employees like Bendure are eligible to enter the vault), Bendure is *not* an employee with much power over other employees.   He does not hire or fire other employees, set schedules, set wages, or otherwise control the work of other employees.   (Tr. 77–78); *see also* (Tr. 164) (Plaintiff Howard admits that Bendure does not hire, fire, or set wages)).   At most, Bendure (an experienced cage employee) trains new cage employees and attempts to resolve minor disputes between dealers and other cage employees—but Bendure has no authority to discipline other employees.   (Tr. 78, 132, 164).   And though Bendure sometimes is called (and refers to himself as) a supervisor, he has never been given that title formally.   (Tr. 77, 89).

As another example of a trusted (yet former) cage employee, Kathleen Danielson worked in the vault while also working as a teller, chip-runner, and at the podium.   (Tr. 222).   The evidence shows that although Danielson did not hire, fire, set schedules, set wages, discipline, or control other employees, she did perform isolated acts beyond the scope of her normal cage employee duties.   (Tr. 192–93).   For instance, Danielson once drafted a cage-employee schedule that her supervisor ultimately adopted.   (Tr. 69).   Danielson also signed an agreement in which Bendure was responsible for paying Defendant a sum or sums of money and she signed certain tax documents.   (Tr. 68–69).   But in any event, the evidence shows that Danielson, like Bendure, did not hire or fire, set schedules, set wages, discipline, or otherwise control other employees.   (Tr. 79, 192–93, 221–23).

In summary, while neither party offered any evidence during trial on any other specific cage employees (there are currently seven) besides Bendure and Danielson, Defendant presented ample testimony that all cage employees—including those who work in the vault (about four of the current seven cage employees)—work as tellers, chip-runners, and at the podium.   (Tr. 170–

71, 174, 186–89, 196–97, 206; Tr. II. 27).   Indeed, cage employees, generally, are not assigned specific duties but instead usually rotate through all of the duties each week (or even each shift) (Tr. 171–72, 182).   Further, it is also clear that no cage employees (including Bendure, Danielson, and any other cage employee who works in the vault) hired, fired, set schedules, set wages, disciplined, or controlled other employees.   (Tr. 190–91, 221–22; Tr. II. 12, 62).

### 2. Management

At the top of the poker room's management is Defendant's president Brian Matthews, he is in charge of the poker room, along with Defendant's other departments.   Matthews makes all decisions on hiring and firing, job duties, and discipline—unless he is absent and the disciplinary issue is minor.   (Tr. 208–09).

Below Matthews is Vicki Pernek, the cage department manager, i.e., she manages the cage employees.   (Tr. 169, 200; Tr. II. 44).   She sets cage employees schedules but does not discipline or hire and fire employees—she only makes recommendations to Matthews on who to hire or fire. (Tr. 225).   Currently, there are about seven cage employees under Pernek.   As noted *supra*, those cage employees perform the jobs (or duties) of teller, chip-runner, podium, and vault work.   And no one, not even the cage employees who are eligible to enter the vault, act as an assistant to Pernek.   (Tr. 71, 173, 205).

Also below Matthews is Phil Faso, who manages the dealers.   (Tr. 199–200; Tr. II. 7–8). Plaintiffs, Howard and Greenstone, were among the poker room dealers who Faso managed. Over time, Faso has also dealt cards in the poker room and had his own tip box.   (Tr. 129–30; Tr. II. 64–65).   But Faso has never, as shown by the weight of the evidence, received any amount

from the tip pool.[8]   (Tr. 175).   Below Faso are poker room floor managers.   The floor managers, who are salaried employees, supervise the dealers under the direction of Faso.   (Tr. 207, 208–09; Tr. II. 9–10).

Finally, the last managerial employee in the poker room is Marsha Kelso, the office manager.   Kelso is in charge of record keeping and other administrative duties.   (Tr. II. 49). Kelso does not have much interaction, if any, with the dealers or cage employees.   (Tr. II. 64).

Importantly, from 2010 to the present day, the evidence shows that none of the managerial employees have received any amount, at all, from the tip pool.[9]   (Tr. 170–73, 191, 205, 209–10; Tr. II. 13–14, 17–18, 21–22, 39–40, 50–51).   Further, Matthews, Pernek, Faso, Kelso, and all the unnamed floor managers are the only managerial employees in the poker room; none of the cage employees are managers.   (Tr. 189–91).

### C.  The non-managerial employee compensation structure

The poker room's non-managerial employee (the dealers and the cage employees) receive two forms of compensation.   First, each is paid an hourly wage that is below the federal minimum wage.   (Tr. 40; Tr. II. 51).   Second, these employee receive tips from customers.

The tip structure is at the heart of one of the issues in this case—the tip pool.   To briefly introduce the pool, though both dealers and cage employees are tipped by customers, Defendant

---

[8] For a discussion of the tip pool, see *infra* sub-section I.C.   Undeniably, if Faso dealt cards at any time during the past six years, then he would have been, at least presumably, required to contribute ten percent of his tips to the tip pool.   Plaintiff Howard provided contradictory testimony as to whether Faso was tipped when acting as a manager (Tr. 129–30, 152–53); given the inconsistency, I do not credit the testimony that Faso was tipped while performing his managerial duties.

[9] Plaintiffs allege in their complaint (Doc. 29, ¶ 10) that employees working in surveillance also received amounts from the tip pool, but the evidence shows that this is not true.   (Tr. 118–19, 201).

requires the dealers to share ten percent of their tips with the cage employees.   This compelled

sharing in known as the tip pool.[10]

### 1. Dealer tips

Dealers enjoy ample opportunity to receive tips from customers.   They may deal up to

thirty hands (or more) an hour, each game will presumably have a winner who will presumably tip

the dealer after the win.   The amount of tips that a dealer can earn in a day is fairly large.

Plaintiffs themselves received on average between two-hundred-fifty to four-hundred dollars per

day in tips.   (Tr. 110, 149–50).

Notably, each dealer has a separate tip box that is specifically assigned to her or him.   (Tr.

146–47).   So, Defendant is able to, and indeed does, track the tips that each dealer receives.   This

also enables the dealers themselves to account for their individual tips.   To this end, dealers go

through an elaborate procedure to account for their tips after each of their shifts.   (Tr. 53–59, 105,

141–43; Tr. II. 45–48).

This procedure starts at the poker tables, where each dealer has an assigned, locked, and

numbered tip box on their poker table.   (Tr. 54, 103).   Once a dealer's shift is over, the dealer

takes her or his tip box, and with another poker room employee, enters a secure room known as

the "tip-out room"—the tip-out room is under video surveillance.   (Tr. 54).

Under such surveillance, the dealer and the other employee will count the chips that the

dealer received in tips.   (Tr. 55, 107).   Once they have agreed upon the amount of tips the dealer

received that shift, the dealer and the other employee both sign a "tip slip."   (Tr. 107; Tr. II. 45–

---

[10] The dealers, including Plaintiffs, had to share only eight percent of their tips when the poker room was started, but that amount was raised to ten percent in 2010.   (Tr. 41).

47).   The tip slip records the amount of tips the dealer received and each dealer is given a carbon copy of the tip slip.   (Tr. 55–56, 107–08).

But the tip slip also records the amount of the dealer's tips that she or he is forced to put into the tip pool.   (Tr. 54–57; Tr. II. 47).   So, once a dealer signs the tip slip, they know the tip amount that they will retain (i.e., ninety percent of their tips) and the tip amount that will be taken away from them and placed into the tip pool (i.e., ten percent of their tips).   There is also evidence that Plaintiffs' paychecks reflected their hourly wage, number of hours worked, and their tips. (Tr. 150–51).

Lastly, the amount in tips dealers receive are about treble the amount cage employees receive.   (Tr. 173–74; Tr. II. 51).   In fact, this large disparity between the amount of tips dealers and cage employees earn is (in part) why Defendant requires all dealers to participate in the tip pool.   (Tr. 214, 226).   Defendant also justifies this forced sharing on the basis that the cage employees, in a way, serve the dealers and enable the dealers to deal cards by ensuring that customers have a steady flow of chips to gamble with.   As Matthews puts it, the dealers and the cage employees are a team.   (Tr. 214).

### 2. Cage employee tips

Like dealers, cage employees enjoy numerous opportunities to be tipped by customers. (Tr. II. 51–52).   For example, when a cage employee works the podium and seats customers, the customers may tip the cage employee then.   (Tr. 176, 183; Tr. II. 28–29).   And when a cage employee works as a chip-runner and runs chips out to a dealer, customers may place a tip in the chip-runner's tip box, which is on the chip-runner's cart.   (Tr. 83, 175, 180–81).   Customers may tip a teller before or after gambling when the customers exchange cash for chips or vice versa. (Tr. 176, 183; Tr. II. 29).

Now, as stated *supra*, but in order to clarify this issue, all cage employees who are eligible to enter the vault—including Bendure and Danielson—perform (or performed in Danielson's case) the duties of chip-runner and teller, along with working the podium.   (Tr. II. 37–38, 49).   Indeed, even Plaintiffs themselves admit that Bendure worked as a teller and a chip-runner.   (Tr. 98, 118, 163–65).   And it is clear that when cage employees work at the podium, or as tellers and chip-runners they receive tips from customers.

But in contrast to the elaborate data tracking methods Defendant deploys for the dealers' tips, Defendant does not apparently track the amount of individual tips each cage employee earns. For instance, though there are two teller windows, the tellers share a single tip box; Defendant does not track which tips are intended for which teller.   (Tr. II. 63; DX. 13).   Likewise, though the record in unclear as to how many chip-runner carts there are, it is clear that there is no evidence that tips placed in the tip box of a chip-runner cart are tracked in the way that the dealers' tips are tracked.   (Tr. 84; Tr. II. 63).   More to the point, when a cage employee working the podium receives a tips, it appears that the employee simply places that tip in the tip box of a chip-runner cart.   (Tr. 83–84).   And there appears to be a communal tip box for the cage employees in the poker room.   (Tr. 175).   So, as Bendure testified, the cage employees share—amongst themselves—the tips that they receive directly from customers.   (Tr. 68).

The tangible evidence confirms this notion that Defendant does not track the tips each cage employee individually earns.   A spreadsheet compiled by Kelso, the poker room office manager, shows that cage employees received tips from two sources: (1) a "cage tip box" and (2) a "10%," which presumably would be the ten percent of dealers' tips from the tip pool.   (DX. 15).   It appears that Defendant aggregates these two sources into a total and distributes those amounts to all cage employees on a per-hour basis.   (Tr. 68; Tr. II. 48, 51–53).   Thus the spreadsheet does

- 14 -

not show (nor does the testimony show) how much in tips each cage employee—in his or her individual capacity—directly received from customers.

Yet Defendant's evidence does show that from 2012 to April 2015 any cage employee who worked a full twenty-eight day pay period received more than thirty dollars in tips, counting both of these tips amounts.[11]   (Tr. 179–80; Tr. II. 48, 52, 55).   For instance, Bendure regularly receives more than thirty dollars in tips per month.   (Tr. 88; Tr. II. 48–49, 52–59).

### D.  Notice of the tip credit and the tip pool

Under the FLSA, when an employer pays its employees less than the federal minimum wage and then supplements that hourly wage through the tips the employees receive (this practice is known as taking a "tip credit"), the employer most give its employees notice of that practice. The evidence shows here that Defendant posted posters in the poker room that provided Plaintiffs with notice that Defendant took a tip credit in compensating its dealers.   But also at issue is what notice Defendant gave Plaintiffs as to the tip pool.   I will address the tip credit notice first.

#### 1.  Tip credit

It is undisputed that Defendant in each year at issue posted wage and hour posters in a location next to where Plaintiffs clocked in and out during their employment with Defendant.[12] (Tr. 97, 101, 102–03, 116, 125, 158–59, 194–95, 203–04, 215–221, 228–29; Tr. II. 16–17, 19–21).

---

[11] The only instances where cage employees did not receive more than thirty dollars in tips per month, from 2012 to April 2015, is where the employee failed to work a full four weeks or where a dealer worked in the cage on a very limited basis.   (Tr. II. 55–56, 58–62).

[12] The poster that Defendant presented at trial states the following:

> Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

(DX. 4).

The evidence shows that these posters notified Plaintiffs that the hourly wage they received was below the federal minimum wage and that the difference between their hourly wage and the minimum wage was supplemented though the tips that the dealers received.   (DX. 3, 4).

## 2.   *Tip pool*

While Plaintiffs do not dispute the notice they received from Defendant as to the tip credit, the same cannot be said for notification of the tip pool.   (Tr. 117–18).   In any event, the weight of the evidence shows that Defendant notified Plaintiffs of the tip pool in three ways: (1) through a meeting in 2010, (2) through a dealer handbook distributed in 2013, and (3) through the elaborate dealer tip-out procedure (as discussed *supra*).

First, Matthews held a meeting in 2010.   The meeting was mandatory for all poker room dealers (including Plaintiffs) and lasted about an hour.   (Tr. II. 41).   The meeting was attended by around fifty or so employees, which included not only Faso and Pernek, but also Plaintiffs. (Tr. 117–18, 131–32, 156–57, 193–94, 212–14; Tr. II. 41).   This meeting represents Defendant's most elaborate communication with Plaintiffs about the tip pool.

At the meeting, Matthews discussed several controversial changes to the tip pool.   (Tr. 213–14, 221; Tr. II. 22–24).   First, given a different lawsuit, Defendant was taking all managerial employees out of the tip pool—i.e., all managerial employees would no longer receive proceeds from the tip pool.[13]   (Tr. 202–03).   Second, from then on only cage employees would receive proceeds from the tip pool.   (Tr. 213).   And third, the then current amount that dealers were forced to give to the tip pool—eight percent of their tips—was being increased to ten percent.   (Tr. 213).

---

[13] Pernek was among these managerial employees who were taken out of the pool.   (Tr. 202, 224–25).

- 16 -

During the meeting, Matthews elaborated on why the increase from eight to ten percent was justified.   (Tr. 214).   He said that while the cage employees do regularly receive tips from customers (like the dealers do), those tips are far smaller than the tips the dealers receive.   (Tr. 226).   The cage employees, however, enable the dealers to do their jobs—the cage employees work as a team with the dealers.   (Tr. 214).

Now, at trial both Plaintiffs admit that at the meeting Matthews discussed that the tip pool amount was being increased from eight to ten percent.   (Tr. 117–18, 131–32, 156–57).   But Plaintiffs dispute Matthews's assertion that he explained who the tip pool amount was going to (that is, the cage employees), that he explained that the cage employees are tipped employees like the dealers are, and that he explained that managerial employees were being taken out of the tip pool.   (Tr. 117–18, 126, 132).   But despite Plaintiffs' disputations, the weight of the evidence shows that Matthews did explain—at the 2010 meeting—that the cage employees would receive all of the tip pool amounts and that cage employees are, like the dealers, regularly tipped by customers.   Indeed, Pernek and Faso both remember that during the 2010 meeting Matthews discussed that the cage employees are tipped, that the tip pool amount would be going to only the cage employees, and that the tip amount was being raised from eight to ten percent.   (Tr. 193–94; Tr. II. 22–24).

Further, as early as 2008 Defendant told Plaintiff Greenstone that chip-runners "and people that helped [the dealers]" would receive eight percent of his tips.   (Tr. 96–97).   Greenstone also has a fundamental understanding of how the cage employees function (Tr. 110–12), knows about the ten percent mandatory tip pool itself and that he would (when he worked for Defendant) retain ninety percent of his tips (Tr. 125); and Howard has a fundamental understanding of how the cage

employees functioned (Tr. 147–49) and knows that dealers receive far larger tips than cage employees (Tr. 111, 150).

Thus, due to Plaintiffs' knowledge of the fundamental structure of both the cage employee department and the tip pool itself, their testimony that Defendant never explained these concepts to them is not entirely credible.   More to this point, Plaintiff Howard testified that the 2010-tip-pool-amount increase drew the ire of the dealers; at the 2010 meeting dealers challenged Matthews on why the tip pool amount was increasing from eight to ten percent.   (Tr. 156–58).   So it seems more than reasonable to credit the testimony that Matthews attempted to justify the tip pool amount increase by explaining to the dealers *who* the tip pool amount would go to and *why* the increase was necessary—i.e., it seems more than likely that Matthews explained to the dealers that the cage employees receive much smaller tips than the dealers, but that the cage employees support the dealers, and thus is was fair to force the dealers to share ten percent of their tips with the cage employees.

Second, around early (or perhaps late) 2013, Defendant distributed a dealer handbook to the Plaintiffs.   (Tr. II. 40, 42).   Both Plaintiffs signed a document certifying that they indeed received a copy of the handbook.   (Tr. 120–21, 154–55).   The handbook states that ten percent of the dealer's tips will be distributed to the cage employees: "A tip share of 10% will be deducted from all dealer tips to be distributed to the Cage personnel, not including full-time supervisors. This does not mean that Cage personnel work for you[;] they are to be treated with the same respect as any other co-worker."   (DX. 9).

Finally, both Plaintiffs, who were poker room dealers, went through the rigorous "tip-out" procedure described above.   (Tr. 105–10, 140–43).   During this procedure, the dealers (and another employee) count the tips the dealers earned that shift, allocate ninety percent of the tips

- 18 -

for the dealer to retain, and then allocate the remaining ten percent of the tips to be placed into the tip pool.   (*See supra* sub-section I.C.1.).

## II.    LEGAL STANDARD

Under the FLSA, an employer must pay its employee a minimum wage.   *See* 29 U.S.C. § 206(a).   That wage may include the employee's tips.   29 U.S.C. § 203(m).   That is, an employer may pay an employee a cash wage below the minimum wage so long as the employer supplements the difference with the employee's tips; this is known as an employer taking a "tip credit."   *See id.*

In order to use a tip credit toward a tipped employee's minimum wage, an employer must satisfy two conditions: (1) the employee must be informed by the employer of the FLSA's tip provisions; and (2) the employee must be allowed to retain all tips which he or she receives, except in instances where pooling of tips is employed among other employees who customarily and regularly receive tips.   29 U.S.C. § 203(m); s*ee also Kubiak v. S.W. Cowboy, Inc.*, 3:12-CV-1306-J-34JRK, 2016 WL 659305, at *6 (M.D. Fla. Feb. 18, 2016) (citing *Rubio v. Fuji Sushi & Teppani, Inc.*, No. 6:11-CV-1753-ORL-37, 2013 WL 230216, at *2 (M.D. Fla. Jan. 22, 2013)).

The employer bears the burden of proving that they are eligible for a tip credit and bears the burden of proving that it provided sufficient notice.   *Vancamper v. Rental World, Inc.*, No. 6:10-CV-209-ORL-19, 2011 WL 1230805, at *5–6 (M.D. Fla. Mar. 31, 2011).   The requirements of a tip credit are strictly construed.   *Rubio*, 2013 WL 230216, at *2 (citing *Garcia v. La Revise Assocs. LLC*, No. 08–cv–9356, 2011 WL 135009, at *5–6 (S.D.N.Y. Jan.13, 2011)).   Lastly, a FLSA action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages "shall be forever barred unless commenced within two years after the cause of action accrued,

except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."   29 U.S.C. § 255.

### III.   ANALYSIS

Plaintiffs argue that Defendant violated the FLSA in two different ways.   First, they argue that Defendant provided them insufficient notice under § 203(m).   Second they argue that the tip pool amount was, in part, distributed to ineligible employees.   Success on either claim would render Defendant liable for the difference between the full minimum wage and the wage Defendant paid Plaintiffs during the relevant time period—regardless of the actual economic harm suffered by Plaintiffs.   *See Kubiak*, 2016 WL 659305, at *6; *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 800 (N.D. Ill. 2013); *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 45 (D.D.C. 2012).

#### A.  Notice

As noted above, to be eligible to take a tip credit an employer must inform the tipped employee of certain provisions of 29 U.S.C. § 203(m).   *See* 29 C.F.R. § 531.59(b).   Applying § 203(m)'s plain language, this duty is to inform, not necessarily to explain.   *See, e.g.*, *Garcia v. Koning Restaurants Int'l, L.C.*, No. 12-CV-23629, 2013 WL 8150984, at *4 (S.D. Fla. May 10, 2013); *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998) (holding that an employer must "inform its employees of its intent to take a tip credit toward the employer's minimum wage obligation," but the employer is not required to explain the tip credit).   The scope of the required notice is in dispute here, and the notice Defendant gave was fully addressed at trial.

As an initial matter, there is a distinction between a "tip credit" and a "tip pool."   As explained above, an employer takes a "tip credit" when the employer pays an employee a cash wage less than the minimum wage required, but supplements the difference with the employee's tips.   *See Kubiak*, 2016 WL 659305 at *6.   In contrast, a "tip pool" is where certain tip amounts

- 20 -

are taken from one employee, and are then given to another employee—e.g.,"[w]here waiters give a portion of their tips to the busboys."   29 C.F.R. § 531.54.

The parties do not dispute here that Defendant adequately notified Plaintiff of the tip credit. In other words, the Plaintiffs concede and the evidence shows that through the wage and hour posters posted at Defendant's business Defendant informed Plaintiffs (1) that they were paid less than the federal minimum wage and (2) that Defendant supplemented the difference between the their hourly pay and the minimum wage with their tips (Doc. 106, ¶ 11; DX. 3, 4).   *See Kubiak*, 164 F. Supp. 3d at 1354 & n. 16; *Pellon v. Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310–11 (S.D. Fla. 2007), *aff'd*, 291 Fed. Appx. 310 (11th Cir. 2008) (holding that "an employer must inform its employees that it intends to treat tips as satisfying part of the employer's minimum wage obligations" to satisfy § 203(m)).   What is in dispute, then, is whether Defendant adequately informed Plaintiffs of the tip pool.

To frame the dispute more precisely, while the parties continue to argue about what notice is necessary, the question here is really whether the notice that was provided was sufficient (along with the factual dispute over what Defendant actually told Plaintiffs, an issue dealt with *infra*). To begin, Defendant argues that its FLSA poster contains all the notice that § 203(m) requires. That is, that the poster alone was sufficient.   On the other hand, Plaintiffs argue that § 531.59(b)'s amendment has broadened the notice landscape to require notice about the tip pool.   That is, that the poster may be sufficient for the tip credit, but that Plaintiffs also needed additional tip pool notice.   Defendant disagrees and ripostes that to the extent that the amended regulation (§ 531.59) requires more notice than the statute (§ 203) does, the regulation is not entitled to deference.

Notably, this tip-pool-notice issue has already been raised in this case, and in my previous order I said the following: "In deciding the cross-motions for summary judgment, however, *it is*

*not necessary to determine the precise contours of the [§ 531.59(b)] post amendment notice requirement*.   There is ample evidence in the record . . . creat[ing] an issue of fact regarding the extent of notice provided to Plaintiffs."   (Doc. 81, p. 8) (emphasis added).   This has proven to be true: I need not decide the precise contours of the notice requirement.

The evidence at trial reveals that Defendant has satisfied the notice that Plaintiffs say is required (i.e., necessary) under the statute and the regulation, given a plain reading of the law and without weighing into whether the regulation exceeds what is required by § 203(m) or whether the regulation simply explains or supplements it (as I have previously said that it appears to do, see Doc. 81 p. 7).

In any event, for the sake of completeness I'll first address the history of the parties' arguments throughout this case, and then I will turn to the evidence presented at trial.

### 1. Tip pool notification under § 203(m)

With the distinction between a tip credit and a tip pool in mind (and that only notice of the tip pool is at issue here), § 203(m), which defines "Wage" under the FLSA, sets forth its notice requirement—in a most cumbersome way—as follows:

> In determining the wage an employer is required to pay a tipped employee, the amount paid [to] such employee by the employee's employer shall be an amount equal to—
>
> > (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
> >
> > (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. *The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection*, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

§ 203(m) (emphasis added).   While § 203(m)'s final sentence plainly permits tip pools, whether the section requires employers to notify their employees of a tip pool—and if so, to what extent— is not plain from § 203(m)'s text.   *Cf. Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 685 n.12 (D. Md. 2012) (noting § 203(m)'s awkward wording).    Indeed, this issue has been heavily litigated in this case, and both parties have offered competing interpretations of § 203(m).   (Docs. 51, 64, 73, 81, 84, 86, 93, 106, 107).

The parties first briefed this issue when they submitted cross-motions for summary judgment.   (Docs. 51, 64).   In its motion, Defendant argued that it gave adequate notice of the tip pool under § 203(m) by prominently posting "an employment poster approved by the Department of Labor."   (Doc. 51, pp. 13–14).   Defendant's poster stated:

> Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

(Doc. 70-3, p. 4; DX. 4)   Defendant cited *Pellon* for the proposition that the poster constituted sufficient notice under § 203(m) (Doc. 51, p. 13).   528 F. Supp. 2d at 1310–11 ("Because it would defy logic to require the display of inadequate information regarding the minimum wage and employer tip credit, a prominently displayed poster using language approved by the Department of Labor to explain 29 U.S.C. § 203(m) is sufficient notice.").

Plaintiffs opposed Defendant's motion by arguing that *Pellon* was not dispositive as it was

decided four years *before* the Department of Labor amended 29 C.F.R. § 531.59, which is titled "The tip wage credit."[14]   (Doc. 64, pp. 7–12).   Section 531.59(b), as amended and by its plain language appears to require that an employer inform its tipped employees (among other notifications) "that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips."   This additional tip-pooling information is, as Plaintiffs argue, required along with the information contained in the Department of Labor poster (which strictly addresses a tip credit).

In denying the motions for summary judgment, the Court agreed (in part) with Plaintiffs by stating that "[i]n light of the amended regulation, it is questionable whether the poster the Defendant had posted, lacking any information about tip pooling, would—without more— constitute sufficient notice, where Defendant claimed a tip credit *and Plaintiffs were part of a tip pool*."[15]   (Doc. 81, p. 9) (emphasis added).

---

[14]  Section 531.59 was amended in 2011.   The Court's order on summary judgement examined in detail § 531.59(b)'s legislative history.   (Doc. 81).

[15]  In agreeing with Plaintiff that *Pellon* was not dispositive—given § 531.59(b)—the Court cited favorably to two out-of-circuit cases: *AppleIllinois*, 917 F. Supp. 2d at 802–03 and *Nat'l Rest. Ass'n*, 870 F. Supp. at 56.   (Doc. 81, pp. 6–9).   In *AppleIllinois*, after § 531.59(b) was amended, that court considered a poster similar to the poster at issue here and stated that the poster was insufficient under § 203(m).   *AppleIllinois*, 917 F. Supp. 2d at 802–03. ("The text of [FLSA] posters alone cannot comply with the requirement to inform employees of the provisions of § 203(m). The federal poster discloses that an employer may claim a tip credit when "certain other conditions [are] met" without describing those other conditions. . . . *One of such conditions not described is the requirement of § 203(m) that the employee retain all tips except for tip pooling*.") (emphasis added).   Still, *AppleIllinois* did not specifically address the contours of *tip pool* notice; the opinion, instead, focused on the notice of a *tip credit* in denying a motion for summary judgment.   917 F. Supp. 2d at 802–05.   In *Nat'l Rest. Ass'n* (which addressed whether § 531.59(b), as a final rule, was properly promulgated under the Administrative Procedure Act, as opposed to explicitly applying the contours of tip-pool notification), that court concluded that § 531.59(b) tracked § 203(m)'s statutory language after performing a side-by-side textual comparison and noted that § 531.59(b) "does not require employers to do anything other than what they were already obligated to do under section [20]3(m)."   870 F. Supp. 2d at 56.   I relied on *Nat'l Rest. Ass'n* to support the propositions that "expressly requiring the disclosure of five specific provisions, as in [§ 531.59(b)], does not require employers to do any more than what they were already obligated to do under section 203(m), albeit a more detailed requirement than some courts previously mandated" and that "it could be said that the final amended rule was intended to clarify the notice requirements."   (Doc. 81, p. 7).

Next, the parties briefed § 203(m)'s tip pool notice contours for a second time when Defendant asked the Court to reconsider its denial of summary judgment.   (Doc. 84).   Defendant asserted that § 531.59(b), as a regulation promulgated by the Department of Labor, was not entitled to *Chevron* deference given an intervening Supreme Court decision, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016).   (Doc. 84, p. 4).   Plaintiffs opposed this motion arguing, in part, that *Encino Motorcars* did not constitute a change in controlling law.   (Doc. 86, pp. 3–7).

In rejecting Defendant's request for reconsideration, I briefly summarized my previous decision denying summary judgment.   In that summary, I noted that *Pellon* was factually distinguishable from the instant case (i.e., notification of a tip pool was not at issue in *Pellon*) and that *Pellon* predated § 531.59(b)'s amendment.   (Doc. 93, pp. 3–6).   I further noted that though Defendant's motion for reconsideration cited to two cases for the proposition that courts in this circuit still continue to rely on *Pellon* even after § 531.59(b) was amended, neither of those cases analyzed § 531.59(b) in detail.   (Doc. 93, p. 6); *Ide v. Neighborhood Rest. Partners*, LLC, F. Supp. 3d 1285 (N.D. Ga. 2014); *Koning Rests. Int'l*, 2013 WL 8150984.

Finally, post-trial, the parties have once again briefed § 203(m)'s notice requirements in their proposed findings of facts and conclusions of law.   (Docs. 106, 107).   For Plaintiffs' part, they rely heavily on § 531.59(b) for the proposition that § 203(m) requires specific disclosures of tip pools.   (Doc. 106, pp. 14–20).   Again, they claim that under § 203(m), as interpreted by § 531.59(b), an employer must (among other notifications) explicitly inform their employees (1) that the employees have a right to retain all of their tips except for those tips taken out for a valid tip pool, and (2) that only customarily and regularly tipped employees can receive tips from the

pool.[16]   (Doc. 106, pp. 15–16) ("By not informing its employees of the legal limitations of the tip

pool, Plaintiffs were kept in the dark by Defendant regarding who could legally participate in the

tip pool").

In Defendant's post-trial briefing, it presents a structural argument on how to interpret

§ 203(m).   (Doc. 107, pp. 25–28).   Defendant assumes that § 203(m)'s final sentence imposes

two separate conditions on employers who wish to take a tip credit[17] and requires nothing more—

i.e., it does not require notice about retaining tips or tip pooling.

The first condition, according to Defendant, is that employers must inform its employees

"of the provisions of this subsection."   According to Defendant, the phrase "provisions of this

subsection" does not refer to § 203(m) in its entirety—that would be nonsensical as the initial part

of § 203(m) (around four sentences or so) deals with nuanced wage issues involving boarding and

lodging that are not relevant to the average, run-of-the-mill FLSA case.   (Doc. 107, p. 26 n.8).

Defendant also argues that the phrase "provisions of this subsection" does not refer to § 203(m)'s

last sentence, because that sentence merely *imposes conditions* on the use to tip credits but does

not *define* the tip credit.   (Doc. 107, p. 26).   By taking Defendant's argument to its logical

─────────────────

[16] At trial, Plaintiffs focused on Defendant's purported failure to inform them that only customarily and regularly tipped employees could receive amounts from the tip pool.   (Tr. 126, 132, 226).

[17] *See Cumbie v. Woody Woo*, Inc., 596 F.3d 577, 580–81 (9th Cir. 2010) (concluding that § 203(m)'s final sentence imposes two separate "conditions on taking a tip credit"); *Kubiak*, 164 F. Supp. 3d at 1355 ("If an employer fails to satisfy any of these preconditions, the employer may not claim the tip credit . . . ."); *Steiner-Out v. Lone Palm Golf Club, LLC*, No. 8:10-CV-2248-T-24TBM, 2010 WL 4366299, at *3 (M.D. Fla. Oct. 28, 2010) ("Pursuant to § 203(m), in order for the employer to qualify for the tip credit, two requirements must be met . . . .").

conclusion, the two sentences of § 203(m) *that do define* the wages of tipped employees—that is, § 203(m)'s third to last sentence and penultimate sentence—are what constitute the phrase "provisions of this subsection" and are what an employer must notify an employee of in order to meet this first tip-credit-condition.[18]

Defendant argues that the second condition that must be satisfied by an employer to be able to use a tip credit is that "all tips received by [a tipped] employee have been retained by the employee."   Yet § 203(m) provides an exception to this condition: though a tipped employee must retain all of his or her tips, § 203(m) allows an employer to take away an employee's tips and to place those amounts into a tip pool, if, and only if, those amounts are distributed only to employees who customarily and regularly receive tips.   *See Kubiak*, 164 F. Supp. 3d at 1354–55 (noting that § 203(m) imposes the condition that "the employee retained all tips he received, except when an

---

[18] Those two sentences of § 203(m) state the following:

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee.

29 U.S.C. § 203(m); *see Cumbie*, 596 F.3d at 580 ("The first sentence states that an employer must pay a tipped employee an amount equal to (1) a cash wage of at least $2.13, plus (2) an additional amount in tips equal to the federal minimum wage minus such cash wage. That is, an employer must pay a tipped employee a cash wage of at least $2.13, but if the cash wage is less than the federal minimum wage, the employer can make up the difference with the employee's tips (also known as a 'tip credit'). The second sentence clarifies that the difference may not be greater than the actual tips received. Therefore, if the cash wage plus tips are not enough to meet the minimum wage, the employer must 'top up' the cash wage. Collectively, these two sentences provide that an employer may take a partial tip credit toward its minimum-wage obligation").

employer requires an employee to participate in a tip pool with other employees who customarily and regularly receive tips") (page number omitted).

Based on this interpretation of § 203(m), Defendant concludes that the statute does not require any notification of a tip pool and that its posters were sufficient under the law.   (Doc. 107, pp. 28–30).   In other words, Defendant concludes (as it has argued all along) that because § 203(m) imposes only two conditions on the use of a tip credit, and because neither condition requires employers to inform their employees of a tip pool, § 203(m) does not impose any duty on employers to notify their employees of a tip pool.

To support the proposition that § 203(m) does not require employers to make any notification of a tip pool, Defendant cites *Campbell v. Pincher's Beach Bar Grill Inc.*, No. 215CV695FTM99MRM, 2016 WL 3626219, at *4 (M.D. Fla. July 7, 2016), *Pellon*, 528 F. Supp. 2d at 1310–11, *Ide*, 32 F. Supp. 3d at 1292–93, *Koning Restaurants Int'l, L.C.*, 2013 WL 8150984 at *4–6, and *Garcia v. Palomino, Inc.*, 738 F. Supp. 2d 1171, 1178 n.37 (D. Kan. 2010).   (Doc. 107, pp. 31–34).   Although most of these cases are from this Circuit and most were decided after § 531.59 was amended, only *Koning Restaurants* addresses (albeit briefly) § 531.59(b); but, that case does not elaborate on § 203(m)'s tip pool notice contours.   *Compare Koning Restaurants*, 2013 WL 8150984 at *4 n.3 (noting in a footnote that *Nat'l Rest. Ass'n* concluded that § 531.59(b), as amended, requires no more notice than § 203(m) already does, that is, that an employer inform its employees of § 203(m)'s provisions) *with Ide*, 32 F. Supp. 3d at 1292–93 (declining to mention § 531.59(b)).

Also in its post-trial briefing Defendant cites 29 C.F.R. § 531.54, which is titled "Tip Pooling."   Defendant argues that whatever tip pool notification the FLSA requires, that notification is limited to—and only to—§ 531.54's explicit requirement that "an employer must

notify its employees of any required tip pool contribution amount."   (Doc. 107, pp. 33–34).   This regulation appears to clearly define the tip pool notice that an employer must give: notice of the amount of the tips taken from the employee in question and placed into the pool.   But the case law on what constitutes sufficient notice under § 531.54 is thin at best.   *See, e.g.*, *Perez v. Sophia's Kalamazoo, LLC*, No. 1:14-CV-772, 2015 WL 7272234, at *7–8 (W.D. Mich. Nov. 17, 2015) (denying summary judgment where the parties presented conflicting evidence as to whether a tip pool was voluntary); *Palacios v. Hartman & Tyner, Inc.*, No. 13-CIV-61541, 2014 WL 7152745, at *3–4 (S.D. Fla. Dec. 15, 2014) (addressing the validity of a tip pool, quoting § 531.54, but noting that notice was not at issue).

Post-trial, Defendant also requests that I hold that § 531.59(b) is entitled to no deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).   Defendant bases this request on the notion that to the extent § 531.59(b) requires more notice than § 203(m) requires, § 531.59(b) is not entitled to *Chevron* deference.   (Doc. 107, ¶¶ 74–79).   Yet I, once again (see Doc. 84), decline Defendant's request: as set forth *infra* sub-section III.A.2, I find that Defendant's notice was sufficient here and thus need not take up this issue.

In sum, talking all of the parties' briefing into account, none of the case law before the Court definitively delineates § 203(m)'s tip-pool-notification requirements; assuming, of course, that § 203(m) does indeed require notice of a tip pool at all.   And certainly none of these cases are factually similar to this case, because none of these cases involved a direct challenge to an employer's notice, or lack thereof, of a tip pool.

At a minimum, it is clear and undisputed that § 203(m) requires a base level of notice to tipped employees with respect to the tip credit.   This notice was provided here.   Then § 531.59(b), by its plain language, states that tip pool notice is also to be given to tipped employees.

This was also provided here, whether or not it is necessary.   And, as Defendant points out, § 531.54 requires notice as to the amount of tips contributed to the tip pool, which was also done here.   Thus I find in this case, in light of the evidence discussed, that the notification provided by Defendant was sufficient to claim a tip credit and utilize a tip pool.

### 2. The tip pool notifications at issue here

So, whatever the specific contours of the tip pool notice requirement are, I need not define all of those contours here.   Even if the Court were to adopt Plaintiffs' interpretation of the notice requirements, the evidence presented at trial shows that Defendant provided sufficient notice.   Put differently, the evidence shows that Defendant informed Plaintiffs (1) that a tip pool existed and that their participation in the tip pool was mandatory; (2) that the tip-pool-contribution amount was ten percent of their tips (or eight percent before 2010), and that Plaintiffs would retain the rest of their tips; (3) that the pool amount would be given to, and only to, the cage employees (at least after the 2010 meeting); and (4) that the cage employees are, like the Plaintiffs and the other dealers, regularly tipped employees.   Defendant accomplished these notifications through a meeting in 2010, a handbook distributed in 2013, and through its day-to-day practices.[19]

The 2010 meeting represents Defendant's most elaborate communication with its employees about the tip pool.   Defendant, through its president Matthews, held a meeting that was mandatory for all dealers (including Plaintiffs, who were in attendance).   The evidence shows that at the meeting Matthews discussed several contentious issues surrounding the tip pool: due to a

---

[19] To the extent Plaintiffs argue that they had no subjective understanding of who was receiving the tip pool amount and whether those recipients were customarily tipped, I note that the § 203(m) notice standard is whether the employer adequately informs its employees of the tip credit (and, assumedly, of the tip pool); the standard is not whether the employees understand those concepts.   *See Kilgore*, 160 F.3d at 298) (stating that an employer must "inform its employees of its intent to take a tip credit toward the employer's minimum wage obligation").

lawsuit pending at that time, Defendant was removing managerial employees from the tip pool; Defendant was increasing the tip-pool amount dealers were forced to contribute by two percent— from eight to ten percent of their tips; and all tip pool amounts were now going to only cage employees.   Importantly, Matthews further stated at the meeting that the two-percent-tip-pool-amount increase was necessary because, although cage employees are also tipped employees like dealers, the tips that cage employees regularly receive tend to be far smaller than the tips that the dealers receive; the cage employees and the dealers are a team; and the dealers are dependent upon the cage employees.   I find Matthews's testimony credible, and consistent with both the testimony of Faso and Pernek, along with the overall facts.   (*See supra* sub-section I.D.2.).

As to the handbook, Bendure testified that sometime in 2013 Defendant submitted dealer handbooks that (again) informed the dealers that ten percent of their tips would be distributed to cage employees.[20]   While both Plaintiffs struggled to remember if they had actually received the handbooks, Defendant's exhibit clearly shows that Plaintiff signed a form stating that they had been given the handbook, and Plaintiffs do not dispute that they did indeed sign the form.

Lastly, undisputed evidence established that each and every shift that Plaintiffs dealt cards for Defendant, starting around 2008 and lasting until 2015, Plaintiffs would go through a process in which the amount of tips flowing from them to the tip pool was accounted for and made known to Plaintiffs.   That is, at the end of a dealer's shifts, the dealer would be accompanied to a room, under video-surveillance, in which another employee would (with the dealer) count *all of* the tips the dealer earned that day, and then the other employee would allocate ninety percent of the tips

---

[20] While Plaintiffs argue that the handbook is misleading in as far as it calls the tip pool a "tip share," which (according to Plaintiffs) makes the tip pool appear voluntary, I note that the handbook makes clear that the tip amount "will" be deducted from the dealers' tips and the handbook makes no mention that the deduction is optional.   (DX. 9).

to the dealer and the remaining ten percent to the tip pool by filling out a tip slip (until 2010, the tip pool amount was only eight percent).   The dealer would then sign the tip slip and would receive a carbon copy of it.   Both Plaintiffs admit that they went through this process after each shift they dealt cards.   (Tr. 105–10; 140–42).   In other words, Defendant's tip-out process notified Plaintiffs each and every shift that they would retain all of their tips except for the tip pool amount and notified Plaintiffs of what those amounts were.

In sum, as early as 2010, Defendant informed Plaintiffs that their participation in the tip pool was mandatory; that ten percent of their tips would be taken from them and put into the tip pool and that Plaintiffs would retain the rest; that the cage employees—and only the cage employees—would receive the tip-pool amounts; and that the cage employees, like Plaintiffs, regularly receive tips from customers, but those tips are far smaller than the tips that Plaintiffs received.   So, even if § 203(m) requires what Plaintiffs contends it does, the evidence establishes that they received sufficient notice from Defendant.

Meanwhile, Plaintiffs failed to present any evidence to the contrary, beyond their own recollections of the details of the 2010 meeting, but their testimony on their recollections was not entirely credible.   (*See supra* sub-section I.D.2.)   Accordingly, the undersigned finds that, based on the preponderance of the evidence, Defendant adequately informed Plaintiffs of the tip pool.

### B.  Pool Validity

In addition to their claim of inadequate notice, Plaintiffs also claim that Defendant's tip pool was invalid due to the inclusion of certain employees.   Generally, a tip pool may be invalidated by the inclusion of either (1) employees who are not customarily and regularly tipped or (2) employers.   Though either circumstance would invalidate the pool here, and in turn

invalidate Defendant's use of the tip credit, I find that the evidence shows that the pool includes only eligible employees and that the pool is therefore valid.

### 1. Customarily and regularly tipped

The FLSA defines a customarily and regularly tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).  Tips received from a tip pool are counted as "received tips" to establish whether an employee is customarily and regularly tipped.   29 C.F.R. § 531.54 ("Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given [to] the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t)."); *Wacjman v. Investment Corp. of Palm Beach*, No. 07-80912-CIV, 2008 WL 783741, at *2 (S.D. Fla. Mar. 20, 2008).

An employee, however, cannot become eligible for tip sharing simply by taking money from a tip pool.  *See* 29 C.F.R. § 531.56(c); *Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048 (GEL), 2006 WL 851749, at *14 & n.22 (S.D.N.Y. Mar. 30, 2006).  Thus, to show that an employee is customarily and regularly tipped, there must be evidence that the employee receives more than thirty dollars in tips per month (through direct tips, or through direct tips and a tip pool). Additionally, "[c]ourts have focused on the extent of an employee's customer interaction as a significant factor in determining whether the employee is a customarily tipped employee."  *Rubio*, 2013 WL 230216 at *2; *Wacjman*, 2008 WL 783741 at *3 ("In determining whether an employee is engaged in an occupation that 'customarily and regularly' receives tips for purposes of § 203(t), the focus is properly drawn to the question of whether the employee performs important customer service functions, i.e. does the employee have more than *de minimis* service interaction with customers.").

To begin with, the evidence shows here that Defendant's employees who work in the occupation of "cage employee" directly receive tips from customers.   There is no dispute that cage employees are tipped when they work as tellers, chip runners, and when they work at the podium.   And it is clear that cage employees who work in the vault also work as tellers, chip runners, and at the podium.   Thus, cage employees—including the cage employees who are eligible to enter the vault—do directly receive (at least some) tips from customers when they work at the podium or as chip-runners and tellers.

Further, Defendant's officer manager, Kelso, testified that she performed a historical analysis of the amount of tips that cage employees have received from 2012 through April 2015. Tr. II. 48, 52, 55.   These records show that each cage employee who worked a full twenty-eight day-work-period, was tipped more than thirty dollars a month.   Plaintiffs presented no evidence to rebut these records.

Plaintiffs do note, however, that the evidence fails to show the precise amount of tips that each cage employee directly received from customers.   (Doc. 106, pp. 23–25).   Still, Defendant's failure to track exact tip amounts is not dispositive here for two reasons.   First, the evidence shows that all cage employees do receive tips directly from customers (Tr. 83, 98, 118, 163–65 175–76, 180–81, 183; Tr. II. 28–29, 37–38, 49).   *See Palacios*, 2014 WL 7152745 at *6 (noting when the employee "is, as a matter of undisputed fact, tipped by patrons, the Court need not look further because the employment position is indisputably one involving the customary and regular receipt of tips, simply by virtue of the fact that tipping routinely occurs").   Second, the evidence also shows that the cage employees perform important customer service functions and have far more than *de minimis* service interaction with customers.   *See Manning v. St. Petersburg Kennel Club, Inc.*, No. 8:13-CIV-3060, 2015 WL 477364, *3 (M.D. Fla. Feb. 5, 2015) ("[I]n some

circumstances, an inquiry into the quality and quantity of an employee's customer interaction is warranted to determine whether he or she can properly be included in a tip pool."); *Palacios*, 2014 WL 7152745 at *6 ("Under circumstances where the challenged position's tips stem from the tip pool itself . . . a Court may need to go further in order to ascertain whether the position is one which customarily and regularly receives tips."); *Wacjman*, 2008 WL 783741 at *3 (focusing on "the question of whether the employee performs important customer service functions").

Indeed, it is clear here that the cage employees who are eligible to enter the vault also work at the podium, as chip runners, and as tellers, all of which are duties that undisputedly involve significant customer interaction. That said, some cage employees do work, at times, exclusively in the vault and without any customer interaction. These times are limited to two types of instances.

The first instance occurs when customers are not even present at the casino. During these periods, for about an hour before customers arrive at the poker room and for about the same amount of time after the customers leave the poker room, cage employees balance the amount of cash and chips in the vault. (Tr. 72, 76, 185–89). It is clear that during these times no poker room employee could even receive a tip from a customer as there are no customers to do so.

The second instance occurs when customers are gambling in the poker room. This happens when a cage employee who is eligible to enter the vault (e.g., Bendure) contemporaneously moves between the vault and the teller station throughout his or her shift. So, taking Bendure as an example, when he enters the vault during these times he exchanges chips for cash or vice versa (and balances those amounts to ensure that the dealers and other cage employees

are not absconding with chips and cash) as necessary to serve the dealers and other cage employees.[21]

Yet at the most fundamental level, without a cage employee distributing additional chips and cash from the vault to the dealers, tellers, chip-runners, and players, the gambling operation would certainly fold—along with all the tipping that flows from the gambling.  So, when cage employees work in the vault, they are tipped employees who are performing tip-related, but non-tipped duties.  *See, e.g.*, *Crate v. Q's Restaurant Group LLC*, No. 8:13-CIV-2549, 2014 WL 10556347, *4 (M.D. Fla. May 2, 2014) ("Pursuant to 29 C.F.R. § 531.56(e), there is a distinction between an employee in a dual job (such as a maintenance man in a hotel who also servers as a waiter) and an employee employed in a single job that performs tipped duties and related, non-tipped duties (such as a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses).").  Put differently, cage employees who enter the vault to obtain chips or cash for the poker room, and who also receive tips when they work as a teller, chip-runner, and at the podium, are akin to "'a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses.'"  *May v. Steak N Shake Operations, Inc.*, No. 3:14-CIV-912, 2014 WL 7251637, *2 (M.D. Fla. Dec. 19, 2014) (quoting 29 C.F.R. § 531.56(e)).  Thus, though vault duties may not be directed towards producing tips, they are duties related to a tipped occupation. And in this case, they aren't the exclusive duties of a cage employee, e.g., Bendure spends time directly interacting with customers in his work as a teller or chip runner or at the podium.

---

[21] Still, while he is in the vault, Bendure always leaves the vault door open so he can listen for customers who may need his assistance as a teller, which would be especially important when he is the only teller available.   (Tr. 75, 91–93).

In short, the evidence shows that the cage employees receive through the tip pool and through direct tips from customers more than thirty dollars in tips per month.   Additionally, the evidence also shows that the cage employees, including those who are eligible to enter the vault, have significant customer interaction when they work as tellers, chip runners, and at the podium. Accordingly, all of Defendant's cage employee are engaged in a tipped occupation under § 203(t).

### 2. Employers

The forced sharing of tips with "employers" is an illegal practice that invalidates a tip pool, regardless of whether the employers are engaged in services that could be subject to tipping.   *See Wacjman*, 2008 WL 783741 at *3 & n.1.   Section 203 defines an "employer," as "any person acting directly or indirectly in the interest of an employer in relations to an employee."   29 U.S.C § 203(d).   Typically, employees who have been deemed to be "employers" under the FLSA are owners or managers.   *See, e.g.*, *Gionfriddo v. Jason Link, LLC*, 769 F. Supp. 2d 880, 893–94 (D. Md. 2011) (holding that the owner of a tavern was an "employer" under the FLSA and thus ineligible to participate in a tip pool); s*ee also Ayres v. 127 Restaurant Corp*., 12 F. Supp. 2d 305, 308–09 (S.D.N.Y. 1998) (holding that a restaurant employee serving as the manager was precluded from receiving tips).

Whether an individual is an employee under the FLSA "is not governed by the 'label' put on the relationship by the parties."   *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).   Instead, in determining who is an "employer," courts look to whether an individual hires and fires employees, controls the manner in which employee work is performed, and fixes employee wages.   *See Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997); *Dole v. Continental Cuisine, Inc.*, 751 F. Supp. 799, 802–03 (E.D. Ark. Sept. 28, 1990).   Yet technical and isolated factors do not determine whether an individual is an employer; courts, instead, look

to the circumstances as a whole. *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008); *Vickery v. Cumulus Broad., LLC*, No. 616CV248ORL37KRS, 2016 WL 4382703, at \*2 (M.D. Fla. Aug. 17, 2016) ("[T]he Eleventh Circuit has condemned the practice of focusing on a single factor, such as control; rather, the district court must consider the entire circumstances of the work relationship.").

The evidence shows here that it is undisputed that none of the cage employees are owners. Further it shows that (as set forth below) the cage employees (including the cage employees eligible to enter the vault) do not hire, fire, fix wages, control how other employees work, or set employee schedules.

For instance, none of the cage employees hired, fired, or fixed wages. The evidence shows that only Matthews (Defendant's president) has these powers or responsibilities. What remains are a few acts performed by the cage employees that fall short—under the entirety of the circumstances—of transforming the cage employees into employers. For instance, Danielson once drafted a proposed cage-employee schedule that Pernek, not Danielson, ultimately adopted and implemented. *Cf. Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 135 (S.D.N.Y. 2014) (denying the defendant's motion for summary judgment when the employee at issue controlled other employee's work schedules, among controlling other conditions of employment). There is also evidence that Danielson signed tax documents and a single agreement on behalf of Defendant. But these acts, under the circumstances, do not show that Danielson hired, fired, set wages for, or controlled other employees.

Evidence also exists that Danielson and Bendure (both of whom are experienced cage employees) trained new cage employees. Further, Bendure would apparently attempt to resolve problems between dealers and chip runners, but the unrebutted testimony shows that only

- 38 -

Matthews was able to discipline employees; Bendure has no such authority.  There is also evidence that Bendure himself, and others, referred to Bendure as a supervisor, but Bendure was never formally given that title.[22]

To be sure, the cage employees eligible to enter the vault occupy a position of trust within Defendant's business as they handle the sensitive duty of accounting for large sums of Defendant's cash and chips, both of which could easily be subject to malfeasance or mistake.  Yet cage employees are not employers under the entirety of the circumstances: they do not hire and fire other employees, they do not set wages, they do not discipline, they do not schedule other employees, they do not control Defendant's day-to-day operations—they simply operate the vault and work as tellers, chip runners, and at the podium.

## IV.   CONCLUSION

Based on the foregoing:

1. Defendant Second Chance Jai-Alai, LCC has proven by a preponderance of the evidence that it did not violate the FLSA as alleged in Count I of the Complaint (Doc. 29).

2. The Clerk is **DIRECTED** to ENTER FINAL JUDGMENT in favor of Defendant Second Chance Jai-Alai, LCC as to all claims by Plaintiffs Christopher Howard and Jeffrey Greenstone, with costs to be taxed in accordance with applicable law.

---

[22] Plaintiffs appear to contend that Faso participated in the tip pool; but there is no evidence that Faso ever received any amount from the tip pool.  (*See supra* subsection I.B.)  Also, there is evidence that prior to 2010 Pernek, the cage department manager, received amounts from the tip pool.  Yet there is no evidence that Pernek received any further amounts after the 2010 meeting.  This action was filed on April 20, 2015; thus, assuming that Defendant did willfully violate the FLSA, the look-back period only reaches to three years prior to the date of filing.  29 U.S.C. § 255(a) ("[A] cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.").

3. The Clerk is further **DIRECTED** to TERMINATE ALL PENDING MOTIONS and

CLOSE THE FILE.

**ORDERED** in Ocala, Florida on December 9, 2016.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties